UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

ENERGY CONVERSION DEVICES, INC.,
at al,

                          Debtors.

_____/

ENERGY CONVERSION DEVICES
LIQUIDATION TRUST,

                          Plaintiff,

vs.

OVONYX, INC., *et al.*,

                          Defendants.

_____/

Case No. 12-43166

Chapter 11
(Jointly Administered)[1]

Judge Thomas J. Tucker

Adv. Pro. No. 18-4320

**OPINION REGARDING DEFENDANTS' MOTIONS TO DISMISS**

## I. Introduction

      The Complaint in this case involves lengthy and complex factual allegations against five

defendants, all of whom seek dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim

upon which relief can be granted. The Complaint alleges claims under Michigan law, including

claims of breach of contract; claims based on Michigan's alter ego and successor liability

doctrines; multiple claims of tortious interference with contract; a claim for aiding and abetting

tortious interference with contract, and a claim of "actual" fraudulent transfer (*i.e.*, a transfer

done with actual fraudulent intent, rather than merely a constructive fraudulent transfer). The

_____

[1] This Chapter 11 case is jointly administered with the case of United Solar Ovonic LLC, Case
No. 12-43167.

Defendants' dismissal motions raise numerous issues about the elements of the claims, and many other issues, including but not limited to issues of contract interpretation and contract law; the interplay between related contracts; and the effect of a Chapter 11 debtor's rejection of an executory contract under Bankruptcy Code § 365.

This adversary proceeding was filed against five defendants by the Plaintiff Energy Conversion Devices Liquidation Trust (the "Trust"). The Plaintiff Trust was created as a result of the confirmed liquidation Plan in the Chapter 11 bankruptcy cases of Energy Conversion Devices, Inc. ("ECD") and its wholly-owned operating subsidiary, United Solar Ovonic LLC ("USO"). Those Debtors filed their voluntary Chapter 11 bankruptcy petitions in this Court on February 14, 2012.

On July 30, 2012, the Court confirmed a joint liquidating plan proposed by the Debtors (the "Plan").[2] The Plan included the substantive consolidation of the ECD and USO estates. The effective date of the Plan was August 28, 2012.[3]

The Trust's First Amended Complaint alleges seven "causes of action" against the Defendants. The Trust's claims are premised on the Trust allegedly having certain contractual rights that were breached. These alleged contractual rights arose under an agreement made in 1998 by ECD and Defendant Tyler Lowrey ("Lowrey"), and an intellectual property license agreement made in 1999 by ECD, Lowrey, and Defendant Ovonyx, Inc. ("Ovonyx"). The Trust claims to have had the following contractual rights: (1) a right to payment by Ovonyx of a

---

[2] Docket # 1064 in Case No. 12-43166, the "Order Confirming Plan." The Plan was filed on June 20, 2012 (Docket # 754 in Case No. 12-43166).

[3] *See* Notice of Effective Date, etc. (Docket # 1220 in Case No. 12-43166).

quarterly royalty of 0.5% of Ovonyx's revenues; and (2) a right of first refusal for the sale of any stock of Ovonyx or any sale of assets by Ovonyx.

Each of the five Defendants filed motions to dismiss the Trust's First Amended Complaint.[4]  The motions dispute that the Trust had any of the alleged contractual rights. Because of this, and for other reasons, the motions argue that the First Amended Complaint fails to state any plausible claims upon which relief can be granted.  For the reasons stated in this Opinion, the Court will grant the motions in part, and deny them in part.

## II.  Background

There are several written contracts that are relevant to the pending motions.  The Court will describe these in detail.  Many of the facts stated in this Opinion are taken from allegations of the First Amended Complaint, and these facts are assumed to be true for purposes of ruling on the Defendants' motions.  Many other facts stated are taken from contracts that were made, the terms of which are not in dispute.

## A.  The 1998 Contract

The first contract at issue was made on December 17, 1998, between ECD and Lowrey, entitled "Ovonic Information Handling Devices Development and Commercialization Contract" (the "1998 Contract").[5]  When it entered into the 1998 Contract, ECD was the holder of patents

---

[4] *See* Docket # 8 (Plaintiff's First Amended Complaint) (filed under seal); Docket # 38 (Defendants Micron Technology Inc.'s and Ovonyx, Inc.'s Motion to Dismiss); Docket # 43 (Defendant Ovonyx Memory Technology, LLC's Motion to Dismiss); Docket # 46 (Defendant Tyler Lowrey's Motion to Dismiss); Docket # 58 (Defendant Intel Corporation's Motion to Dismiss).

[5] A copy of the 1998 Contract is attached as Exhibit 5 to Defendant Ovonyx, Inc.'s and Defendant Micron Technology Inc.'s Brief in Support of their Motion to Dismiss (Docket # 40).  This document was filed under seal.

in the area of information technology and energy, and a developer of "devices concerning, among other things, 'phase-change' memory, a form of nonvolatile memory that is far superior to other forms of memory."[6]  Lowrey was a former senior officer of Defendant Micron Technology, Inc. ("Micron") who was "expert in commercialization and manufacturing of memory circuits" and a "memory business and engineering expert."[7]  In highly technical language, the 1998 Contract stated that ECD and Lowrey were "jointly pursuing the evaluating, developing, licensing, or manufacturing of ECD's proprietary electronic Ovonic Information Handling Devices, such as those that are Chalcogenide-based including the electronic Ovonic threshold thyrister-like power switch, Ovonic encryption, Ovonic neural networks, and current-modified crystallinity-based and current-modified resistance-based devices and products (hereinafter the 'the field')[.]"[8]

The 1998 Contract became "effective, valid, and enforceable when signed by both Lowrey and ECD ('effective date')," but gave Lowrey the right to cancel the contract "thirty days after signing ('cancellation date')."[9]  The 1998 Contract stated that

> [u]nless Mr. Lowrey cancels in the Evaluation Phase prior to the cancellation date, ECD desires to have Mr. Lowrey direct, and Mr. Lowrey agrees to direct, the development activities in the field until termination.  Activities in the field will include all in-the-field development such as intellectual property and its prosecution and defense, press releases and public relations, licensing to or from others, purchase or sale of technology, business development, raising funds for operations, manufacture, operating, purchases,

---

[6]  *See* First Am. Compl. (Docket # 8) at 2 ¶ 3.

[7]  First Am. Compl. at 3 ¶ 7, 8 ¶ 36; Defs.' Ovonyx's and Micron's Br. in Supp. of Mot. to Dismiss (Docket # 40) (filed under seal) at 4 ¶ II.A.1.

[8]  1998 Contract at MTI000032.

[9]  *Id.* at MTI000021 ¶ 1.

4

and sales ("activities in the field").[10]

Under the 1998 Contract, on the effective date of the contract, Lowrey became "a Vice President, employee, and officer of ECD" and was invited "to attend and become a director on ECD's Board subject to termination by ECD or Mr. Lowrey without cause upon notice."[11] Lowrey was given broad discretion in carrying out his duties under the 1998 Contract. The 1998 Contract provided, in relevant part, that Lowrey's

> development and licensing effort may be conducted in a manner of Mr. Lowrey's reasonable choosing because of Mr. [Stan] Ovshinsky's and Mr. Stempel's respect for and confidence in Mr. Lowrey's professionalism and competence, and will be the primary focus of Mr. Lowrey's professional efforts because of his appreciation of the summary data concerning Ovonic Information Handling Devices from ECD and Mr. Lowrey's respect for Mr. Ovshinsky, Mr. Stempel, ECD, its personnel and technology, and the potential result of this contract.[12]

The 1998 Contract contemplated the formation of an "Entity" by either ECD or Lowrey, through which they would pursue the objectives described in the 1998 Contract, related to the intellectual property (sometimes referred to herein as "IP") of ECD and Lowrey.[13] Paragraph 7 of

---

[10]  *Id.* at MTI000032 ¶ 2.

[11]  *Id.* at MTI000036 ¶ 26.

[12]  *Id*. at MTI000032 ¶ 2. Stan Ovshinsky is "a renowned Michigan inventor and scientist who invented numerous technologies in the area of energy and information and was granted over 400 patents." (First Am. Compl. at 2 ¶ 3.) ECD is "Mr. Ovshinsky's brainchild." *Id.*

[13]  The 1998 Contract defined "intellectual property" in paragraph 13, which provided:

13.  **Intellectual property definitions.** Intellectual property ("IP") includes for example and to the full extent allowed by law and without limitation: patents, copyrights, trademarks, trade secrets, confidential and proprietary information, and know-how. "Originated" as used in this contract is meant to follow the law for the respective types of intellectual property, such as who is found to be the inventor of a particular patent or trade-secret, or author of a copyright or

5

the 1998 Contract stated:

7. **Entity formation.** Any references to the Entity in this contract apply only if formed. At any time after the cancellation date, either ECD or Mr. Lowrey may decide by notice to the other to form a corporation (the "Entity") that provides for equal distribution of stock, benefits, and voting **after quarterly paying ECD a 0.5% royalty on all revenues if requested**. Mr. Lowrey, or ECD upon Mr. Lowrey's request, will promptly prepare or have done appropriate formation documents and both shall properly execute promptly. Thereafter, until termination:

a) Mr. Lowrey and ECD shall conduct all activities in the field in this Entity such as manufacturing and licensing, and

b) both will cooperate reasonably in disclosing, transferring, assigning, or licensing, as the case may be, to the Entity all pertinent information and assets in the field to the reasonable extent allowed by law including that learned or acquired in the field before and after Entity formation under the control of ECD or Mr. Lowrey, such as but not limited to: revenues, royalties, contracts, and IP.

c) Major decisions such as appointment and removal of officers, use of confidential information, and license or asset purchases or sales shall be subject to approval.

d) Subject to approval, the Entity can select a site other than Troy and can vary the scope and business plan for its actual manufacturing, operations and further licensing activities.

e) The Entity may provide moneys to upgrade applicable ECD equipment and support activities

confidential information.

6

upon approval.[14]

Before the formation of the Entity, the 1998 Contract required ECD and Lowrey "to make reasonable attempts to operate consistent with its anticipated formation."[15]  In the event the Entity was formed, Lowrey was to be one of its two initial Board members, and Stan Ovshinsky ("Ovshinsky") was to be the other one.[16]  Ovshinsky was to be the Chairman of the Entity's Board and Lowrey was to be the Vice Chairman.[17]  Lowrey was also to be the Entity's President and CEO.[18]  Under the 1998 Contract, Lowrey and Ovshinsky each had the right, upon notice to the other, to appoint "up to two more [B]oard members until the Board totals six" with "those appointments effective upon the other appointing an equal number which shall be promptly done by notice."[19]

The 1998 Contract required Lowrey to assign his intellectual property rights to the Entity, and ECD and Lowrey to grant each other a license to use the other's intellectual property.  It also required ECD to grant the Entity licensing rights.  It provided, in relevant part:

> 14.    **Intellectual property assignment prior to termination.**
>
>    Until termination,
>
> **a)**    Except as limited by other obligations in the field which shall at all times be promptly

---

[14] *Id*. at MTI000033 ¶ 7 (emphasis added).

[15] *Id.* at MTI000033 ¶ 5.

[16] *Id.* at MTI000033 ¶ 8.

[17] 1998 Contract at MTI000033 ¶ 8.

[18] *Id.*

[19] *Id.*

and fully disclosed to Mr. Lowrey, ECD
shall grant the Entity an exclusive license in
the field with a right to sub-license its
intellectual property if approved,

**b)**       Mr. Lowrey shall assign his rights in intellectual
property in the field to ECD until Entity formation
and thereafter to the Entity.

**c)**       Intellectual property in the field, originated by and
with Mr. Lowrey and assigned to ECD, shall be
assigned to the Entity upon formation without
encumbrance.

**d)**       ECD and Mr. Lowrey hereby grants the other a non-
transferable, royalty-free cross-license to use
confidentially without public disclosure the others
IP in the field, and without the right to sub-license
absent approval, a license that shall expire upon
termination.[20]

The 1998 Contract gave ECD a right to receive a quarterly royalty payment from the

Entity (the "Royalty Right"). Paragraph 10 stated: "**Quarterly Royalty to ECD.** Upon ECD's

written request, the Entity shall thereafter pay every three months 0.5% of the Entity's

subsequent revenues to ECD."[21]

The 1998 Contract also gave ECD, as well as Lowrey, a right of first refusal (the "First

Refusal Right"). Paragraph 11 stated:

**Right of first refusal.** Until termination, both Mr. Lowrey and
ECD grants the other a right of first refusal on the other's sales of
stock in the Entity, intellectual property in the field, and any stock
or asset sales by the Entity, a right exercisable only within thirty
days of notice and promptly executed on the same basis as the
proposed purchaser. After termination, this right shall only apply

---

[20] *Id.* at MTI000034 ¶ 14.

[21] *Id.* at MTI000034 ¶ 10.

8

to sales of intellectual property in the field for three years
thereafter.  Any sale shall comply with remaining limitations of
this agreement such as a cross-license.[22]

The 1998 Contract provided that "[s]ubject to the continuing obligations," the contract

would terminate if:

    **a)**      either party cancels prior to the cancellation date,

    **b)**      Mr. Lowrey resigns prior to Entity formation,

    **c)**      Mr. Lowrey, the Entity, or a licensee fails to
commercialize any device or product in the field by
December 31, 2003.[23]

Commercialization was defined in paragraph 15 of the 1998 Contract.  It stated:

**Commercialization.**  Commercialization shall include a single
three months period of:

    a)      sales that exceed $500,000 or

    b)      licensing revenues that exceed $100,000 above directly related expenses
necessary to satisfying the license requirements, or

    c)      net cash flow (after taxes and exclusive of invested capital or interest
received during the period) from operations that exceed $100,000.[24]

The 1998 Contract was "personal to the parties and not transferable or negotiable to

others except with the written permission of both ECD and Lowrey."[25]  The 1998 Contract

provided that it was to be interpreted, construed, and enforced under Michigan law, and that

because it was "jointly drafted, . . . no clause shall be construed against the drafter."[26]

---

[22] *Id.* at MTI000034 ¶ 11.

[23] *Id.* at MTI000034 ¶ 16.

[24] *Id.* at MTI00002331.

[25] *Id.* at MTI000036 ¶ 24.

[26] *Id.* at MTI000036 ¶ 29.

9

In June 1999, about 6 months after executing the 1998 Contract, ECD and Lowrey

formed Defendant Ovonyx, a Delaware corporation.

**B.  The 1999 License Agreement**

On August 2, 1999, Ovonyx, ECD, and Lowrey entered into an agreement entitled

"License and Assignment Agreement" (the "1999 License Agreement"), which referenced the

1998 Contract and identified Ovonyx as the "Entity" to be formed under that contract.[27]  It

recited, in relevant part, that:

> ECD and Mr. Lowrey have entered into a contract entitled Ovonic
> Information Handling Devices Development and
> Commercialization Contract . . . dated December 17, 1998, setting
> forth principles of agreement for their future interactions in
> completing development and commercializing devices and
> products in the field (as defined in the [1998] Contract) through a
> new entity (which entity, Ovonyx, has now been formed)[.][28]

The 1999 License Agreement granted Ovonyx exclusive rights to intellectual property

"developed by both ECD and Mr. Lowrey . . . that relate[d] to the devices and products in the

field."[29]  It stated, in relevant part:

> 1.  <u>ECD License Grant</u>.  ECD hereby grants, without
> [encumbrance], to Ovonyx a royalty-bearing, worldwide,
> exclusive right and license under ECD's past, present and
> future IP (as defined in the [1998] Contract), including the
> right to sublicense, to make, have made, import, use, sell
> and otherwise dispose of products and devices in the field.
> Ovonyx will sublicense, sell, trade or otherwise negotiate

---

[27]  A copy of the 1999 License Agreement  is attached as Exhibit 6 to Defendant Ovonyx's and Defendant Micron's Brief in Support of their Motion to Dismiss (Docket # 40).  This document was filed under seal.

[28]  The 1999 License Agreement at MTI000038 (RECITALS).

[29]  *Id*.

rights in ECD IP only with the majority approval of
Ovonyx's Board of Directors. A list of ECD patents and
patent applications included in ECD IP is attached hereto as
Exhibit A.

2.    Assignment. Mr. Lowrey hereby assigns, without
encumbrance, to Ovonyx all rights, title and interest in and
to Mr. Lowrey's past, present and future IP. A list of
Lowrey patent disclosures is attached hereto as Exhibit B.[30]

The 1999 License Agreement stated that "[a]ll terms and conditions and rights and obligations of

the [1998] Contract remain in full force and effect."[31] The 1999 License Agreement did not

contain any specific references to the 1998 Contract's Royalty Right or First Refusal Right.

## C. The 2000 Stockholders Agreement

On February 4, 2000, Ovonyx entered into an agreement entitled "Stockholders

Agreement" (the "2000 Stockholders Agreement") with each of the stockholders of Ovonyx.[32]

At that time, the stockholders were ECD, Lowrey, Defendant Intel Corporation ("Intel"), and

Ward Parkinson.[33] Intel had "acquired preferred stock issued by Ovonyx and observer rights for

Ovonyx's board of directors" in February 2000.[34] One of the stated purposes of entering into the

2000 Stockholders Agreement was "limiting the manner and terms by which [Ovonyx's] stock

---

[30] *Id*. at MTI000038 ¶ 1-2.

[31] *Id.* at MTI000039 ¶ 5.

[32] A copy of the 2000 Stockholders Agreement is attached as Exhibit 7 to Defendant Ovonyx's,
and Defendant Micron's Brief in Support of their Motion to Dismiss (Docket # 40). This document was
filed under seal.

[33] 2000 Stockholders Agreement at MTI00000120, MTI00000140 (Schedule of Stockholders).

[34] First Am. Compl. (Docket # 8) at 12 ¶ 58.

11

may be transferred."[35]  Section 4 of the 2000 Stockholders Agreement is the very detailed

provision that governed any transfer of Ovonyx stock.  It provided, in relevant part:

> Section 4.        Restrictions on Transfer of Stockholder
>                         Shares
>
> 4.1      Transfer of Stockholder Shares.  **No Stockholder
> will sell**, transfer, assign, pledge or otherwise dispose of (a
> "Transfer") **any interest in any Stockholder Shares except
> pursuant to the provisions of this Section 4**.
>
> 4.2      Election Period.  Each Stockholder agrees not to
> consummate any Transfer (other than a Permitted Transfer) **until
> 30 days after the delivery to [Ovonyx] and other Stockholders
> of such Stockholder's Offer Notice** unless the parties to the
> Transfer have been finally determined pursuant to this Section 4
> prior to the expiration of such 30-day period (the "Election
> Period").
>
> 4.3      **First Offer Right**.  At least 30 days prior to making
> any Transfer of any Stockholder Shares (other than a Permitted
> Transfer), **the transferring Stockholder (the "Transferring
> Stockholder") will deliver a written notice (the "Offer Notice")
> to [Ovonyx] and the other Stockholders (the "Other
> Stockholders").**  The Offer Notice will disclose in reasonable
> detail the proposed number of Stockholder Shares to be transferred
> and the proposed terms and conditions of the Transfer.  **First,
> [Ovonyx] may elect to purchase all, but not less than all, of the
> Stockholder Shares specified in the Offer Notice at the price
> and on the terms specified therein by delivering written notice
> of such election to the Transferring Stockholder and the Other
> Stockholders as soon as practicable but in any event within 10
> days after the delivery of the Offer Notice.  If [Ovonyx] has not
> elected to purchase all of the Stockholder Shares within such
> ten-day period, each of ECD and Lowrey may elect to
> purchase all, but not less than all, of their Pro Rata Share of
> the Stockholder Shares specified in the Offer Notice** at the price
> and on the terms specified therein by delivering written notice of
> such election to the Transferring Stockholder as soon as practicable
> but in any event **within 15 days after delivery of the Offer**

---

[35]  2000 Stockholders Agreement at MTI00000120.

12

**Notice.  If [Ovonyx], ECD and Lowrey have not elected to purchase all of the Stockholder Shares within such 15-day period, each of Other Stockholders (other than ECD and Lowrey) may elect to purchase all, but not less than all, of such Other Stockholder's Pro Rata Share of the Stockholder Shares specified in the Offer Notice** at the price and on the terms specified therein by delivering written notice of such election to the Transferring Stockholder as soon as practicable but in any event **within 20 days after delivery of the Offer Notice**.  Any Stockholder Shares not elected to be purchased by the end of such 20-day period will be reoffered for the ten-day period prior to the expiration of the Election Period by the Transferring Stockholder on a pro rata basis to the Other Stockholders who have elected to purchase their Pro Rata Share.  If [Ovonyx] and/or the Other Stockholders have elected to purchase all of the Stockholder Shares from the Transferring Stockholder, the transfer of such shares will be consummated as soon as practicable after the delivery of the election notices, but in any event within 15 days after the expiration of the Election Period.  To the extent that [Ovonyx] and/or the Other Stockholders have not elected to purchase all of the Stockholder Shares being offered, the Transferring Stockholder may, within 90 days after the expiration of the Election Period and subject to the provisions of Section 4.4, Transfer such Stockholder Shares to one or more third parties at a price no less than the price per share specified in the Offer Notice and on other terms no more favorable to the transferees than offered to [Ovonyx] and the Other Stockholders in the Offer Notice.  The purchase price specified in any Offer Notice will be payable solely in cash at the closing of the transaction or in installments over time, and no Stockholder Shares may be pledged without the prior written consent of [Ovonyx], which consent may be withheld in [Ovonyx's] sole discretion.  Each Stockholder's "Pro Rata Share" will be based upon such Stockholder's proportionate ownership of all Stockholder Shares on a fully-diluted basis.

. . . .

4.9     Transfers in Violation of Agreement.  Any Transfer or attempted Transfer of any Stockholder Shares in violation of any provision of this Agreement will be void, and [Ovonyx] will not record such Transfer on its books or treat any purported transferee of such Stockholder Shares as the owner of such shares for any

13

purpose.[36]

In addition to the rights Intel had under Section 4 of the 2000 Stockholders Agreement, to a 30-day notice of any transfer of Ovonyx stock, and the third tier right to elect to purchase its "Pro Rata Share of the Stockholder Shares," Intel also had an exclusive "Right of First Offer" under Section 6 of the agreement, if a "Sale Event" occurred. The term "Sale Event" was defined in detail, but essentially meant events that could cause a change in control of Ovonyx or a sale of most of Ovonyx's assets:

> "Sale Event" means (a) any sale or issuance or series of sales and/or issuances of shares of [Ovonyx's] capital stock by [Ovonyx] or any holders thereof which results in any Person or group of affiliated Persons (other than the owners of Common Stock as of the date of the Purchase Agreement or any of their Affiliates) owning capital stock of [Ovonyx] possessing the voting power (under ordinary circumstances) to elect a majority of [Ovonyx's] board of directors, **(b) any sale or transfer of more than 50% of the assets of [Ovonyx] and its subsidiaries on a consolidated basis (measured by either book value in accordance with generally accepted accounting principles consistently applied or fair market value determined in the reasonable good faith judgment of [Ovonyx's] board of directors) in any transaction or series of transactions (other than sales in the ordinary course of business)** or (c) any merger or consolidation to which [Ovonyx] is a party, except for a merger in which [Ovonyx] is the surviving corporation and, after giving effect to such merger, the holders of [Ovonyx's] outstanding capital stock possessing a majority of the voting power (under ordinary circumstances) to elect a majority of [Ovonyx's] board of directors immediately prior to the merger will own [Ovonyx's] outstanding capital stock possessing the voting power (under ordinary circumstances) to elect a majority of [Ovonyx's] board of directors.[37]

Intel's Right of First Offer was provided in the very detailed Section 6:

---

[36] 2000 Stockholder Agreement at MTI00000127-MTI00000129 (bold added).

[37] 2000 Stockholders Agreement at MTI00000122 (emphasis added).

<u>Section 6</u>.  <u>Intel Right of First Offer</u>.

6.1     <u>Sale Event Notice</u>.  If after the date of this Agreement [Ovonyx] receives a *bona fide* offer relating to a proposed Sale Event from an unaffiliated third party and the Board determines to enter into negotiations with such third party with respect to such offer, of if the Board determines in good faith to solicit one or more unaffiliated third parties with respect to a proposed Sale Event, then **[Ovonyx] will so advise Intel** within three business days after such determination by the Board.  At least 45 days prior to entering into a definitive agreement with respect to any such Sale Event, **[Ovonyx] will deliver a written notice (a "Sale Event Notice") to Intel.**  The Sale Event Notice will disclose in reasonable detail the proposed terms and conditions of the Sale Event.

6.2     <u>Intel Election</u>.  **Intel may elect to enter into the Sale Event on the terms and conditions specified in the Sale Event Notice** by delivering written notice of such election to [Ovonyx] as soon as practicable but in any event within 45 days after the delivery of the Sale Event Notice.

6.3     <u>Consummation of Sale Transaction</u>.  If Intel elects to enter into the Sale Event on the terms and conditions specified in the Sale Event Notice, the Sale Event will be consummated as soon as practicable after the delivery of Intel's election notice, but in any event within 120 days after the delivery of the Sale Event Notice.  If Intel does not elect to enter into the Sale Event, [Ovonyx] may, within 120 days after the earlier to occur of the expiration of Intel's 45-day first offer period or the delivery of written notice to [Ovonyx] by Intel that Intel does not intend to enter into the Sale Event, enter into a definitive agreement relating to a Sale Event Notice with one or more unaffiliated third parties upon terms and conditions which, in the aggregate, are not materially more favorable to such third party or parties than offered to Intel in the Sale Event Notice.  [Ovonyx] may thereafter consummate any Sale Event with respect to which it has entered into a definitive agreement during the foregoing 120-day period.

6.4     <u>No Assignment of Rights</u>.  The rights granted to Intel pursuant to this Section 6 may not be sold, transferred, assigned or otherwise dispose[d] of by Intel and may not be exercised by Intel on behalf of or pursuant to the direction of any

15

other Person, including any transferee of Intel's Stockholder Shares.

      6.5    <u>Termination</u>.  The rights of Intel under this Section 6 will terminate as of the date Intel and its Affiliates cease to own beneficially an aggregate of at least 4,442 Stockholder Shares (as such number of Stockholder Shares may be adjusted to reflect any stock split, stock dividend, reverse stock split, combination of shares, recapitalization or similar transaction).  The provisions of this Section 6 will terminate immediately prior to the consummation of a Qualified Public Offering.[38]

Under the 2000 Stockholders Agreement, all of the Stockholders of Ovonyx had

obligations if a sale of Ovonyx stock or assets constituting a "Sale Event" was approved.  Section

7 of the 2000 Stockholders Agreement stated, in relevant part:

      <u>Section 7</u>.    <u>Obligations in Connection With Approved Sale</u>.

      7.1    <u>Approved Sale</u>.  **Subject to the rights of Intel** under Section 6, if the Board and the holders of a majority of the Stockholder Shares then outstanding, voting together as a single class, approve a Sale Event involving a Person or group of Persons who are not Affiliates of [Ovonyx] (an "Approved Sale"), then **all holders of Stockholder Shares will consent to and raise no objections against the Approved Sale, and if the Approved Sale is structured as a sale of stock, all holders of Stockholder Shares will agree to sell their Stockholder Shares on the terms and conditions approved by the Board and the holders of a majority of the Stockholder Shares then outstanding.**  The holders of Stockholder Shares will take all necessary and desirable actions in connection with the consummation of the Approved Sale.[39]

Paragraph 9.10 referenced certain other related agreements the parties had entered into,

and stated that those agreements, together with the 2000 Stockholders Agreement, "constitute[d]

---

[38]  *Id*. at MTI00000131-MTI00000132 (bold added) (italics in original).

[39]  *Id*. at MTI00000132 (bold added).

16

the entire agreement among the parties."[40] And Paragraph 9.10 expressly defined the extent to

which the agreement superseded the 1998 Contract. It stated:

> 9.10 <u>Entire Agreement</u>. This Agreement (including the Purchase Agreement, the Registration Agreement dated as of the date hereof between [Ovonyx] and its stockholders, the Stock Purchase Warrant dated as of the date hereof issued by [Ovonyx] to Intel, the Collaboration and License Agreement dated as of the date hereof between [Ovonyx] and Intel, the Corporate Non-Disclosure Agreement (number 2541617) dated as of July 6, 1999 between [Ovonyx] and Intel and the Confidentiality Side Letter dated as of the date hereof between [Ovonyx] and Intel) constitutes the entire agreement among the parties and supersedes any prior understandings agreements, or representations by or among the parties, written or oral, that may have related in any way to the subject matter hereof. **The provisions in this Agreement and the foregoing agreements will be deemed to supersede any conflicting or inconsistent provisions contained in the [1998 Contract] between [Lowrey] and [ECD] dated as of December 17, 1998, including the Ovonyx-ECD Commercialization Acknowledgment thereunder (collectively, the "<u>1998 Contract</u>"), and all other provisions of the Commercialization Contract will remain in full force and effect.**[41]

## D. Ovonyx's payments of royalties to ECD from 2000 until 2012

After entering into the 2000 Stockholders Agreement, and consistent with paragraph 10

of the 1998 Contract, ECD made a written request to Ovonyx for the payment of royalties, and

Ovonyx started paying a 0.5% royalty to ECD beginning upon the first revenues in 2000.[42]

Ovonyx continued to pay royalties to ECD until 2012.[43] From June 1999 to May 23, 2012,

---

[40] *Id*. at MTI00000137.

[41] *Id*. at MTI00000137-MTI00000138 (bold added).

[42] *See* First Am. Compl. at 12 ¶ 57; "Liquidation Trustee's Omnibus Opposition to the Motions to Dismiss Filed by Micron Technology, Inc., Ovonyx, Inc, Tyler Lowrey, Ovonyx Memory Technology, LLC and Intel Corporation" (Docket # 69, the "Trustee's Omnibus Objection") at 8.

[43] *See* First Am. Compl. at ¶ 57; Trustee's Omnibus Objection (Docket # 69) at 8-9.

Ovonyx earned over $58 million in revenues from sub-licensing the intellectual property it obtained under the 1999 Licensing Agreement, and paid ECD 0.5% of those revenues in royalties.[44] "In at least one known instance, including on May 23, 2012, the Ovonyx Board of Directors approved and ratified Royalty payments to ECD."[45]

## E. ECD's bankruptcy case

On February 14, 2012, ECD filed a voluntary petition for relief under Chapter 11, commencing Case No. 12-43166.[46]

### 1. The Chapter 11 Plan and related motions and orders

On June 20, 2012, ECD filed the Plan ("Second Amended Joint Plan of Liquidation of Energy Conversion Devices, Inc. and United Solar Ovonic LLC").[47] Article VII of the Plan dealt with executory contracts and unexpired leases. It provided:

> A.    Executory Contracts and Unexpired Leases.
> Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall serve as an order assuming the Plan Support Agreement unless the Plan Support Agreement has been expressly terminated prior thereto. **Subject to the assumptions provided in Sections X.C and X.D below, unless already assumed or rejected by Final Order of the Bankruptcy Court, all other executory contracts** and unexpired leases **of the Debtors which are not the subject of a pending application to assume as of the Effective Date, <u>shall be deemed rejected</u>.**[48]

The Plan, was modified by a Plan supplement and some amendments filed on July 16, 2012 (the

---

[44] *See* First Am. Compl. at ¶¶ 61-62; Trustee's Omnibus Objection (Docket # 69) at 8-9.

[45] First Am. Compl. at ¶ 63.

[46] Docket # 1 in Case No. 12-43166.

[47] Docket # 754-1 in Case No. 12-43166.

[48] Plan (Docket # 754-1 in Case No. 12-43166) at 24-25 (bold and underlining added).

18

"Plan Supplement").[49]  The Plan Supplement stated, in relevant part:

> Article VII of the Plan provides that, subject to the assumptions provided in Section X.C and X.D of the Plan, all executory contracts and unexpired leases of the Debtors which are not the subject of a pending application to assume shall be deemed rejected as of the Effective Date of the Plan.  The Debtors are amending the Plan to provide that the executory contracts and unexpired leases identified on the schedule attached as Exhibit 3, to the extent such contract or unexpired  lease is an executory contract under 11 U.S.C. [§] 365 of the Bankruptcy Code, is assumed by the Debtors as of the Effective Date whether or not an application to assume the contract is pending as of the Effective Date.  Accordingly, the following sentence is added to the end of Paragraph A of Article VII of the Plan:

>> "Notwithstanding the foregoing, the executory contracts and unexpired leases designated by the Debtors on Exhibit 3 to the Plan Supplement and Amendment to the Second Amended Joint Plan of Liquidation of Energy Conversion Devices, Inc. and United Solar Ovonic LLC, together with any additional executory contract identified by the Debtors by filing a Notice of Assumption prior to the Effective Date of the Plan (collectively, the "Plan Assumed  Contracts") will be assumed pursuant to Section 1123(b)(2) of the Bankruptcy Code by the Debtors upon the Effective Date of the Plan.  The Debtors are authorized to assign any Plan Assumed Contract by filing a motion with the Bankruptcy Court to approve such assignment at any time prior to the closing of the Chapter 11 Cases, which assignment shall be governed by Section 365 of the  Bankruptcy Code, and the Bankruptcy Court retains jurisdiction to decide such assignment motions."[50]

---

[49]  "Plan Supplement and Immaterial Amendments to the Second Amended Joint Plan of Liquidation of Energy Conversion Devices, Inc. and United Solar Ovonic LLC" (Docket # 983 in Case No. 12-43166).

[50]  Plan Supp. (Docket # 983 in Case No. 12-43166) at 2-3 ¶ 4.

Exhibit 3 to the Plan Supplement listed the executory contracts that the Debtor ECD was assuming, as of the "Effective Date" of the Plan.[51]  In that exhibit, ECD listed the 1999 License Agreement and the 2000 Stockholders Agreement as executory contracts being assumed.  But Exhibit 3 did not list the 1998 Contract.[52]

Also on July 16, 2012, ECD filed a motion entitled "Motion for an Order Authorizing the Assumption and Cure of Executory Contracts" (the "Assumption Motion").[53]  The Assumption Motion provided in relevant part:

<u>**RELIEF REQUESTED**</u>

4.  Attached  to this [Assumption] Motion as <u>Exhibit 6</u> is a schedule (the  "**Contract and Cure Schedule**"), which includes a description of each Contract to be assumed and the amount, if any, necessary to  cure such Contracts (the "**Cure Amounts**") pursuant to section 365  of the Bankruptcy Code.
. . . .
6.  No Contract will be deemed assumed until the later of: (i) the Effective Date of the Plan; or (ii) the entry of an Order authorizing the assumption.

7.  The Debtors anticipate a potential assignment of one or more of the Contracts in connection with or subsequent to its assumption.  The Debtors will supplement this [Assumption] Motion or file an additional motion seeking such assignment.[54]

The proposed order attached to the Assumption Motion provided, in relevant part: "2. Pursuant to Section 365(a) of the Bankruptcy Code, each Contract listed on Exhibit 6 to the [Assumption]

---

[51]  Ex. 3 to Docket # 983 in Case No. 12-43166 at pdf. pp. 34-42.

[52]  *See id.* at pdf. p. 38, pdf. p. 40.

[53]  Docket # 981 in Case No. 12-43166.

[54]  *Id.* at 2 (bold in original).

Motion is assumed effective as of the date listed on Exhibit 6."[55]  The 1999 License Agreement

and the 2000 Stockholders Agreement were both listed on Exhibit 6 to the Assumption Motion,

but the 1998 Contract was not listed.[56]  No order was ever entered regarding the Assumption

Motion.

On July 30, 2012, the Court entered an order confirming the Plan (the "Confirmation

Order").[57]  Paragraph 4.k of the Confirmation Order modified Article VII.A of the Plan, which

dealt with executory contracts and unexpired leases:

> k.    The following is added to the end of Article VII.A:
>
> Notwithstanding the foregoing, the executory
> contracts and unexpired leases designated by the
> Debtors on Exhibit 3 to the Plan Supplement and
> Amendment to the Second Amended Joint Plan of
> Liquidation of Energy Conversion Devices, Inc.
> and United Solar Ovonic LLC [Docket No. 983],
> together with any additional executory contract
> identified by the Debtors by filing a Notice of
> Assumption prior to the Effective Date of the Plan
> (collectively, the "Plan Assumed Contracts") will be
> assumed pursuant to Section 1123(b)(2) of the
> Bankruptcy Code by the Debtors upon the Effective
> Date of the Plan. . . . [58]

On August 24, 2012, the Debtors filed an amended Plan supplement and amendments to

---

[55]  *Id.* at pdf. p. 6.

[56]  *Id.* at pdf. pp. 7-14.

[57]  "Findings of Fact, Conclusions of Law, and Order Approving Disclosure Statement and
Confirming Second Amended Joint Plan of Liquidation of Energy Conversion Devices, Inc. and United
Solar Ovonic LLC" (Docket # 1064 in Case No. 12-43166).

[58]  Confirmation Order (Docket # 1064 in Case No. 12-43166) at 12 ¶ 4.k.

21

the Plan (the "Amended Plan Supplement").[59] The Amended Plan Supplement provided notice

that John Madden had been selected as the Liquidation Trustee and amended Exhibit 3 to the

Plan Supplement.[60] The Amended Plan Supplement listed the executory contracts that the

Debtor ECD was assuming under the Plan as of the "Effective Date" of the Plan.[61] It listed the

1999 License Agreement and the 2000 Stockholders Agreement as executory contracts that ECD

was assuming, but it did not list the 1998 Contract.[62]

On August 28, 2012, the Debtors provided notice that "[t]he conditions to effectiveness

[of the Plan] have now been satisfied and accordingly, . . . that the Effective Date of the Plan is

August 28, 2012."[63] As of August 28, 2012, therefore, ECD assumed the 1999 License

Agreement and the 2000 Stockholders Agreement, but ECD did not assume the 1998 Contract.

As a result, according to the Defendants, the 1998 Contract was rejected, effective August 28,

2012. After that date, Ovonyx stopped paying royalties to ECD.[64]

**2. ECD's sale of Ovonyx stock to Micron and ECF's assumption and assignment to Micron of its rights under the 2000 Stockholders Agreement**

Before the Effective Date of the confirmed Plan, on August 3, 2012, ECD filed a motion

---

[59] "Amended Plan Supplement and Immaterial Amendments to the Second Amended Joint Plan of Liquidation of Energy Conversion Devices, Inc. and United States Solar Ovonic LLC" (Docket # 1212 in Case No. 12-43166).

[60] *Id.* at 1-2 ¶¶ 1.

[61] Am. Ex. 3 to Docket # 1212 in Case No. 12-43166 ("Amended List of Assumed Contracts") at pdf. pp. 3-19.

[62] *See id*. at pdf. p. 38, pdf. p. 40.

[63] Docket # 1220 in Case No. 12-43166 ("Notice of Effective Date of Debtors' Second Amended Joint Plan of Liquidation of Energy Conversion Devices, Inc. and United Solar Ovonic LLC").

[64] First Am. Compl. at ¶ 79.

22

(the "Sale and Assignment Motion"), seeking an order authorizing (1) the sale of ECD's stock in

Ovonyx to the "Purchaser" Micron, for $12,000,000, "free and clear of all liens, claims, interests

and encumbrances," and (2) the assumption by ECD of the 2000 Stockholders Agreement and

the assignment of its rights under that agreement to Micron.[65]  At the time, ECD had a "38.6%

equity interest (35.2% on a fully diluted basis) in Ovonyx and the related [2000] Stockholders

Agreement."[66]  The Sale and Assignment Motion provided, in part:

> 9. **The [2000] Stockholders Agreement** governs certain rights of [ECD], Ovonyx and certain other shareholders of Ovonyx with respect to corporate governance and other matters of Ovonyx and its respective shareholders. . . .
>
> . . . .
>
> 14. The Equity Purchase Agreement is **subject to the [F]irst [O]ffer [R]ight contained in the Stockholders Agreement**, but free and clear of certain participation rights of other stockholders of Ovonyx, Inc. to participate by selling their shares on the same terms as the Equity Purchase Agreement in lieu of the Debtor's shares.[67]

The Sale and Assignment Motion stated that "[ECD] issued notice of the contemplated

Transaction to the other parties to the [2000] Stockholders Agreement on August 3, 2012" as

required by Section 4.3 of the 2000 Stockholders Agreement, and as required by the Purchaser

Micron, requested that the Sale and Assignment Order "make clear that certain anti-assignment

provisions of the [2000] Stockholders Agreement are unenforceable in connection with the

---

[65] Docket # 1085 in Case No. 12-43166 at pdf. pp. 1-2, 4.

[66] *Id.* at pdf. p. 4.

[67] *Id.* at pdf. pp. 4-5 (bold added).

23

Transaction pursuant to section 365(f) of the Bankruptcy Code."[68]   Those sections were 2.4

("purport[ing] to prevent any assignee of [ECD] from obtaining ['the right to designate two of

Ovonyx's [B]oard members']"); 4.2 ("contain[ing] a 30 day election period that may prevent the

closing of the Transaction"); and 4.4 ("contain[ing] a purported right, subject to the Purchaser

agreeing, of other stockholders to participate in the Transaction by selling their shares in lieu of

the Debtor selling its shares").[69]

The Sale and Assignment Motion did not contain any reference to the 1998 Contract or

the 1999 Licensing Agreement.

A copy of the Equity Purchase Agreement, signed and dated August 3, 2012, was

attached to the Sale and Assignment Motion.[70]  It contained the following representations and

warranties by ECD, which are cited in the Defendants' motions:

> 4.5    Title.
>
> (a) General. ECD has good, valid, marketable and
> undivided title to the Ovonyx Shares and the [2000] Stockholders
> Agreement free and clear of all Claims, Interests and
> Encumbrances (except to the extent that the express terms of the
> [2000] Stockholders Agreement themselves constitute
> Encumbrances), and, **subject to entry of the Bankruptcy Sale
> Order, upon the Closing Purchaser will be vested with all
> right, title and interest of ECD, at and as of the Closing, in, to
> and under the Ovonyx Shares and [2000] Stockholders
> Agreement free and clear of all Claims, Interests and
> Encumbrances (except to the extent that the express terms of
> the [2000] Stockholders Agreement themselves constitute
> Encumbrances)**.

---

[68]  *Id.* at pdf. pp. 10 n.3, 9 ¶ 26.

[69]  *Id.* at 9 ¶ 27, 10 ¶ 29.

[70]  *Id.* at pdf. pp. 36-70.

(b) <u>Ovonyx Shares</u>. The Ovonyx Shares are validly issued and outstanding and are fully paid and nonassessable. **The Ovonyx Shares are not subject to any agreement, contract, commitment or understanding, including any agreement, contract, commitment or understanding restricting or otherwise relating to the voting, dividend rights or transfer of the Ovonyx Shares**, **other than this Agreement and the [2000] Stockholders Agreement**. Other than the Ovonyx Shares and the [2000] Stockholders Agreement: (i) ECD does not own, beneficially or of record, any shares of capital stock or other equity interests in Ovonyx or any options, warrants or other securities or rights convertible into or exchangeable for any shares of capital stock or other equity interests in Ovonyx; (ii) **to ECD's Knowledge, there are no agreements, contracts, commitments, understandings or other rights outstanding that provide for, or obligate any Person to enter into any agreement, contract, commitment, understanding or to grant other rights that provide for, the sale or issuance to ECD of any shares of capital stock or other equity interests in Ovonyx or any options, warrants or other securities or rights convertible into or exchangeable for any shares of capital stock or other equity interests in Ovonyx**; and (iii) **to ECD's Knowledge, there is no agreement, contract, commitment or understanding giving ECD a right to receive benefits similar to the rights enjoyed by or accruing to holders of capital stock of Ovonyx**.

(c) <u>[2000] Stockholders Agreement</u>. The [2000] Stockholders Agreement is in full force and effect and is the valid and binding obligation of each party thereto, enforceable against each party thereto in accordance with its terms, subject to bankruptcy and other Laws affecting creditors' rights and to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding in Law or in equity). Neither ECD nor, to ECD's Knowledge, any other Person is in breach or violation of or default under, the [2000] Stockholders Agreement. To ECD's Knowledge, no event has occurred and no circumstances exist which, if not remedied, would result in such a breach, violation or default (with or without notice or lapse of time, or both) or would give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of the [2000] Stockholders Agreement. A true and complete copy of the [2000] Stockholders Agreement, as amended to Execution

Date, is attached hereto as Exhibit C.

. . . .

[4.6](g)  No Other Outstanding Equity Interests. Except as set forth in the Ovonyx Capitalization Schedule attached hereto:

(i) no other capital stock of Ovonyx is authorized, issued or outstanding;

(ii) there are no outstanding options, warrants or other securities or rights convertible into or exchangeable for any shares of capital stock or other equity interests in Ovonyx;

(iii) except for the Ovonyx Stockholder's Agreement, there are no agreements, contracts, commitments, understandings or other rights outstanding that provide for, or obligate Ovonyx to enter into any agreement, contract, commitment or understanding or to grant other rights that provide for, the sale or issuance by Ovonyx of any securities contemplated by clause (i) or (ii) above; and

**(iv) there are no agreements, contracts, commitments or understandings giving any Person a right to receive benefits similar to the rights enjoyed by or accruing to holders of capital stock of Ovonyx.**[71]

On August 22, 2012, the Court entered an order granting the Sale and Assignment Motion (the "Sale and Assignment Order"), which provided, in relevant part:[72]

NOW THEREFORE, IT IS ORDERED THAT:

1. The Motion is GRANTED, as further described herein.

. . . .

3. **The Equity Purchase Agreement, attached to the [Sale and Assignment] Motion as Exhibit 6-A**, and all of the terms and conditions thereof, together with all other related documents and instruments, **are approved and incorporated herein in their entirety**.

---

[71] *Id.* at pdf. pp. 48-50 (bold added).

[72] Docket # 1194 in Case No. 12-43166.

26

. . . .

7. Pursuant to Bankruptcy Code sections 105(a), 363(b), 363(f) and 365(f), the Debtor is authorized and directed to transfer the Purchased Assets to the Purchaser and, subject only to the [F]irst [O]ffer [R]ight set forth in section 4.3 of the Assigned Contract but free and clear of any participation right of other Ovonyx stockholders, **upon the Closing, the transfer of the Purchased Assets to Purchaser under the Equity Purchase Agreement will be a legal, valid and effective transfer, and will vest the Purchaser with all right, title and interest of the Debtor, at and as of the Closing, to the Purchased Assets, free and clear of all of the following (collectively, the "Interests"): . . transfer restrictions under any shareholder or similar agreements or any other agreements, arrangements, contracts, commitments, understandings, obligations or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this chapter 11 case, whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to: . . . (b) those Interests arising under all rights of first refusal** . . . provided, however, that all such Interests, to the extent applicable, attach to the cash proceeds of the sale of the Purchased Assets in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to any claims and defenses the Debtor or its estate may possess with respect thereto.

. . . .

15. **Purchaser would not have entered into the Equity Purchase Agreement and would not have consummated the Transaction, thus adversely affecting the Debtor, its estate and creditors, if the sale of the Purchased Assets to the Purchaser and the Debtor's assumption of the Assigned Contract and the assignment or transfer of the Assigned Contract to the Purchaser were not free and clear of all Interests of any kind or nature, as set forth in this Order and including, without limitation, those provisions set forth in paragraph 11 above, or if the Purchaser would, or in the future could, be liable for any Interests**.

. . . .

20. This Order (a) shall be effective as a determination that,

27

on the Closing, all Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected and (b) shall be binding upon and shall govern the acts of all entities. . . . Upon the Closing, the Debtor and any persons holding an Interest in the Purchased Assets as of the Closing are authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release their Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist. Without limiting the foregoing, Ovonyx is hereby ordered, immediately upon the Closing (including, for the avoidance of doubt, in the event the Closing occurs prior to the expiration of the applicable 30 day election period set forth in section 4.2 of the Assigned Contract and the Transaction remains subject to rescission and unwinding as provided in the Equity Purchase Agreement) to make such entries in its books and records, including its stock ledger, as are necessary to reflect the transfer of the Ovonyx Shares from the Debtor to Purchaser and Purchaser's resulting ownership of the Ovonyx Shares and to treat Purchaser as the record and beneficial owner of the Ovonyx Shares for all purposes.

. . . .

26. Nothing contained in any chapter 11 plan confirmed in these cases or the order confirming any such plan shall conflict with or deviate from the terms of this Order.[73]

After the sale of ECD's stock to Micron closed, Ovonyx stopped making royalty payments to ECD. Ovonyx never provided notice to ECD that it was going to stop the payments. The First Amended Complaint alleges that "Ovonyx received at least $6,654,569 in revenues for fiscal years ending May 31 for year 2013, 2014, and 2015" but did not pay ECD 0.5% of this amount.[74]

**F. The series of transactions in July 2015**

---

[73] *Id.* at pp. 5-7, 10-11, 14 (bold added).

[74] First Am. Compl. 15 ¶¶ 79-80 (bold omitted).

The First Amended Complaint describes a series of related transactions that occurred in July 2015.[75]

### 1. The merger of Oscar Merger Corp into Ovonyx

On July 12, 2015, Micron, Oscar Merger Corp. ("Oscar"), which was a wholly-owned subsidiary of Micron, and Ovonyx entered into a agreement entitled "Agreement and Plan of Merger" (the "Merger Agreement").[76]   Under the Merger Agreement, Oscar was "merged with and into [Ovonyx] (the '**Merger**'), the separate corporate existence of [Oscar] . . . cease[d], and [Ovonyx] . . . continue[d] as the surviving corporation."[77]   The general effect of the Merger was that "all the property, rights, privileges, powers and franchises of [Ovonyx] and [Oscar]" vested in Ovonyx "and all debts, liabilities and duties" of Ovonyx and Oscar became "the debts, liabilities and duties of Ovonyx."[78]   The end result of the Merger was that after the "Effective Time" of the Merger, Micron owned 100% of the equity of the surviving Ovonyx entity.  All stock and stock options of Ovonyx that existed prior to the Merger were extinguished, and Micron's shares in Oscar were converted to 100% of the shares of the surviving Ovonyx entity, thereby making the surviving Ovonyx entity a wholly-owned subsidiary of Micron.[79]   Micron also owned all voting rights to elect the Board of Directors of the surviving Ovonyx entity.

---

[75] *See id*. at 16 ¶ 85 through 24 ¶ 125.

[76] *See* Merger Agreement at 1.  An executed copy of the Merger Agreement is attached as Exhibit 8 to Docket # 40 in Adversary Proceeding No. 18-4320, and was filed under seal.

[77] *Id*. at 11 ¶ 2.1 ("The Merger") (underlining in original).

[78] *Id*. at 11 ¶ 2.3 ("General Effects of the Merger").

[79] *See id.* at 12-13 ¶ 2.6 ("Effect of Merger on Capital Stock"); *see also* First Am. Compl. at 16 ¶ 85.

29

The Merger Agreement summarized the end result of the Merger in this way:

> B. On the terms and subject to the conditions set forth in this [Merger] Agreement, as of the Effective Time of the Merger [("[t]he time of filing of the Articles of Merger" with the Nevada state Secretary of State)] and pursuant thereto, (i) all of the issued and outstanding capital stock of [Ovonyx] immediately prior to the Effective Time will be converted into the right to receive the consideration set forth herein, (ii) all of the issued and outstanding options to acquire shares of capital stock of [Ovonyx] will be cancelled and extinguished and will be converted into the right to receive the consideration set forth herein, and (iii) [Micron], which is [Oscar's] sole stockholder, will become the sole stockholder and the sole holder of any rights to acquire capital stock of [Ovonyx].[80]

In the Merger Agreement, Ovonyx represented that, with exceptions not relevant here, it was

> in compliance in all material respects with, and has not breached, violated, or defaulted under in any material respect, or received notice that it has breached, violated or defaulted under, any of the terms or conditions of any [Ovonyx] Contract, nor to the Knowledge of [Ovonyx] has there occurred any event or condition that could constitute such a breach, violation or default in any material respect with the lapse of time, giving of notice or both. . . . [T]o [Ovonyx's] Knowledge, no party obligated to [Ovonyx] pursuant to any [Ovonyx] Contract is subject to any default thereunder.[81]

Lowrey, who was still a shareholder of Ovonyx until the Merger, "received in excess of . . . $20.6 million on account of . . . the [M]erger."[82]

## 2. The sale and transfer of the intellectual property of Ovonyx to IPLLC

The Merger Agreement included a provision obligating Ovonyx,

---

[80]  Merger Agreement at 1 ¶ B ("Recitals").

[81]  *Id.* at 27 ¶ 3.14(c) ("Agreements, Contracts and Commitments").

[82]  First Am. Compl. at 18 ¶ 92 (bold omitted).

30

> **[u]pon receipt of instruction from [Micron]** to . . . immediately
> prior to the Effective Time . . . enter into a patent sale and transfer
> agreement with Carlow Innovations, LLC ("IPLLC"), [(the
> predecessor of Defendant Ovonyx Memory Technology, LLC
> ("OMT"))] **on terms and conditions acceptable to [Micron] in
> its sole discretion**, **providing for the transfer and sale of all of
> [Ovonyx] Registered Intellectual Property to IPLLC**
> immediately prior to the Effective Time[.][83]

On July 31, 2015, IPLLC (predecessor to Defendant OMT) and Ovonyx entered into an

agreement entitled "Asset Sale and Transfer Agreement" (the "OMT Agreement"), as

contemplated by Merger Agreement.[84]  Under that agreement, "OMT agreed to pay to Ovonyx

each calendar quarter a percentage of certain licensing revenues, ranging from 10% to 18%,"[85]

but "OMT had no obligation to pay Ovonyx any licensing revenues that OMT received in the

first thirty days after execution of the OMT Agreement.[86]  The transfer of patent rights by

Ovonyx to OMT under the OMT Agreement "consisted of the substantial majority of the assets

of Ovonyx."[87]

### 3.  The grant of royalty-free licenses by OMT to Intel and to Micron.

Also, on July 31, 2015, IPLLC (predecessor to OMT) entered into a "License Agreement"

---

[83]  Merger Agreement at 43 ¶ 6.13 (bold added).

[84]  A copy of the OMT Agreement is attached as Exhibit 6-4 to Docket # 58 (which was filed
under seal).

[85]  First Am. Compl. at 19 ¶ 101 (bold omitted).  The First Amended Complaint treats IPLLC and
OMT as the same entity and uses both names interchangeably because IPLLC is the predecessor to OMT.
The Court will do the same to avoid confusion.

[86]  *Id.* at 19 ¶ 103.

[87]  *Id.* at 19 ¶ 100.

with Intel (the "OMT/Intel License Agreement").[88]  The First Amended Complaint alleges that

under the OMT/Intel License Agreement, OMT granted to Intel a perpetual world-wide, royalty-

free license.[89]  Also in July 2015, OMT granted to Micron a fully paid-up, perpetual, irrevocable,

non-terminable, world-wide royalty-free license.[90]

Neither Ovonyx nor Lowrey provided notice to the Trust of any of the transactions that

occurred in July 2015,[91] which the Court will refer to collectively as "the July 2015

Transactions."

## G.  The Trust's demand for royalty payments from Ovonyx

"On June 6, 2018, the Trust made demand on Ovonyx to pay all owed Royalties and to

confirm that Ovonyx will pay future Royalties.  Ovonyx has refused to pay the Royalty."[92]

## H.  The First Amended Complaint

On July 12, 2018, almost 6 years after the Effective Date of the Plan, the Trust filed a

---

[88]  A copy of the OMT/Intel License Agreement is attached as Exhibit 6-5 to Docket # 58.

[89]  First Am. Compl. at 16-18 ¶¶ 82, 90, 22 ¶ 118; *see also* Ex. 6-5 to Docket # 58 at 1-2, 6; Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 140 ("OMT entered into a separate deal with Intel giving Intel [a] perpetual royalty free license for $15,000,000.").  However, during oral argument, the Trust's counsel also made statements that implied that it was Ovonyx which had granted Intel the perpetual world-wide royalty-free license.  For example, counsel for the Trust stated that, despite transferring substantially all of its assets to OMT, Ovonyx "entered into an amendment of an existing  license agreement" with Intel to assure that Intel would have a perpetual world-wide royalty-free license."  (*See id.* at 96.)  Counsel for the Trust also stated that "[u]nder Section 2.5 of the sale agreement, Ovonyx could, and . . . did, grant a royalty free license to all of the transferred assets to one third party which was Intel."  (*Id*. at 141.)  Whether or not Intel obtained its perpetual world-wide license from OMT or Ovonyx is not material to the Court's decision on the motions to dismiss.

[90]  First Am. Compl. at 16 ¶ 83.

[91]  *See id.* at 18-19 ¶ 96.

[92]  *Id*. at 22 ¶ 116.

complaint commencing this adversary proceeding.[93]  On August 2, 2018, the Trust filed a first

amended complaint (the "First Amended Complaint"), which is now the operative complaint.[94]

The First Amended Complaint contains seven unnumbered counts.  Five of the seven counts (the

first through fourth and the sixth) seek damages based on alleged breaches of the First Refusal

Right and of the Royalty Right in the 1998 Contract and the 1999 Licensing Agreement.  Those

alleged breaches include: (1) the failure of Ovonyx and Lowrey to give notice to ECD of the July

2015 Transactions, including the Merger Agreement and the OMT Agreement, so that ECD

could exercise its First Refusal Right; and (2) the failure of Lowrey to cause Ovonyx to pay ECD

.05% of Ovonyx's licensing revenues in accordance with the Royalty Right.  The fifth and

seventh counts of the First Amended Complaint seek to avoid transfers that occurred as a result

of the July 2015 Transactions and related relief.

More specifically, the first count of the First Amended Complaint is against Ovonyx and

Lowrey for breach of the 1998 Contract and the 1999 Licensing Agreement.[95]  The second count

is against only Micron and is based on the doctrines of alter ego/successor liability.[96]  It alleges,

in part, that "Micron acquired all of the stock of Ovonyx in July 2015[,] . . . [and] Micron is

liable for" Ovonyx's material breaches of the 1998 Contract and the 1999 Licensing

Agreement.[97]

---

[93]  Docket # 1.

[94]  Docket # 8.

[95]  First Am. Compl. at ¶¶ 126-36.

[96]  *Id.* at ¶¶ 137-145.

[97]  *Id*. at ¶ 143.

The third count also is against only Micron, and is for Micron's alleged tortious interference with ECD's contractual rights under the 1998 Contract and the 1999 Licensing Agreement.[98]

The fourth count is against only OMT, for tortious interference with ECD's contractual rights under the 1998 Contract and the 1999 Licensing Agreement.[99]

The fifth count is a fraudulent transfer claim against OMT, under the Michigan Uniform Voidable Transfer Act.[100] In this count, the Trust alleges that Ovonyx entered into the OMT Agreement "with the intent to hinder, delay, or defraud the other creditors of Ovonyx."[101]

The sixth count is against Intel for aiding and abetting a tortious interference with the 1998 Contract and the 1999 Licensing Agreement.[102]

The seventh count is against Intel and seeks a declaratory judgment that "Intel may not use intellectual property of Ovonyx that was transferred to OMT under the OMT Agreement."[103]

All of the Defendants have filed motions to dismiss.

## III. Standards governing motions to dismiss under Fed. R. Civ. P. 12(b)(6)

The Defendants seek dismissal under Fed. R. Civ. P. 12(b)(6), applicable in this adversary proceeding under Fed. R. Bankr. P. 7012(b), arguing that all of the claims in the

---

[98] *Id.* at ¶¶ 146-56.

[99] *Id.* at ¶¶ 157-67.

[100] *Id.* at ¶¶ 168-73.

[101] *Id.* at ¶ 170.

[102] *Id.* at ¶¶ 174-87.

[103] *Id.* at ¶¶ 188-95.

Trust's First Amended Complaint fail to state a claim upon which relief can be granted. In

*Wahrman v. Bajas* (*In re Bajas*), 443 B.R. 768 (Bankr. E.D. Mich. 2011), this Court discussed

the standard for dismissal under Fed. R. Civ. P. 12(b)(6):

> A motion under Rule 12(b)(6) tests the "sufficiency of [a] complaint." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A court must examine the plaintiff's allegations and determine whether, as a matter of law, "the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993). "[A] court considering a motion to dismiss under Rule 12(b)(6) 'must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff.'" *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 605 (6th Cir.2005) (quoting *Inge v. Rock. Fin. Corp.*, 281 F.3d 613, 619 (6th Cir.2002) (citing *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir.1998))).

> In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the United States Supreme Court revisited the standards that govern Rule 12(b)(6) motions. In doing so, the Court rejected "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 550 U.S. at 561, 127 S.Ct. 1955 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court explained,

> > Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] Factual allegations must be enough to raise a right to relief above the speculative level, . . . on

the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]

*Id.* at 555–56, 127 S.Ct. 1955 (emphasis added) (citations and footnote omitted). The Court went on to hold that:

> stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest [grounds for relief]. Asking for plausible grounds to infer [a right to relief] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [an entitlement to relief]. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely."

*Id.* at 556, 127 S.Ct. 1955 (citation and footnote omitted). *See also Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (Fed.R.Civ.P. 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary[.]")

More recently, in *Ashcroft v. Iqbal*, [556 U.S. 662], 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court reiterated the "plausibility" requirement it announced in *Twombly*, and further explained that concept:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.
>
> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is

36

inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation"). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"—"that the pleader is entitled to relief."

[556 U.S. at 678-79], 129 S.Ct. at 1949–50 (citations omitted).

*Bajas,* 443 B.R. at 768, 770-72.

The Defendants filed documents with their motions to dismiss that were not attached to the Trust's First Amended Complaint, but which the Defendants want the Court to consider in ruling on their motions. The Plaintiff Trust also has filed documents in opposition to the Defendants' motions to dismiss, that were not attached to Plaintiff's First Amended Complaint.

None of the parties object to the Court's consideration of these documents in ruling on the motions to dismiss. Ovonyx and Micron argue that "[w]hen ruling on a motion, the Court may consider and construe documents referred to in and integral to the claims asserted in the

37

First Amended Complaint."[104] Ovonyx and Micron argue further that all of the documents that

have been attached to the motions to dismiss (*i.e.*, the 1998 Contract; the 1999 License

Agreement; the 2000 Stockholders Agreement; and the Merger Agreement) are integral to the

Trust's claims in the First Amended Complaint, so that in deciding the motions, the Court should

apply the plausibility standard applicable to motions to dismiss under Fed. R. Civ. P. 12(b)(6),

rather than the Civil Rule 56 summary judgment standard.[105]  The Court agrees.

In *Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 2d 334, 338 (S.D.N.Y. 2005), the

court explained:

> In considering a motion to dismiss, the court is limited to the
> contents of the complaint. However, "complaint" has been
> construed to include "the facts stated in the complaint *or in
> documents attached to the complaint as exhibits or incorporated in
> the complaint by reference.*" *Kramer v. Time Warner Inc.*, 937
> F.2d 767, 773 (2d Cir.1991) (emphasis added). Thus, documents
> and statements that are not attached to or quoted in the complaint
> itself, but that are incorporated by reference into the complaint and
> are essential to its allegations, may be considered on a motion to
> dismiss without converting the motion to a motion for summary
> judgment. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d
> 42, 47 (2d Cir.1991) (citations omitted). The classic examples of
> documents that may be considered on a motion to dismiss even
> though the plaintiff does not physically attach them to the
> complaint are the contracts that underlie the claims in suit[.]

*Id.*; *see also Com. Money Ctr., Inc. v. Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007)

(citation omitted) ("[W]hen a document is referred to in the pleadings and is integral to the

claims, it may be considered without converting a motion to dismiss into one for summary

judgment."); *Travis v. ADT Sec. Servs., Inc.*, 884 F. Supp. 2d 629, 632 n.1 (E.D. Mich. 2012)

---

[104] Defs. Ovonyx's and Micron's Br. in Supp. of Mot. to Dismiss (Docket # 40) at 14.

[105] *Id.* at 15.

(relying on *Com. Money Ctr., Inc. v. Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007))

(deciding to consider a services contract that was attached to the defendant's motion to dismiss even though it was not attached to the plaintiff's complaint, because such contract was integral to the plaintiff's claims); *QQC, Inc. v. Hewlett-Packard Co.*, 258 F. Supp. 2d 718, 721 (E.D. Mich. 2003) (internal quotation marks and citation omitted) ("[A]lthough a court may not consider matters outside the pleadings on a motion to dismiss, documents properly introduced by a defendant are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim.").

## IV. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).  The Court has "related to" subject matter jurisdiction over each of the Plaintiff Trust's claims in this adversary proceeding, and each is a non-core proceeding.  *See generally Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 26-28 (Bankr. E.D. Mich. 2009).  At this time, fewer than all of the parties in this adversary proceeding have consented to the bankruptcy court entering a final judgment, under 28 U.S.C. § 157(c)(2).[106]  But in ruling on the Defendants' motions to dismiss today, the Court will not be entering any final judgment.

## V. Discussion

## A. The 1998 Contract was an executory contract that ECD rejected in its Chapter 11 case.

_____

[106]  *See, e.g.*, Report of Parties' Rule 26(f) Conference (Docket # 72) at 8.  The deadline for all the parties to give such consent was March 20, 2020.  *See* Adversary Proceeding Scheduling Order (Docket # 76) at 2 ¶ j.  The Court may revisit that deadline, and may discuss it with the parties in an upcoming status conference.

Under §§ 365(a) and 1107 of the Bankruptcy Code, ECD, as a Chapter 11 debtor in possession, had the right to assume or reject any executory contract to which it was a party in its Chapter 11 case, subject to the Court's approval. Section 365(a) states, in relevant part: "(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a). Section 1107 gives a debtor in possession, such as ECD in this case, the same rights as the trustee to assume or reject any executory contract. *See* 11 U.S.C. § 1107(a). Under 11 U.S.C. § 365(d)(2), ECD had the right to assume or reject any executory contract "at any time before the confirmation of a plan."

Therefore, if the 1998 Contract was an executory contract, ECD had the right to timely assume or reject it.

1. **The 1998 Contract was an executory contract as of the petition date and as of the Plan's Effective Date.**

The parties disagree however, over whether the 1998 Contract was an executory contract. The Defendants argue that the 1998 Contract was an executory contract, both as of the petition date and as of the Plan's Effective Date. The Trust disagrees. The Court agrees with the Defendants.

a. **The petition date is the relevant date here.**

The relevant date for determining whether the 1998 Contract was an executory contract is the petition date. *See COR Route 5 Co., LLC v. Penn Traffic Co.* (*In re Penn Traffic Co.*), 524 F.3d 373, 381 (2d Cir. 2008) (citation omitted) ("Executoriness and the debtor's rights with respect to assumption or rejection of an executory contract are normally assessed as of the

40

petition date (the date on which a voluntary bankruptcy such as [the debtor's] is commenced.")).

Although, as noted in the *Penn Traffic* case, "[s]ome courts have . . . denied debtors' post-petition attempts to assume or reject contracts that were executory 'as of the petition date' in light of post-petition events affecting those contracts[,]" such courts "have looked to the impact of post-petition events where the contract expired post-petition by its own terms, such that there were no longer any obligations to assume or reject, or where the debtor itself had taken affirmative action under a contract that affected the existence of outstanding performance obligations." *Id.* (citing cases). Neither of these two circumstances were present here, and the Court finds no other reason to deviate from the general rule of determining whether a contract is executory as of the petition date.

### b. The tests for determining whether the 1998 Contract was executory

The Bankruptcy Code does not contain a definition of "executory contract." In the Sixth Circuit, two approaches have been used to determine whether a contract is executory. These are often referred to as the "Countryman approach" and the "functional approach." In *Chattanooga Mem'l Park v. Still* (*In re Jolly*), 574 F.2d 349 (6th Cir. 1978), the Sixth Circuit Court of Appeals discussed these two approaches:

> Congress did not provide the courts with a definition of "executory contracts," except to the extent that a lease is an example. 11 U.S.C. § 1006(5), Bankruptcy Act § 606(5). . . . A definition frequently used by the courts is "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, Executory Contracts in Bankruptcy: *Part I*, 57 Minn.L.Rev. 439, 460 (1973).
>
> Such definitions are helpful, but do not resolve this

41

problem. The key, it seems, to deciphering the meaning of the
executory contract rejection provisions, is to work backward,
proceeding from an examination of the purposes rejection is
expected to accomplish. If those objectives have already been
accomplished, or if they can't be accomplished through rejection,
then the contract is not executory within the meaning of the
Bankruptcy Act.

. . . .

**Thus, executory contracts involve obligations which
continue into the future. S. Rep. No. 94-458, 94th Congress, 1st
Sess. (1975). They include leases, employment contracts and
agreements to buy or sell in the future. Generally, they are
agreements which include an obligation for the debtor to do
something in the future.**

*Id*. at 350–51 (emphasis added).  Other cases have emphasized the Countryman approach.  *See*

*N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 522 n.6 (1984) (citations omitted) ("The

Bankruptcy Code furnishes no express definition of an executory contract, *see* 11 U.S.C.

§ 365(a), but the legislative history to § 365(a) indicates that Congress intended the term to mean

a contract 'on which performance is due to some extent on both sides.'"); *Terrell v. Albaugh* (*In*

*re Terrell*), 892 F.2d 469, 471 & n.2 (6th Cir. 1989) (relying on *Jolly*, 574 F.2d at 350-51 and the

legislative history of 11 U.S.C. § 365 and explaining that although "[t]he Bankruptcy Code does

not explicitly define the term 'executory contract' . . . Congress apparently had in mind the

definition of executory contracts set forth in Countryman, *Executory Contracts in Bankruptcy*:

*Part I*, 57 Minn.L.Rev. 439, 460 (1973)" because according to the legislative history of 11

U.S.C. § 365, "Congress intended the term to be defined as a contract 'on which performance

remains due to some extent on both sides'").

In *In re DMR Fin. Servs., Inc.*, 274 B.R. 465, 469-71 (Bankr. E.D. Mich. 2002), the court

held that both the Countryman approach and the functional approach apply for determining

42

whether a contract is executory. *Id.*; *see also see also In re Collins & Aikman Corp.*, 384 B.R. 751, 761-62 (Bankr. E.D. Mich. 2008) (describing both approaches to determining whether a contract is an executory contract in the Sixth Circuit). The *DMR* court opined that "*Jolly* encompasses the Countryman test by including **the need for future obligations**, the relief from which is one of the main purposes to be accomplished by rejection." 274 B.R. at 470 (emphasis added). The *DMR* court noted that "[s]ubsequent [to *Jolly,*] Sixth Circuit cases have clearly examined the debtor's future performance obligations as part of the executory analysis." *Id.* (citing *Terrell v. Albaugh* (*In re Terrell*), 892 F.2d 469 (6th Cir. 1989)). The court held that "consideration of future performance obligations . . . i[s] a necessary part of the analysis." *Id.* at 471.

Most recently, the United States Supreme Court, in describing what an executory contract is within the meaning of § 365 of the Bankruptcy Code, reaffirmed the continued vitality of both the Countryman approach and the functional approach, though not referring by name to these approaches. In *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019), the Supreme Court stated that an executory contract under § 365 is "a contract that neither party has finished performing." The Court explained that "[a] contract is executory if 'performance remains due to some extent on both sides.'" *Id.* (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522, n.6 (1984)). The Court explained further that an executory contract is "an agreement [that] represents both an asset (the debtor's right to the counterparty's future performance) and a liability (the debtor's own obligations to perform)." *Id.* The Court described an executory contract as the type of a contract that a trustee or debtor in possession can evaluate in terms of whether future performance under the contract would be beneficial or

43

burdensome to the estate, and that can be rejected under § 365, if found to be of no benefit or if found to be burdensome to the estate:

> Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward. If so, the debtor will want to assume the contract, fulfilling its obligations while benefit[t]ing from the counterparty's performance. But if not, the debtor will want to reject the contract, repudiating any further performance of its duties.

*Id.*

Therefore, under *Mission Product,* executory contracts are defined both in terms of whether there are obligations of both parties continuing into the future (the Countryman approach), and whether there is a purpose that can be accomplished by rejection of the contract (the functional approach).

**c. The 1998 Contract was executory**.

Here, regardless of which approach is applied, the 1998 Contract was an executory contract on both the petition date and on the Plan's Effective Date, although, as the Court has already ruled above, the petition date is the relevant date. On both dates, each of the parties to that contract, namely ECD and Lowrey, had material unfulfilled obligations under the contract that continued into the future, and their failure to perform those obligations would constitute a material breach of that contract. For example, on the petition date, under the 1998 Contract, both parties had reciprocal continuing material obligations, including, but not limited to, the obligations:

- to operate "as a partnership between ECD and Mr. Lowrey for all their activities in the field such as operating, licensing, expenditures, distributions, financing,

employing and contracting";[107]

- "to promptly describe to the other in witnessed form any developed intellectual property in the field and to use, disclose, sell, trade, or negotiate rights in that property only with approval";[108]

- "[b]efore and after termination . . . to cooperate in prosecution, protection, and allocation of ownership as described [in the 1998 Contract]";[109]

- to utilize "all ECD proprietary and confidential information in the field originated before and after [the 1998 C]ontract . . . exclusively . . . to support this joint endeavor's efforts to manufacture, license and sublicense in the field;"[110]

- "to conduct all activities in the field in [the] Entity such as manufacturing and licensing;"[111]

- "to use confidentially without public disclosure the other's IP in the field and without the right to sub-license absent approval, a license that shall expire upon termination";[112]

- to "cooperate reasonably in disclosing, transferring, assigning, or licensing, as the case may be, to the Entity all pertinent information and assets in the field to the reasonable extent allowed by law including that learned or acquired in the field before and after Entity formation under the control of ECD or Mr. Lowrey, such as but not limited to: revenues, royalties, contracts, and IP";[113]

- to not originate "any press releases and public relations in the field" without mutual

---

[107] 1998 Contract at MTI000033 ¶ 6.

[108] *Id.* at ¶ 2.

[109] *Id.*

[110] *Id.* at MTI000033 ¶ 5.

[111] *Id.* at ¶ 7.a.

[112] *Id.* at MTI000034 ¶ 14.d.

[113] *Id.* at MTI000033 ¶ 7.b.

approval prior to termination;[114] and

- to "not contest the others patent validity in the field including after termination."[115]

Lowrey also had individual continuing material obligations under the 1998 Contract, including: directing all "activities in the field."[116]  As noted above, such activities encompassed a broad range of ongoing duties.[117]

ECD had material continuing obligations that applied only to it under the 1998 Contract, including:

- giving Lowrey and the Entity "full access to the ECD Troy Facilities and relevant ECD personnel for analytical work and process technology development in support of their work in the field as reasonably requested by Mr. Lowrey";[118]

- disclosing to Lowrey "all ECD proprietary and confidential information in the field originated before and after [the 1998 C]ontract";[119]

- indemnifying Lowrey and holding him harmless for his activities and any liabilities related to [the 1998 C]ontract except for gross negligence, willful misconduct, or breach of [the 1998 C]ontract, and to defend him and promptly pay for his reasonable legal expenses in defending litigation related to [the 1998 [C]ontract and his related actions prior to termination, including for litigation

---

[114] *Id.* at MTI000034 ¶ 12.

[115] *Id.* at MTI 000035 ¶ 17.e.

[116] *Id.* at MTI000032 ¶ 2.

[117] *See id.*

[118] *Id.* at MTI000034 ¶ 9.  The Trust argues that the ECD closed the Troy Facilities before the bankruptcy case was filed and therefore ECD's obligation to give Lowrey full access to that facility could not be a continuing obligation for purposes of the executory contract analysis.  Even assuming, without deciding, that ECD's closure of the Troy Facilities terminated its obligation to provide Lowrey with access to it, as the Trust alleges, rather than being merely a breach of that provision of the 1998 Contract, ECD had other obligations under that provision, such as the obligation to provide Lowrey with full "access to . . . relevant ECD personnel."

[119] *Id.* at MTI000033 ¶ 5.

46

arising thereafter";[120]

• "provid[ing] Lowrey coverage under ECD's Director and Officer's Insurance plus all the usual and customary benefits and protections normally accorded a V.P. of Research and Development except salary, bonuses, and severance."[121]

Paragraph 23 of the 1998 Contract further shows that the parties had obligations that continued into the future, because it explicitly states this:

> **23. Continuing obligations.** If either party cancels prior to the cancellation date, neither party shall have any continuing obligation to the other, *except for these obligations that shall continue regardless of cancellation or any future events such as termination, unless approved otherwise*:
>
> a)  Mr. Lowrey and ECD agree not to use or disclose the other's confidential information until such information is public through no fault of their own,
>
> b)  ECD shall continue ECD's indemnification obligation to Mr. Lowrey as described below,
>
> c)  both agree to cooperate in prosecuting and defending the other's ownership rights in intellectual property at no out-of-pocket expense to the cooperating non-owner,
>
> d)  any intellectual property jointly originated by the parties shall be subject to approval prior to any use, licensing, or assigning to others except under the IP cancellation and termination rights of each, if applicable,
>
> e)  if the Entity is formed, both ECD and Mr. Lowrey each agree not to use or disclose this Entity's confidential information without approval, and
>
> f)  the Entity shall agree and execute agreements with its employees and contractors not to use or disclose the

---

[120] *Id.* at MTI000036 ¶ 23(g).

[121] *Id.*

> Entity's, Mr. Lowrey's, ECD's, or former
> employer's confidential information,
>
> g)    the parties agree to honor other ongoing
>       rights described herein such as the right of
>       first refusal and cross-licenses to the other
>       party including after termination.[122]

The "Continuing Obligations" listed in paragraph 23 above, standing alone, would make the 1998 Contract an executory contract.

The 1998 Contract also explicitly makes certain other contractual provisions "subject to" the parties' "continuing obligations" or "ongoing obligations."[123]

The Court agrees with the Defendants' characterization of these continuing and ongoing obligations:

> These obligations are not ministerial or insignificant; they reflect
> the parties' clear intent to enter into an ongoing collaboration to
> develop and commercialize intellectual property in the field both
> before and after Ovonyx was formed.  ECD and Lowrey owed each
> other ongoing material obligations both before and during ECD's
> bankruptcy, making the 1998 Contract executory as a matter of
> law.[124]

The continuing material obligations of both parties make the 1998 Contract executory under the Countryman approach.  There are many cases where courts applying, at least in part, the Countryman approach, have deemed licensing agreements with continuing obligations similar to those in the 1998 Contract to be executory contracts within the meaning of § 365 of the Bankruptcy Code.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1662,

---

[122] *Id.* at MTI000036 ¶ 24 (italics added).

[123] *See, e.g., id.* at MIT000034-35 ¶¶16-17, MTI000035.

[124] Defs.' Ovonyx and Micron's Reply Br. in Supp. of Mot. To Dismiss First Am. Compl. (Docket # 95) at 4 (footnote omitted) (citations omitted).

48

(2019) (stating that "[m]any licensing agreements involving trademarks or other property [such as the 'trademark licensing agreement' before the Court] are "executory contracts" where "[t]he licensor not only grants a license, but provides associated goods or services during its term; the licensee pays continuing royalties or fees"); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.* (*In re Richmond Metal Finishers, Inc.*), 756 F.2d 1043, 1045 (4th Cir. 1985) (applying the Countryman test to find that a non-exclusive technology licensing agreement "was an executory contract, within contemplation of 11 U.S.C. § 365(a)" where both parties to the contract had reciprocal obligations, which included the "continuing core obligations of notice and forebearance in licensing;" the duty to indemnify; the duty to provide an accounting; the duty to pay royalties; and other additional contingent duties that "extended over the life of the agreement and remained unperformed"); *RCI Tech. Corp. v. Sunterra Corp.* (*In re Sunterra Corp.*), 361 F.3d 257, 264 (4th Cir. 2004) (applying the Countryman test to conclude that a software licensing agreement was executory within the meaning of 11 U.S.C. § 365(a), because both parties to the contract owed the other party "an ongoing obligation to maintain the confidentiality of the source code of the software developed by the other"); *Everex Sys., Inc. v. Cadtrak Corp.* (*In re CFLC, Inc.*), 89 F.3d 673, 677 (9th Cir. 1996) (finding that a patent license was an executory contract where one party had the duty to "continue to refrain from suing [the other party] for infringement" and the other party had a continuing duty to "mark all products made under the license with proper statutory patent notice").

In addition, the material continuing obligations of ECD also make the 1998 Contract executory under the functional approach, because there was still a purpose to be served by the assumption/rejection decision. ECD could still evaluate whether or not having to perform its

continuing obligations to Lowrey described above would be burdensome to the bankruptcy estate going forward compared to the benefits to the estate of the reciprocal obligations that would be owed to it by Lowery, and reject or assume the 1998 Contract based on its benefit/burden evaluation.

### 2. ECD rejected the 1998 Contract.

Because the 1998 Contract was an executory contract, after ECD filed for relief under Chapter 11, under §§ 365(a), 365(d)(2),[125] and 1123(b)(2),[126] ECD had three choices regarding this contract: it could assume it; it could reject it, or it could do nothing. *See Diamond Z Trailer, Inc. v. JZ L.L.C.* (*In re JZ L.L.C.*), 371 B.R. 412, 422–23 (B.A.P. 9th Cir. 2007).

The parties agree that if the 1998 Contract was executory, as the Court has now ruled, then ECD rejected that contract. ECD affirmatively acted to reject the 1998 Contract under the

---

[125] These provisions of § 365 provide:

> (a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
>
> . . . .
>
> (d)(2) In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365.

[126] Section 1123(b)(2) provides: "(b) Subject to subsection (a) of this section, a plan may-- . . . (2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section[.]" 11 U.S.C. § 1123(b)(2).

terms of its confirmed plan, Article VII.A., by not filing an application to assume it under Article

IV of the Plan;[127] by not listing it as one of the contracts to be assumed on Exhibit 3 to the Plan

Supplement;[128] by not listing it on Exhibit 3 to the Amended Plan Supplement;[129]  by not listing it

as one of the contracts to be assumed in the Assumption Motion;[130] by not listing it in the

proposed order attached to the Assumption Motion;[131] and by not filing a Notice of Assumption

of that contract prior to the Effective Date of the Plan, as provided for under paragraph 4.k of the

Confirmation Order.[132]

Thus, ECD rejected the 1998 Contract in its bankruptcy case.  The effect of that rejection

is discussed in Part V.C of this Opinion, below.

## B.  ECD's Royalty Right in the 1998 Contract was incorporated into, and adopted by, the 1999 License Agreement.

The Trust argues that it does not matter whether the 1998 Contract was rejected by ECD,

---

[127]  Article IV of the Plan stated that "all other executory contracts . . . of the Debtors which are not the subject of a pending application to assume as of the Effective Date, shall be deemed rejected."

[128]  The Plan Supplement stated that "executory contracts designated by the Debtors on Exhibit 3 to the Plan Supplement . . . together with any additional executory contract identified by the Debtors by filing a Notice of Assumption prior to the Effective Date of the Plan will be assumed pursuant to Section 1123(b)(2) of the Bankruptcy Code by the Debtors upon the Effective Date of the Plan."  (Docket # 983 in Case No. 12-43166 at 3.)

[129]  The Amended Plan Supplement amended Exhibit 3 to the Plan Supplement.

[130]  The Assumption Motion stated: "Attached to this Motion as Exhibit 6 is a schedule . . . which includes a description of each Contract to be assumed and the amount, if any, necessary to cure such Contracts . . . pursuant to section 365 of the Bankruptcy Code."

[131]  That proposed order stated, in relevant Part: "2.  Pursuant to Section 365(a) of the Bankruptcy Code, each Contract listed on Exhibit 6 to the [Assumption] Motion is assumed effective as of the date listed on Exhibit 6."

[132]  Paragraph 4.k of the Confirmation Order allowed the Debtors to assume any other executory contracts not previously assumed "by filing a Notice of Assumption prior to the Effective Date of the Plan."

because even if it was rejected, the terms and conditions and rights and obligations under that contract were fully incorporated into the 1999 License Agreement. This included ECD's Royalty Right and ECD's First Refusal Right. Because of this, and because ECD *assumed* the 1999 License Agreement, the Trust argues, the rejection of the 1998 Contract would have no impact on the Royalty Right or the First Refusal Right in the 1998 Contract.

The Defendants argue that the terms of the 1998 Contract were not incorporated into the 1999 License Agreement.

The Court finds it unnecessary to decide whether all the terms of the 1998 Contract were incorporated, by reference or otherwise, into the 1999 License Agreement. Instead, the Court will focus on the contract rights at issue, namely the Royalty Right and the First Refusal Right. As to the latter, the Court finds it unnecessary to decide whether the First Refusal Right was incorporated into the 1999 License Agreement. This is because, as the Court discusses in Part V.D.1.a of this Opinion, below, the 2000 Stockholders Agreement superceded, and thereby eliminated, ECD's First Refusal Right from the 1998 Contract and any such right that was incorporated into the 1999 License Agreement.

As for ECD's Royalty Right, the Court concludes that the 1999 License Agreement did incorporate that right, and that Ovonyx adopted and ratified the duty to pay ECD the royalty described in the 1998 Contract. As a result, Ovonyx owed a duty, under the 1999 License Agreement, to honor ECD's Royalty Right.

The language of the 1999 License Agreement makes clear that the parties to that agreement — *i.e.*, ECD, Lowrey, and Ovonyx — intended that the "Entity" to be formed, as contemplated by the 1998 Contract, was Ovonyx, and makes clear the parties' intent that Ovonyx

52

was to have and use the intellectual property rights described in the 1998 Contract, and that in exchange, Ovonyx was to pay ECD the royalty specified in the 1998 Contract. All of this was expressly contemplated in the 1998 Contract, for the "Entity" to be formed.[133]

The 1999 License Agreement identified Ovonyx as the Entity to be formed that was referred to in the 1998 Contract. And the 1999 License Agreement recites: "WHEREAS, **pursuant to the terms and conditions of the [1998] Contract**, Ovonyx desires to acquire exclusive rights to such intellectual property rights developed by both ECD and Mr. Lowrey and that relate to devices and products in the field[.]"[134] The 1999 License Agreement grants "to Ovonyx a **royalty-bearing**, worldwide, exclusive right and license under ECD's past, present and future IP," without specifying the percentage or amount of royalty to be paid. But the 1998 Contract requires "the Entity" to be formed (which turned out to be Ovonyx) to pay a royalty of "0.5% of the Entity's subsequent revenues to ECD."[135] And the 1999 License Agreement made clear that this royalty obligation and percentage specified in the 1998 Contract continued in effect. It stated that "All terms and conditions and rights and obligations of the [1998] Contract remain in full force and effect."[136]

By signing the 1999 License Agreement with these provisions in it, Ovonyx clearly

---

[133] The 1998 Contract provided, in relevant part, that "ECD shall grant the Entity an exclusive license in the field with a right to sub-license its intellectual property if approved." 1998 Contract at MIT00002331 ¶ 14.a). The 1999 License Agreement carried out this obligation of ECD under the 1998 Contract.

[134] 1999 License Agreement at MTI000038 (bold added).

[135] *See* 1999 License Agreement at MTI00002335 ¶ 1 (bold added); 1998 Contract at MIT00002331 ¶ 11.

[136] 1999 License Agreement at MTI000039 ¶ 5.

ratified, adopted, and agreed to be bound by the terms and conditions of the 1998 Contract, at least with respect to the payment of royalties under ECD's Royalty Right.[137] Under Michigan law, "[a] corporation will be held liable for preincorporation contracts made by the promoters or incorporators if the corporation subsequently ratifies or adopts the contracts, and the promoters will not be held liable." *Medco Health Care Servs., Inc. v. Bragg*, No. 174335, 1996 WL 33364162, at *1 (Mich. Ct. App. May 28, 1996) (citing *Henderson v. Sprout Bros*., *Inc*., 440 N.W.2d 629, 634 (Mich. Ct. App. 1989)) ("[A] corporation may be liable on preincorporation contracts of promoters or incorporators if these contracts are ratified or adopted by the corporation. *Michigan Trust Co. v. Herpolsheimer*, 256 Mich. 589, 598–600, 240 N.W. 6 (1932)") and *Campbell v Rukamp*, 244 N.W. 222, 223 (1932) ("Had the proposed corporation been duly organized and the purchase contract ratified then" the promoters could not be held

---

[137] In *Tucker v. Estate of Budman*, No. 235204, 2004 WL 134021, at *3–4 (Mich. Ct. App. Jan. 27, 2004) (footnote omitted) (citation omitted), the court discussed the meaning of ratification and adoption under Michigan law:

> The term "ratification" is defined in the Restatement of the Law Second, Agency, § 82, as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." § 94. The receipt (§ 98) or retention (§ 99) of benefits, with knowledge of the facts, may constitute an affirmance. In general "the liabilities resulting from ratification are the same as those resulting from authorization." § 100.

> Michigan Law is in accord. Unauthorized acts of a person purporting to act as an agent are deemed ratified if the principal accepts the benefits of the unauthorized acts with knowledge of the material facts. Where both parties to a void lease continued to treat the lease as valid, the parties were held to have adopted the lease and the lease was enforceable according to its terms. *Michigan Trust Co v. Herpolsheimer*, 256 Mich. 589, 598; 240 NW 6 (1932).

54

personally liable on the contract.)).[138]

This conclusion is bolstered by the conduct of Ovonyx for several years after it entered into the 1999 License Agreement. Ovonyx accepted all of the benefits of that 1999 License Agreement when it used the licensing rights it acquired through that agreement to generate significant revenues for itself, and performed its obligation to ECD under Royalty Right of the 1998 Contract by paying ECD a 0.5% royalty beginning in 2000 and continuing until ECD sold

---

[138] *Medco Health* is an unpublished opinion, although the cases it cites, *Henderson* and *Campbell*, are published opinions. *In re Skymark Properties II, LLC*, 597 B.R. 363, 382 n.72 (Bankr. E.D. Mich. 2019), this Court explained that although unpublished Michigan appellate opinions are not binding precedent, they can be cited as persuasive authority:

> Under Mich. Ct. R. 7.215(C)(1) "[a]n unpublished opinion is not precedentially binding under the rule of stare decisis." However, Michigan courts may consider unpublished opinions as persuasive authority. *See, e.g., People v. Green*, 260 Mich. [Ct.] App. 710, 680 N.W.2d 477, 484 n.5 (2004)("Although unpublished opinions are not binding precedent, [Mich. Ct. R.] 7.215(C)(1), we utilize it as a guide and view it as persuasive in light of the limited case law in this area."); *Cedroni Assocs., Inc. v. Tomblinson, Harburn Assocs*., 290 Mich. [Ct.] App. 577, 802 N.W.2d 682, 709 & n.5 (2010) (Kelly, J., dissenting) (viewing a per curiam unpublished opinion of the Michigan Court of Appeals as "[m]ore persuasive and on point" than a published opinion relied on by the majority).

*McCallum v. Pixley* (*In re Pixley* ), 456 B.R. 770, 788 n. 19 (Bankr. E.D. Mich. 2011); *see also Wells v. THB America, LLC* (*In re Clements Mfg. Liquidation Co., LLC* ), 486 B.R. 400, 403 n. 8 (Bankr. E.D. Mich. 2012) (unpublished Michigan Court of Appeals decisions may be cited as persuasive authority); *Paris Meadows, LLC v. City of Kentwood*, 287 Mich.[Ct.] App. 136, 783 N.W.2d 133, 139 n. 3 (2010) (quoting *Mich. Envtl. Council & Pub. Interest Research Grp. in Mich. v. Mich. Pub. Serv. Comm'n*. (*In re Application of Ind. Mich. Power Co.*), 275 Mich. [Ct.] App. 369, 738 N.W.2d 289 (2007)) (unpublished opinions of the Michigan Court of Appeals may be "considered instructive or persuasive"); *Cox v. Hartman*, 322 Mich.[Ct.] App. 292, 911 N.W.2d 219, 228 (2017) (same).

55

its stock to Micron in 2012.  The First Amended Complaint alleges that "[a]fter 1999 and

through 2011, Ovonyx actively worked on developing new technologies and developing new

patents. . . .  During this period, Ovonyx, under Lowrey's direction was, among other things,

actively working on developing memory devices based on intellectual property owned by ECD

and licensed to Ovonyx."[139]  The First Amended Complaint also alleges that, "[f]rom June 1999

to May 2012, Ovonyx received over $58 million in revenues" and that "Ovonyx paid to ECD

approximately 0.5% of this amount[.]"[140]  Given these facts, under Michigan law, Ovonyx

ratified and adopted what Lowrey and ECD had agreed to on its behalf before its formation, and

was bound by the term of the 1998 Contract that gave ECD the Royalty Right.

For these reasons, ECD's Royalty Right from the 1998 Contract clearly is an obligation of

Ovonyx, under the 1999 License Agreement.  *Cf. Whittlesey v. Herbrand Co.*, 187 N.W. 279, 280

(Mich. 1922) (quoting *Short v. Van Dyke*, 52 N.W. 643 (Minn. 1892)).[141]  That Royalty Right is

unaffected by ECD's later rejection of the 1998 Contract, especially given that ECD *assumed* the

1999 License Agreement in its bankruptcy case.[142]

---

[139]  First Am. Compl. at 13 ¶¶ 64-65 (bold omitted).

[140]  *Id.* at 12 ¶ 62.

[141]  In *Whittlesey*, the Michigan Supreme Court held:

> "In a written contract a reference to another writing, if the reference be
> such as to show that it is made for the purpose of making such writing a
> part of the contract, is to be taken as a part of it just as though its
> contents had been repeated in the contract.  But if the reference be made
> for a particular purpose, expressed in the contract, it becomes part of it
> only for that purpose."

[142]  Ovonyx and Micron argue that the 1998 Contract cannot be assumed under § 365 by
incorporating it into the 1999 License Agreement, because "assumption must be express, and not 'by
implication.'"  *See* Defs. Ovonyx's and Micron's Br. in Supp. of Mot. to Dismiss (Docket # 40) at 18-19.

Moreover, ECD's rejection of the 1998 Contract did not affect ECD's Royalty Right in any event. As explained in the next part of this Opinion, ECD's rejection of the 1998 Contract did not terminate ECD's Royalty Right under that contract.

## C. ECD's rejection of the 1998 Contract was a breach, not a rescission or termination, of that contract. Such rejection did not terminate ECD's Royalty Right.

Having found that ECD rejected the 1998 Contract, the Court will consider what effect that rejection had on ECD's Royalty Right. It is not necessary to consider what effect the rejection had on ECD's Right of First Refusal, because, as discussed below, that right was eliminated by the 2000 Stockholders Agreement.

The parties disagree on the effect of the rejection. The Defendants argue that because ECD rejected the 1998 Contract, as a matter of law, it cannot enforce any of its rights under that contract, including the Royalty Right. The Defendants reason that rejection of an executory contract is a breach of that contract; the effect of that breach is governed by state law; and under state law, a debtor who rejects its burdensome performance obligations under an executory contract cannot avail itself of the benefits of the other party's performance under that contract.[143]

The Trust argues that even if the 1998 Contract was an executory contract that was rejected, such rejection is a breach and not a termination of that contract, and ECD can still enforce its Royalty Right.

---

But this argument misses the mark. The 1999 License Agreement was expressly assumed by ECD in its bankruptcy case. And for the reasons discussed above, it is clear that the assumed 1999 License Agreement included the contractual obligation of Ovonyx to pay ECD the royalty in the amount specified in the 1998 Contract.

[143] *Id.* at 17-18. The other Defendants incorporate by reference the arguments that Ovonyx and Micron make in their briefs.

The effect of the Debtor's rejection of the 1998 Contract is governed by the recent decision of the United States Supreme Court in *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019). In *Mission Produc*t, the Supreme Court had to decide: "What is the effect is of a debtor's (or trustee's) rejection of [an executory] contract under Section 365 of the Bankruptcy Code." *Id.* at 1661.

In *Mission Product*, the debtor corporation and a non-debtor corporation entered into a licensing agreement pre-petition, under which the debtor granted the non-debtor party "a non-exclusive license to use [the debtor's] trademarks, both in the United States and around the world." *Id.* at 1658. The debtor filed a voluntary petition for relief under Chapter 11 before the licensing agreement expired, and then rejected the licensing agreement under § 365 of the Bankruptcy Code. *Id.* The debtor took the view that rejection of an executory contract under § 365 has "the effect of a contract rescission in the non-bankruptcy world: Though also allowing a damages claim, the rejection terminates the whole agreement along with all rights it conferred." *Id.* at 1661. The non-debtor party to the contract argued that a rejection has "the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for damages, while leaving intact the rights the counterparty has received under the contract." *Id.* The Supreme Court held, in relevant part, "that both Section 365's text and fundamental principles of bankruptcy law command the . . . rejection-as-breach approach. . . . Rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach." *Id.*

The Court looked first to the text of the relevant bankruptcy court provisions to determine the effect of a debtor's rejection of an executory contract under § 365(a). The Court stated that

58

"the text of the Code's principal provisions on rejection . . . does much of the work." *Id.* The

Court explained:

> Section 365(g) describes what rejection means. Rejection
> "constitutes a breach of [an executory] contract," deemed to occur
> "immediately before the date of the filing of the petition." Or said
> more pithily for current purposes, a rejection is a breach. And
> "breach" is neither a defined nor a specialized bankruptcy term. It
> means in the Code what it means in contract law outside
> bankruptcy. *See Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 133
> L.Ed.2d 351 (1995) (Congress generally meant for the Bankruptcy
> Code to "incorporate the established meaning" of "terms that have
> accumulated settled meaning" (internal quotation marks omitted)).
> So the first place to go in divining the effects of rejection is to
> non-bankruptcy contract law, which can tell us the effects of
> breach.

*Id.* at 1661-62 (internal cross-reference omitted); *see also id.* at 1658 (citing 11 U.S.C.

§ 365(g)(1) and stating that "[a]ccording to Section 365(g), 'the rejection of an executory

contract[] constitutes a breach of such contract' . . . [which] is deemed to occur 'immediately

before the date of the filing of the [bankruptcy] petition,' rather than on the actual post-petition

rejection date.").

The Supreme Court explained further that under non-bankruptcy contract law, when one

party materially breaches a contract, the non-breaching party has a choice of either continuing to

perform under the contract, and suing for damages for the breach, or refusing to continue to

perform under the contract. *See id.* at 1662. (citing 13 R. Lord, Williston on Contracts § 39:32,

pp. 701–702 (4th ed. 2013)). The choice of which course to take is in the hands of the non-

breaching party. The non-breaching party may continue the contract or terminate it. The

breaching party "has no ability, based on its own breach, to terminate the agreement." *Id.*

The Court provided the following example to illustrate the effect of rejection of a contract

in a non-bankruptcy setting:

> Consider a made-up executory contract to see how the law of breach works outside bankruptcy. A dealer leases a photocopier to a law firm, while agreeing to service it every month; in exchange, the firm commits to pay a monthly fee. During the lease term, the dealer decides to stop servicing the machine, thus breaching the agreement in a material way. The law firm now has a choice (assuming no special contract term or state law). The firm can keep up its side of the bargain, continuing to pay for use of the copier, while suing the dealer for damages from the service breach. Or the firm can call the whole deal off, halting its own payments and returning the copier, while suing for any damages incurred. See 13 R. Lord, Williston on Contracts § 39:32, pp. 701–702 (4th ed. 2013) ("[W]hen a contract is breached in the course of performance, the injured party may elect to continue the contract or refuse to perform further"). But to repeat: The choice to terminate the agreement and send back the copier is for the *law firm*. By contrast, the *dealer* has no ability, based on its own breach, to terminate the agreement. Or otherwise said, the dealer cannot get back the copier just by refusing to show up for a service appointment. The contract gave the law firm continuing rights in the copier, which the dealer cannot unilaterally revoke.

*Id.* at 1662 (italics in original).

After discussing non-bankruptcy breach of contract law, the Court applied its principles to rejection of executory contracts in bankruptcy: "A rejection does not terminate the contract. When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive." *Id.* Based on the "rejection-as-breach approach," the Court held "that under Section 365, a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy. Such an act cannot rescind rights that the contract previously granted." *Id.* at 1666. Construing § 365 in this manner, the Court held that the debtor-licensor's rejection of the license agreement could not revoke the trademark

60

license or the non-debtor licensee's right to continue to use that trademark. *Id.*

The holding in *Mission Product* compels the conclusions that ECD's rejection of the 1998 Contract was a breach of that contract, and that the Court must determine the effect of such breach by applying non-bankruptcy contract law. In this case, Michigan contract law is the applicable non-bankruptcy law, because the 1998 Contract states that it is to be interpreted, construed, and enforced under Michigan law.

In *Schnepf v. Thomas L. McNamara, Inc.*, 93 N.W.2d 230, 232 (Mich. 1958), the Michigan Supreme Court explained:

> Where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has a genuine election either of continuing performance or of ceasing to perform. **Any act indicating an intent to continue** will operate as a conclusive election, *not indeed of depriving him of a right of action for the breach which has already taken place*, but depriving him of any excuse for ceasing performance on his own part. Anything which draws on the other party to execute the agreement after the default in respect of time or which shows that it is deemed a subsisting agreement after such default will amount to a waiver. (Italics ours.) 12 Am.Jur. p. 968, § 390. *Sinclair Refining Co. v. Costin*, Tex.Civ.App., 116 S.W.2d 894, 898.

*Id*. (bold added); *see also Blazer Foods, Inc. v. Rest. Properties, Inc.*, 673 N.W.2d 805, 812 n.7 (Mich. Ct. App. 2003) (citing *Schnepf v. Thomas L. McNamara, Inc.*, 93 N.W.2d 230, 232 (Mich. 1958); *Arnone v. Chrysler Corp.*, 6 Mich. App. 224, 228, 148 N.W.2d 902 (1967), and 2 Restatement Contracts, 2d (1981), § 236, comment b, p 214) ("When one party to a contract materially breaches the contract by failing to perform duties under it, the other party can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach.")).

61

Although ECD materially breached the 1998 Contract by rejecting it in its bankruptcy case, ECD did not indicate its intention to repudiate the 1998 Contract, especially given the fact that ECD *assumed* the 1999 License Agreement, and the 1999 License Agreement stated that "[a]ll terms and conditions and rights and obligations of the [1998] Contract remain in full force and effect." In any event, under *Mission Product*, and *Schnepf*, whether the 1998 Contract survived ECD's rejection of it depended on whether Lowrey (who was the only other party to the 1998 Contract) chose to terminate that contract or to continue performing under it. After ECD rejected the 1998 Contract under § 365, under Michigan law, Lowrey, the non-breaching party to that contract, had two choices: (1) he could either consider the contract terminated, refuse to perform his obligations under it, and sue ECD for damages for total breach, without himself being liable for any damages resulting from his nonperformance,[144] or (2) continue to perform his obligations and receive benefits under the 1998 Contract, and sue for damages for a partial breach. If Lowrey chose the latter course, he could not later decide to terminate the 1998 Contract.

Lowrey chose to continue performing and receiving benefits under the 1998 Contract well after the effective date of ECD's rejection of the 1998 Contract (August 28, 2012). Lowrey remained in his position as President and Chief Executive Officer of the "Entity" (Ovonyx) whose formation was contemplated by the 1998 Contract, performing all of the duties

---

[144] Had Lowery elected this course of action — termination and cessation of performance — he might have relied on the general rule that under Michigan law, "[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 639 (6th Cir. 2018) (citation omitted). But *Schnepf* and the other cases cited above take this case out of this general rule, given Lowery's continued performance after ECD's rejection of the 1998 Contract.

contemplated by the 1998 Contract, until July 31, 2015.[145]  Similarly, Ovonyx continued

operating in the same manner as prior to rejection, in pursuit of the activities that the 1998

Contract contemplated it would have in the event it was formed.  This included Ovonyx's use of

ECD's and Lowrey's intellectual property that had been assigned to Ovonyx.  Therefore, ECD's

Royalty Right survived ECD's rejection of the 1998 Contract in its bankruptcy case.

**D.  The First Amended Complaint's first cause of action, against Lowrey and Ovonyx for breach of contract**

In the first cause of action in its First Amended Complaint, the Trust alleges that Lowrey

and Ovonyx breached ECD's Royalty Right and First Refusal Right, under the 1998 Contract and

the 1999 License Agreement.  The Court next will consider Lowrey's and Ovonyx's arguments

for dismissal of these claims.

**1.  Lowrey's alleged breach of ECD's First Refusal Right under the 1998 Contract**

The Trust alleges in the first cause of action that Lowrey breached ECD's First Refusal

Right under the 1998 Contract, by not providing notice to ECD of the July 2015 Transactions so

that ECD could exercise its First Refusal Right.[146]  Lowrey admits that he and ECD owed each

other a First Refusal Right under the 1998 Contract, but he argues that such right no longer

existed at the time of the July 2015 Transactions, because:

- The Trust rejected the 1998 Contract in the Plan.

- By its plain language the 2000 Stockholders Agreement superseded the First Refusal Right in the 1998 Contract and provides no First Refusal Right to the Trust.

---

[145]  *See* First Am. Compl. at 3 ¶ 7.

[146]  *See id.* at 24  ¶ 129.

- Even if the 2000 Stockholders Agreement did provide the Trust with such a right, the Trust sold its rights in that agreement to Micron in 2012, thereby transferring any First Refusal Right to Micron.

- Because the Trust was no longer a shareholder in Ovonyx, it gave up any pro rata interest in any First Refusal Right outlined in Section 4 of the 2000 Stockholders Agreement.

- The 2015 Merger falls squarely in the definition of a Sale Event in the 2000 Stockholders Agreement. Thus, Sections 6 and 7 of the 2000 Stockholders Agreement apply with respect to First Refusal Rights and therefore, only Intel, and not the Trust or any other party, is given a First Refusal Right.

- ECD's confirmed Plan barred the Trust from exercising any First Refusal Right, even if it had one. Under the Plan, the function of the Trust is to liquidate assets, not acquire stock in other companies or to operate them.[147]

The Court agrees with Lowrey that ECD's First Refusal Right did not survive the 2000 Stockholders Agreement.

### a. The 2000 Stockholders Agreement superceded the 1998 Contract with respect to the First Refusal Right.

The Court finds and concludes, based on paragraph 9.10 of the 2000 Stockholders Agreement, that the 2000 Stockholders Agreement superceded the 1998 Contract with respect to ECD's First Refusal Right. Because certain provisions of the 2000 Stockholders Agreement conflicted with, and were inconsistent with, ECD's First Refusal Right under the 1998 Contract, such right was extinguished by the 2000 Stockholders Agreement.

Paragraph 9.10 of the 2000 Stockholders Agreement states, in relevant part: "The provisions in this [2000 Stockholders] Agreement . . . will be deemed to supersede any conflicting or inconsistent provisions contained in the [1998 Contract] between Lowrey and [ECD] dated as of December 17, 1998, including the Ovonyx-ECD Commercialization

---

[147] Def. Tyler Lowrey's Br. in Supp. of Mot. to Dismiss First Am. Compl. (Docket # 50) at 11.

64

Acknowledgment thereunder (collectively, the '[1998 Contract]'). . . ."[148] ECD's First Refusal

Right granted in paragraph 11 of the 1998 Contract clearly conflicts with, and is inconsistent

with, many of the provisions of the 2000 Stockholders Agreement, including provisions in

sections 4 ("Restrictions on Transfer of Stockholder Shares"), 6 ("Intel Right of First Offer"),

and 7 (Obligations in Connection With Approved Sale").

       Paragraph 11 of the 1998 Contract provides that ECD and Lowrey are granting to each

other "a right of first refusal on the other's sales of stock in [Ovonyx], intellectual property in the

field, and any stock or asset sales by [Ovonyx], a right exercisable only within thirty days of

notice and promptly executed on the same basis as the proposed purchaser."[149] This provision

required Lowrey (1) to give **ECD** 30 days notice of his sale of any of his stock in Ovonyx, and

(2) to give **ECD** the **first** right to purchase that stock on the same terms on which the proposed

purchaser has agreed to purchase the stock. It also required Lowrey (1) to give **ECD** 30 days

notice of any stock or asset sale by Ovonyx, and (2) to give **ECD** the first right to purchase the

stock or assets for sale by Ovonyx on the same terms on which the proposed purchaser has

agreed to purchase those stock shares or assets.

       By contrast, Section 4.1 of the 2000 Stockholders Agreement ("Transfer of Stockholder

Shares") prohibits Lowrey from selling, transferring, assigning, pledging, or otherwise disposing

of any shares of his stock *except as provided by Section 4 of that agreement.*[150] Section 4.3 of the

---

    [148] 2000 Stockholders Agreement at MTI00000138 (italics added). This provision is quoted in full in Part II.C of this Opinion.

    [149] 1998 Contract at MTI000034 ¶ 11.

    [150] *See* 2000 Stockholders Agreement at MTI00000127. Section 4 of the 2000 Stockholders Agreement is quoted in full in Part II.C of this Opinion.

2000 Stockholders Agreement ("First Offer Right") requires Lowrey (1) to give **Ovonyx** and the **other Stockholders** 30 days written notice of his intent to transfer his stock in Ovonyx (if such stock transfer is not a "Permitted Transfer" under Section 4.5 of that agreement), and (2) to give **Ovonyx** the **first** right to purchase any stock of Ovonyx that he is selling on the same terms as his proposed sale to another purchaser. This provision conflicts with the First Refusal Right in the 1998 Contract, in two material ways.

First, the notice requirement in this provision is materially different. Besides requiring Lowrey to provide notice to **Ovonyx** of any sale of his Ovonyx stock, which the 1998 Contract did not require, the only other parties to whom Lowrey was required to provide notice were the "**Other Stockholders**" of Ovonyx. ECD's right to notice of Lowrey's sale of his stock of Ovonyx was therefore dependent on ECD being a Stockholder of Ovonyx, at the time. There was no such limitation on ECD's right to notice in the 1998 Contract. At the time of the July 2015 Transactions, ECD was not a Stockholder of Ovonyx, having sold all of its shares in Ovonyx to Micron three years earlier, in August 2012. Therefore, unlike under paragraph 11 of the 1998 Contract, which required notice to ECD of any stock sale by Lowrey, under Section 4.3 of the Stockholders Agreement, Lowrey was not required to provide ECD with notice of any sale of his stock in Ovonyx after ECD sold its stock to Micron.

Second, the entity to whom Lowrey was required to offer the **first** right to purchase his stock was different. Under the 2000 Stockholders Agreement, that entity was **Ovonyx**, while under the 1998 Contract, that entity was **ECD**. Therefore, Ovonyx's First Offer Right under Section 4.3 of the 2000 Stockholders Agreement clearly conflicts with ECD's First Refusal Right under paragraph 11 of the 1998 Contract. If Lowrey complied with his duty under the 2000

66

Stockholders Agreement to offer only Ovonyx the first right to purchase any of his Ovonyx stock he was selling, he would have been in breach of his duty under the 1998 Contract to offer only ECD that right. Given this conflict alone, Section 4.3 of the Stockholders Agreement supercedes paragraph 11 of the 1998 Contract, eliminating ECD's First Refusal Right under the 1998 Contract, based on Paragraph 9.10 of the 2000 Stockholders Agreement.

In addition to Section 4.1, other sections of the 2000 Stockholders Agreement conflict with ECD's First Refusal Right under paragraph 11 of the 1998 Contract. Section 4.5 ("Permitted Transfers") of the 2000 Stockholders Agreement is one such section. It permits Lowrey to sell his Ovonyx stock "pursuant to a Public Sale" and "to or among members of . . . [his] Family Group," as those terms are defined in the 2000 Stockholder Agreement, without the restrictions imposed by Sections 4.1 through 4.4 of the 2000 Stockholders Agreement, including the prohibition of the transfer of any Ovonyx stock without providing a 30-day notice to Ovonyx and other Shareholders, and without providing Ovonyx with the First Offer Right.[151] This additional transfer right that the 2000 Stockholders Agreement grants to Lowrey, based on his status as one of the Shareholders of Ovonyx stock, conflicts with paragraph 11 of the 1998 Contract, which provides no such unfettered transfer right to Lowrey. By contrast, paragraph 11 of the 1998 Contract requires Lowrey to provide ECD with the First Refusal Right on the sale of any of his Ovonyx stock, even if the proposed sale is a "Public Sale" or a sale to a member of

---

[151] "'Family Group' means a Stockholder's spouse and descendants (whether natural or adopted) and any trust solely for the benefit of the Stockholder and/or the Stockholder's spouse and/or descendants." 2000 Stockholders Agreement at MTI00000121.

"'Public Sale' means any sale of Stockholder Shares to the public pursuant to an offering registered under the Securities Act or to the public pursuant to the provisions of Rule 144 under the Securities Act (or any similar provision then in force)." *Id.* at MTI00000122.

Lowrey's "Family Group."

Section 6 of the 2000 Stockholders Agreement is another section that conflicts with the 1998 Contract.[152]  That section, in relevant part, provides **Intel**, and only Intel, with a right to notice of any "Sale Event" and a "**Right of First Offer**" if a "Sale Event" occurs.[153]  Under this provision, a "Sale Event" is defined in great detail, and includes (1) any Stockholder's sale of its shares of Ovonyx's capital stock which resulted in "any Person or group of affiliated Persons (other than the owners of Common Stock as of the date of the Purchase Agreement or any of their Affiliates) owning capital stock of [Ovonyx] possessing the voting power . . . to elect a majority of [Ovonyx's] board of directors," (2) "any sale or transfer of more than 50% of the assets of [Ovonyx] and it subsidiaries on a consolidated basis," and (3) "any merger or consolidation to which [Ovonyx] is a party," with certain exceptions.[154]

By contrast, paragraph 11 of the 1998 Contract requires notice to **ECD**, and only ECD, of any sale by Lowrey of his stock in Ovonyx, "intellectual property in the field, and of any stock or asset sales by [Ovonyx]."  It also mandates that ECD be given the **First Refusal Right**.  There is no way for Lowrey to have complied with the notice and offer requirements of the 2000 Stockholders Agreement, if a Sale Event occurs, without breaching ECD's First Refusal Right in the 1998 Contract.  Because the Right of First Offer in the 2000 Stockholders Agreement conflicts with the First Refusal Right in the 1998 Contract, ECD's First Refusal Right was extinguished based on Section 9.10 of the 2000 Stockholders Agreement.

---

[152]  Section 6 is quoted in full in Part II.C of this Opinion.

[153]  The definition of "Sale Event" in the 2000 Stockholders Agreement is quoted in full in Part II.C of this Opinion.

[154]  2000 Stockholders Agreement at MTI00000122.

68

Section 7 of the 2000 Stockholders Agreement also conflicts with Lowrey's obligations under paragraph 11 of the 1998 Contract. Section 7.1 of the 2000 Stockholders Agreement requires Lowrey to "consent to and raise no objections against [any] Approved Sale, and if the Approved Sale is structured as a sale of stock," this provision requires Lowrey to "agree to sell [his] Stockholder Shares on the terms and conditions approved by the Board and the holders of a majority of the Stockholder Shares then outstanding."[155] Because complying with his obligations under Section 7 of the 2000 Stockholders Agreement would put Lowrey in breach of his obligations under ECD's First Refusal Right in the 1998 Contract, the 2000 Stockholders Agreement supercedes the 1998 Contract with regard to that right.

**b. All of ECD's actions and representations in the bankruptcy case further evidence ECD's intent and understanding that only the 2000 Stockholders Agreement govern the rights of the parties regarding the sale or transfer of stock and assets of Ovonyx.**

ECD's actions and representations in its bankruptcy case further evidence ECD's intent and understanding that only the 2000 Stockholders Agreement govern the rights of the parties to that contract, regarding the sale and transfer of stock and assets of Ovonyx. ECD's actions and representations in the bankruptcy case include the following:

• ECD assumed both the 1999 License Agreement, which did not mention the First Refusal Right, and the 2000 Stockholders Agreement with its stated purposes of "limiting the manner and terms by which [Ovonyx's] stock may be transferred," and it rejected the 1998 Contract — the only contract that expressly contained the First Refusal Right.

• In paragraph 9 of the Sale and Assignment Motion, in which ECD sought an order approving the sale of its Ovonyx stock and the assignment of the 2000 Stockholders Agreement to Micron, ECD stated, in relevant part, that "**[t]he [2000] Stockholders Agreement governs** certain rights of [ECD], Ovonyx and certain other shareholders

---

[155] *Id*. at MTI00000132.

69

of Ovonyx with respect to corporate governance and **other matters of Ovonyx and its respective shareholders**," but ECD did not mention the 1998 Contract or any rights under that contract in this paragraph or in any other provision of the Sale and Assignment Motion.[156]

- In paragraph 14 of the Sale and Assignment Motion, ECD stated that "[t]he Equity Purchase Agreement is **subject to the [F]irst [O]ffer [R]ight contained in the [2000] Stockholders Agreement**, **but free and clear of certain participation rights of other stockholders of Ovonyx, Inc. to participate by selling their shares on the same terms as the Equity Purchase Agreement in lieu of the Debtor's shares."**[157] In that motion, ECD did not mention the 1998 Contract, much less state that the Equity Purchase Agreement was subject to any rights, including the First Refusal Right, in the 1998 Contract. And under the 2000 Stockholders Agreement, anyone who was not a shareholder of Ovonyx had no participation or other rights regarding the transfer of Ovonyx stock or assets.

- In paragraph 19 of the Sale and Assignment Motion, ECD represented that it was "not aware of any parties holding liens, claims, interests [or] encumbrances in [its Ovonyx stock and the 2000 Stockholders Agreement]."[158] This was an implicit but clear representation by ECD that the First Refusal Right contained in Paragraph 11 of the 1998 Contract, which was mutual in that it ran in favor of both ECD and Lowrey, was no longer in effect. The only apparent explanation for that, in turn, was that such First Refusal Right had been superceded and eliminated by the 2000 Stockholders Agreement.

- In Paragraph 2.1 of the "Equity Purchase Agreement" with Micron, ECD agreed to "sell, transfer, assign, convey and deliver to [Micron], all of ECD's right, title and interest in, to and under [all of its shares of Ovonyx stock] **and the [2000] Stockholders Agreement**, **free and clear of all Claims, Interests and Encumbrances (except to the extent that the express terms of the [2000] Stockholders Agreement themselves constitute Encumbrances)."**[159] "Encumbrances" was defined broadly in the Equity Purchase Agreement and included, among many other encumbrances,

---

[156] *See* Sale and Assignment Mot. (Docket # 1085 in Case No. 12-43166) at pdf. p. 5 (bold added).

[157] *Id.* at pdf. p. 5 (bold added).

[158] *Id*. at pdf. p. 7.

[159] Equity Purchase Agreement (Docket # 1085 in Case No. 12-43166) at pdf. p. 46 ¶ 2.1 ("Purchase and Sale") (bold added).

70

contractual commitments, **rights of first refusal**,
. . . rights limited to ECD, . . . transfer restrictions
under any shareholder or similar agreements or any
other agreements, arrangements, contracts,
commitments, understandings, obligations or
interests of any kind or nature whether known or
unknown, legal or equitable, matured or unmatured,
contingent or noncontingent, liquidated or
unliquidated, asserted or unasserted, whether arising
prior to or subsequent to the commencement of the
Bankruptcy Case, whether imposed by agreement,
understanding, Law, equity or otherwise, including,
but not limited to . . . **rights of first refusal**. . . .[160]

This provision clearly expresses the intent of the parties that their rights be
governed only by the 2000 Stockholders Agreement and that any first refusal
rights in any other contract, commitment, or understanding be extinguished.
Based on this language and the following other language in the Equity Purchase
Agreement, the First Refusal Right under the 1998 Contract, to the extent it
restricted Lowrey's right to transfer his Ovonyx stock or ECD's right to transfer
its Ovonyx stock, was clearly terminated once the Equity Purchase Agreement
was approved by the Court, if that First Refusal Right had not already been
superceded by the 2000 Stockholders Agreement. The Equity Purchase
Agreement expressly stated that it was free and clear of any rights of first refusal,
which would include the Right of First Refusal under the 1998 Contract (if it was
still in effect).

• Paragraph 4.5(a) of the Equity Purchase Agreement provided that the sale of Ovonyx
stock and the assignment of the 2000 Stockholders Agreement was

**free and clear of all Claims, Interests and
Encumbrances (except to the extent that the
express terms of the [2000] Stockholders
Agreement themselves constitute
Encumbrances**), and, subject to entry of the
Bankruptcy Sale Order, upon the Closing [Micron]
will be vested with all right, title and interest of
ECD, at and as of the Closing, in, to and under the
[shares of Ovonyx stock] and [2000] Stockholders
Agreement free and **clear of all** Claims, Interests
and **Encumbrances (except to the extent that the**

---

[160] *Id.* at pdf. p. 43 (underlining in original) (bold added).

> **express terms of the [2000] Stockholders
> Agreement themselves constitute
> Encumbrances.)"**[161]

- Paragraph 4.5(b) of the Equity Purchase Agreement stated that ECD's shares of Ovonyx stock

> **are not subject to any agreement**, contract,
> commitment or understanding, including any
> agreement, contract, commitment or understanding
> **restricting, or otherwise relating to the** voting,
> dividend rights or **transfer of [shares of Ovonyx
> stock] other than this Agreement [(the Equity
> Purchase Agreement)] and the [2000]
> Stockholders Agreement.**[162]

This representation by ECD would have been false if the First Refusal Right in the 1998 Contract had not been superceded by the 2000 Stockholders Agreement, because the First Refusal Right restricted ECD's sale of its Ovonyx stock. It required ECD to provide Lowrey with notice of the sale and to give Lowrey the Right of First Refusal for the stock.

- Paragraph 6.1(iv) of the Equity Purchase Agreement stated:

> Notwithstanding anything in this Agreement to the
> contrary, (A) ECD shall deliver to Ovonyx and the
> Other Stockholders (**as defined in the [2000]
> Stockholders Agreement**) a notice of the
> transactions contemplated by this Agreement in the
> form attached hereto as <u>Exhibit D</u> (the "<u>Offer
> Notice</u>") **in accordance with Sections 4.3 and 9.8
> of the [2000] Stockholders Agreement** within two
> Business Days following the Execution Date and
> (B) such delivery by ECD of the Offer Notice shall
> not constitute a breach of this <u>Section 6.1(c)</u> or any
> other provision of this Agreement or give rise to any
> right of [Micron] to terminate this Agreement under
> <u>Article 11</u>. ECD shall promptly (but in any event
> within one Business Day) notify [Micron] if it

---

[161] *Id*. at pdf. p. 48 ¶ 4.5(a) ("<u>General</u>").

[162] *Id*. at pdf. p. 48 ¶ 4.5(b) ("<u>Ovonyx Shares</u>") (bold added).

receives from Ovonyx or any Other Stockholder (**as defined in the [2000] Stockholders Agreement**) any written notice purporting to exercise rights to purchase any of the Ovonyx Shares **as contemplated by Section 4.3 of the [2000] Stockholders Agreement** and deliver to [Micron] a copy of such written notice. On the Execution Date, ECD shall send the Offer Notice by reputable express courier service **to Ovonyx** and **Other Stockholders (as defined in the [2000] Stockholders Agreement) in accordance with section 9.8 of the [2000] Stockholder Agreement**.[163]

This provision showed that ECD was complying with the notice requirement in the 2000 Stockholders Agreement rather than the notice requirements in the 1998 Contract. As discussed above, the notice requirements of the two contracts were materially different, and inconsistent with each other.

- On August 22, 2019, the Court entered an order granting the Sale and Assignment Motion (the "Sale and Assignment Order"), thereby approving ECD's sale of its Ovonyx stock, and the assumption and assignment of the 2000 Stockholders Agreement, to Micron.[164] The Order, in relevant part, incorporated all of the terms of the Equity Purchase Agreement,[165] and stated, in relevant part, (1) that ECD was representing that the sale was free and clear of all "Interests" as defined in the Sale and Assignment Order (which included "rights of first refusal," and "transfer restrictions under any shareholder or similar agreements" ),[166] and "subject only to the

---

[163] *Id*. at pdf. p. 53 ¶ 6.1(iv) ("Pre-Closing Covenants of ECD") (bold added).

[164] *See* Order (A) Granting Debtor Energy Conversion Devices, Inc[.]'s Motion to Sell Certain Equity Interests in Ovonyx, Inc. Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Authorizing the Assumption and Assignment of [2000] Stockholders Agreement In Connection Therewith and (C) Granting Certain Related Relief (Docket # 1194 in Case No. 12-43166).

[165] *See id*. at pdf. p. 5 ¶ 3 (underlining in original) ("3. The Equity Purchase Agreement, attached to the Motion as Exhibit 6-A, and all of the terms and conditions thereof, together with all other related documents and instruments, are approved and incorporated herein in their entirety.").

[166] The term "Interests" was defined broadly in the Sale and Assignment Motion as

liens, security interests, collateral assignments, encumbrances, claims (as defined in section 101(5) of the Bankruptcy Code), obligations,

73

[F]irst [O]ffer [R]ight set forth in section 4.3 of the [Equity Purchase Agreement],"[167] and (2) that Micron relied on, and would not have entered into the Equity Purchase Agreement but for ECD's representation that the sale was free and clear of Interests,[168] and (3) that the Sale and Assignment Order (a) shall be effective as a determination that, on the Closing, all Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated."[169] ECD has never moved the Court to amend, modify, or set aside the Sale and Assignment Order.

---

liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, **rights of first refusal**, rights of setoff or recoupment, third party rights, rights limited to the Debtor, other agreement terms tending to limit any rights or privileges of the Debtor under any contracts, conditional sale contracts, title retention contracts, mortgages, leases, deeds of trust, hypothecations, indentures, security agreements, easements, licenses, servitudes, proxies, voting trusts, **transfer restrictions under any shareholder or similar agreements** or any other agreements, arrangements, contracts, commitments, understandings, obligations or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this chapter 11 case, whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to: (a) those Interests that purport to give any party a right or option to effect a setoff against or any forfeiture, modification or termination of Debtor's interests in the Purchased Assets, or any similar rights if any; (b) those Interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any; and (c) those Interests arising in connection with any agreements, the transactions contemplated under the Equity Purchase Agreement, acts, or failures to act, of the Debtor or any of the Debtor's predecessors, affiliates, or representatives, including, but not limited to, Interests arising under any doctrines of successor liability or similar theories under applicable state or federal law or otherwise[.]

Sale and Assignment Order (Docket # 1194 in Case No. 12-43166) at pdf. pp. 6-7 ¶ 7; *see also id.* at pdf pp. 8 ¶ 11, 9 ¶ 12, 11 ¶ 20.

[167] *Id.* at pdf. p. 6 ¶ 7.

[168] *Id.* at pdf. p. 10 ¶ 15.

[169] *Id.* at 11 ¶ 20.

The language in the Equity Purchase Agreement, and the Sale and Assignment Motion, confirms that ECD believed and intended that only the 2000 Stockholders Agreement controlled the rights and obligations of the parties, with respect to any rights of first refusal or transfer restrictions.

For the above reasons, the Court concludes that ECD's First Refusal Right in the 1998 Contract was extinguished by the 2000 Stockholders Agreement. To the extent Count I of the First Amended Complaint for breach of contract against Lowrey is based on Lowrey's alleged breach of ECD's First Refusal Right, such count must be dismissed.

### c. Paragraph 23(g) of the 1998 Contract does not save the First Refusal Right from being superceded by the 2000 Stockholders Agreement.

The Court's conclusion that the 2000 Stockholders Agreement superceded the First Refusal Right in the 1998 Contract is consistent with ¶ 23(g) in the 1998 Contract, to the extent that ¶ 23(g) applies. That paragraph provides that the First Refusal Right continues regardless of any future event, "unless approved otherwise."[170] The parties' approval of the terms of the 2000 Stockholders Agreement, which were inconsistent with the First Refusal Right in the 1998 Contract, extinguished the First Refusal Right and satisfied the ¶ 23(g) condition for the First Refusal Right not to continue — namely, that it be "approved otherwise."

### d. ECD's First Refusal Right did not spring back to life because of any events that occurred after ECD entered the 2000 Stockholders Agreement.

The Trust argues that even if the 2000 Stockholders Agreement superseded and terminated ECD's Refusal Right, as the Court has now ruled, two events that occurred after 2000

---

[170] 1998 Contract at MTI000036 ¶ 23(g).

each had the effect of reviving ECD's First Refusal Right.

The first such event is ECD's assumption of the 2000 Stockholders Agreement and assignment of that agreement to Micron, as part of ECD's 2012 sale of its Ovonyx stock to Micron. The Trust argues that:

> [O]nce ECD's estate assumed and assigned the 2000 [Stockholders] Agreement to Micron, Micron bore all of the obligations of that document, not ECD's estate. To the extent that the 2000 [Stockholders] Agreement purportedly burdened ECD's rights under the 1998 [Contract] (or the 1999 [License] Agreement), ECD's estate was relieved of that burden when Micron took assignment of the 2000 [Stockholders] Agreement but did not take the 1998 [Contract].[171]

This is so, according to the Trust, because:

> [p]ursuant to Bankruptcy Code section 365(k), a debtor's estate is relieved of all ongoing obligations upon the assumption and assignment of an executory contract. As the court explained in *Concerto Software, Inc. v. Vitaquest Intern., Inc.*, 290 B.R. 448 (D. Me. 2003), "the case law provides that an assumption and assignment of an executory contract under section 365 substitutes the assignee for the debtor." *Id.* at 454; *see also Wainer v. A.J. Equities,Ltd*, 984 F.2d 679, 683, 684 (5th Cir. 1993).[172]

This argument by the Trust is without merit. First, the argument confuses liabilities with rights. In assigning the 2000 Stockholders Agreement to Micron, as part of ECD's 2012 sale of its Ovonyx stock to Micron, ECD relieved itself of any liability for breach of the 2000 Stockholders Agreement occurring after the assignment. That is what Bankruptcy Code § 365(k) means in this context. It says:

> Assignment by the trustee to an entity of a contract or lease

---

[171] Trustee's Omnibus Objection (Docket # 69) at 30-31.

[172] *Id.* at 30.

76

assumed under this section relieves the trustee and the estate from
any liability for any breach of such contract or lease occurring after
such assignment.

11 U.S.C. § 365(k). This simply means, at most, that ECD and its bankruptcy estate would not

be liable for any breach of the 2000 Stockholders Agreement by anyone that occurred after ECD

assigned that agreement to Micron. Of course, ECD sold all of its stock to Micron at the same

time it assigned the 2000 Stockholders Agreement to Micron. After ECD no longer owned any

Ovonyx stock, it would not have been possible, in any event, for ECD to have breached any of

the provisions of the 2000 Stockholders Agreement requiring the giving of notice or first

refusal/first offer rights to any other party before ECD sold any Ovonyx stock.

Whatever may have been the practical and legal effect that this assignment had on

relieving ECD of potential *liability* under the 2000 Stockholders Agreement, that assignment did

nothing to create any new *rights* for ECD, or to revive any of ECD's *rights* that had previously

terminated, such as ECD's First Refusal Right. And the Trust cites no authority suggesting

otherwise.

 ECD's First Refusal Right was a *right*, which was superseded and thereby extinquished

when ECD entered into the 2000 Stockholders Agreement with Ovonyx, Lowery, Intel, and

Ward Parkinson. That agreement gave the shareholders of Ovonyx detailed notice and first offer

rights with respect to a sale of Ovonyx stock by any of the shareholders and with respect to

certain sales of Ovonyx assets. As discussed above, these rights were wholly inconsistent with

ECD's First Refusal Right under the 1998 Contract and the 1999 License Agreement, and

therefore the 2000 Stockholders Agreement expressly superseded ECD's First Refusal Right.

Nor was the 2000 Stockholders Agreement merely a "burden" on ECD's First Refusal

77

Right, as the Trust tries to characterize it. Rather, the 2000 Stockholders Agreement superceded, and thereby *terminated*, ECD's First Refusal Right. *See Salvage I Enters., Inc. v. Dayton Hudson Corp.*, 870 F.2d 657 (6th Cir. 1989) (unpublished) (quoting, with approval, the district court's holding that under Michigan law, when one agreement supercedes an earlier agreement, "'the effect is to supersede and rescind the earlier contract, leaving the later agreement as the only agreement of the parties on the subject.'" (quoting *Joseph v. Rottschafer*, 227 N.W. 784, 786 (Mich. 1929)).

The Trust cites no logic or authority supporting its view that its First Refusal Right somehow was revived in 2012, when ECD assumed the 2000 Stockholders Agreement and assigned it to Micron. The Court rejects the Trust's argument.

The second event that occurred, which the Trust says somehow revived its First Refusal Right, is that, according to the Trust, "as part of the July 2015 Transactions, the 2000 [Stockholders] Agreement was terminated."[173] From this, the Trust argues: "Thus, even if that agreement did supersede the 1998 [Contract's] First Refusal Rights, the 2000 [Stockholders] Agreement's termination necessarily restores the First Refusal Rights because there no longer would be any inconsistencies or conflicts."[174]

This argument too is without merit. First, the Trust cites no legal authority in support of this argument. Second, the Trust does not actually allege in its First Amended Complaint that the

---

[173] Trustee's Omnibus Objection (Docket # 69) at 31 n.17.

[174] *Id.; see also id.* at 13 (where the Trust states: "Though no Defendant discloses it, all parties to the 2000 [Stockholders] Agreement agreed by July 10, 2015 to terminate the 2000 [Stockholders] Agreement in connection with the Merger Agreement and in anticipation of the Merger. Termination of the 2000 [Stockholders] Agreement terminated any first refusal rights under that agreement. 2000 [Stockholders] Agreement § 2.6.") The Court notes that § 2.6 of the 2000 Stockholders Agreement says no such thing. (*See* 2000 Stockholders Agreement at MTI00000126, § 2.6).

2000 Stockholders Agreement was terminated, or when precisely that termination occurred. Rather, this is asserted in the Trust's brief, and then only in the vague terms quoted above.

Third, it is the "July 2015 Transactions" which the Trust asserts violated its First Refusal Right. Under this argument by the Trust, the revival of ECD's First Refusal Right did not occur until the "July 2015 Transactions" allegedly terminated the 2000 Stockholders Agreement. But ECD's allegedly revived First Refusal Right could not have been violated by the very "July 2015 Transactions" that somehow revived that First Refusal Right. This argument by the Trust puts the proverbial cart before the horse.

Fourth and finally, and as discussed above, when ECD's First Refusal Right was superceded and thereby terminated, upon ECD's entry into the 2000 Stockholders Agreement, that was a permanent extinguishment of that First Refusal Right, by agreement of the parties, including ECD. ECD's First Refusal Right was not placed in some sort of suspended animation in 2000; it was terminated in 2000.

## 2. Ovonyx's alleged breach of ECD's First Refusal Right under the 1999 License Agreement

The Trust alleges, in the first cause of action in the First Amended Complaint, that Ovonyx breached ECD's First Refusal Right under the 1999 License Agreement, by failing to "provide notice to ECD [of the July 2015 Transactions] so that ECD could exercise the First Refusal Right."[175] Because the Court has found that the First Refusal Right was extinguished by the 2000 Stockholders Agreement, Ovonyx could not have breached that right in July 2015 — such a right no longer existed.

---

[175] First Am. Compl. at 24 ¶ 130.

But even if the First Refusal Right had still existed in July 2015, it would not have imposed any obligation on *Ovonyx* to honor ECD's First Refusal Right, under the plain meaning of the language used in the 1998 Contract, which allegedly was incorporated into the 1999 License Agreement. The First Refusal Right in the 1998 Contract only imposed obligations on ECD and Lowrey. The 1998 Contract stated, in relevant part that "both Mr. Lowrey and ECD grants the other a right of first refusal. . . ."[176] At the time the 1998 Contract was signed, Ovonyx had not yet been formed, and Ovonyx was not a signatory to that contract. In addition, there is no provision in the 1998 Contract that expresses an intent that the "Entity" to be formed have any duty to honor the First Refusal Right, although there are many other provisions in the 1998 Contract that do express an intent to bind that "Entity" to other obligations.[177]

Because ECD's First Refusal Right was superceded by the 2000 Stockholders Agreement, and because there is no basis in the language of the 1998 Contract (or the 1999 License Agreement) for finding a contractual obligation on the part of Ovonyx to ECD under the First

---

[176] 1998 Contract (Ex. 5 to Docket # 40) at MTI000034 ¶ 11.

[177] *See, e.g., id.* at MTI000032 ¶ 1 ("ECD, Mr. Lowrey, and the Entity agree not to enter into any agreements in this field without the approval described below until termination, and thereafter only in compliance with the terms of this contract."); MTI000033 ¶ 6 ("Lowrey and ECD shall operate consistent with limitations on liabilities offered by ECD and subsequently the Entity . . . ."); MTI000033 ¶ 7.d) ("Subject to approval, the Entity can select a site other than Troy and can vary the scope and business plan for its actual manufacturing, operations and further licensing activities[.]"); MTI000033 ¶ 7.e) ("The Entity may provide moneys to upgrade applicable ECD equipment and support activities upon approval."); MTI000034 ¶ 10 ("Upon ECD's written request, the Entity shall thereafter pay every three months 0.5% of the Entity's subsequent revenues to ECD."); MTI000034 ¶ 17.b) ("ECD and the Entity shall each assign to Mr. Lowrey his solely originated or invented IP."); MTI000034 ¶ 17 ("Mr. Lowrey and ECD, and the Entity if formed, shall fully cooperate on any assignments necessary to effect this allocation upon termination, and in any further prosecution such as at the PTO at no expense to the cooperating non-owner."); MTI000036 ¶ 23.f) ("[T]he Entity shall agree and execute agreements with its employees and contractors not to use or disclose the Entity's, Mr. Lowrey's, ECD's, or former employer's confidential information[.]"); MTI000036 ¶ 27 ("If the Entity is formed both the Entity and ECD shall thereafter jointly and severally assure ECD's indemnification obligation to Mr. Lowrey . . . .").

80

Refusal Right, the Trust's breach of contract claim against Ovonyx must be dismissed, to the extent it is based on a breach of ECD's First Refusal Right.

### 3. Lowrey's alleged breach of ECD'S Royalty Right under the 1998 Contract

### a. Lowrey is not liable for the alleged breach of the ECD's Royalty Right.

The Trust also alleges, in the first count of the First Amended Complaint, that Lowrey breached ECD's Royalty Right under the 1998 Contract, by not causing Ovonyx to pay ECD 0.5% of Ovonyx's revenues after ECD sold its Ovonyx shares in 2012.[178]  Lowrey argues that "[b]y the plain language of the 1998 Contract Ovonyx, not [Lowrey], was obligated to pay royalties [to ECD]" and that he cannot be held personally liable for the failure of Ovonyx to pay the royalty.[179]  The Court agrees with Lowrey.

The relevant language in the 1998 Contract states: "Upon ECD's written request, **the Entity** shall thereafter pay every three months 0.5% of the Entity's subsequent revenues to ECD."[180]  The plain meaning of this language is that, if formed, the Entity would have an obligation to pay ECD a royalty in the amount of 0.5% of its revenues.  Absent from this language is any mention of Lowrey personally guaranteeing this payment obligation of the Entity, or otherwise being liable for the Entity's failure to pay.

That the Entity to be formed, and not Lowrey, would have an obligation to pay ECD the royalties makes sense when considered in the context of the stated purpose and the terms of the 1998 Contract.  That contract contemplated the formation of an Entity in which all of the

---

[178]  *See* First Am. Compl. at 24 ¶ 129.

[179]  Def. Lowrey's Br. in Supp. of Mot. to Dismiss First Am. Compl. (Docket # 50) at 7.

[180]  1998 Contract at MTI000034 ¶ 10 (bold added).

activities in the field were to be conducted.[181]  In furtherance of this purpose, the 1998 Contract

provided that ECD would "grant the Entity an exclusive license in the field with a right to sub-

license its intellectual property if approved," and ECD also would assign to the Entity all of

Lowrey's "rights in intellectual property in the field" that Lowrey was required to assign to ECD

before the Entity's formation.[182]  Part of the consideration for ECD's transfer of those rights and

interests to Ovonyx, was a royalty that Ovonyx was to pay to ECD based on the revenues

Ovonyx generated by use of those transferred rights and interests.

This is consistent with what actually happened, at least from 1999 until 2012.

Ovonyx was formed, and upon its formation, ECD, Lowrey, and Ovonyx entered into the

1999 License Agreement under which ECD granted "without encumbrance, to Ovonyx **a**

**royalty-bearing,** worldwide, exclusive right and license under ECD's past, present and future IP

(as defined in the [1998] Contract), including the right to sublicense," and Lowrey assigned

"without encumbrance, to Ovonyx all rights title and interest in and to Mr. Lowrey's past, present

and future IP."[183]

As discussed in Part V.B of this Opinion above, by signing the 1999 License Agreement,

Ovonyx ratified and adopted the terms and conditions of the 1998 Contract, at least with respect

to ECD's Royalty Right.  As a result of this, under Michigan law, not only did Ovonyx become

liable to pay ECD under the Royalty Right, but also Ovonyx's shareholders (including Lowrey)

were absolved of any such liability.  In this situation, "[a] corporation will be held liable for

---

[181] *See id*. at MTI000033 ¶ 7.a) ("Mr. Lowrey and ECD shall conduct all activities in the field in
this Entity such as manufacturing and licensing[.]").

[182] *Id*. at  MTI000034 ¶¶ 14.a) - b).

[183] 1999 License Agreement at MTI000038 ¶¶ 1-2 (bold added).

preincorporation contracts made by the promoters or incorporators if the corporation subsequently ratifies or adopts the contracts, **and the promoters will not be held liable**." *Medco Health Care Servs., Inc. v. Bragg*, No. 174335, 1996 WL 33364162, at *1 (Mich. Ct. App. May 28, 1996) (emphasis added) (citing *Henderson v. Sprout Bros.*, *Inc.*, 440 N.W.2d 629, 634 (Mich. Ct. App. 1989) and *Campbell v. Rukamp*, 244 N.W. 222, 223 (Mich. 1932) (explaining that "[h]ad the proposed corporation been duly organized and the mentioned purchase contract ratified, then" the promoters could not be held personally liable on that contract)).

Given the foregoing Michigan case law, the Court is not aware of any basis under Michigan law, given the facts of this case, to hold Lowrey personally liable for Ovonyx's breach of ECD's Royalty Right.

### b. Lowrey is not personally liable for Ovonyx's alleged breach of ECD's Royalty Right.

Although it is not entirely clear, it appears that the Trust may also be relying on Lowrey's position as one of the controlling shareholders of Ovonyx, and/or his position as President and CEO of Ovonyx, as grounds for holding him personally liable for Ovonyx's breach of its obligation to pay ECD a royalty. But the facts alleged in the First Amended Complaint are insufficient, as a matter of Michigan law, for concluding that Lowrey is personally liable for Ovonyx's failure to pay ECD a royalty.

### i. The general rule under Michigan law, that corporations exist separately from their owners

"It is well-settled that Michigan courts will respect the separate existence of business entities from their owners. This is true even when a single shareholder or member owns the

entity." *Alpha Inv., L.L.C. v. Alpha Real Estate, L.L.C.*, No. 291939, 2010 WL 4977902, at *3 (Mich. Ct. App. Dec. 7, 2010) (citations omitted) (holding that "in the absence of evidence that would warrant disregarding the separate existence of the entities involved, [an incorporator who signed the purchase agreement at issue which stated that he 'was acting on behalf of two entities that had not yet been formed'] could not be individually liable for breaches of those contracts").[184]

### ii. Exceptions to Michigan's general rule respecting the corporate form

### a. Piercing the corporate veil/alter ego

As an exception to the general rule, Michigan courts will disregard a corporation's separate existence and hold an individual shareholder(s)/owner(s) personally liable where the corporate form is used to commit a fraud or a wrong; or, in the words of one case, where "the owner exercised its control over the entity in a *manner* amounting to a fraud or wrong under such circumstances that a court 'would aid in the consummation of a wrong' if it were to honor the separate existence of the entity." *Green v. Ziegelman*, 873 N.W.2d 794, 806 (Mich. Ct. App. 2015) (italics in original) (relying on and quoting *Gledhill v. Fisher & Co.*, 262 N.W. 371, 372 (Mich. 1935)).

In *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. LTD*, 475 F.3d 783, 798 (6th Cir. 2008), the Sixth Circuit Court of Appeals, applying Michigan law, explained:

---

[184] Ovonyx attempts to distinguish the facts in *Alpha* from the facts in this case by stating that in *Alpha*, "it was clear that the promoter was 'acting on behalf of' two entities that he had yet to form when he signed the agreements. Lowrey assumed no such role on behalf of the Entity – he signed on his own behalf as an individual party to the 1998 [Contract]." (Trustee's Omnibus Objection (Docket # 69) at 39-40.) The Court disagrees with Ovonyx's reading of the 1998 Contract. It is clear that Lowrey and ECD signed the 1998 Contract both on their own behalf and on the behalf of the "Entity" that the contract contemplated would be formed.

84

Under Michigan law, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, 449 Mich. 542, 537 N.W.2d 221, 224 (1995) (citing *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 26 N.W.2d 757, 761 (1947)). "This presumption, often called the 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Id.* (alteration in original) (quoting *Wells v. Firestone*, 421 Mich. 641, 364 N.W.2d 670, 674 (1984)). Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss. *Foodland Distribs. v. Al–Naimi*, 220 Mich. [Ct,] App. 453, 559 N.W.2d 379, 381 (1996) (citing *SDC Chem. Distribs., Inc. v. Medley*, 203 Mich. [Ct.] App. 374, 512 N.W.2d 86, 90 (1994)); *see also Gledhill v. Fisher & Co.*, 272 Mich. 353, 262 N.W. 371, 372 (1935).

*Id.*; *see also Bodnar v. St. John Providence, Inc.*, No. 337615, 2019 WL 1049639, at *9 (Mich. Ct. App. Mar. 5, 2019) (same); *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 796 (E.D. Mich. 2014) (applying Michigan law) (same).

A court, in considering whether an entity is used as a mere instrumentality, may consider factors such as "undercapitalization of the corporation, the maintenance of separate books, the separation of the corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham." *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704–5 (6th Cir.1988).

*Llewellyn-Jones*, 22 F. Supp. 3d at 796; *see also GKN Driveline Newton LLC v. Stahl Specialty Co.*, No. 15-CV-14427, 2016 WL 1746012, at *5 (E.D. Mich. May 3, 2016) (noting that the Sixth Circuit, in *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302–03 (6th Cir. 2005) (quoting *Laborers' Pension Trust Fund v. Sidney Weinberger Homes*, 872 F.2d 702, 704–05 (6th Cir. 1988)), "stated that courts should consider additional specific factors, such as 'undercapitalization of the corporation, the maintenance of

85

separate books, the separation of corporate and individual finances, the use of the corporation to

support fraud or illegality, the honoring of corporate formalities, and whether the corporation is

merely a sham'").

Under Michigan law, a breach of contract can satisfy the "fraud or wrong" element for

piercing the corporate veil. *Servo Kinetics,* 475 F.3d at 799-800 (citations omitted) ("Turning to

the second element, we hold that, assuming that a jury concluded that [the plaintiff] could

recover for breach of contract, this breach would constitute a "fraud or wrong" for the purpose of

veil-piercing liability.").

The *Green* court, relying on the Michigan Supreme Court's decision in *Gledhill v. Fisher*

*& Co.*, 262 N.W. 371 (Mich. 1935) as a foundation, laid out the analysis a court should make

"when considering whether to disregard the separate existence of an artificial entity." 873

N.W.2d at 807. The *Green* court explained:

> [A] court must first examine the totality of the evidence
> surrounding the owner's use of an artificial entity and, in
> particular, the manner in which the entity was employed in the
> matter at issue. From this evidence, the trial court must determine
> whether the evidence establishes that the owner operated the entity
> as his or her alter ego—that is, as a sham or mere agent or
> instrumentality of his or her will.
>
> The court then must determine whether the manner of use
> effected a fraud or wrong on the complainant. In considering this
> element, it is not necessary to prove that the owner caused the
> entity to directly harm the complainant; it is sufficient that the
> owner exercised his or her control over the entity in such a manner
> as to wrong the complainant. But it bears repeating that
> establishing an entity for the purpose of avoiding personal
> responsibility is not by itself a wrong that would warrant
> disregarding the entity's separate existence.
>
> Finally, the trial court must determine whether the wrong
> would cause the complainant to suffer an unjust loss. If

disregarding the separate existence would harm innocent third parties, it may be just to allocate the loss to the complainant, notwithstanding the wrong.  Similarly, a loss is not unjust if the complainant had full knowledge of the circumstances surrounding the owner's use of the entity and agreed to proceed despite that knowledge. If, considering the totality of the equities, the trial court would be consummating a wrong by honoring an entity's separate existence, the court may disregard the entity's separate existence.

873 N.W.2d at 807-08 (citations omitted).

Piercing the corporate veil is not an independent substantive cause of action under Michigan law.  Rather, it is a remedy used only for the benefit of third parties, and used only if the corporation has been found liable on some other independent claim. *Spartan Tube & Steel, Inc. v. Himmelspach* (*In re RCS Engineered Prods. Co., Inc.*), 102 F.3d 223, 226 (6th Cir. 1996) (applying Michigan law) ("[A]n alter ego claim is not by itself a cause of action.").

### b.  Personal liability assessed against corporate officers who cause the corporation to commit a crime or a tort

Michigan courts also will disregard the corporate form and hold an officer(s) of a corporation personally liable for his own tortious or criminal acts, even when such officer was acting for the benefit of the corporation, and for the actions of the corporation where that officer caused the corporation to act criminally or tortiously.  In *Livonia Bldg. Materials Co. v. Harrison Const. Co.*, 742 N.W.2d 140, 143–44 (Mich. Ct. App. 2007), the court stated:

Officers of a corporation may be held individually liable when they personally cause their corporation to act unlawfully. *People v. Brown*, 239 Mich. [Ct.] App. 735, 739–740, 610 N.W.2d 234 (2000). " [A] corporate employee or official is personally liable for all tortious or criminal acts in which he participates, regardless of whether he was acting on his own behalf or on behalf of the corporation.'" *Id.*, quoting *Attorney General v. Ankersen*, 148 Mich. [Ct.]  App. 524, 557, 385 N.W.2d 658 (1986).

*Id.*; *see also Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237, 246–47 (Mich. 2010)

(same); *Llewellyn-Jones,* 22 F. Supp. 3d at 795 (internal quotation marks and citations omitted) (stating that "Michigan law has long provided that corporate officials may be held personally liable for their individual tortious acts done in the course of business, regardless of whether they were acting for their personal benefit or the corporation's benefit," and that "Michigan courts have recognized [that][o]fficers of a corporation may be held individually liable when they personally cause their corporation to act unlawfully.").  In either of such cases, it is not necessary to pierce the corporate veil to hold the officer personally liable.  *Dep't of Agric.,* 779 N.W. 2d at 247.

The Trust has not alleged any facts that would establish any of these grounds for holding Lowrey personally liable for Ovonyx's failure to pay ECD a royalty.  The Trust has not alleged that, in failing to pay the royalties to ECD from 2012 on, Ovonyx was a mere instrumentality of Lowrey, nor has the Trust alleged sufficient facts from which the Court plausibly could conclude this.  Nor has the Trust alleged that, with respect to the failure of Ovonyx to pay ECD the royalties,  Lowrey personally committed a crime or a tort or that he caused Ovonyx to commit a crime or a tort.  Therefore, under the facts alleged in the First Amended Complaint, there is no basis for the Court to hold Lowrey personally liable for Ovonyx's breach of its obligation to pay the royalties under ECD's Royalty Right.  To the extent the first count of the complaint against Lowrey is based on such a breach, it fails to state a plausible claim upon which relief can be granted, and must be dismissed.

### 4.  Ovonyx's alleged breach of ECD'S Royalty Right under the 1999 License Agreement

In the first cause of action the Trust also alleges that Ovonyx breached ECD's Royalty Right under the 1999 License Agreement, by not paying the 0.5% royalty to ECD after ECD sold

88

its stock to Micron in 2012.[185]  To this extent the Trust has stated a plausible claim against

Ovonyx.  For the reasons discussed in Part V.B of this Opinion, above, Ovonyx was bound to

pay ECD the royalty at issue, by the 1999 License Agreement and its incorporation of ECD's

Royalty Right from the 1998 Contract, as well as by Ovonyx's ratification and adoption of the

royalty payment provision in the 1998 Contract.

And Ovonyx acted as though it thought itself obligated to pay ECD the royalties at issue.

Ovonyx paid ECD a quarterly royalty in the amount of 0.5% of all of Ovonyx's revenues

beginning in 2000 and continuing for approximately 12 years.  And the First Amended

Complaint also alleges that "[i]n at least one known instance, including on May 23, 2012, the

Ovonyx Board of Directors approved and ratified Royalty payments to ECD."[186]  The First

Amended Complaint also alleges that although Ovonyx stopped making royalty payments to

ECD, it kept its obligation to do so on the books and records of Ovonyx for at least one year after

the sale of ECD's Ovonyx stock.[187]  The First Amended Complaint states, in relevant part:

> 78.  For at least a year after the Bankruptcy Sale, Ovonyx
> continued to represent in its financial statements that it was
> obligated to pay the 0.5% Royalty as required under the 1998
> [Contract] and the 1999 [License] Agreement. [**For example, in
> Ovonyx's financial statements for fiscal year ending May 31,
> 2013, Ovonyx represented that it has paid ECD the Royalty,
> with no indication that its obligations had terminated.**]

> 79.  However, Ovonyx failed to pay any Royalties after the
> [the closing of ECD's sale of its stock.] [**Indeed, Ovonyx made
> the intentional decision not to pay the Royalty, but did so in**

---

[185]  First Am. Compl. at 24 ¶ 130.

[186]  *Id*. at 13 ¶ 63 (bold and brackets omitted).

[187]  *Id*. at 15  ¶ 78.

89

**secret – at no time did Ovonyx inform ECD, or provide any notice, that Ovonyx was not going to honor its contractual obligations.]"**[188]

The Trust also alleges that it was not until May 2018 that Ovonyx, through Lowrey, first disclosed to the Trust that "**after the sale of ECD's interest in Ovonyx to Micron . . . when Lowrey was the senior officer of Ovonyx, [Ovonyx] made the knowing decision to not pay the Royalty . . . in secret – the Trust was never informed**."[189]

There is nothing in the record to indicate why Ovonyx stopped paying ECD a royalty after ECD's sale of its stock to Micron in 2012.[190]  And there is little in the way of argument by Ovonyx justifying such cessation of the royalty payments.

Ovonyx argues that "ECD's rejection of the 1998 Contract prohibits the Trust from enforcing it against Ovonyx as a matter of law."[191]  But this agument is based on Ovonyx's erroneous legal conclusion that rejection of a contract under 11 U.S.C. § 365 constitutes a recision or termination of the contract.  But for the reasons explained in Part V.C of this Opinion above, ECD's rejection of the 1998 Contract was only a breach, not a rescission or termination of that contract, and ECD's Royalty Right survived the rejection.

Nor did ECD's 2012 sale of its Ovonyx stock to Micron, or ECD's assumption and

---

[188] *Id.* at 15  ¶¶ 78-79 (bold in original).

[189] *Id.* at 4 ¶ 10 (bold in original).

[190] During the hearing, when the Court asked counsel for Ovonyx if there was "anything in the record [regarding] why Ovonyx stopped paying royalties to ECD when they did," counsel responded that there was not.  (*See* Tr. (Docket # 173) at 17).

[191] Defs. Ovonyx's. and Micron's Br. in Supp. of Mot. to Dismiss (Docket # 40) at 17; *see also id.* at 2 ("ECD never assumed the 1998 Contract in its bankruptcy case, and thus, as a matter of law, it cannot enforce it now.").

90

assignment of the 2000 Stockholder's Agreement, eliminate ECD's Royalty Right. As explained in Part V.B above, Ovonyx's obligation to pay ECD a royalty arose out of the 1999 License Agreement under which Ovonyx received valuable licensing rights in return for agreeing to be bound by the royalty terms of the 1998 Contract, including the obligation under that contract to pay ECD 0.5% of all of Ovonyx's revenues as a royalty. ECD's Royalty Right under the 1998 Contract was not based on, and did not depend on, ECD's ownership of stock of Ovonyx. Rather, Ovonyx's obligation to pay ECD a royalty was part of the consideration Ovonyx paid for rights to use intellectual property that Ovonyx obtained under the 1999 License Agreement. Therefore, ECD's sale of its Ovonyx stock to Micron had no impact on Ovonyx's obligation to pay ECD a royalty.

With regard to the 2000 Stockholders Agreement, which ECD assumed and assigned to Micron when it sold the Ovonyx stock to Micron in 2012, the Trust notes: "No party argues that the 2000 [Stockholders] Agreement has any bearing on Ovonyx's obligations to pay the Royalty. No provision in the 2000 [Stockholders] Agreement in any way limits Ovonyx's obligations to pay the Royalty."[192] The Court agrees.

For these reasons, the Court concludes that the First Amended Complaint plausibly alleges a claim for breach by Ovonyx of its contractual obligation to pay ECD a royalty under the 1999 License Agreement and the 1998 Contract. To the extent Ovonyx's motion seeks a dismissal of the first count of the First Amended Complaint with regard to ECD's Royalty Right, the motion must be denied.                    ,

**E. The First Amended Complaint's second cause of action, against Micron, based on alter**

---

[192] Trustee's Omnibus Objection (Docket # 69) at 33.

ego/successor liability

In the second cause of action in the First Amended Complaint, the Trust alleges that because Ovonyx "materially breached the 1999 License Agreement[,]" and Micron "acquired all of the stock of Ovonyx in July 2015," Micron was the successor in interest to Ovonyx and became "liable for the obligations of Ovonyx."[193] The Trust also alleges, in the alternative, that Micron is the alter ego of Ovonyx and "abused the corporate form of Ovonyx by causing Ovonyx to enter into the OMT Agreement and to orchestrate transactions by which Micron and its joint venture partner Intel would receive the benefit of a royalty free license for Ovonyx's technology relating to 3D XPoint [technology it was developing and marketing,] without complying with the 1998 [Contract] and the 1999 [License] Agreement."[194] The Trust reasons that because Micron is the "alter ego of Ovonyx" it "is responsible for the obligations of Ovonyx under the 1999 [License] Agreement."[195]

Micron argues that because the Trustee's alter ego and successor liability theories of recovery are not independent causes of action, but rather are only remedies, any recovery under either theory "hinges on an underlying breach of contract by Ovonyx."[196] Because "the Trust's breach-of-contract claim against Ovonyx fails as a matter of law," Micron says, it follows that "the Trust's second cause of action for alter ego/successor liability against Micron" also fails.[197]

---

[193] First Am. Compl. at 25 ¶¶ 142-43.

[194] *Id.* at 25-26 ¶¶ 144-45.

[195] *Id.* at 26 ¶ 145.

[196] Defs.' Ovonyx's and Micron's Br. in Supp. of Mot. to Dismiss (Docket # 40) at 31-32 ¶ IV.B.

[197] *Id.*

Micron argues further that the Trust has not "pled sufficient facts to support [the elements of alter ego liability or successor liability on Micron]."[198]

Micron is correct that under Michigan law, alter ego liability and successor liability are only remedies, not independent causes of action. *See, e.g.*, *Spartan Tube & Steel, Inc. v. Himmelspach* (*In re RCS Engineered Prod. Co., Inc.*), 102 F.3d 223, 226 (6th Cir. 1996) (applying Michigan law) ("[A]n alter ego claim is not by itself a cause of action."); *Mikron Digit. Imaging, Inc. v. Omega Med. Imaging, Inc.*, No. 16-13134, 2017 WL 372019, at *8 (E.D. Mich. Jan. 26, 2017) (citing *Morris v. Schnoor*, No. 315006, 2014 WL 2355705, at *44 (Mich. Ct. App. May 29, 2014) and holding that because "each of [the plaintiff's] underlying claims against [the defendant] fail . . . the successor liability claim cannot survive as a separate cause of action.").

The Trust agrees, but argues that "[w]hen alter ego/successor liability is pled as a separate cause of action, courts allow the claim to stand if the underlying actions survive[.]"[199] The Trust is correct. *See, e.g.*, *GKN Driveline Newton LLC v. Stahl Specialty Co.*, No. 15-CV-14427, 2016 WL 1746012, at *5 (E.D. Mich. May 3, 2016) (internal quotation marks and citations omitted) (stating that "[i]t is well established that piercing the corporate veil is not itself a cause of action" and that "[t]his is because piercing the corporate veil is an equitable theory or remedy, rather than a cause of action upon which relief can be granted" but "[a]lthough plead as a separate claim" deciding to "construe [the p]laintiff's [veil] piercing claim as a request for equitable relief based on [the p]laintiff's underlying breach of contract claim.").

Because one of the Trust's claims against Ovonyx survives — *i.e.*, the claim that Ovonyx

---

[198] *Id.*

[199] Trustee's Omnibus Objection (Docket # 69) at 41 ¶ III.D.1.

93

breached the 1998 Contract and the 1999 License Agreement with respect to the Royalty Right — the Court must consider whether the First Amended Complaint has plausibly pled a basis for the Court to impose liability on Micron for such breach. Thus, the Court will consider the Trust's alter-ego and successor liability theories against Micron.

### 1. The Trust's alter ego theory

Regarding the the Trust's alter ego claim against Micron, the First Amended Complaint states:

> 144.    Micron abused the corporate form of Ovonyx by causing Ovonyx to enter into the OMT Agreement and to orchestrate transactions by which Micron and its joint venture partner Intel would receive the benefit of a royalty free license for Ovonyx's technology relating to 3D XPoint without complying with the 1998 [Contract] and the 1999 [License] Agreement.
>
> 145.    Micron, as alter ego of Ovonyx, is responsible for the obligations of Ovonyx under the 1999 Agreement.[200]

As discussed in Part V.D.3.b of this Opinion, above, with regard to the alter ego claim against Lowrey, "Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. LTD*, 475 F.3d 783, 798 (6th Cir. 2008) (citations omitted). The Trust must plausibly allege facts that support each of these three elements.

The Trust has not expressly alleged that Ovonyx was a "mere instrumentality" of Micron. But the Trust has alleged sufficient facts from which the Court could plausibly conclude that, at least beginning when Micron became the 100% shareholder of Ovonyx as a result of the July

---

[200] First Am. Compl. at 25-26 ¶¶ 144-45.

2015 Merger, Ovonyx was a "mere instrumentality" of Micron, and that the other alter ego elements are met.

Here, a distinction must be drawn between Micron's ownership and control of Ovonyx before the July 2015 Merger, and after that Merger. Before the Merger, according to the Trust's allegations, Micron owned only 37.1% of the stock of Ovonyx.[201] For the time period 2012 until July 2015, when Ovonyx failed to pay any royalties due under ECD's Royalty Right, the allegations of the First Amended Complaint do not permit the conclusion that Ovonyx was a mere intsrumentality of Micron. The factual allegations do not plausibly support such a conclusion. For this time period, there are no allegations about the factors which Michigan courts evaluate to determine whether one corporation is the "mere instrumentality" of another, and whether a defendant has abused the corporate form; such as "undercapitalization of the corporation," the failure to maintain separate books, the failure to separate corporate finances from individual finances, "the use of the corporation to support fraud or illegality," and "whether the corporation is merely a sham." *See Llewellyn-Jones,* 22 F. Supp. 3d at 796. Also lacking is any allegation regarding the degree of control that Micron allegedly had over Ovonyx during this pre-Merger time period, and the ways in which Micron controlled Ovonyx, if at all, during that time period (*e.g.*, through common management and decision making or intertwined financial affairs).

In *Trustees of Detroit Carpenters Fringe Benefit Funds v. Patrie Const. Co.*, 618 F. App'x 246, 251-54 (6th Cir. 2015), the court determined that the amended complaint did not allege "sufficient factual content in support of [the] alter-ego contentions to survive a motion to

---

[201] *See id.* at 17-18 ¶ 90 (alleging that Micron did not already own 62.9% of the Ovonyx stock).

dismiss under Rule 12(b)(6)," where the amended complaint contained only "[g]eneralized and conclusory allegations regarding common ownership, employees, management, control, and decisionmaking," and although it alleged that the defendant controlled each of the companies at issue, the complaint contained no allegations regarding the degree of control.

Compounding this problem for the Trust are allegations in the First Amended Complaint that tend to support a finding that, before the 2015 Merger occurred, Ovonyx was operating independently of, and not under the control, of Micron. For example, the First Amended Complaint states that:

> 93.  [Ovonyx negotiated with Micron for several months prior to executing the Merger [Agreement]. Ovonyx established a so-called Sale Transaction Committee, comprised of Lowrey, Ward Parkinson, and Robert Jecmen, (the "Sale Committee"). Allegedly the Sale Committee engaged the services of two valuation firms, but Ovonyx failed to provide copies of any valuations obtained in connection with the merger in response to the Rule 2004 Subpoena.][202]

But for the time period beginning in July 2015, when Ovonyx became the 100% shareholder of Ovonyx under the Merger, the First Amended Complaint does allege sufficient facts to plausibly show the alter ego elements, with respect to breach of ECD's Royalty Right. As 100% shareholder, of course, Micron had complete control over Ovonyx. And the alter ego elements — (1) that Ovonyx was a mere instrumentality of Micron; (2) that Ovonyx was used by Micron to commit a fraud or wrong; and (3) that the Trust suffered an unjust loss — are sufficiently pled, based on the allegations and claims discussed in detail later in this Opinion. *See* discussion of the Trust's third cause of action against Micron (Micron's tortious interference

---

[202]  First Am. Compl. at 18 ¶ 93.

96

with contract, through the use and control of Ovonyx) (Part V.F of this Opinion); discussion of the Trust's sixth cause of action against Intel (aiding and abetting Micron's tortious interference with contract, through Micron's use and control of Ovonyx) (Part V.I of this Opinion); and discussion of the Trust's fifth cause of action against OMT (fraudulent transfer that Micron caused Ovonyx to make to OMT) (Part V.H of this Opinion).

For the reasons just discussed, the Trust's alter ego claim against Micron will survive Micron's motion to dismiss.

### 2. The Trust's successor liability theory

The Trust's successor liability claim against Micron will not survive, however, for the reasons discussed below.

It appears that the allegations in the First Amended Complaint by which the Trust seeks to support its successor liability claim against Micron are the following:

> 142.    Ovonyx has materially breached the 1999 Agreement.

> 143.    Micron acquired all of the stock of Ovonyx in July 2015. By acquiring such stock, Micron is liable for the obligations of Ovonyx.[203]

In other words, the Trust is alleging that Micron is liable for Ovonyx's debt to the Trust, for breach of contract, because Micron acquired all of the stock of Ovonyx. The Trust appears to argue that these allegations are sufficient to state a claim for successor liability, in part, because one of the steps by which Micron acquired all the stock of Ovonyx was a merger of Micron's wholly-owned subsidiary, Oscar Merger Corp., into Ovonyx. Even though this was not a merger of *Micron* with Ovonyx, but rather a merger of Micron's subsidiary with Ovonyx, the Trust

---

[203] *Id.* at 25 ¶¶ 142-43.

97

argues:

> "The traditional rule of successor liability examines the nature of
> the transaction between predecessor and successor corporations.  If
> the acquisition is accomplished by merger, with shares of stock
> serving as consideration, the successor generally assumes all its
> predecessor's liabilities."  *Foster v. Cone-Blanchard Mach. Co.*,
> 597 N.W.2d 506, 509 (Mich. 1999).  Here, Micron obtained all of
> Ovonyx's outstanding shares, and control over Ovonyx under the
> Merger Agreement.  Compl. ¶ 85.  The Trust has thus alleged that
> it thus assumed both the benefits and liabilities of Ovonyx.[204]

In the *Foster* case cited by the Trust, the Michigan Supreme Court discussed successor

liability:

> The traditional rule of successor liability examines the
> nature of the transaction between predecessor and successor
> corporations.  **If the acquisition is accomplished *by merger*,** with
> shares of stock serving as consideration, **the successor generally
> assumes all its predecessor's liabilities.**  However, where the
> purchase is accomplished by an exchange of cash for assets, the
> successor is not liable for its predecessor's liabilities unless one of
> five narrow exceptions applies.  The five exceptions are as follows:
>
> > "(1) where there is an express or implied
> > assumption of liability; (2) **where the transaction
> > amounts to a consolidation or merger**; (3) where
> > the transaction was fraudulent; (4) where some of
> > the elements of a purchase in good faith were
> > lacking, or where the transfer was without
> > consideration and the creditors of the transferor
> > were not provided for; or (5) where the transferee
> > corporation was a mere continuation or
> > reincarnation of the old corporation. (19 Am Jur 2d,
> > Corporations, § 1546, pp. 922–924; *Malone v. Red
> > Top Cab Co.*, 16 Cal.App.2d 268, 273 [60 P.2d 543
> > (1936) ].)" [*Turner*, *supra* at 417, n. 3, 244 N.W.2d
> > 873, *quoting Schwartz v. McGraw–Edison Co.*, 14
> > Cal.App.3d 767, 92 Cal.Rptr. 776 (1971).]

---

[204]  Trustee's Omnibus Objection (Docket # 69) at 44.

The traditional rule reflects the general policy of the corporate contractual world that liabilities adhere to and follow the corporate entity. It serves to protect creditors and shareholders, to facilitate determination of tax responsibilities, and to promote free alienability of business assets.

*Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 509–10 (Mich. 1999) (footnote omitted) (bold and italics added); *see also Bestfoods v. Aerojet-Gen. Corp.*, 173 F. Supp. 2d 729, 757 (W.D. Mich. 2001) (same) (citing *Foster*, 597 N.W.2d at 509-10).

In addition to the above "traditional" grounds described in *Foster* for finding successor liability, the *Foster* court noted that it also had applied a "continuity of enterprise" theory to find successor liability, in a products liability case, *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873 (Mich. 1976). In *Foster*, the court described the "continuity of enterprise" theory:

> After examining the relevant policy concerns, this Court in *Turner* [*v. Bituminous Cas. Co.*, 244 N.W.2d 873 (Mich. 1976)], concluded that a continuity of enterprise between a successor and its predecessor may force a successor to "accept the liability with the benefits" of such continuity. *Turner* held that a prima facie case of continuity of enterprise exists where the plaintiff establishes the following facts: (1) there is continuation of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations of the predecessor corporation; (2) the predecessor corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and (3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation. *Turner* identified as an additional principle relevant to determining successor liability, whether the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation.

*Id.* at 510 (footnote omitted) (citation omitted).

At least one case has held that the three requirements for finding successor liability under a "continuity of enterprise" theory, as described in the *Turner* and *Foster* cases, quoted above,

are the same as the requirements for finding a "*de facto* merger," which is a traditional basis for successor liability. *See Bestfoods*, 173 F. Supp. 2d at 757 & n.7 (W.D. Mich. 2001).

Under the Trust's allegations in this case, there was no formal merger of Micron with Ovonyx. The only merger alleged was the merger of Micron's 100% subsidiary corporation with (and into) Ovonyx. But that merger is not a sufficient basis for finding Micron liable for Ovonyx's debts under a successor liability theory. *See Bestfoods*, 173 F. Supp. 2d at 758.

In *Bestfoods*, a corporation ("CPC") decided to acquire another corporation ("Ott I"). Ott I had owned and operated a chemical manufacturing facility, and had environmental liabilities as a result, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), "for past and future costs incurred in the environmental cleanup of the soil, surface water and groundwater surrounding a dormant chemical manufacturing plant[.]" *Id.* at 732. Under an amendment to a purchase agreement entered into by and between CPC and Ott I, CPC was to form a wholly-owned subsidiary ("Ott II") prior to closing the sale, which would acquire Ott I and would receive all the benefits and assume all of the liabilities that inured to CPC under the original purchase agreement between CPC and Ott I. *Id.* at 736. The amended agreement further provided that CPC would "'have no liability whatsoever with respect to any of said obligations and undertakings.'" *Id.*

The *Bestfoods* court assumed "for purposes of . . . discussion that Ott II could be considered the successor corporation to Ott I by virtue of a *de facto* merger." *Id*. at 757 (italics in original). Even under this assumption, the court found that Ott II's parent company, CPC, had no liability. The court stated: "**[T]he court is aware of no case holding that a parent corporation may be held liable solely on the basis of a *de facto* merger of a subsidiary with the**

100

**predecessor corporation.**" *Id.* (italics in original) (bold added). The *Bestfoods* court further

stated:

> Applying the elements of *de facto* merger to the transaction between Ott I and CPC leading to the formation of Ott II, I conclude that the governments have failed to demonstrate a *de facto* merger between Ott I and CPC . . . While CPC purchased and paid for the assets with its own stock, it did so by establishing a subsidiary corporation, a clearly lawful and permissible structure for limiting corporate liability. As the Supreme Court has emphasized, a wholly owned subsidiary is presumed to be independent for liability purposes. *See* [*United States v.*] *Bestfoods*, 524 U.S. 51[,] 61–62 (1998), 118 S.Ct. 1876. The mere fact that CPC purchased Ott I's assets in exchange for its own stock is insufficient, standing alone, to confer liability. *See Chrysler Corp.* [*v. Ford Motor Co.*], 972 F. Supp. [1097,] 1111 [(E.D. Mich. 1997)].
>
> . . . .
>
> **The governments cite no case in which a parent company has been held liable as a successor to a company whose assets have been obtained by a stock transfer and then held and operated by a subsidiary of the parent.**

*Id.* at 758 (italics in original) (bold added).

Under the standards established by Michigan law for finding successor liability, the Trust

has not pled a plausible claim against Micron. Although Micron ultimately became the owner of

all of the stock of Ovonyx, this was not accomplished by a merger of Ovonyx and Micron.

Micron acquired some of the stock of Ovonyx by purchasing it from ECD in 2012, in ECD's

bankruptcy case, *not* by merging with Ovonyx. Before Micron acquired the remaining stock of

Ovonyx in the 2015 Merger, Micron owned only 37.1% of the stock of Ovonyx.[205] And when

---

[205] *See* First Am. Compl. at 17-18 ¶ 90 (alleging that Micron did not already own 62.9% of the Ovonyx stock).

Micron acquired the remainder of the stock of Ovonyx, this was not accomplished by a merger between Ovonyx and Micron. Rather, Oscar Merger Corp., a wholly owned subsidiary of Micron, merged with and into Ovonyx, and Ovonyx, then a wholly-owned subsidiary of Micron, continued operating as the surviving entity of the Merger, assuming all of the debts, liabilities, and duties of Oscar, while Oscar Merger Corp. became defunct, ceasing all of its operations.

For these reasons, the Trust has failed to state a claim upon which relief can be granted against Micron based on successor liability. The second cause of action in the First Amended Complaint must be dismissed.

## F. The Trust's third cause of action, against Micron for tortious interference with contract

The Trust's third cause of action is a tortious interference with contract claim against Micron.[206] Under Michigan law,

> Tortious interference with a contract requires "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich.App. 83, 89–90, 706 N.W.2d 843 (2005). Under Michigan law, the third element of this involves a showing of "a *per se* wrongful act or [the commission of] a lawful act with malice and without justification for the purpose of invading the contractual rights or business relationship of another." *Urban Associates, Inc. v. Standex Elecs., Inc.*, 216 Fed.Appx. 495, 514 (6th Cir.2007) (internal quotations omitted). "A *per se* wrongful act is one that is 'inherently wrongful or an act that can never be justified under any circumstances'." *Id*. (quoting *Prysak v. R.L. Polk Co.*, 193 Mich.App. 1, 13, 483 N.W.2d 629 (1992)). And when a party's actions are "motivated by legitimate business reasons," a court will not find the improper motive necessary for tortious interference with contract. *Id.* (citing *Prysak*, 193 Mich.App. at 13, 483 N.W.2d 629).

---

[206] This claim is made only as an alternative to the Trust's alter ego claim. (Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 125.)

*Crestmark Bank v. Electrolux Home Prod., Inc.*, 155 F. Supp. 3d 723, 745 (E.D. Mich. 2016)

(italics in original) (footnote omitted).  If the interferer's acts were not wrongful *per se*, "[t]he

'plaintiff must demonstrate, with specificity, affirmative acts by the interferer which corroborate

the unlawful purpose of the interference.'" *Rockwell Med., Inc. v. Yocum*, 76 F. Supp. 3d 636,

648–49 (E.D. Mich. 2014), *aff'd*, 630 F. App'x 499 (6th Cir. 2015) (citation omitted); *see also*

*Knight Enters. v. RPF Oil Co.*, 829 N.W.2d 345, 348 (Mich. Ct. App. 2013) (citation omitted)

(same).  In other words, the Trust must plausibly allege either (1) that Micron "committed an act

that was so wrongful that [it] had no justification whatsoever for committing that act, and did so

with malice and the intent to induce" Ovonyx to breach its contract with ECD; or (2) that Micron

"committed a lawful act with the malicious intent to instigate" Ovonyx to breach its contract with

ECD.  *See Knight Enters.*, 829 N.W.2d at 348.

As to this count, Micron argues that the Trust's allegations "offer little more than

conclusory recitations of the elements [of the tortious interference with contract claim] and

therefore, fail to plausibly state a claim."[207]  The Court disagrees.  The Court concludes that the

Trust has alleged facts which, if proven, plausibly would satisfy each of the elements of its

tortious interference with contract claim against Micron.

### 1.  The existence of a contract

The first element of a tortious interference with contract claim is the existence of a

contract.  The contracts on which the Trust relies are the 1998 Contract (which was executed by

ECD and Lowrey and which contains the Royalty Right and the First Refusal Right), and the

---

[207]  Defs. Ovonyx's. and Micron's Br. in Supp. of Mot. to Dismiss (Docket # 40) at 38 (citation omitted).

1999 License Agreement (which was executed by ECD, Lowrey, and Ovonyx and states, in relevant part, that "[a]ll terms and conditions and rights and obligations of the [1998] Contract remain in full force and effect"). Micron argues that the 1998 Contract is the only contract that contains the Royalty Right and the First Refusal Right, and because that contract was rejected, there is no enforceable contract on which the Trust can rely to establish the first element of its tortious interference with contract claim.

The Court disagrees. The Court has ruled, in Part V.D.1.a of this Opinion, above, that ECD's contractual First Refusal Right was superceded and terminated by the 2000 Stockholders Agreement. But as the Court found, in Part V.C of this Opinion, above, ECD's rejection of the 1998 Contract did not terminate the contract, and ECD's Royalty Right survived its rejection of the 1998 Contract.

## 2. Breach of the contract(s)

The second element of a tortious interference with contract claim is a breach of the identified contract(s). The Trust bases its tortious interference claim on Lowrey's and Ovonyx's alleged material breaches of the 1998 Contract and the 1999 License Agreement (1) by failing to provide "any notice of the July 2015 Transactions, including the Merger Document and the OMT Agreement," thereby denying the Trust "the opportunity to exercise the First Refusal Right";[208] and (2) by Ovonyx failing to pay, and Lowrey failing to cause Ovonyx to pay, the 0.5% Royalty to ECD.

The Trust argues, in relevant part, that the July 2015 Transactions were undertaken for the improper purpose of, and had the effect of, significantly impairing ECD's Royalty Right:

---

[208] First Am. Compl. at 26 ¶¶ 147-53.

The [First Amended] Complaint alleges that Micron and Intel engineered the purchase of Ovonyx's shares by Micron and the transfer of all of its substantial intellectual property rights to OMT [as part of the July 2015 Transactions] in a way **that significantly reduced ECD's Royalty** and deprived it of its First Refusal Right. Additionally, in connection with the Merger, Micron caused Ovonyx to transfer substantially all of its valuable assets to OMT, a shift in the status quo (i.e., **Ovonyx would now not license its own technology) that deprived ECD of its rights**. These allegations plausibly suggest . . . an improper purpose.[209]

The First Amended Complaint alleges:

13.     [O]n July 31, 2015, Ovonyx transferred a majority of its valuable intellectual property to Defendant Ovonyx Memory Technology, LLC, ("OMT"), **for virtually no consideration.** . . .

. . .

107.    The effect of the OMT Agreement was that, at Micron's direction, Ovonyx transferred the bulk of its assets to OMT for virtually no consideration, thus putting its assets beyond the reach of Ovonyx's creditors. . . .[210]

It further alleges:

89.     Given the size of Micron's existing DRAM business and the typical Ovonyx license agreement royalty rate, [**the potential royalty expense savings to Micron [(due to its obtaining a royalty-free license as part of the July 2015 Transactions)] (based on Durcan's 2018 single year sales estimate as a result of the Micron Royalty-Fee License) was many times greater than the $41.3 million Duff & Phelps valued the Micron Royalty-free License to Micron**.]

90.     [**In addition, a footnote to the D&P Valuation disclosed that "As part of the transaction, Micron/Ovonyx collectively received $28.5 million in cash from Intel, in**

---

209  Trust's Omnibus Objection (Docket # 69) at 48 (bold added) (citation omitted).

210  First Am. Compl. at 5 ¶ 13, 20 ¶ 107.

**which Intel bought-out its existing royalty obligations under the existing license agreement with Ovonyx." This part of the transaction has the effect of (1) greatly reducing the effective net cash consideration Micron paid to acquire the 62.9% of Ovonyx it did not already own to only $9.3 million (based on information provided in the D&P Valuation) and (2) eliminating the entire Royalty into perpetuity related to sales by Intel, the only entity that has started significant commercialization of 3D XPoint.]**

. . . .

154.    With respect to the breaches, Micron had actual knowledge of the obligations owed to ECD under the 1998 [Contract] and 1999 [License] Agreement. Among other things, Micron could have, but chose not to, take assignment of the 1998 [Contract] and the 1999 [License] Agreement in connection with its Bankruptcy Sale acquisition of ECD's stock in Ovonyx.

155.    On information and belief, Micron understood that acquiring Ovonyx's stock, including Lowrey's shares, without providing the Trust notice to exercise the First Refusal Right would cause a breach of the 1998 [Contract] and the 1999 [License Agreement].

156.    Micron acted with an improper purpose by ensuring that Ovonyx would never provide notice to the Trust. Micron knew that the effect of the agreement it designed, drafted, and negotiated with Ovonyx would result in a breach of the 1998 [Contract] and the 1999 [License] Agreement, and allow Micron to acquire Ovonyx, the phase-change technology and the Ovonic Switch - critical to 3D XPoint.[211]

In its brief in support of its motion to dismiss, Micron argues that the Trust has not

alleged facts that plausibly show a breach of contract occurred.[212]   Micron argues that

---

[211]  *Id.* at 17-18 ¶¶ 89-90, 27 ¶¶ 154-56 (bold in original).

[212]  Defs. Ovonyx's. and Micron's Br. in Supp. of Mot. to Dismiss (Docket # 40) at 38-39.

even if [the 1998 Contract] was enforceable, there would be no breach as required by the second element of this claim because, as a matter of law, Ovonyx did not owe ECD or the Trust any right of first refusal with respect to the OMT Transfer or the Ovonyx Acquisition in light of the plain language of [the] 1998 Contract and superseding language of the 2000 [License] Agreement."[213]

Micron does not address, at all, the Trust's argument that ECD's Royalty Right was breached, in Micron's brief in support of its motion to dismiss the Trust's tortious interference with contract claim.

The Court agrees with Micron's argument that any purported breach of the First Refusal Right cannot be a basis for the breach of contract element of the Trust's tortious interference with contract claim, because, for the reasons stated earlier in this Opinion, the Court has found that ECD's First Refusal Right was extinguished by the 2000 Stockholder's Agreement. To the extent that the Trust relies on a breach of ECD's First Refusal Right to satisfy the second element of its tortious interference with contract claim, it has failed to state a plausible claim.

However, for the reasons stated earlier in the Opinion, the Court has found that under the 1998 Contract and the 1999 License Agreement, Ovonyx, but not Lowrey, had an obligation to pay ECD a royalty of 0.5% of Ovonyx's revenues. Therefore, the Trust has plausibly alleged that Ovonyx's failure to pay such a royalty was a breach of the 1998 Contract and the 1999 License Agreement.

Moreover, the Trust has alleged facts to support a second, more subtle theory of breach of contract by Ovonyx. As noted above, the Trust alleges that the transfer by Ovonyx in July 2015 of all of its intellectual property rights, for far less than the actual value of those assets, had a

---

[213] *Id*. at 38. Ovonyx and Micron define "OMT Transfer" as the transfer in which Ovonyx sold and transferred substantially all of its intellectual property assets to [IPLLC, the predecessor of OMT]." *Id.* at 12. That is the definition the Court will hereinafter use when referring to the "OMT Transfer."

purpose and effect of significantly impairing or eliminating ECD's contractual Royalty Right. It greatly reduced the revenues of Ovonyx, on which the amount of royalties due to ECD (and its successor, the Trust) were calculated, for virtually no value in return. In addition to being a fraudulent transfer, as alleged in the Trust's fifth cause of action against OMT (discussed in Part V.H of this Opinion below,) the Trust appears to claim that this also was a breach of contract by Ovonyx, because in effect it deprived the Trust of ECD's contractual Royalty Right.

In seeking dismissal, Micron has not argued that this breach of contract theory is not a valid legal theory under Michigan contract law. None of the Defendants have argued this. In fairness, this may be because of the emphasis of the parties on ECD's First Refusal Right. In any event, none of the parties have briefed this issue. Therefore, for purposes of ruling on the motions to dismiss, the Court will assume, without definitively deciding at this time, that such breach of contract theory is a valid legal theory under Michigan law.

For these reasons, the Trust has plausibly pled the second element of the Trust's tortious interference with contract claim — breach of contract.

### 3. Unjustified instigation of the breach by Micron

The third and final element of a tortious interference with contract claim is an unjustified instigation of the breach of contract. Micron argues that the Trust has not plausibly alleged that Micron unjustifiably instigated a breach of contract, because "[t]he Trust does not allege that Micron engaged in the OMT Transfer and the Ovonyx Acquisition for the purpose of inducing a breach of Ovonyx's alleged contractual obligations to the Trust."[214]

The Court disagrees. Viewing the allegations in the First Amended Complaint in a light

---

[214] *Id*. at 40.

most favorable to the Trust, as the Court must, the Court finds that the Trust has alleged facts that plausibly support the third element of its tortious interference claim; namely, an unjustified instigation by Micron of Ovonyx's breach of the 1998 Contract and the 1999 License Agreement. The Trust has alleged that Micron knew about Ovonyx's obligation to pay ECD the 0.5% royalty. The Trust alleges that Micron knew about both the 1998 Contract and the 1999 License Agreement, because ECD offered to assign those contracts to Micron, in connection with ECD's sale of its Ovonyx stock to Micron in 2012. But Micron refused the offer. The Trust alleges further that, after Micron acquired control of Ovonyx through the 2015 Merger, Micron took a series of specific affirmative acts (the acts that collectively, the Court has referred to as part of the "July 2015 Transactions") for the improper purpose and effect of greatly reducing or eliminating any royalty that Ovonyx would owe to ECD on account of ECD's Royalty Right under the 1998 Contract and the 1999 License Agreement.

The Trust alleges that the end result of the July 2015 Transactions was that substantially all of Ovonyx's intellectual property, from which it could generate the revenues that would be used to calculate ECD's 0.5% royalty, were transferred to and owned by OMT, "a company that has no operations and no employees, but merely holds intellectual property rights."[215] After the July 2015 Transactions, OMT was the entity that would primarily benefit from the licensing of Ovonyx's intellectual property, with Ovonyx only receiving a small percentage of the total revenues that OMT generated using those acquired licensing rights. Worse yet for Ovonyx's bottom line was that OMT granted both Micron and Intel royalty-free licenses, and under the OMT Agreement, OMT had no obligation to pay Ovonyx **any** licensing revenues that OMT

---

[215] First Am. Compl. (Docket # 8) at 20 ¶ 105.

received in the first thirty days after execution of the OMT Agreement. Notably, it was in this 30-day time frame that OMT expected to receive a $15 million payment from Intel "in connection with a replacement license that was . . . extremely valuable to Intel."[216]

The Trust also alleges that this and some of the additional terms of the OMT Agreement "**made no commercial sense [from Ovonyx's perspective]**."[217] The Trust argues further that the OMT Agreement also made no commercial sense from ***OMT's*** perspective. According to the Trust, it doesn't make sense that OMT would purchase assets that it would never actually be able to market or use to generate income, and it makes no sense that it would accept only $1.5 million instead of the $15 million that Intel had agreed to pay for the perpetual world-wide royalty-free license.[218] According to the Trust, it made no sense for OMT to purchase assets only to immediately give those assets to Micron and Intel.[219] Based on the alleged fact that the terms made no commercial sense to either party to the OMT Agreement, the Trust argues that it is plausible to conclude "that OMT seems to just . . . have been established by Micron or Intel simply as a way to hold the IP away from Ovonyx . . . and thus avoid any of the obligations" Ovonyx had to ECD under the 1998 Contract and the 1999 License Agreement.[220]

Although the acts that comprise the July 2015 Transactions are not *per se* wrongful acts, it is plausible, as the Trust argues, that Micron's lawful acts were done with malice and without

---

[216] *Id.* at 19-20 ¶ 103 (bold omitted).

[217] *Id.* (bold in original)

[218] *See* Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 142.

[219] *Id*. at 146.

[220] *Id.* at 143, 146.

justification, for the purpose of evading ECD's Royalty Right. Given these allegations, it is plausible that Micron instigated Ovonyx to enter into the OMT Agreement as part of the July 2015 Transactions, for the purpose of having Ovonyx breach its agreement to pay ECD a 0.5% royalty of all of its revenues. The Trust alleges that once Micron owned all of the stock of Ovonyx and had replaced all of Ovonyx's officers and directors with officers and directors of its wholly-owned subsidiary that merged into Ovonyx, Micron not only failed to cause Ovonyx to pay royalties to ECD, but it also reduced Ovonyx's revenues to such an extent that should it ever be required to honor ECD's Royalty Right, the amount it would be required to pay would be *de minimus*. These allegations make plausible the Trust's claim that Micron had an improper purpose in entering into the July 2015 Transactions.

Therefore, at least to the extent that the First Amended Complaint relies on Ovonyx's breach of ECD's Royalty Right, the Trust has stated a plausible claim for tortious interference with contract against Micron. Micron's motion to dismiss must be denied to the extent its seeks a complete dismissal of the tortious interference with contract claim alleged in the Trust's third cause of action.

## G. The Trust's fourth cause of action, against OMT for tortious interference with contract

The Trust's fourth cause of action is against OMT, for tortious interference with contract.

### 1. The Trust's position

The Trust's claim against OMT is based on the part OMT played in the July 2015 Transactions. The Trust alleges that "OMT worked to strip Ovonyx of its assets and avoid the

obligations to ECD under the 1999 [License] Agreement."[221]  The Trust alleges further that

"OMT participated in [the July 2015 Transactions] which had as its apparent purpose the

placement of Ovonyx's valuable assets beyond the reach of creditors, for the financial benefit of

Micron and Intel."[222]  The Trust alleges that in entering into the OMT Agreement, OMT sought

to avoid the obligations owed to ECD by Ovonyx under the First Refusal Right and the Royalty

Right.  The Trust alleges:

> 89.     Given the size of Micron's existing DRAM
> business and the typical Ovonyx license agreement royalty rate,
> [**the potential royalty expense savings to Micron [(due to its
> obtaining a royalty-free license as part of the July 2015
> Transactions)] (based on Durcan's 2018 single year sales
> estimate as a result of the Micron Royalty-Fee License) was
> many times greater than the $41.3 million Duff & Phelps
> valued the Micron Royalty-free License to Micron**.]
>
> . . . .
>
> 99.     **On July 31, 2015, Ovonyx and OMT entered into
> that certain "Asset Sale and Transfer Agreement" (the "<u>OMT
> Agreement</u>").  Pursuant to the OMT Agreement, Ovonyx
> transferred to OMT all of Ovonyx's rights, title and interest in
> and to certain patent rights held by Ovonyx, including patents
> and technology owned by Ovonyx and rights under various
> license agreements.**
>
> 100.    **The patent rights transferred by Ovonyx to
> OMT consisted of the substantial majority of the assets of
> Ovonyx**.
>
> . . . .
>
> 105.    On information and belief, OMT is a company that
> has no operations and no employees, but merely holds intellectual

---

[221]  Trust's Omnibus Objection (Docket # 69) at 48 (citing paragraphs 99 through 100 of the First Amended Complaint).

[222]  *Id.* at 48-49 (citing paragraphs 89 and 107 of the First Amended Complaint).

property rights.

. . . .

107.  **The effect of the OMT Agreement was that, at Micron's direction, Ovonyx transferred the bulk of its assets to OMT for virtually no consideration, thus putting its assets beyond the reach of Ovonyx's creditors.  The royalty OMT "paid" to Ovonyx amounts to a participation in the receipts from Ovonyx's own assets, which had the effect of eliminating almost all of ECD's Royalty.**

. . . .

164.  Ovonyx has materially breached the 1999 [License] Agreement.

165.  With respect to the breaches, based on existing license agreements Ovonyx has entered into that were being assigned to OMT, OMT had actual knowledge of the obligations owed to ECD under the 1998 [Contract] and 1999 [License] Agreement.

. . . .

167.  OMT acted with an improper purpose by ensuring that Ovonyx would never provide notice to the Trust.  On information and belief, OMT entered into the OMT Agreement to facilitate Micron's acquisition of Ovonyx and would acquire rights to intellectual property for consideration that was far below market value.[223]

## 2. OMT's position

OMT argues that the Trust's tortious interference with contract claim should be dismissed, for all of the same reasons argued by Micron for dismissing the Trust's tortious interference claim against Micron.  The Court rejects those arguments, for the same reasons discussed in Part V.F of this Opinion, above.

---

[223]  First Am. Compl. at 17, 19-20, 28 (bold and underlining in original).,

OMT makes the following additional arguments regarding the Trust's pleading

deficiencies, which pertain only to OMT:

- "The Trust does not even successfully plead that OMT had knowledge of the Trust itself, much less the obligations allegedly owed to it."[224]

- "The Trust does not allege that the 1998 Contract and the 1999 License Agreement were transferred to OMT pursuant to the OMT . . . Agreement. Nor does the Trust allege that OMT ever received or reviewed copies of those contracts. Indeed the Trust does not even allege that they were so much as discussed in connection with the OMT Transfer."[225]

- The Trust has not plausibly pled that "OMT knew the terms or even the existence of, the 1998 [Contract] and 1999 [License Agreement]" or that OMT knew "what would cause of breach of the 1998 [Contract] and 1999 [License Agreement.]"[226]

- "The representations and warranties Ovonyx gave OMT in the OMT . . . Agreement . . . that it had not entered into any other agreement or assumed any obligations in conflict with the OMT . . . Agreement and that its execution of the OMT . . . Agreement would not cause a breach of any other agreement to which Ovonyx was a party" is inconsistent with OMT having knowledge of, and entering into the OMT Agreement for the purpose of causing Ovonyx to breach an existing contract.[227]

- "The Trust does not allege that OMT engaged in the OMT Transfer for the purpose of inducing a breach of Ovonyx's alleged contractual obligations to the Trust."[228]

- The Trust failed to plead specific affirmative acts that OMT engaged in that support the Trust's conclusions that OMT acted improperly.[229]

### 3. Discussion

The Court agrees with OMT, that the Trust has failed to plausibly state a claim for

---

[224] OMT's Br. in Supp. of Mot. to Dismiss (Docket # 47) at 9.

[225] *Id.*

[226] *Id.* at 10.

[227] *Id.* at 10 n.3.

[228] *Id.* at 11.

[229] *Id.* at 12.

tortious interference of contract claim against OMT, based on OMT's additional reasons listed above.  At a bare minimum, the Trust must plead sufficient facts from which the Court could find it plausible that OMT knew about the existence of the 1998 Contract, and that such contract required Ovonyx to pay ECD a 0.5% royalty.  The Trust has not done so.  Without such knowledge, OMT could not have acted with the unlawful purpose of causing a breach of that contract.  OMT's mere participation in the OMT Agreement as part of the July 2015 Transactions, without more, is not sufficient to  show that OMT had an unlawful purpose in entering into those transactions.  The tortious interference with contract claim against OMT therefore must be dismissed.

## H.  The Trust's fifth cause of action, against OMT for an actual fraudulent transfer

The Trust's fifth cause of action is against OMT, for an actual fraudulent transfer under the "Michigan Uniform Voidable Transfers Act" ("MUVTA").  Mich. Comp. Laws Ann. § 566.31 *et seq.*  But in the Trust's brief in support of its omnibus objection to OMT's motion to dismiss, the Trust bases its argument on, and applies, the Michigan Uniform Fraudulent Transfer Act ("MUFTA").[230]  Mich. Comp. Laws Ann. § 566.31 *et seq.*

The Michigan Legislature enacted MUFTA, 1998 Mich. Pub. Acts 434, effective December 30, 1998.  Effective April 10, 2017, the Legislature amended and replaced MUFTA with MUVTA.[231]   MUVTA is not retroactive, meaning that it does not apply to transfers that

---

[230]  Trustee's Omnibus Objection (Docket # 69) at 49-56.

[231]  *See* 2016 Mich. Pub. Acts 331, effective March 8, 2017 (amending sections 1, 4, and 9 of 1998 Mich. Pub. Acts 434 (Mich. Comp. Laws Ann. §§ 566.31, 566.34, and 566.39); 2016 Mich. Pub. Acts 552, effective April 10, 2017 ("'repeal[ing] acts and parts of acts,' by amending the title and sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 ([Mich. Comp. Laws §§ 566.31, 566.32, 566.33, 566.34, 566.35, 566.36, 566.37, 566.38, 566.39, 566.40, 566.41, 566.42, and 566.43) , sections 1, 4, and 9 as amended by 2016 PA 331 and section 8 as amended by 2000 Mich. Pub. Acts 362, and by adding

115

occurred before its effective date of April 10, 2017. *See* Mich. Comp. Laws Ann. § 566.45.

Because the transfer at issue from Ovonyx to OMT occurred in July 2015, the MUFTA

applies. The provision of MUFTA at issue is Mich. Comp. Laws Ann. § 566.34, which

provided:

> Sec. 4. (1) A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor, whether the creditor's claim arose
> before or after the transfer was made or the obligation was
> incurred, if the debtor made the transfer or incurred the obligation
> . . .
>
> (a) With actual intent to hinder, delay, or defraud any creditor of
> the debtor.
> . . .
>
> (2) In determining actual intent under subsection (1)(a),
> consideration may be given, among other factors, to whether 1 or
> more of the following occurred:
>
> (a) The transfer or obligation was to an insider.
>
> (b) The debtor retained possession or control of the property
> transferred after the transfer.
>
> (c) The transfer or obligation was disclosed or concealed.
>
> (d) Before the transfer was made or obligation was incurred, the
> debtor had been sued or threatened with suit.
>
> (e) The transfer was of substantially all of the debtor's assets.
>
> (f) The debtor absconded.
>
> (g) The debtor removed or concealed assets.
>
> (h) The value of the consideration received by the debtor was
> reasonably equivalent to the value of the asset transferred or the
> amount of the obligation incurred.

---

sections 14 and 15."). FRAUDULENT TRANSFERS—UNIFORM VOIDABLE TRANSACTIONS
ACT, 2016 Mich. Legis. Serv. P.A. 552 (S.B. 982) (West).

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mich. Comp. Laws Ann. § 566.34(1)-(2).  This list of eleven factors is non-exclusive, and the factors in the list are commonly referred to in case law under MUFTA as "badges of fraud." *Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d 269, 285  (W.D. Mich. 2017).  "'Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them.'"  *Dillard v. Schlussel*, 865 N.W.2d 648, 657-58 (Mich. Ct. App. 2014) (quoting *Schilling v. Heavrin* (*In re Triple S Rests., Inc.*), 422 F.3d 405, 414 (6th Cir. 2005) (quotation marks and citation omitted)).

> "Badges of fraud are not conclusive, but are more or less strong or weak according to their nature and the number concurring in the same case, and may be overcome by evidence establishing the *bona fides* of the transaction.  However, a concurrence of several [of these factors] will always make out a strong case [in support of fraudulent intent]."

 *Id.* at 658 (italics in original) (citing *Bentley v. Caille*, 286 N.W. 163, 164 (Mich. 1939) (quotation marks and citations omitted)); *see also Wells v. Salmo* (*In re Select One, Inc.*), 556 B.R. 826, 848 (Bankr. E.D. Mich. 2013) (same).

Under MUFTA "'Creditor' means a person who has a claim."  Mich. Comp. Laws Ann. § 566.31 Sec. 1.(d).  "'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* at Sec. 1.(c).  MUFTA also contains a definition of

117

"insider."  It states:

> (g) "Insider" includes all of the following:
>
> . . . .
>
> (ii) If the debtor is a corporation, all of the following:
>
>> (A) A director of the debtor.
>>
>> (B) An officer of the debtor.
>>
>> (C) A person in control of the debtor.
>>
>> (D) A partnership in which the debtor is a general partner.
>>
>> (E) A general partner in a partnership described in sub-subparagraph (D).
>>
>> (F) A relative of a general partner, director, officer, or person in control of the debtor.

Mich. Comp. Laws § 566.31(g)(ii).

### 1.  The Trust's fraudulent transfer allegations against OMT

The Trust alleges that "[t]he effect of the OMT Agreement was that, at Micron's direction, Ovonyx transferred the bulk of its assets to OMT for virtually no consideration, thus putting its assets beyond the reach of Ovonyx's creditors."[232]  The Trust alleges further that the OMT Agreement was part of the July 2015 Transactions, through which "Micron and Intel engineered the purchase of Ovonyx's shares by Micron and the transfer of all of its substantial intellectual property rights to OMT in a way that significantly reduced ECD's Royalty[.]"[233]  The Trust also alleges that "[t]he OMT Agreement was entered into with the intent to hinder, delay, or defraud

---

[232]  First Am. Compl. at 20 ¶ 107.

[233]  Trustee's Omnibus Objection (Docket # 69) at 48 (citing First Am. Compl. at 17 ¶¶ 89-90).

other creditors of Ovonyx."[234]  The Trust alleges that

Ovonyx's intent is evidenced by the following actions:

    a.    **[Lowrey, who was the senior officer of Ovonyx, had no involvement in the negotiations with OMT but entirely deferred to Micron's wishes with respect to the OMT Agreement, knowing that it was a part of the [M]erger that would pay him over $25 million];**

    b.    Ovonyx intentionally hid the OMT Agreement from the [Trust], including for months afterwards even though the [Trust] had been requesting information from Ovonyx;

    c.    No effort was taken to evaluate the OMT Agreement or determine whether consideration OMT was paying for substantially all of Ovonyx's assets was fair; and

    d.    The transaction materially benefitted Micron, which at the time owned in excess of 35% of the stock of Ovonyx, had the right to appoint two board members, and was an insider of Ovonyx.[235]

The Trust further alleges that it is "a creditor of Ovonyx" and that it was harmed by OMT's and

Ovonyx's entering into the OMT Agreement.[236]

### 2. OMT's response

OMT argues that the Trust does not plausibly allege a fraudulent transfer claim, because

(1) "the Trust is not a creditor of Ovonyx,"[237] and (2) the Trust has not plausibly alleged that, in

---

[234]  First Am. Compl. at 29 ¶ 170.

[235]  *Id.* at 29 ¶ 171 (bold in original).

[236]  *Id.* at 29 ¶ 172.

[237]  OMT's Br. in Supp. of Mot. to Dismiss First Am. Compl. (sealed Ex. 3 to Docket # 47) at 13-14.

entering into the OMT Agreement, Ovonyx had an intent to hinder, delay or defraud the Trust.[238]
The Court disagrees with OMT's arguments.

### 3. Discussion

### a. The Trust is a creditor of Ovonyx.

OMT argues that the Trust is not a creditor of Ovonyx, because Ovonyx owes no obligations to the Trust under the 1998 Contract or the 1999 License Agreement. But the Court has ruled otherwise, in Parts V.B and V.D.4 of this Opinion (discussing Ovonyx's obligation to pay royalties to ECD).

### b. The Trust has plausibly alleged that Ovonyx entered into the OMT Agreement with the intent to hinder, delay or defraud the Trust.

### i. OMT's position on fraudulent intent

OMT argues that the Trust has not plausibly alleged that Ovonyx entered into the OMT Agreement with the intent to hinder, delay or defraud the Trust. This is so, according to OMT, because the Trust's allegations only allege one of the badges of fraud listed in Mich. Comp. Laws Ann. § 566.34(2).[239] That is the Trust's allegation that Ovonyx transferred "substantially all of [Ovonyx's] assets" to OMT under the OMT Agreement. *See* Mich. Comp. Laws Ann. § 566.34(2)(e). But according to OMT, a single badge of fraud "is not sufficient to support [the Trust's] claim that Ovonyx acted with [the] intent to hinder, delay, or defraud its creditors," and the Trust has failed to plausibly allege more than this one badge of fraud.[240]

OMT argues further that the Trust's allegations "that Lowrey was not involved in

---

[238] *Id.* at 14, 15-24.

[239] *Id.* at 16.

[240] *Id.* at 20.

negotiating the OMT . . . Agreement and 'entirely deferred to Micron's wishes' . . . is not a badge of fraud;"[241] that "the Trust's allegation of concealment is not supported by any well-pleaded facts;"[242] that "the Trust has failed to allege any plausible facts suggesting that Ovonyx did not receive reasonably equivalent value for the OMT Transfer;"[243] and that the Trust's allegation "that the OMT Transfer 'materially benefitted Micron' which was 'an insider of Ovonyx' due to its stock ownership and right to appoint two board members . . . misses the mark . . . [because w]hile a transfer ***to*** an insider is a badge of fraud, a transfer that merely ***benefits*** an insider is not."[244]

### ii. The Trust's position on fraudulent intent

The Trust admits that, at least with regard to its allegation regarding Lowrey's lack of involvement in negotiating the sale of substantially all of Ovonyx's assets, such allegation "does not explicitly fall under a formally enumerated 'badge'" of fraud. Nevertheless, the Trust argues that "the list of 11 badges is 'nonexclusive'" and Lowrey's lack of involvement is relevant to the "'bona fides' of this transaction."[245] The Trust also argues that the allegations in the First Amended Complaint are

> sufficient to establish at least four badges of fraud: that the OMT [T]ransfer involved substantially all of Ovonyx's assets, that Ovonyx removed or concealed assets, that the value of the consideration received [by] Ovonyx was not reasonably equivalent to the value of the asset transferred or the amount of the obligation

---

[241] *Id*. at 16.

[242] *Id*. at 17.

[243] *Id.* at 18.

[244] *Id.* at 19 (bold and italics in original).

[245] Trustee's Omnibus Objection (Docket # 69) at 52.

121

incurred, and that the transfer was to an insider.[246]

The Trust concludes that based on these four badges of fraud, it has plausibly alleged that Ovonyx had a fraudulent intent in entering into the OMT Agreement.  The Court agrees.

### iii.  The Trust need not plead more than one badge of fraud to plausibly plead fraudulent intent.

As an initial matter, it is not necessary to plead multiple badges of fraud in order to plausibly raise an inference of fraudulent intent under Michigan law.  OMT relies on a statement in *Dillard* that "once a creditor establishes the presence of multiple badges of fraud, he or she has established a fact question regarding actual intent," *see Dillard*, 865 N.W.2d at 660, for the proposition that multiple badges of fraud are *required* to establish an inference of fraudulent intent. *Dillard* does not so hold.  *Dillard* can be read as holding *only* that multiple badges of fraud establish an inference of fraudulent intent.  This an accurate statement in light of wording of Mich. Comp. Laws § 566.34(2), which expressly provides that consideration of "1 or more" badges of fraud may establish an inference of fraudulent intent.  *Dillard* cannot be read to *require* more than one badge of fraud to establish fraudulent intent.  Nor can any of the other cases that apply Michigan law, cited by OMT.[247]

As was correctly observed in the concurring opinion in *Estes v. Titus*, 751 N.W.2d 493, 504-06 (Mich. 2008) (Kelly, J., concurring) (footnotes omitted),

> To state ["a prima facie case alleging a transfer made with an actual intent to defraud"] creditors must allege at least one badge of fraud under [Mich. Comp. Laws §] 566.34(2).

---

[246] *Id*. at 56.

[247] OMT's Br. in Supp. of Mot. to Dismiss First Am. Compl. (sealed Ex. 3 to Docket # 47) at 20-21.

. . . .

[Mich. Comp. Laws §] 566.34(2), which supplies a list of ["the
relevant factors for determining whether the transfer was made with
an actual intent to defraud a creditor"], states that any one may be
considered to establish the intent to defraud.

. . . .

It is interesting to note that the application of the badges of fraud
listed in the Michigan UFTA differs from that allowed in other
states' versions of the UFTA. For example, the UFTA as adopted in
New Jersey, Oregon, and Illinois does not expressly allow the use of
only one factor to establish the intent to defraud. Not surprisingly,
in these states, courts require a "confluence" of factors indicating an
actual intent to defraud.

It is undisputed that the Trust has pled at least one of the badges of fraud listed in Mich.

Comp. Laws § 566.34(2).

### iv. The Trust has alleged three other badges of fraud.

In addition to alleging that Ovonyx transferred substantially all of its assets, the Trust has

made allegations that support the existence of at least three other badges of fraud listed in

MUFTA. This is especially so when the OMT Agreement is viewed in the context of the other

agreements that made up the July 2015 Transactions.

The Court agrees with those cases which have held that, in situations involving "a

complicated transaction consisting of number of steps and simultaneous, multilateral agreements,"

under certain circumstances, "the Court must view the fraudulent transfer claim in light of the

entire larger transaction." *See Wells v. THB Am., LLC* (*In re Clements Mfg. Liquidation Co.*,

*LLC*), 521 B.R. 231, 235, 243 (Bankr. E.D. Mich. 2014) (citing *Official Comm. of Unsecured*

*Creditors of Nat'l Forge Co. v. Clark* (*In re Nat'l Forge Co.*), 344 B.R. 340, 347-48 (W.D. Pa.

2006) (citations omitted) ("It is now widely accepted that multilateral transactions may under

appropriate circumstances be 'collapsed' and treated as phases of a single transaction for purposes

of applying fraudulent conveyance principles."); *Official Comm. of Unsecured Creditors of Grand*

*Eagle Cos., Inc. v. ASEA Brown Boveri, Inc.*, 313 B.R. 219, 229 (N.D. Ohio 2004) (citation

omitted) ("Courts will generally look past the form of a transaction to its substance. 'Thus an

allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a

general plan, the plan must be viewed as a whole with all its composite implications.'"); *Mills v.*

*Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 254-55 (S.D.N.Y. 2006) (quotation marks and

citations omitted) (explaining that "[w]here a transfer is actually only a step in a general plan, an

evaluation is made of the entire plan and its overall implications" and that "courts have

'collapsed' a series of transfers to assess the existence of fair consideration and the knowledge and

intent of the parties, in order to determine whether or not a particular transaction constitutes a

fraudulent conveyance"); *Creditors' Comm. of Jumer's Castle Lodge, Inc. v. Jumer* (*In re Jumer's*

*Castle Lodge, Inc.*), 338 B.R. 344, 356 (C.D. Ill. 2006), *aff'd*, 472 F.3d 943 (7th Cir. 2007)

(citations omitted) ("Where an allegedly fraudulent transfer is merely one step in a general plan,

the plan must be viewed as a whole with all its composite parts taken into consideration. Thus, it

is well-settled that 'a multilevel transaction will be collapsed and treated as a single transaction in

order to determine if there was a fraudulent conveyance.'"); *Brown v. Gen. Elec. Capital Corp.*

(*In re Foxmeyer Corp.*), 286 B.R. 546, 573-74 (Bankr. D. Del. 2002) (quotation marks and

citation omitted) (explaining that "[u]nder [the step transaction] doctrine, interrelated yet formally

distinct steps in an integrated transaction may not be considered independently of the overall

transaction" and that "by linking together all interdependent steps with legal or business

significance, rather than taking them in isolation, the result may be based on a realistic view of the

124

entire transaction.")).

Under the circumstances of this case, it may be appropriate for the Court to view the July 2015 Transactions as a single transaction in order to determine if there was a fraudulent transfer. The circumstances of this case are that the Trust alleges, in relevant part, that Ovonyx, at the direction of Micron, entered into a series of substantially contemporaneous inter-related transactions with Micron, with a wholly owned subsidiary of Micron, with OMT, and with Intel (the July 2015 Transactions), with the actual intent of substantially reducing revenues to Ovonyx from licensing its IP, in order to deprive the Trust of its right to collect 0.5% of Ovonyx's revenues, and that the effect of the July 2015 Agreements was just that.[248]

### a. The Trust has alleged that there was not reasonably equivalent value given for the Ovonyx transfers.

The Trust alleges that the value of the consideration received by Ovonyx was not reasonably equivalent to the value of the assets transferred. Because the OMT Agreement was just one integral step of the multiple steps taken in the July 2015 Transactions, in order to determine whether Ovonyx received reasonably equivalent value for the assets it transferred, the Court must consider the value of the assets that Ovonyx transferred to not just OMT, but also to Micron and Intel, and compare that value to the value of every benefit, direct and indirect, that Ovonyx received in exchange, not just directly from OMT, but also from Intel and Micron.

The First Amended Complaint alleges that in the July 2015 Transactions Ovonyx transferred:

- substantially all of its assets, including any right, title, and interest Ovonyx had in its patent rights to its IP, and with it, the right to 100% of the royalties from licensing

---

[248] *See* First Am. Comp. at 16 ¶ 82 - 24 ¶ 125.

125

such IP, to OMT;[249]

- a perpetual royalty-free world-wide license to Micron;[250]

- a perpetual royalty-free world-wide license to Intel;[251] and

- the right to $15 million in licensing fees that were due to be paid by Intel in the first 30 days after execution of the OMT Agreement.[252]

The Trust alleges that Ovonyx received "virtually no consideration" in exchange for the transfer of the bulk of its assets, which transfer put those assets "beyond the reach of Ovonyx's creditors."[253] Although the allegations in the First Amended Complaint do not state an exact dollar amount of the value Ovonyx received in return for the above listed transfers, they do explain the reasons for the Trust's argument that what value Ovonyx received in exchange for such transfers was insignificant, when compared to the value of what was transferred:

- Ovonyx received from OMT a right to payment each calendar quarter of between 10% and 18% of the royalty revenues that OMT generated as a result of it owning the patents and licensing rights of the IP that Ovonyx transferred to it.[254]

   The Trust alleges that "[t]he royalty OMT 'paid' to Ovonyx amounted to a participation in the receipts from Ovonyx's own assets, which had the effect of eliminating almost all of ECD's Royalty."[255] The only parties from whom Ovonyx, and later OMT, could reasonably expect to receive royalties were Intel and Micron, and those two joint venturers were each granted royalty-free licenses in the July 2015 Transactions. (The Trust alleges that Micron and Intel were involved in a joint venture

---

[249] First Am. Compl. at 19 ¶¶ 99-100.

[250] *Id.*. at 16 ¶ 83, 21 ¶ 113.

[251] *Id.* at 16 ¶ 82, 21 ¶ 113, 22-23 ¶¶ 118-123.

[252] *Id.* at 19 ¶ 103.

[253] *Id.* at 20 ¶ 107.

[254] *Id.* at 19 ¶ 101.

[255] *Id.* at 20 ¶ 107.

126

to develop 3D XPoint technology which was expected to generate significant income and would have potentially infringed on Ovonyx's patents if Ovonyx had not transferred those patents to OMT and if Intel and Micron had not obtained royalty-free licenses.)[256]  Moreover, OMT was not required to pay Ovonyx a royalty on any money it received in the first 30 days after execution of the OMT Agreement. Intel was obligated to make a $15 million payment "in connection with a replacement license that was . . . extremely valuable to Intel" within that time period, and therefore, Ovonyx would not be entitled to any percentage of that payment by Intel.[257]  It follows that the only way OMT could generate royalties, of which Ovonyx would be entitled to only a small percentage, was to license the IP to third parties.  But since OMT was allegedly only a holding company for intellectual property rights, which had no employees, and no operations,[258] it had no apparent capability of licensing IP to other third parties.[259]

- "Ovonyx did not undertake any analysis to determine whether the consideration provided by OMT was fair value for the assets Ovonyx was transferring to OMT. [On information and belief, the royalties OMT agreed to pay Ovonyx were substantially below market.]"[260]

- Ovonyx received from Intel, at most, only a small fraction of between $13.5 million and $30 million that Intel paid to Micron, Ovonyx and OMT jointly, "to terminate its existing license obligations to Ovonyx and enter into a new" agreement under which Intel received a royalty-free perpetual, world-wide license in the IP that Ovonyx had transferred to OMT.[261]

- Ovonyx received from Micron, for the transfer a royalty-free perpetual world-wide license, only a fraction of what such license was worth.  The Trust alleges that the

---

[256] *See id.* at 20 ¶ 108.

[257] *Id.* at 19-20 ¶ 103 (bold omitted).

[258] *Id.* at 20 ¶ 105.

[259] At the hearing on the motions to dismiss the Trust argued: "Prior to July 2015, OMT had no assets, no track record that . . . would suggest that it was capable of making productive use . . . as it stated in the OMT . . . [A]greement of the IT assets it was acquiring.  Nothing to suggest that it could generate any more revenue than Ovonyx on these assets." *(*Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 139.)

[260] First Am. Compl. at 19 ¶ 102 (emphasis in original omitted).

[261] *Id.* at 23 ¶ 122.  During the hearing on the motions to dismiss, the Trust stated that "OMT entered into a separate deal with Intel giving Intel [a] perpetual royalty free license for $15 [million]" but that "Intel actually only paid [$]1.5 [million] of that [$]15 [million.]" (Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 140-41).

127

value Micron paid was based on a valuation performed by Duff & Phelps, on behalf of Micron (the "D&P Valuation"), which valued Micron's royalty-free license as of July 31, 2015 at $43.1 million.[262] The D&P Valuation of such license was "based on projections . . . [that] were less than 10% of [Micron's] DRAM sales in the peak year and declining rapidly thereafter."[263] However on August 14, 2015, only two weeks after the D&P Valuation, the CEO of Micron stated at Micron's 2015 Summer Analyst Conference that Micron's 3D XPoint business, which would have involved exploiting Ovonyx's patents, and the payment of royalties for such use had the July 2015 Transactions not occurred, would easily bring in revenues equivalent to 50% of its DRAM business.[264] Based on this statement the D&P Valuation should have been approximately 40% higher than it was.

In addition to alleging that what Ovonyx received, in exchange for the assets that it transferred in the July 2015 Transactions, was far below market value, the First Amended Complaint makes other allegations challenging the bona fides of the OMT Agreement and the other transaction that are part of the July 2015 Transactions. The First Amended Complaint alleges that:

- "Samsung Electronics Co., LTD, an Ovonyx licensee and one of the largest semiconductor and information technology companies in the world, contacted Ovonyx in July 2015 to discuss an acquisition with Ovonyx, but Ovonyx declined to negotiate with the third party and instead only proceeded with finalizing the merger with Micron."[265]

- "On information and belief, Ovonyx and Lowrey made no effort to market the stock in Ovonyx to any person other than Micron."[266]

- As noted above, "Ovonyx did not undertake any analysis to determine whether the consideration provided by OMT was fair value for the assets Ovonyx was transferring to OMT. [On information and belief, the royalties OMT agreed to pay Ovonyx were

---

[262] First Am. Compl. at 16-17 ¶ 86.

[263] *Id.* at 17 ¶ 88 (bold omitted).

[264] *Id.*

[265] *Id.* at 18 ¶ 94 (bold omitted).

[266] *Id.* at 18 ¶ 95.

substantially below market.]"[267]

- "The OMT Agreement had additional terms that made no commercial sense" such as the fact that "OMT had no obligation to pay Ovonyx any licensing revenues that OMT received in the first thirty days after the execution of the OMT Agreement" even though "OMT was supposed to receive from Intel a $15 million payment in connection with a replacement license that was . . . extremely valuable to Intel."[268]

- "Lowrey . . . had no involvement over the more than two year period in the drafting or negotiations of the OMT Agreement[] which transferred a bulk of the Ovonyx assets to OMT, even though he was the senior officer [(President and CEO)] and, on information and belief, one of less than five employees of Ovonyx at all times."[269]

- Lowrey received in excess of $25.6 million for the sale of his stock to Micron and for dividends on that stock.[270]

- "The OMT Agreement was not [an] arms-length, commercially reasonable transaction but a sweetheart deal, done in secret."[271]

OMT argues that the Trust's allegations are not sufficient to plausibly support the no-reasonable-value badge of fraud, because "the Trust never actually alleges that Ovonyx failed to receive reasonably equivalent value" for the transfers under the OMT Agreement, "and the [First Amended] Complaint has no well-pleaded allegations upon which the Court could rely in reaching this conclusion."[272] The Court disagrees.

The allegations described above plausibly support the Trustee's position that Ovonyx did not receive reasonably equivalent value for what it transferred as a result of the OMT Agreement

---

[267] *Id.* at 19 ¶ 102 (bold omitted).

[268] *Id.* at 19-20 ¶ 103 (bold omitted).

[269] *Id.* at 21 ¶ 112 (bold omitted).

[270] *Id.* at 21 ¶ 111.

[271] *Id.* at 20-21 ¶ 109.

[272] OMT's Br. in Supp. of Mot. to Dismiss First Am. Compl. (Sealed Ex. 3 to Docket # 47) at 18 (footnote omitted).

and the other transactions that were integral parts of July 2015 Transactions.[273]  The transfer by Ovonyx to OMT of all of its rights, title, and interest in its patents and licensing rights in the OMT Agreement appears, from the Trust's allegations, to be objectively commercially unreasonable due to what little consideration Ovonyx received in return (only a fraction of the 100% of the revenues it was entitled to before the OMT Agreement).  And the commercial unreasonableness is further indicated by the fact that OMT appeared to have no greater ability to market the patents and licensing rights than Ovonyx did, with OMT having no employees and no ongoing operations.  What makes even less commercial sense is that under the OMT Agreement, OMT had no obligation to pay Ovonyx any percentage of an expected $15 million royalty payment to be made by Intel in the first thirty days of execution of the agreement.  Still worse for Ovonyx's revenue stream, was that, due to the other transactions that were related to the OMT Agreement, Micron and Intel were each granted royalty-free licenses, thereby eliminating their obligation to make any royalty payments on what Micron and Intel thought would be a lucrative venture (3D XPoint technology development), made possible by the exploitation of Ovonyx's patents.  It is hard to see any real benefit to Ovonyx of entering into the OMT Agreement, particularly given the other transactions that made up the July 2015 Transactions.

   OMT argues that the Trust's allegations in the First Amended Complaint do not include all of the consideration that Ovonyx received in exchange for what it transferred in the OMT Agreement.  OMT argues that "the OMT . . . Agreement on its face, contradicts [the Trust's no reasonably equivalent value] assertion by showing that, in addition to a significant percentage of

_____

[273]  OMT acknowledges this and states: "The Trust makes a conclusory allegation that Ovonyx 'transferred the bulk of its assets to OMT for virtually no consideration.'" *Id.* (citing paragraph 107 of the First Amended Complaint).  This allegation certainly is sufficient to satisfy the requirement of pleading the "no equivalent value" badge of fraud.

future licensing revenues, Ovonyx received a series of rights and promises that the Trust completely and misleadingly ignores in the [First Amended] Complaint. *See, e.g.*, Ex. 1 OMT . . . Agreement §§ 5.1, 5.2."[274]  These sections of the OMT Agreement state the following about OMT's predecessor, IPLLC:

> Section 5.1    Restrictions.  IPLLC shall not enter into any agreement for the purpose of diminishing revenue or otherwise avoiding the obligation of IPLLC to Ovonyx under this Agreement or diminishing the rights or benefits of Ovonyx hereunder.

> Section 5.2    Revenue Generation.  IPLLC shall use commercially reasonable efforts to prosecute, maintain, license, litigate, enforce, assert, collect upon, and otherwise exploit the IPLLC Assets consistent with the goal of generating revenue.[275]

OMT fails to explain how the percentage of future licensing revenues (between 10% and 18%) is "significant" given that Ovonyx previously owned and had the right to 100% of the licensing revenues.  Nor does OMT explain how the rights and promises in §§ 5.1, 5.2 had value, and what approximate value they had in comparison to the value of what was transferred.  Nor does OMT explain how it had the ability to exploit the "IPLLC Assets" in such a way as to generate more revenue for Ovonyx than Ovonyx could generate on its own.  Finally, OMT has failed to explain how IPLLC's promise, not to enter into any agreement in the future that would diminish Ovonyx's revenues, had any value, in light of the fact that the OMT Agreement itself apparently had the effect of eliminating Ovonyx's revenue stream in perpetuity from the two entities most likely to generate royalty revenue — Intel and Micron.

For these reasons, OMT's argument regarding other valuable interests transferred to

---

[274] *Id.*

[275] OMT Agreement (Ex. 6-4 of Docket # 58) at 14 §§ 5.1 - 5.2.

Ovonyx does not undercut the Trust allegations about the minimal value received by Ovonyx in exchange for what it transferred under the OMT Agreement.

Next, OMT argues that the allegations in the First Amended Complaint about Lowrey's lack of participation in negotiating the OMT Agreement, and his deferring entirely to Micron's wishes, do not relate to any of the badges of fraud under the MUFTA. While this may be true, it does not mean that such allegations are not relevant to the fraudulent intent inquiry. Under *Dillard*, "the confluence of several" badges of fraud "supports a strong inference of fraud." *See Dillard*, 865 N.W.2d at 658. But such an inference of fraudulent intent "'may be overcome by evidence establishing the *bona fides* of the transaction.'" *Id.* (italics in original) (citation omitted). Allegations that tend to show that the transaction at issue was not the result of arms-length bargaining are thus relevant to whether or not OMT can overcome the effect of multiple badges of fraud.

The Trust's allegations that Lowrey failed to market Ovonyx's stock to anyone other than Micron, failed to discuss acquisition of Ovonyx with Samsung Electronics Co., LTD or any other third party, failed to participate in the negotiations of the OMT Agreement, and personally received millions of dollars as a result of the July 2015 Transactions, tend to undercut the bona fides of the transaction. A reasonable inference can be drawn that there was no one representing the interests of Ovonyx during negotiations over the OMT Agreement, and that Lowrey may have had a strong personal incentive to allow Ovonyx to enter into that agreement and other agreements that were not beneficial to it.

### b. The Trust has alleged that there was a transfer to an insider of Ovonyx, and that Ovonyx removed or concealed assets.

In addition to the two badges of fraud discussed above, the Trust also alleges two other

132

badges of fraud. The Trust alleges that there was a transfer to an insider. Under MUFTA, an insider of a corporation includes "[a] person in control of the debtor." Mich. Comp. Laws § 566.31(g)(ii)(C). Micron, upon obtaining 100% of the equity of Ovonyx, was then in control of Ovonyx and exercised that control to cause the rest of the July 2015 Transactions to be consummated, including the OMT Transfer. The effect of the July 2015 Transactions was that Ovonyx transferred all of its assets to OMT, then there was a transfer to Micron of a perpetual world-wide royalty-free license. As discussed above, in this case it may be appropriate to collapse all of the transactions that made up the July 2015 Transactions. Once that is done, it is plausible that there was a transfer to an insider of the transferor Ovonyx as a result of the OMT Agreement.

The Trust also alleges that Ovonyx removed assets or concealed assets. The Trust has alleged that the intent and the effect of the OMT Agreement was to remove the assets from the reach of Ovonyx's creditors, including the Trust. OMT concedes that there was a transfer of substantially all of the assets of Ovonyx. It argues however, that there were still assets which were available to Ovonyx's creditors — a percentage of the royalties earned by OMT. But it is undisputed that Ovonyx removed assets from the reach of creditors.

In plausibly alleging four badges of fraud and in plausibly alleging that the OMT Agreement and the other agreements that made up the July 2015 Transactions were not bona fide transactions, the Trust has plausibly stated a fraudulent transfer claim against OMT. To the extent OMT's motion seeks dismissal of the fraudulent transfer claim, the motion must be denied.

## I. The Trust's sixth cause of action, against Intel for aiding and abetting tortious interference with contract

The Trust's sixth cause of action is against Intel, for aiding and abetting Micron's tortious

interference with the Trust's contractual rights.[276] "'To analyze a claim of secondary liability, the court must first determine the contours of the primary violation on which the secondary liability is alleged to be based.'" *El Camino Res., LTD. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 914 (W.D. Mich. 2010), *aff'd*, 712 F.3d 917 (6th Cir. 2013) (citation omitted). The Trust's aiding and abetting claim is based on the Trust's underlying claim against Micron in the third cause of action. In that cause of action, the Trust alleges that in 2015, Micron tortiously interfered with the Trust's First Refusal Right and Royalty Right under the 1998 Contract and the 1999 License Agreement, by instigating the breach by Ovonyx and Lowrey of their obligations under those contracts.[277] In order to plausibly allege aiding and abetting liability against Intel, the Trust first must plausibly allege that Micron instigated a breach of the Trust's Right of First Refusal or Royalty Right.

### 1. Intel's threshold argument

Intel argues that "[a]s a threshold matter, [the Trust] cannot plausibly assert a contract right that would give rise to an interference claim."[278] For all of the reasons raised by the other Defendants in their motions to dismiss, Intel argues that "no contract right ever existed in 2015 to support [the Trust's tortious] interference claim[.]"[279] Intel argues that by 2015, the Trust had no First Refusal Right and no Royalty Right against either Lowrey or Ovonyx that had survived ECD's sale of its stock to Micron in 2012 and the confirmation of the Debtor's Plan in 2012, under which the 1998 Contract was rejected. Intel argues further with regard to the First Refusal

---

[276] First Am. Compl. at 26-27 ¶¶ 146-56.

[277] *Id.* at 26 ¶¶ 146-49.

[278] Def. Intel's Br. in Supp. of its Mot. to Dismiss Compl. for Failure to State a Claim (Docket # 59) at 10.

[279] *Id.* at 14.

134

Right, that even if such right did exist in 2015, the Trust would be judicially or equitably estopped from arguing that such right existed because of representations that ECD made in the Equity Purchase Agreement, which representations were incorporated into the Sale and Assignment Order.[280] According to Intel, there is no underlying tortious interference with contract claim on which to base the Trust's aiding and abetting claim, because "there was no enforceable contract with which anyone could interfere [in 2015]."[281]

For the reasons stated earlier in this Opinion, the Court rejects Intel's arguments, with respect to the Trust's Royalty Right. Earlier in this Opinion, the Court concluded that while the Trust does not have a First Refusal Right, the Trust did have, in 2015 and still, an enforceable Royalty Right against Ovonyx. The Court also concluded that the Trust has plausibly alleged that Micron instigated Ovonyx's breach of the Trust's Royalty Right, and has plausibly alleged a tortious interference with contract claim against Micron. That tortious interference claim against Micron, therefore, serves as the underlying basis for the Trust's aiding and abetting claim against Intel. But in order to state an aiding and abetting claim against Intel, the Trust still must plausibly allege the elements of an aiding and abetting claim.

### 2. Elements of an aiding and abetting claim

"Proof of an aiding and abetting claim . . . requires (1) [actual] knowledge of wrongful conduct by the aider/abettor; and (2) substantial assistance of the wrongful conduct by the aider/abettor." *El Camino Res. Ltd. v. Huntington Nat'l Bank*, 712 F.3d 917, 922 (6th Cir. 2013) (applying Michigan law).

---

[280] *See id.* at 11-14.

[281] *Id.* at 14-15.

135

With respect to the knowledge requirement, courts applying Michigan law have held that 'the alleged abettor is required to have the same degree of *scienter* as the person committing the actual fraud.' Actual knowledge of the tort itself is necessary to impose liability on the alleged aider and abettor. Alleging that the defendant 'knew or should have known' of the illegal scheme is not sufficient.

*Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1346 (E.D. Mich. 2011) (italics in original) (citations omitted). "For purposes of establishing aiding-and-abetting liability, the requisite knowledge may be shown by circumstantial evidence. . . . Circumstantial evidence is evidence which, although not directly proving a material fact, would support a reasonable inference in favor of the likelihood of that fact." *El Camino Res. Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 920 (W.D. Mich. 2010) (citations omitted).

With respect to the "substantial assistance" element:

"The plaintiff [must] show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort.'" *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537 (6th Cir.2000) (quoting *K & S P'ship v. Continental Bank, N.A.*, 952 F.2d 971, 979 (8th Cir.1991)). Therefore, the plaintiff must demonstrate both but-for and proximate causation. *See El Camino*, 722 F.Supp.2d at 910.

*Fremont*, 811 F. Supp. 2d at 1347.

### 3. Intel's position on the elements of the aiding and abetting claim

Intel alleges that "[the Trust] has not plausibly alleged any of the other elements required to state an aiding and abetting claim."[282] Intel argues that, even assuming that the Trust "had plausibly alleged that *Micron* or *OMT* tortiously interfered with its contract rights, [the Trust's] aiding and abetting claim *still* fails because [the Trust] did not adequately allege that *Intel*

---

[282] Def. Intel's Br. in Supp. of its Mot. to Dismiss Compl. for Failure to State a Claim (Docket # 59) at 10.

'actually knew'" that the Trust had a valid and enforceable First Refusal Right or Royalty Right against Ovonyx in July 2015; that Ovonyx breached those rights; and that "Micron or OMT instigated those alleged breaches";[283] and the Trust did not allege that Intel "substantially assisted others' interference" with the Trust's contract rights.[284]

Regarding the "actual knowledge" requirement, Intel argues that, "*at most*, [the Trust's allegations] support an inference of constructive, not actual, knowledge."[285] Intel argues further that the Trust's "conclusory allegations 'upon information and belief' that Intel 'was aware of the terms of the 1998 [Contract] and 1999 [License] Agreement' do not come close to plausibly alleging actual knowledge . . . by Intel."[286] Intel argues that these allegations do not "'amount to anything more than speculation.'"[287]

With regard to the "substantial assistance" element, Intel argues that the Trust has not plausibly alleged that Intel provided substantial assistance to Micron or OMT and that such assistance was a primary factor in causing the breach of contract.

### 4. The Trust's position on the elements of the aiding and abetting claim

The Trust's brief discusses the elements of the underlying tortious interference with contract claim against Micron, but not the additional "actual knowledge" and "substantial assistance" elements of the aiding and abetting claim against Intel. The Trust did however,

---

[283] *Id.* at 19-20 (italics in original); *see also id.* at 22; Def. Intel Corp.'s Reply Br.in Supp. of its Mot. to Dismiss (Docket # 96) at 1.

[284] Def. Intel Corp.'s Reply Br.in Supp. of its Mot. to Dismiss (Docket # 96) at 1.

[285] Def. Intel's Br. in Supp. of its Mot. to Dismiss Compl. for Failure to State a Claim (Docket # 59) at 22.

[286] *Id.* at 20.

[287] *Id.* at 21 (citation omitted).

address these elements during oral argument on the motions to dismiss.

Regarding the "actual knowledge" and "substantial assistance" requirements, the Trust argues that "Intel had a general awareness of its own role in the improper activity" and that Intel "knew by facilitating the [July] 2015 [T]ransactions it was [aiding] OMT and Micron [in] breaching their obligations."[288]  The Trust argued further that

> the complaint concretely alleges that Intel knew about the '98 and '99 agreements by virtue of its position as a preferred stockholder, through its board observation rights under the 2000 [S]tockholder[s] [A]greement. It knew that Micron had acquired the stock in 2012. And the complaint alleges Intel knew of Ovonyx's obligations under those agreements and that they had remained with the [T]rust.

> The complaint alleges that Intel received a massive windfall through the [July] 2015 [T]ransactions. A feature of the business transaction that -- and the feature of the business transactions that supports that and shows that Intel was aiding the instigation of the breaches. The complaint alleges that Intel encouraged the [July] 2015 [T]ransactions knowing that consummation to Intel's benefit without any notice would violate the '98 and '99 agreements, including consenting to amendments to Ovonyx's Articles of Incorporation, approving payments of dividends, waiving redemption rights, terminating rights under the [2000 S]tockholder[s] [A]greement and facilitating the transfer of assets to OMT.

> These allegations are not conclusory or speculative, they are concrete.  That is sufficient to nudge the complaint over the line for purposes of aiding  and abetting tortious interference.[289]

The Trust argues that all of this is circumstantial evidence of Intel's actual knowledge of Micron's tortious interference with the Trust's contract rights, and of Intel's substantial assistance of that

---

[288]  Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 135.

[289]  *Id.* at 136.

138

interference.[290]   The Court agrees with the Trust, and concludes that the Trust has plausibly

alleged an aiding and abetting claim against Intel.

### 5. The facts alleged and the reasonable inferences drawn from those facts plausibly support both elements of an aiding and abetting claim against Intel.

The facts alleged by the Trust, and the reasonable inferences that can be drawn from those

facts, support both elements of the Trust's aiding and abetting claim against Intel.  Such

allegations, and reasonable inferences from such allegations, include the following:

- Intel and Micron were partners in a joint venture to develop and market 3D XPoint technology, which exploited intellectual property and a device that were invented by ECD;[291]

- Intel and Micron believed that such 3D XPoint technology would generate substantial revenues, and that would require Intel and Micron to pay significant royalties to the Trust based on its Royalty Right under the 1998 Contract and the 1999 License Agreement and under licensing agreements Micron and Intel had with Ovonyx;[292]

- Intel knew about Ovonyx's obligation to pay a royalty to the Trust, based on it being the largest preferred stockholder of Ovonyx with Board observer rights, and based on it being a party to the 2000 Stockholders Agreement with Ovonyx, which agreement expressly referred to the 1998 Contract and stated that, to the extent that it was not inconsistent with the 2000 Stockholders Agreement, that contract would "remain in full force and effect" and based on

---

[290]  *Id.*

[291]  First Am. Compl. at 2 ¶ 4 ("In 2015, Defendant Micron . . . announced, along with its joint venture partner . . . Intel . . . the commercial development of '3D Xpoint,' which, on information and belief, employs the intellectual property and device that ECD invented."); 21 ¶ 114 ("A representative of IM Flash, an Intel and Micron joint venture, was quoted as stating that the [3D XPoint] technology's 'magic parts' were Chalcogenide material and an 'Ovonyx switch' that, on information and belief, is the Ovonic Switch.")

[292]  *See id*. at 2-3 ¶¶ 4-5 (stating in relevant part that "[the 3D XPoint] technology now stands on the edge of extraordinarily valuable commercialization" and that on July 28, 2015, Micron and Intel made a public announcement in which they unveiled 3D XPoint technology as "a major breakthrough in memory process technology" which is "up to 1,000 faster and has up to 1,000 times greater endurance than NAND, and is 10 times denser than conventional memory.")

Intel's extensive involvement in Ovonyx's business;[293]

- "In 2013, [when] Ovonyx achieved commercialization . . . Intel, as the holder of preferred stock, could have forced Ovonyx to redeem all of its preferred stock[, b]ut . . . did not [because] . . . Intel desired to retain access to and influence on Ovonyx's intellectual property, including phase-change memory technology and the Ovonic Switch. Indeed, . . . in July 2015, Intel obtained a royalty-free license of valuable intellectual property from OMT, which OMT obtained rights to such intellectual property from Ovonyx."[294]

- Intel negotiated for and obtained a First Offer Right in the 2000 Stockholders Agreement to protect its stockholder interest in Ovonyx;

- Intel did not exercise its First Offer Right, when it was triggered by the sale of substantially all of the assets of Ovonyx to OMT,[295] because it knew that it, along with Micron, would receive a perpetual worldwide royalty-free licence to the IP under the July 2015 Transactions, which would eliminate the exposure of Intel and Micron to liability for their potential infringement of Ovonyx's patents in marketing its 3D XPoint technology and would also eliminate their obligation to pay the Trust royalties;

- Intel knew that the effect of the July 2015 Transactions would be to deprive the Trust of substantially all of the revenues to which it would have been entitled on account of its Royalty Right and the existing license agreement between Ovonyx and Intel;

---

[293] *Id.* at 4 ¶ 10 ("[T]he Defendants ensured that the [Trust] was denied its valuable contractual rights."); 5 ¶ 14 ("Intel also was involved in the misconduct. Intel . . . **which was the largest preferred stockholder of Ovonyx and had Ovonyx Board observer rights, necessarily participated in the steps necessary to effectuate the Micron-Ovonyx merger and the transfer of assets to OMT. Indeed, Intel, which at all relevant times must have known about the agreements between Ovonyx and ECD, received a massive windfall by buying out its existing royalty obligations under its existing license with Ovonyx at, on information and belief, substantially below a reasonable value, and replacing it with a new royalty-free license of intellectual property Ovonyx was transferring to OMT, on information and belief, at well below reasonable cost.**") (bold in original); 13 ¶ 65 ("**Lowrey on behalf of Ovonyx, worked extensively with Intel from 2000 to at least 2009 on developing technology, including technology that would become material to the development of 3D XPoint**. On information and belief, Intel and Ovonyx continued to work with each other including regarding patents related to Intel until at least October 2013. Intel had particular interest in using the Ovonic Switch for its memory circuits, and Lowrey assisted Intel in this regard and was knowledgeable of the development progress and status.") (bold in original).

[294] *Id.* at 16 ¶ 82 (bold omitted).

[295] *Id.* at 16 ¶ 84, 22 ¶ 117.

140

- Intel and Micron, acting in concert, and according to a common plan, entered into the series of inter-related transactions in July of 2015 for the purpose of obtaining perpetual world-wide royalty-free licenses, which they knew would, in effect, deprive the Trust of the benefits of its Royalty Right;[296]

- The OMT Agreement, under which Ovonyx transferred substantially all of its assets to OMT, did not make commercial sense for Ovonyx;[297]

- Intel knew of and was intimately involved in the July 2015 Transactions, and each of the individual transactions that collectively made up the July 2015 Transactions were necessary to achieve the desired result of providing Intel and Micron with royalty-free licenses, including the OMT Agreement which caused Ovonyx to breach the Trust's Royalty Right, and therefore, Intel's participation in the July 2015 Transactions furthered, and was a substantial factor in, Ovonyx's breach of the Royalty Right;[298] and

---

[296] *See id.* at 16 ¶ 82, 21 ¶ 113 ("Micron and Intel received a royalty-free license to all of the technology that OMT had acquired from Ovonyx."); 22 ¶ 118 (**"OMT licensed to Intel all of the patent rights OMT obtained from Ovonyx."**) (bold in original); Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 126 (Trust's attorney arguing that the purpose of the July 2015 Transactions was to "ensure no party other than Micron and Intel would ever be able to exploit the intellectual property critical to 3D X[P]oint that they were on the verge of announcing which [Micron and Intel] did within days of doing so").

[297] *Id.* at 5 ¶ 13 ([O]n July 31, 2015, Ovonyx transferred a majority of its valuable intellectual property to . . . OMT . . . **for virtually no consideration. This transfer of value by Ovonyx to OMT was done at the direction of Micron, and on its face makes no business sense for Ovonyx, which would see its anticipated revenues, right as Micron was announcing 3D XPoint, plummet as a result of the transfer from Ovonyx to OMT.**") (bold in original); 19-20 ¶ 103 (**"The OMT Agreement had additional terms that made no commercial sense [from Ovonyx's perspective]. Under the OMT Agreement, OMT had no obligation to pay Ovonyx any licensing revenues that OMT received in the first thirty days after execution of the OMT Agreement. In those first thirty days, on information and belief, OMT was supposed to receive from Intel a $15 million payment in connection with a replacement license that was, on information and belief, extremely valuable to Intel. On information and belief, prior to the execution of the OMT Agreement, Ovonyx knew that OMT was supposed to be receiving a substantial licensing fee and would be forfeiting a valuable opportunity. On information and belief, Intel only paid OMT $1.5 million or 10% of the $15 million contracted amount**.") (bold in original), 22 ¶ 119.

[298] The First Amended Complaint states:

117.  Intel was heavily involved in the July 2015 [T]ransactions. . . . [I]t did not exercise any rights of first refusal in connection with the Merger Document or any rights of first offer in connection with the OMT Agreement but in fact facilitated the July 2015 [T]ransactions through various corporate governance

141

- But for Intel's involvement in the July 2015 Transactions, such transactions would not have occurred and there would have been no breach of the Royalty Right.[299]

---

rights it had with respect to Ovonyx, including (1) consenting to amendments to Ovonyx's articles of incorporation, (b) approving payments of dividends, (c) waiving rights of redemption, and [(d)] terminating rights under a stockholder agreement.

*Id.* at 22 ¶ 117 (bold omitted).

[299] The First Amended Complaint infers that Intel knew about and was involved in all of the July 2015 Transactions, from the fact that the individual transactions that make up the July 2015 Transactions refer to the other agreements and state that the other agreements are being executed shows that each of the transactions were related to the others:

> **120.** **In the same payment section of the OMT-Intel License, OMT acknowledged it was entering into the OMT-Intel License because it was receiving assignment of patents and patent applications from Ovonyx and that Intel was also paying Ovonyx.**
>
> **121.** **Further, the OMT-Intel license agreement referenced a fourth amendment to the existing license agreement between Ovonyx and Intel (the "<u>Fourth Amendment</u>"). This demonstrates that Intel was intimately involved in all aspects of the July 2015 [T]ransactions.**
>
> **122.** **On information and belief, pursuant to the Fourth Amendment[,] Intel purportedly paid between $13.5 million and $30 million (collectively to Micron, Ovonyx, and OMT) to terminate its existing license obligation to Ovonyx and enter into a new, royalty-free, license. This is buttressed by a provision of the OMT Agreement, section 2.5(a), that obligated OMT to grant to Ovonyx a royalty-free license so that Ovonyx could grant a license to one third party- that third party being Intel.**
>
> **123.** **The net effect of the Intel transactions is that Intel, a joint venturer with Micron on developing 3D XPoint, acquired a royalty-free license to the intellectual property that Ovonyx had owned, paying no more than approximately $30 million, with Micron, on information and belief, receiving the lion's share of the cash.**

142

### i. It is reasonable to infer that Intel knew that Micron instigated Ovonyx's breach of the Trust's Royalty Right.

The facts pled by the Trust, and inferences that reasonably may be drawn from those facts, show sufficient circumstantial evidence to plausibly infer that, at least as early as 2000, Intel actually knew about Ovonyx's obligation to pay ECD a royalty. It is reasonable to infer that Intel actually knew about the terms in the 1998 Contract, which were explicitly referenced in the 2000 Stockholders Agreement and which contained Ovonyx's Royalty Right, because Intel was very sophisticated in business matters; was the largest preferred stockholder of Ovonyx; had Board observer rights for Ovonyx; took actions, such as obtaining Board observer rights, that would allow it to be informed regarding Ovonyx's business activities; actively participated in negotiations which led to the 2000 Stockholders Agreement; was a party to the 2000 Stockholders Agreement that negotiated the First Offer Right for Intel; and was a party to at least five other separate agreements between Ovonyx and itself that were incorporated into the 2000 Stockholders Agreement.[300] It is also reasonable to infer from the Trust's allegations that Intel knew that, in entering into the July 2015 Transactions, Micron was causing Ovonyx to breach the Royalty Right. And Intel knew that Ovonyx would not be earning royalties from Intel, on account of it gaining a perpetual world-wide royalty-free license.

### ii. It is reasonable to infer that Intel provided substantial assistance to Micron's interference with Ovonyx's contract with the Trust.

---

*Id*. at 22-23 ¶¶ 120-23 (bold and underlining in original) (bracketing in original omitted).

[300] *See* paragraph 9.10 of the 2000 Stockholders Agreement (referencing the Stock Purchase Warrant . . . issued by [Ovonyx] to Intel, the Collaboration and License Agreement . . . between [Ovonyx] and Intel, the Corporate Non-Disclosure Agreement (number 2541617) dated as of July 6, 1999 between [Ovonyx] and Intel and the Confidentiality Side Letter dated as of the date hereof between [Ovonyx] and Intel).

143

It is also reasonable to infer that Intel provided Micron with substantial assistance in instigating Ovonyx's breach of the Trust's Royalty Right. Intel had a strong economic motive to do so. Intel's receipt of the perpetual world-wide royalty-free license was dependent on Micron taking the actions that, allegedly, tortiously interfered with the Trust's Royalty Right. The July 2015 Transactions, allegedly, made no commercial sense for Ovonyx. It is also reasonable to infer that Intel aided Micron in instigating the breach based on the timing of the July 2015 Transactions, relative to the public announcement unveiling 3D XPoint technology on July 28, 2015.

For all of these reasons, the facts alleged in the First Amended Complaint, if true, are circumstantial evidence sufficient to make plausible the Trust's claim that Intel aided and abetted Micron's instigation of Ovonyx's breach of the Trust's Royalty Right. Therefore, Intel's motion to dismiss must be denied, to the extent it seeks dismissal of the Trust's aiding and abetting claim, relating to the Royalty Right. Intel's motion to dismiss will be granted, to the extent it seeks dismissal of the Trust's aiding and abetting claim, relating to ECD's First Refusal Right.

## J. The Trust's seventh cause of action against Intel, seeking a declaratory judgment

The Trust's seventh cause of action seeks a judgment against Intel declaring "that upon the avoidance of the OMT Agreement, Intel has no right to intellectual property belonging to Ovonyx by virtue of the [perpetual world-wide royalty-free license OMT granted to Intel.]"[301]

The Trust concedes that its request for a declaratory judgment depends on it prevailing on its fraudulent transfer claim against OMT in the fifth cause of action. Intel argues that the Trust cannot prevail on that fraudulent transfer claim for the same reasons argued by OMT. But the

---

[301] First Am. Compl. at 32 ¶ 195.

144

Court has discussed and rejected those arguments, in Part V.H of this Opinion.

The Court will therefore deny Intel's request to dismiss the seventh cause of action.

## VI. Conclusion

For the reasons stated in this Opinion, the Court will enter an order:

(1)     granting Lowrey's motion to dismiss the first cause of action against him in the First Amended Complaint (breach of contract), in its entirety;

(2)     granting Ovonyx's motion to dismiss the first cause of action against it (breach of contract), to the extent that cause of action is based on a breach of the Trust's First Refusal Right;

(3)     denying Ovonyx's motion to dismiss the first cause of action against it (breach of contract), to the extent that cause of action is based on a breach of the Trust's Royalty Right;

(4)     granting Micron's motion to dismiss the second cause of action against it (alter ego/successor liability), to the extent that cause of action is based on a breach of the Trust's First Refusal Right;

(5)     granting Micron's motion to dismiss the second cause of action against it (alter ego/successor liability), to the extent that cause of action is based on a theory of successor liability for breach of the Trust's Royalty Right;

(6)     denying Micron's motion to dismiss the second cause of action against it (alter ego/successor liability), to the extent that cause of action is based on a theory of alter ego for breach of the Trust's Royalty Right;

(7)     granting Micron's motion to dismiss the third cause of action against it (tortious interference with contract), to the extent that cause of action is based on a breach of the Trust's First Refusal Right;

(8)     denying Micron's motion to dismiss the third cause of action against it (tortious interference with contract), to the extent that cause of action is based on breach of the Trust's Royalty Right;

(9)     granting OMT's motion to dismiss the fourth cause of action against it (tortious interference with contract), in its entirety;

(10)    denying OMT's motion to dismiss the fifth cause of action against it (actual fraudulent transfer);

145

(11)     granting Intel's motion to dismiss the sixth cause of action against it (aiding and abetting tortious interference with contract), to the extent that cause of action is based on a breach of the Trust's First Refusal Right;

(12)     denying Intel's motion to dismiss the sixth cause of action against it (aiding and abetting tortious interference with contract), to the extent that cause of action is based on breach of the Trust's Royalty Right; and

(13)     denying Intel's motion to dismiss the seventh cause of action against it (declaratory judgment).


**Signed on October 1, 2020**



/s/ **Thomas J. Tucker**

**Thomas J. Tucker**
**United States Bankruptcy Judge**