UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

ENERGY CONVERSION DEVICES, INC.,
*et al*,

                  Debtors.

_____/

ENERGY CONVERSION DEVICES
LIQUIDATION TRUST,

                  Plaintiff,

vs.

OVONYX, INC., *et al.*,

                  Defendants.

_____/

Case No. 12-43166

Chapter 11
(Jointly Administered)[1]

Judge Thomas J. Tucker

Adv. No. 18-4320

**OPINION AND ORDER REGARDING PLAINTIFF'S MOTION TO COMPEL
PRODUCTION OF DOCUMENTS**

**A.  Introduction and background**

      In this adversary proceeding, the Court must decide a dispute between the Plaintiff and

the Defendants about certain documents that the Defendants have withheld in discovery, under

claims of privilege.  The case is before the Court on the Plaintiff's motion entitled "Plaintiff

Energy Conversion Devices Liquidation Trust's Motion to Compel Production of Documents

Claimed by Defendants as Privileged" (Docket # 677, the "Motion").[2]  The Court held a

---

    [1]  This Chapter 11 case is jointly administered with the case of United Solar Ovonic LLC, Case
No. 12-43167.

    [2]  Docket # 677 is a redacted version of the Motion.  The unredacted version of this Motion was
filed under seal, at Docket # 679.

telephonic hearing on the Motion on December 6, 2023, and then ordered the Defendants to file unredacted copies of the documents in dispute, under seal, so that the Court could conduct an *in camera* review of the documents.[3] The Defendants filed such documents, under seal, on December 13, 2023.[4] The Court has reviewed the documents, and now will rule on the privilege issues.

The Court has published several prior opinions in this adversary proceeding, two of which described the facts and claims alleged by the Plaintiff in great detail. The Court refers the reader to those two opinions for background on this complex litigation. *See Energy Conversion Devices Liquidation Trust v. Ovonyx, Inc.* (*In re Energy Conversion Devices, Inc.*), 621 B.R. 674 (Bankr. E.D. Mich. 2020); *Energy Conversion Devices Liquidation Trust v. Ovonyx, Inc.* (*In re Energy Conversion Devices, Inc.*), 654 B.R. 462 (Bankr. E.D. Mich. 2023). A third opinion granted an earlier motion by the Plaintiff to compel discovery, regarding one specific document claimed to be privileged, and is relevant to one part of the present Motion. *Energy Conversion Devices Liquidation Trust v. Ovonyx, Inc.* (*In re Energy Conversion Devices, Inc.*), 641 B.R. 349 (Bankr. E.D. Mich. 2022) (the "2022 Opinion").

**B. Discussion**

**1. Defendants' argument that Plaintiff did not meet its "meet and confer" obligations before filing the Motion**

The Defendants argue that before the Plaintiff filed the Motion, it failed to meet its obligation to meet and confer with defense counsel about the discovery the Plaintiff seeks. That

---

[3] *See* Docket ## 763, 766.

[4] Docket ## 768, 769; *see also* Docket ## 770, 771.

obligation is set forth in Fed. R. Civ. P. 37(a)(1), which applies in this adversary proceeding under Fed. R. Bankr. P. 7037.  That rule states:

> (a)      Motion for an Order Compelling Disclosure or Discovery.
>
>> (1) *In General.*  On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery.  The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

Fed. R. Civ. P. 37(a)(1).  The Plaintiff's Motion does include a certification of the type required by Rule 37(a)(1),[5] but the Defendants argue that the certification is inadequate, and that the Plaintiff's "meet and confer" effort before filing the Motion was insufficient.[6]

The "meet and confer" effort made by the Plaintiff before filing the Motion was that after the parties exchanged privilege logs, the Plaintiff's counsel e-mailed a detailed letter to the

---

[5]  *See* Mot. (Docket # 677) at pdf pp. 2-3, and App. 2, 3 to Mot. at pdf pp. 61-64, 66-67.

[6]  The Defendants also cite a local rule of this Court, L.B.R. 9014-1(i) (E.D. Mich.).  That local rule imposes a meet-and-confer obligation for discovery motions, but it requires only that such obligation be met before the hearing on the discovery motion.  Unlike Civil Rule 37(a)(1), the local rule does not impose any obligation that must be met before the discovery motion is filed.  The local rule states:

> **(i) Discovery Motions.** With respect to a matter relating to discovery to which F.R.Bankr.P. 7026 through 7037 apply, counsel for each of the parties must meet and confer in advance of the hearing in a good faith effort to narrow the areas of disagreement.  The conference must be held a sufficient time in advance of the hearing so as to enable the parties to narrow the areas of disagreement to the greatest extent possible.  It is the responsibility of counsel for the movant to arrange for the conference and, in the absence of an agreement to the contrary, the conference must be held in the office of the attorney nearest to the court in which the motion is pending.

L.B.R. 9014-1(i) (E.D. Mich.) (bold in original).

Defendants' counsel. As the Motion accurately states, the letter "identif[ied] specific deficiencies with the Defendants' logs, [and] request[ed] an explanation for why a claim of privilege had been asserted over various categories of documents."[7] The letter requested a written response from defense counsel within five days, and a meeting two days later.[8] Five days after receiving the Plaintiff's letter, the Defendants' counsel responded with an e-mail, stating only that "[w]e're reviewing and will get back to you with a substantive response."[9] Nine days after that, after hearing nothing further from the Defendants about the matter, the Plaintiff filed the Motion.

The Plaintiff argues that under the circumstances, its pre-filing meet-and-confer effort was sufficient under Civil Rule 37(a)(1). The Defendants disagree, and in their initial response to the Motion asked the Court either to deny the Plaintiff's Motion, or to "defer any hearing until after the [Plaintiff] has satisfied [its meet-and-confer] obligations."[10]

The Defendants may be right in their contention that the Plaintiff filed its Motion before making a sufficient effort to resolve or narrow the discovery disputes. But the Court does not need to decide that question, because the Court already has provided an adequate remedy for any violation of Civil Rule 37(a)(1). Instead of denying the Plaintiff's Motion, the Court required the parties to meet and confer about the Motion, before the Court held a hearing on the merits of the

---

[7] Mot. (Docket # 677) at pdf p. 2. A copy of the letter is attached as Appendix 2 to the Motion (Docket # 677) at pdf pp. 61-64.

[8] *See id.* at pdf p. 61.

[9] Mot. App. 3 (Docket # 677) at pdf p. 66.

[10] Defs.' Resp. in Opp'n to Pl.'s Mot. to Compel (Docket # 703) at 15-16 (filed under seal).

4

Motion.[11]  That is one of the alternative forms of relief requested by the Defendants.  And that process resulted in a substantial narrowing of the discovery dispute.

At this juncture, the Court will not deny the Plaintiff's Motion.  It is unclear whether that relief is even available for a violation of Rule 37(a)(1).  Rule 37 does not specify denial of a discovery motion as a remedy for a Rule 37(a)(1) violation.  Rather, Rule 37(a)(5) provides a different remedy — that rule forbids an award of attorney fees and expenses to a prevailing party on a motion to compel, if "the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action."  Fed. R. Civ. P. 37(a)(5)(A)(i).[12]  As shown by the cases cited by the parties, the courts appear to be divided as to whether a discovery motion may be denied for failure to comply with Rule 37(a)(1).  *See, e.g., Buskirk v. Wiles*, No. 3:15-0353, 2016 WL 7118288, at *2 (S.D.W. Va. Dec. 6, 2016) (citation omitted) (court found a violation of Rule 37(a)(1), but found "that such failure does not result in denial of the Motion to Compel" and court considered the merits of the motion to compel); *Frontier-Kemper Constructors, Inc. v. Elk Run Coal Co., Inc.*, 246 F.R.D. 522, 526 (S.D.W. Va. 2007) ("[T]he [rules] do not provide that failure to meet and confer automatically results in denial of the motion [to compel].  Rather, the sanction for failing to meet and confer is the denial of a request for expenses incurred in making a motion, including attorney's fees" under Fed. R. Civ. P. 37(a)(5)); *Williams v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty. & Kansas City, Kan.*, 192 F.R.D. 698, 700 (D. Kan. 2000) (court found a failure to meet and confer, but decided merits of

_____

[11]  *See* "Order Scheduling Further Hearing on the Plaintiff's Motion to Compel Production of Documents" (Docket # 752) at ¶¶ 2-3.

[12]  In Part B.3 of this Opinion, below, the Court discusses Rule 37(a)(5) further, and explains why the Court is not granting attorney fees or expenses to either side in connection with this Motion.

5

discovery motion anyway); *Deakin v. Magellan Health, Inc.*, 340 F.R.D. 424, 445 (D.N.M. 2022) (court denied attorney fees for motion to compel, because of failure to meet and confer, but decided the motion on the merits); *but see Compass Bank v. Shamgochian*, 287 F.R.D. 397, 400 (S.D. Tex. 2012) (court denied motion to compel without prejudice because of failure to adequately meet and confer); *Selley v. Midland Cnty.*, No. 17-cv-12834, 2018 WL 4145936, at *1 (E.D. Mich. Aug. 30, 2018) (court denied an earlier motion to compel without prejudice, because movant failed to make "adequate efforts to meet and confer").

In any event, in the exercise of its discretion, the Court will not deny the Motion. In this case it is better for the Court to decide Motion on the merits.

## 2. The merits of the discovery disputes

### a. Some applicable legal standards

The Court agrees with the Plaintiff's following summary of the applicable law, which the Defendants do not dispute:

> State law governs this privilege dispute. *See* Fed. R. Evid. 501; Fed. R. Bankr. P. 9017. Here, Idaho, Michigan, and Virginia provide the relevant bodies of law.
>
> "The burden of establishing the existence of the privilege rests with the person asserting it." *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999) [(citation omitted)]; *see also Mainstay High Yield Corp*[.] *Bond Fund v Heartland Indus*[.] *Partners, L*[.]*P*[.], 263 F.R.D. 478, 480 (E.D. Mich. 2009) (citation and quotation omitted). ["]The [attorney-client] privilege is 'narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit.[']" *Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (quoting *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)).
>
> Under Sixth Circuit precedent, there are eight elements of the attorney-client privilege: "(1) [w]here legal advice of any kind

6

is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his [insistence] permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." *Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998) [(citation omitted)].

Idaho, Michigan, and Virginia law are substantially similar. In Idaho, a communication is privileged "where it is not intended to be disclosed to third parties, other than those third parties who are furthering the rendition of professional legal [services] to the client or who are necessary to transmit the confidential information. [I.R.E. 502(a)(5) (2004).]" *Kirk v. Ford Motor Co.*, 141 Idaho 697, 704[, 116 P.3d 27, 34] ([] 2005.  The same is true under Virginia law. *See Walton v. Mid-Atlantic Spine Specialists, P.C.*, 280 Va. 113, 122[, 694 S.E.2d 545, 549] (2010) (["][C]onfidential communications between an attorney and his or her client made in the course of that relationship and concerning the subject matter of the attorney's representation are privileged from disclosure." [(citations omitted)]).

"In Michigan, '[t]he attorney-client privilege attaches to communications made by a client to an attorney acting as a legal adviser and made for the purpose of obtaining legal advice.'" *Stavale v. Stavale*, 332 Mich. [Ct.] App[.] 556, 560, 957 N.W.2d 387, 390 (2020) (quoting [*Estate of Nash*] *v*[.] *Grand Haven*, 321 Mich. [Ct.] App[.] 587, 593, 909 N.W.2d 862, 866 (2017)) (internal quotation [marks] and citation omitted).  For the attorney client privilege to attach, "the communication in question must be made: (1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship." [*Estate of Nash*], 321 Mich. [Ct.] App at 595[,] 909 N.W.2d at 867].  "['][T]he scope of the privilege is narrow.[']" [321 Mich. Ct. App. at 593, 909 N.W.2d at 866]. Courts apply the privilege only when "necessary to achieve its purpose" and only to protect legal disclosures that "might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976) [(citation omitted)].[13]

**b.  Application to this dispute**

---

[13]  Pl's Br. in Supp. of Mot. (Docket # 677, Ex. 3) at 6-8 (Docket # 677 at pdf pp. 18-20) (record citation omitted).

7

When it was first filed, the Motion sought an order compelling the Defendants to produce a very large number of documents. Since that time, the parties have agreed to substantially narrow the list of documents, production of which the Plaintiff seeks to compel, but which the Defendants say are privileged. Most recently, the parties filed a joint status report on December 4, 2023, listing the documents that are still in dispute.[14] The documents still in dispute are grouped by the parties into five categories, which the Court will discuss below, one by one.

**Category I. — the "Duff [&] Phelps Documents"**

In this category are seven listed documents, which were produced in discovery to the Plaintiff in redacted form.[15] A third party, Duff & Phelps, produced these documents, with certain redactions for privilege, in response to a subpoena served by the Plaintiff, after the Defendants reviewed the documents for privilege.

In its 2022 Opinion, this Court considered a claim of privilege by Defendant Micron Technology, Inc. ("Micron"). Micron argued that a specific Excel spreadsheet that Micron had prepared was protected by the attorney-client privilege, because it reflected certain communications and legal advice from Micron lawyers. The Plaintiff argued that the spreadsheet was not privileged to begin with, and that even if it was, Micron had waived the privilege by giving a copy of the spreadsheet to a third party, Duff & Phelps. The Court found it unnecessary to decide whether the spreadsheet was privileged to begin with, because it found that Micron had waived any such privilege, by giving the spreadsheet to Duff & Phelps.

---

[14] *See* Corrected Joint Status Report (Docket # 762), and its Ex. 1 (Docket # 762-1) (list of the documents, broken down into five categories).

[15] *See* Ex. 1 to Corrected Joint Status Report (Docket # 762-1) at pdf p. 1.

8

Now, the Plaintiff argues that Micron waived any attorney-client privilege with respect to the seven documents currently at issue. These documents are not spreadsheets. Rather, they are all copies of e-mails from a representative of Micron, on the one hand, to representatives of Duff & Phelps, on the other hand. The e-mails have been produced to the Plaintiff with redactions, blocking out certain portions of the e-mails that Micron claims are protected by the attorney-client privilege.

The Plaintiff argues that Micron waived any privilege it may have had regarding the information contained in the redacted parts of these e-mails. The Plaintiff argues that because these e-mails were communications by Micron to a third party, Duff & Phelps, no part of the e-mails are privileged. The Plaintiff cites this Court's 2022 Opinion in support of these arguments.

The Court agrees with the Plaintiff. The Court reiterates the reasoning and holding of its 2022 Opinion, and agrees that it strongly supports Plaintiff's arguments here.

Duff & Phelps was hired by Micron in 2015, to provide certain valuation services. In its 2022 Opinion, the Court quoted Micron's description of these services, as follows:

> Micron has stated the following, among other things, about the facts relevant to the Plaintiff's waiver argument:
>
>> Here, Micron engaged Duff & Phelps to perform a valuation of rights that Micron obtained as part of the July 2015 transactions in which Micron acquired all remaining stock of Ovonyx (collectively, the "2015 Transactions"). Because the 2015 Transactions were extremely complex, it was necessary for Micron lawyers to be able to explain certain aspects of them to Duff & Phelps; otherwise, Duff & Phelps would not have been able to perform its valuation work correctly. Therefore, even if Duff & Phelps was providing financial advice, Micron's disclosures to Duff & Phelps were in

9

furtherance of providing legal services to Micron.
The Court should conclude that the Royalty
Spreadsheet remains protected by the attorney-client
privilege and deny the Trust's Motion.

Micron also has stated the following:

> After the closing of the 2015 Transactions, Micron
> engaged Duff & Phelps to provide valuation
> services. As explained in Duff & Phelps' written
> report, its scope of work included valuing the
> "intellectual property ('IP') license to Ovonyx
> patents that Micron received as part of the
> transaction . . . ." Micron incorporated the results of
> Duff & Phelps' work into its financial records,
> including with respect to the allocation of the
> purchase price for the Ovonyx entity.

> Duff & Phelps required Micron to provide it with
> various information in order to conduct its analysis.

The Duff & Phelps valuation report, referred to by Micron
above, has been produced in discovery. And a Micron
representative has testified about the purpose of the Duff & Phelps
analysis and report, as follows:

> [T]he fundamental purpose of the Duff & Phelps
> analysis was a cost allocation. It was an effort to
> figure out: Okay, so X dollars were paid, how do we
> allocate those X dollars across assets?

2022 Opinion, 641 B.R. at 352-53 (footnotes and record citations omitted) (underlining in

original).

In the 2022 Opinion, the Court stated the following about the law applicable to the

privilege dispute, which the Court concludes also is applicable to the present dispute over the

Duff & Phelps documents:

> The parties and the Court agree that state law, rather than
> federal law, governs this privilege dispute, based on Fed. R. Evid.

10

501. That rule provides, in relevant part, that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." State law, rather than federal law, supplies the rule of decision for the Plaintiff's claims against Micron in this adversary proceeding, so state law governs this privilege dispute.

The parties and the Court further agree, for reasons not worth mentioning here, that there are two possible choices of state law that could apply to this privilege dispute — the law of Michigan and the law of Idaho. And all agree that the Court does not need to choose which state's law applies, because the relevant law of privilege is substantially the same in these two states.

641 B.R. at 353 (footnote omitted).

The Court's reasoning, in the 2022 Opinion, for finding that Micron waived any attorney-client privilege with respect to the spreadsheet it gave to Duff & Phelps, was this:

The Court does not need to decide whether the Document was privileged originally, because even if it was, Micron clearly waived that privilege, when it gave the Document to Duff & Phelps in 2015.

Micron acknowledges that it waived any attorney-client privilege for the Document when it gave the document to Duff & Phelps in 2015, ***unless***, in the words of an Idaho case, Duff & Phelps was "furthering the rendition of professional legal services to" Micron, or, in the words of a Michigan case, Micron gave Duff & Phelps the Document "in furtherance of legal services." *See Kirk v. Ford Motor Co.*, 116 P.3d 27, 34 (Idaho 2005); *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 670 (E.D. Mich. 1995), *aff'd sub nom. Fox v. Variety Corp.*, 91 F.3d 143 (6th Cir. 1996).

Duff & Phelps clearly was not engaged by Micron to provide, and did not provide, any legal services. Micron's counsel admitted this during the hearing. Rather, the undisputed facts show that Duff & Phelps was engaged to provide valuation and cost accounting services for Micron. It was not engaged to give Micron legal advice, or any other kind of legal services. When Micron gave the Document to Duff & Phelps, it clearly did not do so to further the rendition of legal services by Duff & Phelps to

11

Micron. Thus, Micron waived any attorney-client privilege that previously may have covered the Document. Today the Document is not protected by the attorney-client privilege.

In short, the Court agrees with the Plaintiff's waiver argument:

> [Duff & Phelps] received this document solely to provide a cost accounting valuation–a purely ordinary course business activity. It is undisputed that the purpose of [Duff & Phelp's] engagement was to provide a valuation untethered to any litigation or legal matter, and thus Micron's business person delivering to [Duff &Phelps] the Excel Spreadsheet–which existed before [Duff &Phelps] was engaged–waived any privilege.

641 B.R. at 353-54 (footnotes omitted) (bold and italics in original).

Much of the foregoing reasoning applies to the present dispute. The e-mail communications at issue, from a Micron representative to representatives of Duff & Phelps, are not privileged, because they were not done to "further[] the rendition of professional legal services to" to Micron by Duff & Phelps, in the words of the Idaho case cited above. And, using the words of the Michigan case cited above, Micron did not make these e-mail communications to Duff & Phelps "in furtherance of legal services." This is so for the following reasons, stated in the 2022 Opinion quoted above:

> Duff & Phelps clearly was not engaged by Micron to provide, and did not provide, any legal services. . . . Rather, the undisputed facts show that Duff & Phelps was engaged to provide valuation and cost accounting services for Micron. It was not engaged to give Micron legal advice, or any other kind of legal services. When Micron gave the Document to Duff & Phelps, it clearly did not do so to further the rendition of legal services by Duff & Phelps to Micron.

641 B.R. at 354.

For these reasons, none of the redacted parts of the e-mail communications from Micron to Duff & Phelps are privileged. The Court will order the Defendants to produce these e-mails to the Plaintiff without any redactions.

**Category II. — the "Freeman Email"**

This category concerns a single document that was produced to the Plaintiff in redacted form.[16] It is an e-mail dated October 11, 2018, from Matt Freeman of Micron to Rene Hartner of Micron (the "Freeman Email"). The version of this document that was produced in discovery contains a single redaction, consisting of two lines in the e-mail. The Court has reviewed the unredacted version of this document *in camera*. The Court finds and concludes that the redacted portion of this document is protected by the attorney-client privilege.

The sender and the only recipient of this e-mail, Matt Freeman and Rene Hartner, respectively, were employees of Micron. Neither of them was an attorney. Rather, Mr. Freeman was employed by Micron from 2004 to 2019, in various positions, including "Vice President of Corporate Development."[17] Mr. Hartner succeeded Mr. Freeman in that role, in October 2018.[18]

On behalf of Micron, Mr. Freeman worked on the July 2015 transactions that are the subject of this adversary proceeding, and in which Micron acquired the remaining stock of Ovonyx. As Mr. Freeman has described it,

---

[16] A copy of the redacted version of this document, which was produced in discovery, appears as Exhibit 10 to the Plaintiff's Reply in support of the Motion (Docket # 710, filed under seal); *see* Tr. of Hr'g (Docket # 773) at 18.

[17] *See* Decl. of Matthew Freeman [etc.] (Docket # 703, Ex. 3) at ¶ 1.

[18] *See* Tr. of Hr'g (Docket # 773) at 17; Ex. 10 to Pl.'s Reply Br. (Docket # 710) (filed under seal) (which includes an October 10, 2018 e-mail from Rene Hartner of Micron listing him as "VP | Corporate Business Development").

13

> I also was involved in the July 2015 transactions that included Micron's acquisition of the remaining stock of Ovonyx (collectively, the "2015 Transactions"). The 2015 Transactions were highly complex, and I regularly sought confidential legal advice from Micron in-house lawyers, including Steve Arnold, Jeffrey Sulman, David Kaplan, and David Ashmore while I was working on the 2015 Transactions. I generally recall working on documents containing legal advice from these individuals and saving copies of those documents to my hard drive.[19]

The record contains three declarations of Mr. Freeman under penalty of perjury.[20] In the third of these declarations, dated November 2, 2023, Mr. Freeman states that the redacted portion of the October 11, 2018 e-mail "summarizes legal advice concerning intellectual property licensing issues that Micron's intellectual property lawyers, including Steve Arnold, discussed with me on a confidential basis."[21]

This statement by Mr. Freeman is not contradicted by any other evidence in the record. And it is consistent with, and plausible in light of, the content of the redacted portion of the October 11, 2018 e-mail, which the Court has reviewed *in camera*. As a result, the Court finds that the redacted portion of this document is privileged. The Defendants will not be required to produce the unredacted version of this document.

**Category III. — the "Freeman Spreadsheets"**

This category consists of 10 spreadsheets created by Micron (the "Freeman

---

[19] Decl. of Matthew Freeman [etc.] (Docket # 703, Ex. 3) at ¶ 8.

[20] These declarations all were filed under seal, and appear at Docket ## 646 (unlettered Ex., attached to Micron brief); 703 (Ex. 3); and 751 (Ex. 18). The first of these declarations was filed in connection with the discovery dispute decided by the Court's 2022 Opinion. The second and third of these declarations were filed in connection with the present Motion.

[21] Suppl. Decl. of Matthew Freeman [etc.] (Docket # 751, Ex. 18, filed under seal) at ¶ 2.

14

Spreadsheets").  None of these spreadsheets was produced in discovery, even in redacted form.

Micron argues that these 10 spreadsheets are protected by the attorney-client privilege, in their

entirety.  The Defendants filed unredacted copies of these documents, under seal, and the Court

has reviewed them *in camera*.

The 10 spreadsheets in Category III are listed in the parties' joint status report using the

following labels:

- MICRON-PRIV053
- MICRON-PRIV054
- MICRON-PRIV055
- MICRON-PRIV059
- MICRON-PRIV061
- MICRON-PRIV062
- MICRON-PRIV064
- MICRON-PRIV071
- MICRON-PRIV072
- MICRON-PRIV073[22]

With one exception, these spreadsheets contain not only numbers and text labels for the numbers,

but also notes and statements.  The one exception is MICRON-PRIV064, which contains only

numbers and text labels.

As evidence to support their argument that these documents are privileged, the

Defendants rely on the second declaration of Micron's Matthew Freeman, cited above,[23] and a

declaration under penalty of perjury by one of the Defendants' attorneys, Katherine A. Preston.[24]

As quoted in the discussion above regarding Category II, the Freeman Email, paragraph 8

---

[22]  *See* Ex. 1 to Corrected Joint Status Report (Docket # 762-1) at pdf p. 1.

[23]  Decl. of Matthew Freeman [etc.] (Docket # 703, Ex. 3) (filed under seal) (underlining removed).

[24]  Decl. of Katherine A. Preston [etc.] (Docket # 703, Ex. 1) (filed under seal).

of Mr. Freeman's second Declaration states how he was involved in the July 2015 transactions, how he worked with Micron in-house lawyers, and how he generally recalls working on documents "containing legal advice" from those lawyers.[25]

The Defendants argue that Micron's Matthew Freeman worked on all of the 10 spreadsheets at issue, and that in doing so, he worked with Micron attorneys. Specifically, the Defendants argue that these spreadsheets all contain or reflect confidential legal advice from Micron attorneys.

Mr. Freeman's Declaration does say that about certain specific documents. But his Declaration does not specifically say that about **any** of these 10 spreadsheets. Rather, his Declaration merely lists two of the above 10 spreadsheets — MICRON-PRIV054 and MICRON-PRIV064 — as "additional examples" of documents that "are the types of documents that I worked with lawyers on as well."[26] Mr. Freeman's Declaration does not mention any of the other 8 of these 10 spreadsheets.

The other 8 spreadsheets, among other documents, are addressed in paragraphs 26 and 28 of the Declaration of Katherine A. Preston, who is one of the Defendants' attorneys in this case.

First, Ms. Preston lists MICRON-PRIV055 as one of 18 specific documents to which the following applies:

> Based on my review of the Withheld Freeman Documents, the following communications are similar in their substance, in whole or in part, to specific documents listed in Mr. Freeman's Declaration accompanying this Response (the "Second Freeman

---

[25] Decl. of Matthew Freeman [etc.] (Docket # 703, Ex. 3) (filed under seal) at ¶ 8.

[26] *See* Decl. of Matthew Freeman [etc.] (Docket # 703, Ex. 3) (filed under seal) at ¶¶ 8, 9.

Declaration") or his prior Declaration attached to Adv. D.E. 645:[27]

Second, Ms. Preston listed the remaining 7 of the 10 spreadsheets at issue, as being among 26

specific documents to which the following applies:

> Based on my review of the Withheld Freeman Documents, the
> following communications appear on their face to discuss and
> include legal issues and advice about one or more topics discussed
> in the Second Freeman Declaration, and as to which, according to
> the Second Freeman Declaration, he worked with Micron
> lawyers.[28]

The foregoing, plus the content of the 10 spreadsheets themselves, which the Court has

reviewed *in camera*, is the only evidence presented to support a claim of privilege for these

spreadsheets.

As noted in Part B.1.a of this Opinion, the Defendants have the burden of demonstrating

that these documents are privileged. After reviewing the record and the documents themselves,

the Court concludes that, with certain specific exceptions listed below, the Defendants have

failed to meet their burden of showing privilege as to any parts of any of these spreadsheets.

The statements in the Declarations of Mr. Freeman and Ms. Preston are too general, and

insufficient, to demonstrate either (1) that the entirety of any of these spreadsheets is protected by

---

[27] Decl. of Katherine A. Preston [etc.] (Docket # 703, Ex. 1) (filed under seal) at ¶ 26 (underlining removed). The reference in Ms. Preston's Declaration, to Mr. Freeman's "prior Declaration attached to Adv. D.E. 645," is to a Declaration of Mr. Freeman that was dated June 2, 2022, which was filed in connection with the Plaintiff's earlier motion to compel discovery, which the Court granted in its 2022 Opinion. *See* Decl. of Matthew Freeman [etc.] (Docket # 646) (filed under seal). That earlier Freeman Declaration concerned only one specific spreadsheet that is not at issue now, and which the Court ultimately ordered Micron to produce in discovery, without redactions, in the Court's 2022 Opinion. That earlier Freeman Declaration does not support or refute any of the Defendants' privilege claims now at issue.

[28] Decl. of Katherine A. Preston [etc.] (Docket # 703, Ex. 1) (filed under seal) at ¶ 28.

the attorney-client privilege; or (2) that any particular part of any of these spreadsheets is so protected.  There is no evidence presented that *every part* of any of these spreadsheets contains or reflects legal advice from any of Micron's attorneys.  And lacking that, there is no evidence that establishes which parts, if any, of any of these spreadsheets contains or reflects such legal advice.  And with only a few limited exceptions, listed below, the content of these spreadsheets does not show that they contain or reflect legal advice from Micron's attorneys.  With those limited exceptions, the Defendants have failed to meet their burden to show privilege.

The exceptions to this are certain portions of the following two spreadsheets, which the Defendants may black out (redact) in the copies that the Defendants produce to the Plaintiff:

- MICRON-PRIV053 (redaction on page 1 of 1)
- MICRON-PRIV059 (redactions on pages 1, 2, and 7-12 of 13)[29]

The portions that the Court will permit to be redacted in these documents are indicated by the copies of these documents that the Court is filing under seal today,[30] as a supplement to this Opinion and Order.  That supplement will contain a copy of these two documents, with the permitted redactions highlighted in pink by the Court.  The Court will send a copy of that supplement to the Defendants' counsel, with a copy of these two redacted documents attached, so that defense counsel will be able to see what redactions are permitted.  The supplement will not

---

[29]  The Court notes that page 1 of 5 of MICRON-PRIV055 says, in the upper right hand corner, "Micron Attorney Privileged & Confidential."  But that is not sufficient, given the evidence presented and given the content of this document, to demonstrate that any part of this document is in fact privileged.

[30]  This filing under seal is being done so that the record in this case will show what redactions the Court is permitting.  It will not be accessible by the parties or anyone else, other than any reviewing court.

be sent to the Plaintiff's counsel.

The Court will order the Defendants to produce all 10 of the documents in this Category III (Freeman Spreadsheets), with only the redactions permitted by the Court, as described above.

**Category IV. — the "IRC Documents"**

This category of documents consists of documents that are listed in the parties' joint status report using the following 7 labels:

- MICRON-PRIV002
- MICRON-PRIV003
- MICRON-PRIV004
- MICRON-PRIV012
- MICRON-PRIV078
- MICRON-PRIV079
- MICRON-PRIV080[31]

None of these documents have been produced in discovery, even in redacted form. Micron argues that these documents are protected by the attorney-client privilege, in their entirety. The Court has reviewed these documents *in camera*.

These documents total 535 pages. Of those pages, 531 pages are what appear to be Power Point slides, with some accompanying Excel spreadsheets included in them, that were prepared at various times by Micron's Matthew Freeman for Micron's Investment Review Committee (collectively, the "IRC meeting slides"). There is some duplication in this category of documents, in that some of the same IRC meeting slides appear more than once in this group of documents.

---

[31] *See* Ex. 1 to Corrected Joint Status Report (Docket # 762-1) at pdf p. 1.

19

The remaining four pages of the 535 pages in this group of documents are copies of cover e-mails, sending IRC meeting slides at various times. Two of these e-mails were sent by Darren Young, Micron's "Director[,] Corporate Development," to Mr. Freeman and many other persons within Micron,[32] and the other two e-mails were (1) one e-mail sent by Mr. Freeman to many others within Micron;[33] and (2) one e-mail sent by Mr. Freeman to Micron's Chris Brown.[34]

There is nothing privileged in or about the Freeman cover e-mails in this category, even though the recipients of at least three of the e-mails included, among many others, a Micron attorney, Ryan Poulson or Joel Poppen. There is no evidence, or anything in the very brief content of any of these e-mails, to show that they are privileged.

The privilege claim focuses on the IRC meeting slides. As with the Category III Freeman Spreadsheets, discussed above, the Defendants argue that Micron's Matthew Freeman worked on all of these documents, and that in doing so, he worked with Micron attorneys. The Defendants argue that these IRC meeting slides all contain or reflect confidential legal advice from Micron attorneys.

### 1. Defendants' evidence offered to show privilege

As quoted in the discussion above regarding Category II (the Freeman Email), paragraph 8 of Mr. Freeman's second Declaration states how he was involved in the July 2015 transactions, how he worked with Micron in-house lawyers, and how he generally recalls working on

---

[32] These cover e-mails are in MICRON-PRIV002 and MICRON-PRIV012.

[33] This cover e-mail is in MICRON-PRIV003.

[34] This cover e-mail is in MICRON-PRIV004.

documents "containing legal advice" from those lawyers.[35]  Mr. Freeman's Declaration also

explained his role and that of Micron's Investment Review Committee (the "IRC"), and in doing

so Mr. Freeman discussed in general terms PowerPoint slides prepared for the IRC.  But Mr.

Freeman's Declaration is very general, in that it specifically names only one of the Category IV

documents, MICRON-PRIV078.  The Declaration states:

> 2.  As part of my work in Corporate Development for
> Micron between 2004 and 2019, I worked on many potential
> licensing and acquisition deals with third parties.  Once such third
> party was Ovonyx, Inc. ("Ovonyx").
>
> 3.  For example, I was directly involved in Micron's
> purchase of a minority of Ovonyx's outstanding stock from Energy
> Conversion Devices, Inc. ("ECD") in 2012.  I also was directly
> involved in efforts on behalf of Micron to negotiate a license
> agreement with Ovonyx both before and after 2012.
>
> 4.  As part of Micron's efforts to buy Ovonyx stock in
> 2012, I worked with and received confidential legal advice from
> Ryan Poulson and Steve Arnold, in-house lawyers for Micron.  I
> generally recall working on documents with them and saving
> copies of those documents to my hard drive.
>
> 5.  I have reviewed such documents that I understand
> Micron withheld as privileged in this litigation, including the
> documents that I understand were designated MICRON-PRIV040
> and **MICRON-PRIV078**, and **I can confirm that they contain
> confidential legal advice and input from Messrs. Poulson and
> Arnold**.
>
> 10.  During my time at Micron, I participated in numerous
> meetings of Micron's Investment Review Committee ("IRC"),
> which evaluated potential transactions to determine whether
> Micron should enter into them.  The members of the IRC always
> included at least one Micron in-house lawyer, such as Rod Lewis
> and Joel Poppen, and IRC meetings included frequent and ongoing
> confidential discussion of legal issues with Micron in-house

---

[35]  Decl. of Matthew Freeman [etc.] (Docket # 703, Ex. 3) (filed under seal) at ¶ 8.

lawyers. This is particularly true with respect to the 2015 Transactions, which involved several different agreements and legal considerations. In fact, the overwhelming majority of the IRC's discussion of the 2015 Transactions focused on legal issues. In order for the IRC to operate and advise on investment decisions, it had to obtain confidential legal advice from Micron's in-house legal department, because the transactions under discussion generally would involve numerous legal considerations, such as corporate and intellectual property issues. It was very common practice during the time of the 2015 Transactions for senior management to ask a larger than normal team of in-house lawyers to attend the IRC meetings in order to share their opinions and counsel. **This made it critical for me to ensure that in-house lawyers provided inputs to, reviewed, and approved all materials to be presented ahead of the IRC meetings during this timeframe.**

11. While at Micron, I worked on PowerPoint presentations and other documents for IRC meetings. In working on such documents, I regularly asked Micron in-house lawyers for confidential legal advice and input on them. I generally recall saving copies of such documents to my hard drive. Sometimes I also sent copies of these documents via email to other Micron executives who were closely involved with the same issues and who needed to know the information being discussed, such as other IRC members.

12. I have reviewed such documents that I understand Micron withheld as privileged in this litigation, including the document that I understand was designated **MICRON-PRIV078** in this litigation, and **I can confirm that they contain confidential legal advice and input from Micron in-house lawyers, such as Ryan Poulson.**[36]

Thus, while Mr. Freeman's Declaration specifically says that the document MICRON-PRIV078 "contain[s] confidential legal advice and input from" Micron in-house lawyers, including "Messrs. Poulson and Arnold," the Declaration does ***not*** specifically say that about any

---

[36] Decl. of Matthew Freeman [etc.] (Docket # 703, Ex. 3) (filed under seal) at ¶¶ 2-5, 10-12 (emphasis added).

of the six other documents in this Category IV. And as for the document MICRON-PRIV078, that document is 83 pages long, and Mr. Freeman's Declaration does not say, or even hint at, what parts of that document "contain confidential legal advice and input" from Micron's lawyers.

The Declaration of Katherine Preston, one of Micron's attorneys in this adversary proceeding, attempts more specifically to support Micron's privilege claim about the IRC meeting slides at issue, naming 6 of the 7 Category IV documents (*i.e.*, all except MICRON-PRIV004):

> 24. Based on my review of the Withheld Freeman Documents, some of the documents labeled as "Communications between Micron business people," such as **MICRON-PRIV078 and MICRON-PRIV080**, appear on their face to be associated with Micron's IRC.
>
> 25. Based on my review of the Withheld Freeman Documents, the following documents were sent directly to at least one Micron attorney:
>
> - **MICRON-PRIV002**
> - **MICRON-PRIV003**
> - **MICRON-PRIV012**
> - MICRON-PRIV033
> - MICRON-PRIV086
>
> 26. Based on my review of the Withheld Freeman Documents, the following communications are similar in their substance, in whole or in part, to specific documents listed in Mr. Freeman's Declaration accompanying this Response (the "Second Freeman Declaration") . . . :
>
> - **MICRON-PRIV002**
> - **MICRON-PRIV012**
> . . .
>
> 28. Based on my review of the Withheld Freeman Documents, the following communications appear on their face to discuss and include legal issues and advice about one or more

topics discussed in the Second Freeman Declaration, and as to which, according to the Second Freeman Declaration, he worked with Micron lawyers:

. . .

- **MICRON-PRIV079**

. . . [37]

Ms. Preston's Declaration is very general, and it is not particularly helpful to Micron's privilege claim. First, Ms. Preston's statement in paragraph 24, that two specific documents at issue "appear on their face to be associated with Micron's IRC," does nothing to establish that these documents are privileged.

Second, Ms. Preston's statement in paragraph 25, that three specific documents at issue "were sent directly to at least one Micron attorney," without more, does not establish that any of these documents are privileged. And each of these three documents, MICRON-PRIV002; MICRON-PRIV003, and MICRON-PRIV012, begins with a cover e-mail from Darren Young or Matthew Freeman, showing that the documents were e-mailed to many Micron employees, including one or more in-house attorneys and including many other Micron employees who were not attorneys.

Third, Ms. Preston's statement in paragraph 26, that two specific documents at issue[38] "are similar in their substance, in whole or in part, to specific documents listed in Mr. Freeman's" second Declaration, is too vague to establish that these two documents are privileged in any part, let alone which parts of the documents are privileged.

---

[37] Decl. of Katherine A. Preston [etc.] (Docket # 703, Ex. 1) (filed under seal) at ¶¶ 24-26, 28 (emphasis added).

[38] MICRON-PRIV002 and MICRON-PRIV012.

24

Fourth, Ms. Preston's statement in paragraph 28, that one of the documents at issue, MICRON-PRIV079, "appear[s] on [its] face to discuss and include legal issues and advice . . . as to which, [Mr. Freeman] worked with Micron lawyers," does not pan out. As discussed below, from the Court's *in camera* review of this document, the Court finds that there is nothing in this document that is privileged.

The foregoing is the evidence Defendants point to in support of their privilege claim regarding the Category IV documents. That evidence, of course, is supplemented by whatever content there is in the documents themselves that shows that the attorney-client privilege applies to the documents or any parts of the documents.

### 2. The legal arguments of the parties, and applicable legal principles

The Plaintiff points out that the role of Micron's IRC was "evaluating the business case for" the July 2015 transactions, as well as evaluating the business case for making or not making other investment transactions.[39] That general statement is not disputed by the Defendants, and is supported by paragraph 10 of the second Freeman Declaration, quoted above. The Plaintiff argues that "[i]t is well-settled that records that were not prepared primarily for legal purposes (e.g., documents made for business purposes, such as whether a proposed acquisition is economically viable) are not privileged."[40] Thus, the Plaintiff contends, any advice or input from Micron's attorneys that went into the IRC meeting slides, being for a business purpose, rather than legal purposes, is not privileged.

---

[39] *See* Pl's Br. in Supp. of Mot. (Docket # 677, Ex. 3) at 13 (Docket # 677 at pdf p. 25).

[40] *Id.* (record citation omitted).

In support of this argument, the Plaintiff cites this Court's 2022 Opinion, and two other cases.[41] The first of those other cases was cited in the Court's 2022 Opinion: *William F. Shea, LLC v. Bonutti Rsch., Inc.*, No. 2:10-cv-615, 2013 WL 1499609, at *2 (S.D. Ohio Apr. 11, 2013). This Court cited the *Shea* case as holding that "a defendant's spreadsheets estimating the value of certain of its patents were not privileged, even though they contained data that was the product of in-house legal advice."[42] The second case the Plaintiff cites is *Carhartt, Inc. v. Innovative Textiles, Inc.*, 333 F.R.D. 113, 117 (E.D. Mich. 2019), which the Plaintiff quotes for the proposition that "[i]f an attorney serves a non-legal function that could as well be performed by a non-lawyer, and acts in the ordinary course of business, his or her communications in that capacity would likely not be protected by the attorney-client privilege."[43]

The Defendants contend that the advice and input that Micron's attorneys gave the IRC, and that is reflected in the IRC meeting slides, necessarily involved legal advice, because the IRC's work necessarily involved a complex mixture of legal judgments and business/financial judgments. As such, the Defendants contend, the legal advice and input from Micron's attorneys to the IRC is protected by the attorney-client privilege.

The Defendants correctly point out that this Court's 2022 Opinion concerned waiver of the privilege by disclosure to a third party, and did not decide whether the spreadsheet involved in that Opinion was privileged to begin with. *See* 2022 Opinion, 641 B.R. at 353. In further support of their position, the Defendants cite *BankDirect Capital Finance, LLC v. Capital*

---

[41] *Id.*; *see also* Pl's Reply Br. (Docket # 710) at 11 n.7 (filed under seal).

[42] *See* 2022 Opinion, 641 B.R. at 353.

[43] *See* Pl's Reply Br. (Docket # 710) at 11 n.7 (filed under seal).

*Premium Finance, Inc.*, 326 F.R.D. 176 (N.D. Ill. 2018) and *Dura Global Technologies v.*

*Magna Donnelly Corp.*, No. 07-CV-10945-DT, 2008 WL 2217682 (E.D. Mich. May 27, 2008).[44]

The Court finds persuasive the points made in the following passage in the *BankDirect*

case:

> The attorney-client privilege protects from discovery confidential communications between client and attorney that were made in order to obtain legal assistance. **The burden of proof is on the party claiming privilege**. . . .
> . . . .
>
> [C]ommunications from the attorney to the client are privileged if they constitute legal advice or would reveal the substance of a client confidence—directly or indirectly.
>
> **The question is always whether the "primary" or "predominant purpose" of the communication is to render or solicit legal advice.**
>
> **Because the privilege operates "in derogation of the search for truth," it is narrowly construed[.]** . . .
>
> In this case, the parties' dispute focuses on the distinction between "business" advice and "legal" advice. This critical distinction is often not an easy one to make – line drawing in any area seldom is, —even allowing for the imprecision inherent in language. Indeed, it can be quite difficult. . . . As always, the touchstone of the inquiry is whether the purpose of the communication is "generated for the purpose of obtaining or providing legal assistance." For example it has been said that legal advice, as contrasted with business advice, "involves the interpretation and application of legal principles to guide future conduct or to assess past conduct." **Courts have held that "[w]here business and legal advice are intertwined, the legal advice must predominate for the communication to be protected."**
>
> It must not be forgotten that the mere participation of a lawyer does not make statements to or from the lawyer automatically

---

[44] *See* Defs.' Resp. in Opp'n. to Pl.'s Mot. to Compel (Docket # 703) at 32-34 (filed under seal).

protectable. The privilege extends to communications about legal subjects, and "it is hard to see why a business evaluation meets that description. Hiring lawyers to do consultants' work does not bring a privilege into play." But, owners of businesses may regularly consult their attorneys about a variety of problems arising in the course of the business.

"[N]o one gets into a multi-million dollar . . . business [deal] without legal counsel." The wise and not uncommon thing to do in such a case is to have a combination of legal and financial advice.

*BankDirect*, 326 F.R.D. at 180-81 (citations omitted) (emphasis added).

### 3. The Court's findings about the Category IV documents

Having considered the evidence presented by the parties, and the applicable legal principles, and having reviewed the IRC meeting slides *in camera*, the Court finds that there is some limited content in the documents that is protected by the attorney-client privilege. Except as otherwise described below, however, the Defendants have failed to meet their burden of showing that all or any parts of the Category IV documents are protected by the attorney-client privilege.[45]

The statements in the Declarations of Mr. Freeman and Ms. Preston are too general, and insufficient, to demonstrate either (1) that the entirety of any of these documents is protected by the attorney-client privilege; or (2) that any particular part of any of these documents is so protected. There is no evidence presented that *every part* of any of these documents contains or reflects legal advice from any of Micron's attorneys. And lacking that, there is no evidence that

---

[45] The Court notes that there are many pages in the Category IV documents that do not seem to be directly related to the subject matter of this adversary proceeding. But in ruling on the Plaintiff's Motion, the Court has not been asked to rule on any relevance questions. Rather, the Court currently is tasked only with determining whether, and to what extent, the Defendants have met their burden of showing that the documents at issue are protected by the attorney-client privilege.

28

establishes which parts, if any, of any of these documents contains or reflects such legal advice. And with only a few limited exceptions, listed below, the content of these documents does not show that they contain or reflect legal advice from Micron's attorneys. With those limited exceptions, the Defendants have failed to meet their burden to show privilege.

The exceptions to this are parts of the documents for which redaction is permitted, which the Court finds are privileged. Those are listed below.

- **MICRON-PRIV002:**

There is a total of 164 pages in this document, including the first page, which is a cover page created by the Defendants, with the following label:

IV.A.

MICRON-PRIV002

For purposes of identifying specific pages in this document, this cover page is pdf page 1.

The Defendants must produce the entirety of this document, except that the Defendants may redact (black out) the following pages or parts of pages:

- on pdf page 7, only the fifth bullet point (which starts with the words "The timing . . .")

- the entirety of pdf pages 36-37

- the entirety of pdf pages 39-43

- **MICRON-PRIV003:**

There is a total of 20 pages in this document, including the first page, which is a cover page created by the Defendants, with the following label:

IV.B.

MICRON-PRIV003

The Defendants must produce the entirety of this document, with no redactions.

- **MICRON-PRIV004:**

There is a total of 32 pages in this document, including the first page, which is a cover page created by the Defendants, with the following label:

IV.C.

MICRON-PRIV004

The Defendants must produce the entirety of this document, with no redactions.

- **MICRON-PRIV012:**

There is a total of 164 pages in this document,[46] including the first page, which is a cover page created by the Defendants, with the following label:

IV.D.

MICRON-PRIV012

For purposes of identifying specific pages in this document, this cover page is pdf page 1.

The Defendants must produce the entirety of this document, except that the Defendants may redact (black out) the following pages or parts of pages:

- on pdf page 7, only the fifth bullet point (which starts with the words "The timing . . .")

- the entirety of pdf pages 36-37

---

[46] This document appears to be a duplicate of MICRON-PRIV002, discussed above.

- the entirety of pdf pages 39-43

• **MICRON-PRIV078:**

There is a total of 84 pages in this document,[47] including the first page, which is a cover page created by the Defendants, with the following label:

IV.E.

MICRON-PRIV078

For purposes of identifying specific pages in this document, this cover page is pdf page 1.

The Defendants must produce the entirety of this document, except that the Defendants may redact (black out) the following pages or parts of pages:

- on pdf page 6, only the fifth bullet point (which starts with the words "The timing . . .")

- the entirety of pdf pages 35-36

- the entirety of pdf pages 38-42

• **MICRON-PRIV079:**

There is a total of 12 pages in this document,[48] including the first page, which is a cover page created by the Defendants, with the following label:

IV.F.

MICRON-PRIV079

---

[47] This document appears to be a duplicate of part of MICRON-PRIV002 and MICRON-PRIV012.

[48] This document appears to be a duplicate of part of MICRON-PRIV002 and MICRON-PRIV012.

The Defendants must produce the entirety of this document, with no redactions.

- **MICRON-PRIV080:**

There is a total of 66 pages in this document, including the first page, which is a cover page created by the Defendants, with the following label:

IV.G.

MICRON-PRIV080

For purposes of identifying specific pages in this document, this cover page is pdf page 1.

The Defendants must produce the entirety of this document, except that the Defendants may redact (black out) the following parts of the following pages:

- on pdf page 37, in the upper right hand quarter of this PowerPoint slide, the third sentence that appears under the title "Investment Rationale."

- on pdf page 38, near the bottom of this PowerPoint slide, the wording on the line immediately below the title "Strategic Rationale for Investment:"

**Category V. — the "OMT-Micron Communications"**

This category of documents consists of documents that are listed in the parties' joint status report using the following four labels:

- OMT-PRIV0004

- OMT-PRIV0005

- OMT-PRIV0006

- OMT-PRIV0410[49]

---

[49] *See* Ex. 1 to Corrected Joint Status Report (Docket # 762-1) at pdf p. 2.

The Defendants have not produced any of these documents in discovery, even in redacted form. The Defendants argue that these documents are protected by the attorney-client privilege, in their entirety. The Court has reviewed these documents *in camera*.

These documents total 22 pages. They are e-mail communications from May and July of 2015, between David Kaplan, who was then an in-house attorney for Micron, on the one hand, and Steven Steger, an attorney who was then the managing member of Defendant Ovonyx Memory Technology, LLC ("OMT"), on the other hand. The Defendants allege that these documents concern a license agreement that OMT was then negotiating with Intel Corporation ("Intel").[50] The finalized version of that license agreement was one of the several agreements that were part of the July 2015 transactions.

The Defendants contend that even though these documents are communications between two different parties (Micron and OMT), the documents are protected by the so-called "common interest" doctrine. The Defendants argue that the documents concern common legal and economic interests that Micron and OMT shared at the time, and because of the common legal interests, these communications between these Micron and OMT attorneys are covered by the attorney-client privilege.

The Plaintiff disputes Defendants' argument, and argues that at most, Micron and OMT had common *economic* interests, not common *legal* interests, such that the common interest privilege does not apply. The Plaintiff also argues that until the July 2015 transactions closed, there was only a potential agreement between OMT and Intel, such that Micron and OMT did not

---

[50]  Intel previously was a named defendant in this adversary proceeding, but it reached a settlement with the Plaintiff, and all claims against Intel were dismissed. *See* "Order Dismissing Claims Against Defendant Intel Corporation" (Docket # 571).

yet have any common interests under such an agreement.

The United States Court of Appeals for the Seventh Circuit has described the common interest doctrine in this way:

> Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person. In effect, the common interest doctrine extends the attorney-client privilege to otherwise non-confidential communications in limited circumstances. For that reason, the common interest doctrine only will apply where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise.

*United States v. BDO Seidman, LLP*, 492 F.3d 806, 815-16 (7th Cir. 2007) (citations omitted);

*see also Estate of Nash v. City of Grand Haven*, 909 N.W.2d 862, 868 (Mich. Ct. App. 2017)

(quoting the foregoing passage from *BDO Seidman* with approval).

As the Defendants point out, the July 2015 transactions included several agreements, including three agreements made by OMT:

> [T]he 2015 Transactions involved several different agreements and were highly complex. OMT, one of the involved parties, entered into three different agreements as part of the 2015 Transactions: (i) an Asset Sale and Transfer Agreement with Ovonyx (the "Ovonyx-OMT Agreement"), (ii) a Patent Sale and Transfer Agreement with Micron (the "Micron-OMT Agreement"), and (iii) a License Agreement with Intel (the "Intel-OMT Agreement").[51]

The Plaintiff argues that during the time period leading up to the July 2015 execution of these agreements, OMT and Micron were adverse to each other, because they were negotiating the Micron-OMT Agreement. OMT and Micron were opposing parties with respect to that

---

[51] Defs.' Resp. in Opp'n to Pl.'s Mot. to Compel (Docket # 703) at 8 (filed under seal) (record citations omitted) (underlining deleted).

agreement, akin to a buyer and a seller in a sale agreement.  But the Defendants argue that this is

not the case with the Intel-OMT Agreement.  Micron was not a party to that agreement — it was

an agreement only between OMT and Intel.

Under the common interest doctrine, it is possible for two parties to have both adverse

interests and common interests at the same time.  When that occurs, the common interest

doctrine applies, but only to the extent of communications concerning the common legal

interests.  As one court has described it,

> While the common interest of the parties must be "at least a
> substantially similar legal interest," the parties need not be in
> complete accord.  In fact, . . . the "common interest privilege does
> not require a complete unity of interests among the participants.
> The privilege applies where the interests of the parties are not
> identical, and it applies even where the parties' interests are
> adverse in substantial respects. . . .  When the interests of the
> parties diverge to some extent, the common interest doctrine
> applies "only insofar as their interests [are] in fact identical;
> communications relating to matters as to which they [hold]
> opposing interests . . . lose any privilege."

*JP Morgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2010 WL 11545362, at *3 (E.D. Mich.

Dec. 10, 2010) (citations omitted).

The Court agrees with the Defendants that OMT and Micron had common interests, both

financial interests and legal interests, with respect to the negotiations of the Intel-OMT

Agreement.  First, the Defendants correctly argue that they contemplated that after the July 2015

transactions closed, OMT, Ovonyx and Micron all would have a common interest in OMT

maximizing the value of its patent portfolio.  As the Defendants explain:

> OMT is a patent monetization entity that received patents from
> both Micron and Ovonyx as part of the 2015 Transactions.  *See
> generally* Ovonyx-OMT Agreement; Micron-OMT Agreement.

35

> The parties agreed that if OMT monetized its portfolio, whether through license agreements, sales, or litigation, Micron and Ovonyx both would receive a percentage of the proceeds. Ovonyx-OMT Agreement § 2.3; Micron-OMT Agreement § 2.3. In addition, once the 2015 Transactions closed, Micron and Ovonyx were both licensees of OMT's portfolio. Ovonyx-OMT Agreement § 2.4; Micron-OMT Agreement § 2.4. Given this relationship, Micron, Ovonyx, and OMT all shared a common legal interest in the maintenance, prosecution, and monetization of OMT's portfolio.[52]

The Plaintiff does not dispute these points, and they are further supported by the Declaration of Steven Steger.[53]

Second, the Defendants correctly argue that both OMT and Micron had an interest in the terms of the OMT-Intel Agreement, to the extent that agreement would affect the ability of OMT to monetize the patents received by OMT from Micron and Ovonyx under the Micron-OMT Agreement and the Ovonyx-OMT Agreement. While conceding that this common interest was a *financial* interest, the Defendants argue, and the Court agrees, it also was a common *legal* interest. It was a legal interest because it concerned the ability to license, enforce and otherwise monetize patents. *See, e.g.*, *Crane Sec. Tech., Inc. v. Rolling Optics*, 230 Fed. Supp. 3d 10, 16 (D. Mass. 2017) (citations omitted), which held:

> With regard to what "legal interest" means in the context of patent cases, other courts have followed [*In re Regents of the Univ. of California*, 101 F.3d 1386 (Fed. Cir. 1996)] in finding that communications concerning the strength and enforceability of patents between parties who are negotiating exclusive patent licenses are protected under the common-interest doctrine, even though the communications obviously have a commercial purpose, as well. *Regents*, 101 F.3d at 1390[.]

---

[52] *Id.* at 39 (record citation omitted).

[53] *See* Decl. of Steven Steger [etc.] (Docket # 703, Ex. 4) (filed under seal) at ¶¶ 4-6.

36

For example, the court in *MobileMedia Ideas LLC v. Apple Inc.*, 890 F. Supp. 2d 508 (D. Del. 2012) applied the common interest privilege to communications shared by three parties that had discussed forming a "legal enforcement entity" to which patents would be transferred. 890 F. Supp. 2d at 511. Such communications included "information regarding legal aspects of litigation strategy, as well as other legal information relating to venture formation, tax issues, competition law and licensing opportunities." *Id.* The parties "planned to form an entity to acquire, develop, administer, manage and possibly assert intellectual property," and they shared "legal advice and analysis in that regard." *Id.* (footnote omitted). In discussing the common interest doctrine, the court held, among other things, the following:

> [T]he members of the community of interest "must share at least a substantially similar legal interest. . . . [T]he legal interests between or among the clients need not be identical . . . . Further, the fact "there may be an overlap of commercial and legal interests . . . does not negate the effect of the legal interests in establishing a community of interest." The standard is substantially similar legal interest, that is not solely commercial. Thus, the privilege may apply although the communications include discussions of various business matters as long as they are "infused with legal concerns."

*Id.* at 515 (footnotes omitted) (citations omitted).

The Defendants did not attempt to tie their common interest argument specifically to the four documents at issue, until the hearing. At that time, defense counsel's argument discussed these documents in two parts. The first part concerns the document labeled OMT-PRIV0410, which consists of e-mails dated May 12, 2015 through May 15, 2015, between Micron's David Kaplan and OMT's Steven Steger. Defense counsel argued the following about this document during the hearing:

So the specific documents that are being challenged here by the [Plaintiff] at this point, there are really two topics, because there are four documents, as the [Plaintiff] acknowledged, and three of them are part of the same email thread.

One of these email threads is not a discussion of a specific agreement or a specific component of the transaction. Rather, it's a discussion between lawyers for OMT and Micron about confidentiality surrounding the transaction.

This is not an issue on which Micron and OMT are adverse to each other. It's an issue on which their interests are aligned. They want to ensure that any appropriate confidentiality protections apply, and that is a legal interest protecting confidentiality.[54]

This is a fair description of the document, as far as it goes. But there is nothing in these e-mails to indicate that they concern the Intel-OMT Agreement, about which Micron and OMT had a common interest. Rather, these e-mails appear to concern only what ultimately became the Micron-OMT Agreement, about which Micron and OMT had interests adverse to each other. The first e-mail, dated May 12, 2015, from David Kaplan to Steven Steger, includes the following question: "Now that we are about to turn docs, are we comfortable there's a privilege here? . . . If we are turning patent sale agreement drafts back and forth, are we in opposition to each other?"[55] And in an e-mail dated May 15, 2015, from Kaplan to Steger, Mr. Kaplan includes the statement "Sorry for the delay on the sale agreement."[56] These references to a "patent sale agreement" and a "sale agreement" seem clearly to be references to what ultimately

---

[54] Tr. of Hr'g (Docket # 773) at 41-42.

[55] OMT-PRIV0410, e-mail dated May 12, 2015 at 7:10 p.m., from Kaplan to Steger.

[56] *Id.* (e-mail dated May 15, 2015 at 12:46 p.m., from Kaplan to Steger).

38

became the Micron-OMT Agreement, under which Micron sold patents to OMT, and not the Intel-OMT Agreement.

For these reasons, the Court finds that the common interest privilege does not apply to this document, OMT-PRIV0410, and the Court will order the Defendants to produce this entire document to the Plaintiff, with no redactions.

The second part of the Defendants' hearing argument concerns the three other documents, OMT-PRIV0004, OMT-PRIV0005, and OMT-PRIV0006. Of these, the primary document is OMT-PRIV0004. That document consists of an exchange of e-mails dated July 9, 2015 between Mr. Kaplan and Mr. Steger. Attached to those is a draft of the proposed Intel-OMT Agreement, which contained proposed revisions by Mr. Kaplan to Intel's draft of the agreement. Mr. Kaplan sent this document to Mr. Steger, asking Mr. Steger "what more changes we should present to Intel."[57]

The other two documents, OMT-PRIV0005 and OMT-PRIV006, are only copies of parts of the e-mails contained in OMT-PRIV0004.

During the hearing, the Defendants' counsel made the following argument about these specific documents:

> The other set of communications is about an agreement, as the [Plaintiff] mentioned, to which Micron is not a party. It's a license agreement that OMT was entering into with Intel, which also had a role in the 2015 transaction.
> . . . .
>
> . . . [C]are was paid by both Micron and OMT to setting OMT up to be in a position to monetize its intellectual property

---

[57] *See* OMT-PRIV0004 (e-mail from Kaplan to Steger dated July 9, 2015 at 1:34 a.m., and attached draft "License Agreement").

portfolio.  So they share an interest in ensuring that OMT will be able to do that.

> And being able to enforce its patents is a legal issue. Lawyers for OMT and Micron are discussing the provisions of this potential agreement between OMT and Intel, and they're trying to ensure that nothing in this agreement interferes with that.  They're trying to ensure that OMT's ability to enforce its patents is protected.  That may have a strategic component to it, but it is also a legal interest.
> . . . .

> . . . [S]ince the interest at issue here is enforceability of a patent portfolio, that is a shared legal interest, a common legal interest, that suffices for purposes of common interest privilege.
> . . . .

> The Intel agreement had provisions in it, and not revealing anything about the privileged portion, but you can see it in the final agreement.  Provisions of the OMT/Intel agreement addressed which parties OMT could approach for licenses or sue for infringement, and were also interrelated with other agreements that formed part of the 2015 transaction.

> So, for instance, there is a discussion of -- in the OMT/Intel agreement of the rights that OMT might have to assert infringement claims against certain foundry customers of Intel, which if I understand it, . . . involved if Intel is manufacturing products for someone else, what are OMT's rights with respect to that customer[] . . . to potentially get a license or sue them for infringement.

> . . . [P]rovisions of the OMT/Intel agreement could affect what OMT could do with its patent portfolio generally, including what rights OMT would have to enforce those patents. If OMT agreed as part of this OMT/Intel agreement to limit its ability to monetize its patent, that would impact Micron, as well.[58]

Having reviewed the documents *in camera*, the Court agrees with the Defendants, and

finds that the common interest privilege does apply to these three documents, OMT-PRIV0004,

---

[58]  Tr. of Hr'g (Docket # 773) at 42-43, 45-46.

OMT-PRIV0005, and OMT-PRIV0006.  The Defendants will not be required to produce to the

Plaintiff any part of any of these documents.

**3.  Discovery sanctions under Fed. R. Civ. P. 37**

      The Court will next address the matter of discovery sanctions under Fed. R. Civ. P.

37(a)(5).[59]

---

     [59]  Civil Rule 37 applies in this adversary proceeding.  *See* Fed. R. Bankr. P. 7037.  Rule 37(a)(5)
states:

> **(a) Motion for an Order Compelling Disclosure or Discovery.**
> . . . .
>
> **(5)** *Payment of Expenses; Protective Orders*.
>
> **(A)** *If the Motion Is Granted (or Disclosure or Discovery Is Provided
> After Filing)*. If the motion is granted – or if the disclosure or requested
> discovery is provided after the motion was filed – the court must, after
> giving an opportunity to be heard, require the party or deponent whose
> conduct necessitated the motion, the party or attorney advising that
> conduct, or both to pay the movant's reasonable expenses incurred in
> making the motion, including attorney's fees. But the court must not
> order this payment if:
>
>> **(i)** the movant filed the motion before attempting in good faith to
>> obtain the disclosure or discovery without court action;
>>
>> **(ii)** the opposing party's nondisclosure, response, or objection
>> was substantially justified; or
>>
>> **(iii)** other circumstances make an award of expenses unjust.
>
> **(B)** *If the Motion Is Denied*. If the motion is denied, the court may issue
> any protective order authorized under Rule 26(c) and must, after giving
> an opportunity to be heard, require the movant, the attorney filing the
> motion, or both to pay the party or deponent who opposed the motion its
> reasonable expenses incurred in opposing the motion, including
> attorney's fees. But the court must not order this payment if the motion
> was substantially justified or other circumstances make an award of
> expenses unjust.
>
> **(C)** *If the Motion Is Granted in Part and Denied in Part.* If the motion
> is granted in part and denied in part, the court may issue any protective

41

For this Motion, neither side has requested sanctions, based on Rule 37 or otherwise, except to the limited extent of the non-monetary sanction discussed in Part B.1 of this Opinion.

Each side has prevailed in part on the Plaintiff's Motion. Rule 37(a)(5)(C) therefore applies. As this Court has previously noted,

> [Rule 37(a)(5)(C)] states that where a motion to compel discovery is "granted in part and denied in part," as here, "the court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Also relevant are the exceptions to the requirement that the court award sanctions in a situation where a motion to compel discovery is granted in full, or the requested discovery "is provided after the motion was filed." In that situation, the general rule is that the court must award "the movant's reasonable expenses incurred in making the motion, including attorney's fees," but there are exceptions. The rule states that the court "must not order this payment if: . . . (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A).

*Vining v. Comerica Bank* (*In re MTG, Inc.*), 645 B.R. 557, 584 (Bankr. E.D. Mich. 2022).

In the Court's discretion under Rule 37(a)(5), the Court will not award any sanctions (attorney fees or expenses) to either side. As noted above, neither side has requested sanctions. And the Court concludes that under all the circumstances, an award of expenses to either side would be "unjust."

## C. Conclusion and Order

For the reasons stated above,

IT IS ORDERED that:

---

order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion.

Fed. R. Civ. P. 37(a)(5).

1.  The Motion is granted to the extent of the relief provided by this Order, and otherwise is denied.

2.  No later than April 12, 2024, the Defendants must deliver to the Plaintiff's counsel, by e-mail or hand-delivery, a complete and legible copy of all of the documents discussed in Part B.2 of the Court's Opinion, above, with redactions permitted only as described in Part B.2 of the Court's Opinion.

3.  No later than April 12, 2024, the Defendants must file, under seal, and serve on the Plaintiff, a copy of all the redacted document pages that Defendants have produced in compliance with this Opinion and Order.[60]

4.  The Court does not award any expenses or sanctions against any of the parties, under Fed. R. Civ. P. 37 or otherwise.

Signed on April 5, 2024



/s/ Thomas J. Tucker
_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**

---

[60]  The purpose of this requirement is to help enable the Court to verify that the Defendants correctly made only the redactions permitted by this Order.