UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

ENERGY CONVERSION DEVICES, INC.,
at al,

Debtors.

_____/

ENERGY CONVERSION DEVICES
LIQUIDATION TRUST,

Plaintiff,

vs.

OVONYX, INC., *et al.*,

Defendants.

_____/

Case No. 12-43166

Chapter 11
(Jointly Administered)[1]

Judge Thomas J. Tucker

Adv. No. 18-4320

**OPINION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT,
AND REGARDING *DAUBERT* MOTIONS**

## I. Introduction

This adversary proceeding arises from an exclusive license to use intellectual property,

given by a Chapter 11 debtor several years before it filed bankruptcy.

Now before the Court are cross-motions for summary judgment, and motions to exclude

certain expert evidence as inadmissible under Fed. R. Evid. 702. The parties briefed the motions

extensively, and filed many exhibits. The Court held a hearing on the motions, and then took

them under advisement. The Court has considered all of the written and oral arguments of the

---

[1] This Chapter 11 case is jointly administered with the case of United Solar Ovonic LLC, Case
No. 12-43167.

parties, as well as the exhibits filed.[2]

For the reasons stated in this Opinion, the Court concludes that the Defendants are entitled to summary judgment in their favor on all of the Plaintiff's claims that have not been dismissed by the Court's prior rulings. The Court will recommend that the United States District Court grant such summary judgment, which will be a final order. Under 28 U.S.C. § 157(c)(1), this Opinion will constitute this Court's proposed findings of fact and conclusions of law regarding the summary judgment motions.

In a separate order, the Court will deny the motions to exclude expert evidence.

## II. Background

Now before the Court are the following four motions:

1. The motion by Plaintiff Energy Conversion Devices Liquidation Trust (the "Trust"), entitled "Plaintiff Energy Conversion Devices Liquidation Trust's Motion for Partial Summary Judgment (Count I);"[3]

2. The motion by Defendants Ovonyx, Inc. ("Ovonyx"), Micron Technology, Inc. ("Micron"), and Ovonyx Memory Technology, LLC [f/k/a Carlow Innovations, LLC] ("OMT") (collectively, the "Defendants"), entitled "Defendants' Motion for Summary Judgment;"[4]

3. The Trust's motion entitled "Plaintiff Energy Conversion Devices Liquidation Trust's Motion to Exclude Testimony of Defendants' Expert Charles Bullock;"[5] and

4. The Defendants' motion entitled "Defendants' Motion to Exclude the Reports and Testimony

---

[2] The exhibits are filed in both a redacted form, and in an unredacted form (filed under seal). Except for the Declarations of Gregory C. Coppola, this Opinion will cite the Plaintiff Trust's summary judgment exhibits as "App __." This Opinion will cite the Defendants' joint summary judgment exhibits as "Defs.' Ex. __."

[3] Docket # 789 (redacted), Docket # 796 (unredacted, filed under seal).

[4] Docket # 791 (redacted), Docket # 794 (unredacted, filed under seal).

[5] Docket # 788 (redacted), Docket # 797 (unredacted, filed under seal).

2

of Jonathan D. Putnam."[6]

The summary judgment motions seek judgments on various causes of action in the Trust's Third Amended Complaint, which is the operative complaint.[7] The Third Amended Complaint contains eight causes of action. As the Court will detail in Part VI.B of this Opinion below, the Court previously dismissed some of those claims, in prior rulings. As for the claims that remain, the Trust seeks partial summary judgment on only its "First Cause of Action" in the Third Amended Complaint, against Ovonyx for breach of contract, and only as to liability. The Defendants seek summary judgment on all of the counts of the Third Amended Complaint that were not previously dismissed.

## III. Jurisdiction

The Court ruled on jurisdictional matters in its Opinion regarding the motions to dismiss, filed October 1, 2020 (Docket # 192, the "First Opinion"),[8] and reiterates those rulings now. This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and L.R. 83.50(a) (E.D. Mich.). The Court has "related to" subject matter jurisdiction over each of the Plaintiff's claims in this adversary proceeding, and each is a non-core proceeding. *See generally Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 26-28 (Bankr. E.D. Mich. 2009). Fewer than all of the parties in this adversary

---

[6] Docket # 790 (redacted), Docket # 793 (unredacted, filed under seal).

[7] Docket # 451 (redacted). An unredacted copy of the Third Amended Complaint is filed under seal at Docket # 462.

[8] The First Opinion is published: *Energy Conversion Devices Liquidation Trust v. Ovonyx, Inc.* (*In re Energy Conversion Devices, Inc.*), 621 B.R. 674 (Bankr. E.D. Mich. 2020). In this Opinion, citations to the First Opinion first cites page numbers in the version filed at Docket # 192, and then page numbers from the version published at 621 B.R. 674.

proceeding have consented to the bankruptcy court entering a final judgment, under 28 U.S.C. § 157(c)(2).[9] Because the Court concludes that a final judgment should now be entered, in favor of the Defendants on all of the remaining counts, the Court must follow the procedure set out in 28 U.S.C. § 157(c)(1). This Opinion constitutes this Court's proposed findings of fact and conclusions of law, with respect to the summary judgment motions. The Court will recommend to the United States District Court that summary judgment be entered in favor of the Defendants on all of the Plaintiff's claims.

## IV. Standards governing the summary judgment motions

In considering whether summary judgment should be granted for either side, the Court applies the standards governing motions for summary judgment under Fed. R. Civ. P. 56, which the Court described in detail in its prior opinion in the case of *Schubiner v. Zolman* (*In re Schubiner*), 590 B.R. 362, 376-77 (Bankr. E.D. Mich. 2018), and which the Court now incorporates by reference. Those standards include, among other things, the requirements that in deciding each summary judgment motion, (a) the Court "'must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party[,]'" *Schubiner*, 590 B.R. at 376 (citation omitted); and (b) the Court "must 'believe the evidence of the nonmovant, and draw all justifiable inferences in favor of the nonmovant.'" *Id.* at 377 (citations omitted); *see also Gold v. Wall* (*In re Wall*), 661 B.R. 365, 376-77 (Bankr. E.D. Mich. 2024).

## V. Facts

The facts stated in this Part V are not genuinely disputed.

_____

[9] *See, e.g.*, Report of Parties' Rule 26(f) Conference (Docket # 72) at 8. The Court established May 20, 2024 as a deadline for all the parties to give any such consent. *See* Order Further Extending Certain Deadlines (Docket # 780).

At issue in the Trust's breach of contract claim are the terms of two related contracts — one made in 1998 and the other one made in 1999. The later of these two contracts is a contract that Ovonyx, Energy Conversion Devices, Inc. ("ECD"), and Tyler Lowrey ("Lowrey") entered into on August 2, 1999, entitled "LICENSE AND ASSIGNMENT AGREEMENT" (the "1999 License Agreement").[10]

The earlier of the two contracts was made by ECD and Lowrey on December 17, 1998, and entitled "OVONIC INFORMATION HANDLING DEVICES DEVELOPMENT and COMMERCIALIZATION CONTRACT" (the "1998 Contract").[11]

The 1998 Contract envisioned the formation of an "Entity," through which ECD and Lowrey would use certain intellectual property owned by ECD (the "IP"), to "jointly pursu[e] the evaluating, developing, licensing, or manufacturing of ECD's proprietary electronic Ovonic Information Handling Devices . . . ('the field')."[12] The 1999 License Agreement stated that Ovonyx was formed to be the new "Entity" described in the 1998 Contract, and to carry out the purpose of the 1998 Contract, under the framework established by the 1998 Contract. As the 1999 License Agreement stated, "ECD and Mr. Lowrey have entered into . . . the [1998] Contract . . . setting forth principles of agreement for their future interactions in completing development and commercializing devices and products in the field (as defined in the [1998] Contract) . . .

---

[10] *See* Defs.' Ex. 6-16 (the 1999 License Agreement) (capitalization in original).

[11] *See* Defs.' Ex. 6-15 (the 1998 Contract) (capitalization in original).

[12] *See id.* at Preamble, ¶ 7 ("**Entity formation**") (bold in original). The 1998 Contract defined "IP" to include "patents copyrights, trademarks, trade secrets, confidential and proprietary information, and know-how." *Id*. at ¶ 13. For a detailed description of the 1999 License Agreement and the 1998 Contract, *see* "Opinion Regarding Defendants' Motion to Dismiss," filed October 1, 2020 (Docket # 192, the "First Opinion") at 3-10; 621 B.R. 674, 684-88.

through a new entity (which entity, Ovonyx, has now been formed). . . ."[13]  The 1999 License

Agreement then stated that "pursuant to the terms and conditions of the [1998] Contract, Ovonyx

desires to acquire exclusive rights to such intellectual property rights developed by both ECD and

Mr. Lowery and that relate to devices and products in the field[.][14]  And the 1999 License

Agreement stated that "[a]ll terms and conditions and rights and obligations of the [1998]

Contract remain in full force and effect."[15]

## A.  ECD's right to a royalty referred to, but not defined, under the 1999 License Agreement

Under the 1999 License Agreement, ECD "grant[ed], without encumberance, to Ovonyx

a **royalty-bearing**, worldwide, **exclusive right and license** under ECD's past, present and future

IP (as defined in the [1998] Contract), including the right to sublicense, to make, have made,

import, use, sell and otherwise dispose of products and devices in the field."[16]  Although the

1999 License Agreement referred to the exclusive license ECD gave to Ovonyx as "royalty

bearing," it did not expressly require Ovonyx to pay ECD any particular royalty.  Other than the

"royalty bearing" reference, the 1999 License Agreement did not mention any royalty at all.  For

example, it did not specify the amount of the royalty, when the royalty would be paid, or how the

royalty would be calculated.  Only the 1998 Contract provided specifics for the payment of a

---

[13]  Defs.' Ex. 6-16 (the 1999 License Agreement) at first paragraph of the "RECITALS;" *see also* Defs.' Ex. 6-1 (Lowrey Dep. Tr.) at 53 (stating that Ovonyx was the "Entity" referred to in the 1998 Contract), 61 (same).

[14]  Defs.' Ex. 6-16 (the 1999 License Agreement) at second paragraph of the "RECITALS."

[15]  *Id.* at ¶ 5.

[16]  *Id.* at ¶ 1 (bold added).

6

royalty. Paragraph 10 of the 1998 Contract provided: "10. **Quarterly royalty to ECD**. Upon ECD's written request, the Entity shall thereafter pay every three months 0.5% of the Entity's subsequent revenues to ECD[]"[17] (the "Royalty Right").

ECD made its first request for payment of the quarterly royalty in a letter from ECD's President to Ovonyx, dated March 13, 2001. That request was explicitly made based on the 1998 Contract. ECD's letter stated that "now that Ovonyx is established and has a positive cash flow, ECD, in accordance with Paragraph 10 of the [1998 Contract] requests that Ovonyx pay to ECD a quarterly royalty of 0.5% based upon the revenues of Ovonyx."[18] After ECD made that request, Ovonyx made quarterly royalty payments to ECD of 0.5% of all of its revenues, for over ten years, up to and through "the third quarter of Ovonyx's 2012 fiscal year, *i.e.*, December 2011 through February 2012."[19]

After making the 2012 royalty payment covering revenues earned through February 2012, Ovonyx stopped making royalty payments to ECD, even though Ovonyx earned revenue.[20]

**B. ECD's 2008 transfer of ownership of ECD's IP to Ovonyx**

---

[17] Defs.' Ex. 6-15 (the 1998 Contract) at ¶ 10 (bold in original); *see also id.* at ¶ 7 ("[E]ither ECD or Mr. Lowrey may decide by notice to the other to form a corporation (the "Entity") that provides for equal distribution of stock, benefits, and voting after quarterly paying ECD a 0.5% royalty on all revenues if requested.").

[18] Letter dated March 13, 2001 from Stanford R. Ovshinsky, President and Chief Executive Officer of ECD to Lowrey, Vice Chairman, President and CEO of Ovonyx (App. 4 to Pl.'s Br. in Supp. of Partial Summ. J. on Count I (Docket # 789 (redacted), Docket # 796 (unredacted, filed under seal)) at pdf p. 118.

[19] *See* Defs.' Ex. 5-2 (Decl. of Lowrey in Supp. of Defs.' Mot. for Summ. J. ("Lowrey Decl.") at ¶ 20.

[20] *See* Defs.' Ex. 6-1 (Lowrey Dep. Tr.) at 174-75; *see also* Defs.' Ex. 5-2 (Lowrey Decl.) at ¶ 12 ("In its 2012, 2013, and 2014 fiscal years, Ovonyx earned a total of $1,335,748 in revenue and incurred a total of $4,120,960 in operating expenses.").

On October 10, 2008, more than three years before Ovonyx stopped making royalty payments to ECD of 0.5% of its revenues, ECD transferred ownership of ECD's patents and patent applications to Ovonyx, under an agreement entitled "Patent Assignment" (the "2008 Patent Assignment").[21] The 2008 Patent Assignment stated that Ovonyx "presently holds, by virtue of the [1999 License Agreement], an exclusive license to the PATENTS within the FIELD as defined by the [1998 Contract]," and that "ECD wishes to transfer ownership of the PATENTS to Ovonyx and Ovonyx wishes to obtain the PATENTS from ECD."[22] Lowrey testified that the transfer of the patents was made because ECD no longer wanted to be responsible for paying the maintenance fees for the patents.[23]

The effect of the 2008 Patent Assignment was that, beginning as of October 10, 2008, Ovonyx owned all of the IP that ECD had previously licensed to Ovonyx under the 1999 License Agreement.[24]

---

[21] *See* Defs.' Ex. 6-19 ("**PATENT ASSIGNMENT**") (bold, capitalization, and underlining in original).

[22] *Id.*

[23] *See* Defs.' Ex. 5-2 (Lowrey Decl.) at ¶ 22 ("My recollection is that ECD told Ovonyx that if Ovonyx did not want to take assignment of the patents, then ECD planned to abandon them because it no longer wanted to be responsible for paying the maintenance fees.").

[24] The Trust has admitted this. *See* Defs.' Ex. 6-58 (Pl.'s Objs. and Resps. to Def. Ovonyx's First Set of Reqs. For Admis. at Resp. to Req. for Admis. No. 82 (the Trust admitted the following: "Admit that all of ECD's intellectual property licensed to Ovonyx under the 1999 License Agreement, not already owned by Ovonyx or expired, was transferred to Ovonyx under the 2008 Patent Assignment."). *See also* Pl.'s Opp'n to Def.s' Mot. For Summ. J. (Docket # 801 (redacted), Docket # 810 (unredacted)) at pdf p. 7 ¶ 7 ("In 2008, ECD and Ovonyx agreed to convert the license to outright ownership[.]"); Defs.' Ex. 6-1 (Lowrey Dep. Tr.) at 276 ("The patents that ECD had licensed to us we acquired, Ovonyx acquired. So many of those patents that ECD licensed to us in 1999 or all of them that were on that sheet we owned now, and those would have been transferred to Carlow [Innovations LLC] as I understand. . . . Ovonyx acquired essentially all of ECD's patents related to the field, all that we

8

The 2008 Patent Agreement referenced each of the prior agreements that ECD had entered into concerning ECD's IP: the 1998 Contract; the 1999 Licensing Agreement; and a "License Agreement" entered into between ECD and Ovonyx on September 26, 2002 (the "2002 License Agreement").[25] The 2008 Patent Assignment stated, in relevant part:

> ECD further agrees that Ovonyx shall have the sole and exclusive right, exercisable at its sole discretion, to prosecute or abandon any of the patents/applications listed in Schedule A, to pay maintenance fees or not to pay maintenance fees for any of the patents/applications listed in Schedule A, both without accounting to or incurring any liability to ECD under any one or combination of the [1999 License Agreement], or the [1998 Contract].[26]

Despite the 2008 Patent Assignment, Ovonyx continued to pay ECD's Royalty Right. As noted above, until after the third fiscal quarter of 2012, Ovonyx acted consistently with the obligation under ¶ 10 of the 1998 Contract, by continuing to pay ECD a 0.5% royalty on all of Ovonyx's revenues.

## C. ECD's assumption of the 1999 License Agreement and rejection of the 1998 Contract in its bankruptcy case

---

knew of, in 2008, October 2008."), 277 (Lowrey agreed that "even though ECD had entered into an exclusive license agreement [with Ovonyx], what ECD had previously exclusively licensed now were in fact owned by Ovonyx[.]").

[25] *See* Def.s' Ex. 6-18 (the 2002 License Agreement). The 2002 License Agreement referenced the 1998 Contract, and contemplated the formation of a new entity by ECD, which would be owned 95% by ECD and 5% by Ovonyx, "for the purposes of carrying out the development and commercialization of Royalty Bearing Products under licenses granted and agreed to be granted by Ovonyx pursuant to [the 2002 License Agreement]." (*Id.* at 5 ¶¶ 1.15-1.16). The new company was to be "formed, financed, promoted, and controlled by ECD" and required Ovonyx to license certain of its IP to the new company. The licensed IP excluded "all products that constitute or incorporate therein Memory Devices and Discrete Memory unless purchased from other Ovonyx licensees of such excluded devices (such as Intel or STM)." *Id.* at 2 ¶ 1.1. The new company would therefore be a licensee of Ovonyx and would "engage in further work to develop and commercialize certain applications" using the licensed IP. *Id.* at fourth paragraph of "**RECITALS**." (bold in original).

[26] Defs.' Ex. 6-19 ("**PATENT ASSIGNMENT**") (bold in original).

On February 14, 2012, ECD and its wholly owned operating subsidiary United Solar Ovonic LLC ("USO") (collectively, the "Debtors") each filed a voluntary petition for relief under Chapter 11, commencing Case Nos. 12-43166 and 12-43167. On February 17, 2012, the Court ordered that the two cases be jointly administered.[27]

As the Court's First Opinion explained in detail,[28] the Debtors proposed a plan of liquidation, and that plan (the "Plan") was confirmed on July 30, 2012. The "Effective Date" of the confirmed Plan was August 28, 2012. Under the confirmed Plan, and under 11 U.S.C. § 365(a), ECD assumed the 1999 License Agreement, but rejected the 1998 Contract. In addition, ECD assumed an agreement entered into on February 4, 2000, entitled "Stockholder Agreement" (the "2000 Stockholders Agreement"), by and between Ovonyx and each of the stockholders of Ovonyx at that time, namely: ECD; Lowrey; Intel Corporation ("Intel");[29] and Ward Parkinson. Therefore, as of August 28, 2012, ECD assumed the 1999 License Agreement and the 2000 Stockholders Agreement, and rejected the 1998 Contract.

## D. ECD's 2012 sale of its Ovonyx stock to Micron, and ECD's retention of the assumed 1999 License Agreement

Prior to the Effective Date of the confirmed Plan, on August 3, 2012, ECD filed a motion (the "Sale Motion")[30] for an order granting it authority (1) to sell all of its shares in Ovonyx to

---

[27] *See* Docket # 30 in Case No. 12-43166; Docket # 22 in Case No. 12-43167.

[28] *See* First Opinion at 18-22, 39-51; 621 B.R. at 693-95, 705-712.

[29] Intel was a defendant in this adversary proceeding, but the Trust settled all of its claims against Intel.

[30] *See* "Debtor Energy Conversion Devices, Inc.'s Motion for an Order Authorizing (A) the Sale of Certain Equity Interests in Ovonyx, Inc. Free and Clear of Liens, Claims, Interests and Encumbrances (B) the Assumption and Assignment of Stockholders Agreement in Connection Therewith and (C)

10

Micron, "free and clear of all liens, claims, interests and encumbrances," under an equity purchase agreement in the form of an agreement attached to the Sale Motion as Exhibit 6-A; and (2) to assume and assign to Micron the 2000 Stockholders Agreement.  The Sale Motion stated that ECD owned, and sought to sell, its "38.6% equity interest (35.2% on a fully diluted basis) in Ovonyx[.]"[31]  The Sale Motion stated, in relevant part, that the purchase price for the stock was $12 million, and that the equity purchase agreement required the stock sale to "close prior to the [E]ffective [D]ate of the Debtor's confirmed [C]hapter 11 [P]lan."[32]  The Sale Motion explained that the assignment of the 2000 Stockholders Agreement was "of great value to [Micron]" because it "would provide [Micron] with the ability to appoint two of the Ovonyx board members" and "provides for certain rights that would allow Micron to avoid the dilution of its equity interest in Ovonyx in the future."[33]  Although ECD had offered to also assign to Micron the 1999 License Agreement, Micron declined the offer.  On August 22, 2012, after holding a hearing on the Sale Motion, the Court entered on order granting that motion.[34]

After ECD's sale of its stock in Ovonyx to Micron, Ovonyx decided to stop making royalty payments to ECD.[35]

---

Certain Related Relief" (Docket # 1085 in Case No. 12-43166) at 1-2 ¶¶ (a)-(c).

[31]  *Id.* at 4 ¶ 8.

[32]  *Id.* at 2 ¶ 2.

[33]  *Id.* at 4 ¶ 9.

[34]  Docket # 1194 in Case No. 12-43166 ("Order (A) Granting Debtor Energy  Conversion Devices, Inc's Motion to Sell  Certain Equity Interests in Ovonyx, Inc. Free and Clear of  Liens, Claims, Interests and Encumbrances . . .").

[35]  *See, e.g.,* Lowrey Decl. (Defs.' Ex. 5-2) at ¶ 8.b ("[Outside Counsel] advised me that Ovonyx should stop making royalty payments to ECD.").

**E. Ovonyx's participation in a series of transactions that occurred in July 2015**

In July 2015, Ovonyx participated in a series of related transactions, which are collectively referred to below as the "2015 Transactions" or "Project Fish," which resulted in, among other things, Ovonyx transferring all, or substantially all, of its IP to another entity, and Micron and Intel receiving royalty-free licenses to such IP. This Court described these complex 2015 Transactions in the First Opinion, and will repeat that description here:[36]

> **1. The merger of [Defendant Micron's subsidiary,] Oscar Merger Corp.[,] into Ovonyx**
>
> On July 12, 2015, Micron, Oscar Merger Corp. ("Oscar"), which was a wholly-owned subsidiary of Micron, and Ovonyx entered into a agreement entitled "Agreement and Plan of Merger" (the "Merger Agreement").[37] Under the Merger Agreement, Oscar was "merged with and into [Ovonyx] (the 'Merger'), the separate corporate existence of [Oscar] . . . cease[d], and [Ovonyx] . . . continue[d] as the surviving corporation."[38] The general effect of the Merger was that "all the property, rights, privileges, powers and franchises of [Ovonyx] and [Oscar]" vested in Ovonyx "and all debts, liabilities and duties" of Ovonyx and Oscar became "the debts, liabilities and duties of Ovonyx."[39] The end result of the Merger was that after the "Effective Time" of the Merger, Micron owned 100% of the equity of the surviving Ovonyx entity. All stock and stock options of Ovonyx that existed prior to the Merger were extinguished, and Micron's shares in Oscar were converted to 100% of the shares of the surviving Ovonyx entity, thereby making the surviving Ovonyx entity a wholly owned subsidiary of

---

[36] First Opinion (Docket # 192) at 28-32; 621 B.R. at 699-701 (bold in original) (footnotes in First Opinion renumbered to fit the footnote numbering sequence in this Opinion) (footnotes also edited to add the record citations (in brackets) to the applicable summary judgment exhibits).

[37] *See* Merger Agreement [(Defs.' Ex. 6-21)] at 1. An executed copy of the Merger Agreement is attached as Exhibit 8 to Docket # 40 in Adversary Proceeding No. 18-4320, and was filed under seal.

[38] *Id.* at 11 ¶ 2.1 ("The Merger") (underlining in original).

[39] *Id.* at 11 ¶ 2.3 ("General Effects of the Merger") (underlining in original).

Micron.[40] Micron also owned all voting rights to elect the Board of Directors of the surviving Ovonyx entity.

The Merger Agreement summarized the end result of the Merger in this way:

> B. On the terms and subject to the conditions set forth in this [Merger] Agreement, as of the Effective Time of the Merger [("[t]he time of filing of the Articles of Merger" with the Nevada state Secretary of State)] and pursuant thereto, (i) all of the issued and outstanding capital stock of [Ovonyx] immediately prior to the Effective Time will be converted into the right to receive the consideration set forth herein, (ii) all of the issued and outstanding options to acquire shares of capital stock of [Ovonyx] will be cancelled and extinguished and will be converted into the right to receive the consideration set forth herein, and (iii) [Micron], which is [Oscar's] sole stockholder, will become the sole stockholder and the sole holder of any rights to acquire capital stock of [Ovonyx].[41]

In the Merger Agreement, Ovonyx represented that, with exceptions not relevant here, it was

> in compliance in all material respects with, and has not breached, violated, or defaulted under in any material respect, or received notice that it has breached, violated or defaulted under, any of the terms or conditions of any [Ovonyx] Contract, nor to the Knowledge of [Ovonyx] has there occurred any event or condition that could constitute such a breach, violation or default in any material respect with the lapse of time, giving of notice or both . . . [T]o [Ovonyx's] Knowledge, no party obligated to [Ovonyx] pursuant to any [Ovonyx] Contract is

---

[40] *See id.* at 12-13 ¶ 2.6 ("Effect of Merger on Capital Stock") (underlining in original); *see also* First Am. Compl. [(Docket # 8 (filed under seal))] at 16 ¶ 85. [*See also* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at pdf p. 6 ¶ 14, pdf p. 30 at ¶ 144.]

[41] Merger Agreement [(Defs.' Ex. 6-21)] at 1 ¶ B ("Recitals").

subject to any default thereunder.[42]

Lowrey, who was still a shareholder of Ovonyx until the Merger, "received in excess of . . . $20.6 million on account of . . . the [M]erger."[43]

### 2. The sale and transfer of the intellectual property of Ovonyx to IPLLC [, the predecessor of Defendant OMT]

The Merger Agreement included a provision obligating Ovonyx,

> [u]pon receipt of instruction from [Micron] to . . . immediately prior to the Effective Time . . . enter into a patent sale and transfer agreement with Carlow Innovations, LLC ("IPLLC"), [(the predecessor of Defendant Ovonyx Memory Technology, LLC ("OMT"))] **on terms and conditions acceptable to [Micron] in its sole discretion, providing for the transfer and sale of all of [Ovonyx] Registered Intellectual Property to IPLLC** immediately prior to the Effective Time[.][44]

On July 31, 2015, IPLLC (predecessor to Defendant OMT) and Ovonyx entered into an agreement entitled "Asset Sale and Transfer Agreement" (the "OMT Agreement"), as contemplated by Merger Agreement.[45] Under that agreement, "OMT agreed to pay to Ovonyx each calendar quarter a percentage of certain licensing revenues, ranging from 10% to 18%,"[46] but "OMT had no

---

[42] *Id.* at 27 ¶ 3.14(c) ("<u>Agreements, Contracts and Commitments</u>") (underlining in original).

[43] First Am. Compl. [(Docket # 8 (filed under seal))] at 18 ¶ 92 (bold omitted). [*See also* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at pdf p. 6 ¶ 14.]

[44] Merger Agreement [(Defs.' Ex. 6-21)] at 43 ¶ 6.13 (bold added).

[45] A copy of the OMT Agreement is [at Defendants' Exhibit 6-26 and is also] attached to Docket # 58 (which was filed under seal).

[46] First Am. Compl. [(Docket # 192)] at 19 ¶ 101 (bold omitted). [*See also* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at pdf p. 35 ¶ 162.] The First

14

obligation to pay Ovonyx any licensing revenues that OMT received in the first thirty days after execution of the OMT Agreement."[47] The transfer of patent rights by Ovonyx to OMT under the OMT Agreement "consisted of the substantial majority of the assets of Ovonyx."[48]

### 3. The grant of royalty-free licenses by OMT to Intel and to Micron.

Also, on July 31, 2015, IPLLC (predecessor to OMT) entered into a "License Agreement" with Intel (the "OMT/Intel License Agreement").[49] The First Amended Complaint alleges that under the OMT/Intel License Agreement, OMT granted to Intel a perpetual world-wide, royalty-free license.[50] Also in July 2015, OMT granted to Micron a fully paid-up, perpetual, irrevocable, non-terminable, world-wide royalty-free license.[51]

---

Amended Complaint treats IPLLC and OMT as the same entity and uses both names interchangeably because IPLLC is the predecessor to OMT. The Court will do the same to avoid confusion. [In the Third Amended Complaint, Defendant Ovonyx Memory Technology, LLC, (f/k/a Carlow Innovations LLC) is defined exclusively as "OMT." *See* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 6 ¶ 16.]

[47] [First Am. Compl. (Docket # 192)] at 19 ¶ 103. [*See also* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 34 ¶ 164.]

[48] [First Am. Compl. (Docket # 192)] at 19 ¶ 100. [*See also* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 34 ¶ 163 ("[T]he assets Ovonyx was transferring to OMT . . . represented more than 50% of Ovonyx's assets.").]

[49] A copy of the OMT/Intel License Agreement is [at Defendant's Exhibit 6-25 and also] attached as Exhibit 6-5 to Docket # 58.

[50] First Am. Compl. [(Docket # 192)] at 16-18 ¶¶ 82, 90, 22 ¶ 118; *see also* [Defs.' Ex. 6-25] at 1-2, 6; Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 140 ("OMT entered into a separate deal with Intel giving Intel [a] perpetual royalty free license for $15,000,000."). [*See also* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 27 ¶ 131 (After the Merger "only Micron and Intel [were] able to use the technology on a royalty-free, perpetual license basis."), 35 ¶ 167 ("[N]either Ovonyx nor OMT could earn revenues from Micron or Intel sales because each had been granted a royalty-free license, nor could any additional revenue be anticipated because the transactions were structured to prevent OMT from licensing the technology independently.").]

[51] First Am. Compl. [(Docket # 192)] at 16 ¶ 83. [*See also* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 27 ¶ 131 (After the Merger "only Micron and Intel [were] able to use the technology on a royalty-free, perpetual license basis."), 35 ¶ 167 ("[N]either

Neither Ovonyx nor Lowrey provided notice to the Trust of any of the transactions that occurred in July 2015,[52] which the Court will refer to collectively as "the July 2015 Transactions."[53]

Ovonyx did not pay ECD any royalty based on the 2015 Transactions.

## F. The Trust's demands for royalty payments from Ovonyx

"On June 6, 2018, the Trust made demand on Ovonyx [by overnight mail, and by email] to pay all owed [r]oyalties and to confirm that Ovonyx will pay future [r]oyalties."[54]  The Trust made that demand as successor to ECD's rights, under the confirmed Chapter 11 Plan.  The letter demand for royalties stated, in relevant part:

> Ovonyx has failed to pay any [r]oyalty since fiscal year 2012. From information provided, it appears that Ovonyx received $465,142 in revenues for fiscal year 2013, $679,711 in revenues for fiscal year 2014, and $5,509,716 in revenues for fiscal year 2015. Thus, Ovonvx should have paid $33,272.85 (equal to 0.5% of $6,654,569 in aggregate revenues for fiscal years 2013-2015) in [r]oyalty payments to the Trust for revenues received in those fiscal years. The Trust hereby demands payment of this amount. plus 0.5% of Ovonyx's revenues for all subsequent quarters after the end of fiscal year 2015, including the quarter ending May 31, 2018 (with supporting detail concerning such revenues), within thirty days of this letter, and within thirty days after the expiration of each subsequent quarter.

---

Ovonyx nor OMT could earn revenues from Micron or Intel sales because each had been granted a royalty-free license, nor could any additional revenue be anticipated because the transactions were structured to prevent OMT from licensing the technology independently.").]

[52]  *See* [First Am. Compl. (Docket # 192)] at 18-19 ¶ 96.  [*See also* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 5-6 ¶¶ 14-17, 32 ¶ 157, 36 ¶ 177, 44 ¶¶ 215, 217.]

[53]  First Opinion (Docket # 192) at 28-32; 621 B.R. at 699-701 (bold in original) (footnotes in First Opinion renumbered to fit the footnote numbering sequence in this Opinion) (footnotes also edited to add the record citations (in brackets) to the applicable summary judgment exhibits).

[54]  Pl.'s Br. in Supp. of Partial Summ. J. on Count I (Docket # 789 (redacted), Docket # 796 (unredacted, filed under seal)) at pdf p. 37 ¶ 72 (citing App. 36).

The Trust continues to investigate potential claims and causes of action against or relating to Ovonyx, the 1998 Agreement. and the 1999 Agreement, and any, and all such claims and causes of action, or rights of the Trust (including rights pursuant to orders of the Bankruptcy Court) are preserved.[55]

To date, Ovonyx has refused to pay ECD any royalty since after the third fiscal quarter of fiscal year 2012.

## G.  This adversary proceeding

On July 12, 2018, the Trust filed a complaint against the Defendants, commencing this adversary proceeding.[56]  On August 8, 2018, the Trust filed its first amended complaint (the "First Amended Complaint").[57]  The First Amended Complaint alleged, among other things, that as of the Effective Date of the Plan, ECD had all of the rights provided to it under the 1999 License Agreement, including a contractual right to the payment of a 0.5% royalty on all of Ovonyx's revenues (the Royalty Right), and that Ovonyx breached the 1999 License Agreement by, in relevant part, failing to pay ECD a royalty on all revenues Ovonyx earned.[58]

The Defendants each filed a motion to dismiss the First Amended Complaint (collectively, the "Motions to Dismiss").  The Court granted the Motions to Dismiss in part, and denied them in part, for the reasons stated in the Court's First Opinion.  The Court refused to

---

[55]  App. 36 of Pl.'s Br. in Supp. of Partial Summ. J. on Count I (Docket # 789 (redacted), Docket # 796 (unredacted, filed under seal)).

[56]  Docket # 1.

[57]  Docket # 8 (filed under seal).

[58]  *See id.* at 3 ¶ 6 ("[U]nder the 1999 [License] Agreement . . . , the Trust is entitled to payment of royalties by Defendant Ovonyx[.]"), 24 ¶ 130 ("First Cause of Action") ("It is a breach of the 1999 [License] Agreement if Ovonyx did not pay the Royalty[.]").

dismiss the Trust's breach of contract count against Ovonyx, with respect to the Royalty Right.

## VI. Discussion

**A. The Third Amended Complaint's First Cause of Action against Ovonyx for breach of the 1999 License Agreement, with respect to the Royalty Right**

The Trust seeks summary judgment as to liability only against Ovonyx on its "First Cause of Action" in the Third Amended Complaint, for breach of contract.[59] The Trust seeks a determination that Ovonyx is liable for breach of the 1999 License Agreement, with respect to the Royalty Right.

More specifically, the Trust seeks a determination that Ovonyx is liable for two forms of damages for breach of contract. First, the Trust seeks a summary judgment that Ovonyx is liable to pay royalties based on its actual revenue received after 2012. It is undisputed that after 2012 Ovonyx had revenue, but paid no royalties.

Second, the Trust seeks a summary judgment that Ovonyx had, and has breached, an implied duty under the 1999 License Agreement to use reasonable efforts to exploit its intellectual property to generate revenue, and thereby generate royalties for the Trust. Ovonyx breached that implied duty, the Trust says, when Ovonyx transferred substantially all of its assets to OMT as part of the 2015 Transactions, for virtually nothing in exchange. According to the Trust, that transfer left Ovonyx with greatly reduced revenue, and thereby basically destroyed the Royalty Right under the 1999 License Agreement.

The Trust does not seek summary judgment as to the amount of either form of its damages, arguing instead that a trial will be necessary to establish the damage amounts.

---

[59] Third Am. Compl. (Docket # 462) at ¶¶ 218-228.

18

Ovonyx disputes the Trust's breach of contract claim for several reasons, and seeks summary judgment it its favor, determining that is has no liability to the Trust on the First Cause of Action.

1. **Ovonyx's alleged breach by failing to pay the royalty on Ovonyx's actual revenues after 2012**

a. **Ovonyx ratified and adopted the duty to pay ECD the royalty required by the 1998 Contract.**

In its First Opinion, this Court found that by entering into the 1999 License Agreement, "Ovonyx adopted and ratified the duty to pay ECD the royalty described in the 1998 Contract."[60] The Court found that this was unambiguously so, based on the language of the two agreements.

The Court reiterates those findings now. None of the evidence presented with the summary judgment motions contradicts those findings.

As the starting point in the Court's discussion at this summary judgment stage, the Court reiterates and adopts everything stated in the following quotation from the Court's First Opinion. This quotation includes all of the related footnotes from the First Opinion, but they are renumbered to fit the footnote numbering sequence in this Opinion, and they are edited to add citations (in brackets) of the applicable summary judgment exhibits.

> **[Quotation from the First Opinion]:**
>
> As for ECD's Royalty Right, the Court concludes that the 1999 License Agreement did incorporate that right, and that Ovonyx adopted and ratified the duty to pay ECD the royalty described in the 1998 Contract. As a result, Ovonyx owed a duty, under the 1999 License Agreement, to honor ECD's Royalty Right.
>
> The language of the 1999 License Agreement makes clear

---

[60] First Opinion (Docket # 192) at 52; 621 B.R. at 712.

19

that the parties to that agreement — *i.e.*, ECD, Lowrey, and Ovonyx — intended that the "Entity" to be formed, as contemplated by the 1998 Contract, was Ovonyx, and makes clear the parties' intent that Ovonyx was to have and use the intellectual property rights described in the 1998 Contract, and that in exchange, Ovonyx was to pay ECD the royalty specified in the 1998 Contract. All of this was expressly contemplated in the 1998 Contract, for the "Entity" to be formed.[61]

The 1999 License Agreement identified Ovonyx as the Entity to be formed that was referred to in the 1998 Contract. And the 1999 License Agreement recites: "WHEREAS, **pursuant to the terms and conditions of the [1998] Contract**, Ovonyx desires to acquire exclusive rights to such intellectual property rights developed by both ECD and Mr. Lowrey and that relate to devices and products in the field[.]"[62] The 1999 License Agreement grants "to Ovonyx a **royalty-bearing**, worldwide, exclusive right and license under ECD's past, present and future IP," without specifying the percentage or amount of royalty to be paid. But the 1998 Contract requires "the Entity" to be formed (which turned out to be Ovonyx) to pay a royalty of "0.5% of the Entity's subsequent revenues to ECD."[63] And the 1999 License Agreement made clear that this royalty obligation and percentage specified in the 1998 Contract continued in effect. It stated that "All terms and conditions and rights and obligations of the [1998] Contract remain in full force and effect."[64]

By signing the 1999 License Agreement with these provisions in it, Ovonyx clearly ratified, adopted, and agreed to be bound by the terms and conditions of the 1998 Contract, at least with respect to the payment of royalties under ECD's Royalty

---

[61] The 1998 Contract provided, in relevant part, that "ECD shall grant the Entity an exclusive license in the field with a right to sub-license its intellectual property if approved." [App. 1]: 1998 Contract at MIT00002331 ¶ 14.a. The 1999 License Agreement carried out this obligation of ECD under the 1998 Contract.

[62] [App. 2]: 1999 License Agreement at MTI000038 (bold added).

[63] *See* [App. 2]: 1999 License Agreement at MTI00002335 ¶ 1 (bold added); [App. 1]: 1998 Contract at MIT00002331 ¶ 10.

[64] [App. 2]: 1999 License Agreement at MTI000039 ¶ 5.

20

Right.[65]  Under Michigan law, "[a] corporation will be held liable for preincorporation contracts made by the promoters or incorporators if the corporation subsequently ratifies or adopts the contracts, and the promoters will not be held liable." *Medco Health Care Servs., Inc. v. Bragg*, No. 174335, 1996 WL 33364162, at *1 (Mich. Ct. App. May 28, 1996) (citing *Henderson v. Sprout Bros., Inc.*, 440 N.W.2d 629, 634 (Mich. Ct. App. 1989)) ("[A] corporation may be liable on preincorporation contracts of promoters or incorporators if these contracts are ratified or adopted by the corporation. *Michigan Trust Co. v. Herpolsheimer*, 256 Mich. 589, 598–600, 240 N.W. 6 (1932)") and *Campbell v Rukamp*, 244 N.W. 222, 223 (1932) ("Had the proposed corporation been duly organized and the purchase contract ratified then" the promoters could not be held personally liable on the contract.)).[66]

---

[65]  In *Tucker v. Estate of Budman*, No. 235204, 2004 WL 134021, at *3–4 (Mich. Ct. App. Jan. 27, 2004) (footnote omitted) (citation omitted), the court discussed the meaning of ratification and adoption under Michigan law:

> The term "ratification" is defined in the Restatement of the Law Second, Agency, § 82, as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." § 94. The receipt (§ 98) or retention (§ 99) of benefits, with knowledge of the facts, may constitute an affirmance.  In general "the liabilities resulting from ratification are the same as those resulting from authorization." § 100.

> Michigan Law is in accord. Unauthorized acts of a person purporting to act as an agent are deemed ratified if the principal accepts the benefits of the unauthorized acts with knowledge of the material facts. Where both parties to a void lease continued to treat the lease as valid, the parties were held to have adopted the lease and the lease was enforceable according to its terms. *Michigan Trust Co v. Herpolsheimer*, 256 Mich. 589, 598; 240 NW 6 (1932).

[66]  *Medco Health* is an unpublished opinion, although the cases it cites, *Henderson* and *Campbell*, are published opinions.  *In re Skymark Properties II, LLC*, 597 B.R. 363, 382 n.72 (Bankr. E.D. Mich. 2019), this Court explained that although unpublished Michigan appellate opinions are not binding precedent, they can be cited as persuasive authority:

> Under Mich. Ct. R. 7.215(C)(1) "[a]n unpublished opinion is not precedentially binding under the rule of

This conclusion is bolstered by the conduct of Ovonyx for several years after it entered into the 1999 License Agreement. Ovonyx accepted all of the benefits of that 1999 License Agreement when it used the licensing rights it acquired through that agreement to generate significant revenues for itself, and performed its obligation to ECD under [the] Royalty Right of the 1998 Contract by paying ECD a 0.5% royalty beginning in 2000 and continuing until ECD sold its stock to Micron in 2012. The First Amended Complaint alleges that "[a]fter 1999 and through 2011, Ovonyx actively worked on developing new technologies and developing new patents. . . . During this period, Ovonyx, under Lowrey's direction was, among other things, actively working on developing memory devices based on intellectual property owned by ECD and licensed to Ovonyx."[67] The First Amended Complaint also alleges that, "[f]rom June 1999 to May 2012, Ovonyx received over $58 million in revenues" and that

stare decisis." However, Michigan courts may consider unpublished opinions as persuasive authority. *See, e.g., People v. Green*, 260 Mich. [Ct.] App. 710, 680 N.W.2d 477, 484 n.5 (2004)("Although unpublished opinions are not binding precedent, [Mich. Ct. R.] 7.215(C)(1), we utilize it as a guide and view it as persuasive in light of the limited case law in this area."); *Cedroni Assocs., Inc. v. Tomblinson, Harburn Assocs*., 290 Mich. [Ct.] App. 577, 802 N.W.2d 682, 709 & n.5 (2010) (Kelly, J., dissenting) (viewing a per curiam unpublished opinion of the Michigan Court of Appeals as "[m]ore persuasive and on point" than a published opinion relied on by the majority).

*McCallum v. Pixley* (*In re Pixley* ), 456 B.R. 770, 788 n. 19 (Bankr. E.D. Mich. 2011); *see also Wells v. THB America, LLC* (*In re Clements Mfg. Liquidation Co., LLC* ), 486 B.R. 400, 403 n. 8 (Bankr. E.D. Mich. 2012) (unpublished Michigan Court of Appeals decisions may be cited as persuasive authority); *Paris Meadows, LLC v. City of Kentwood*, 287 Mich.[Ct.] App. 136, 783 N.W.2d 133, 139 n. 3 (2010) (quoting *Mich. Envtl. Council & Pub. Interest Research Grp. in Mich. v. Mich. Pub. Serv. Comm'n*. (*In re Application of Ind. Mich. Power Co.*), 275 Mich. [Ct.] App. 369, 738 N.W.2d 289 (2007)) (unpublished opinions of the Michigan Court of Appeals may be "considered instructive or persuasive"); *Cox v. Hartman*, 322 Mich.[Ct.] App. 292, 911 N.W.2d 219, 228 (2017) (same).

[67] First Am. Compl. at 13 ¶¶ 64-65 (bold omitted).

"Ovonyx paid to ECD approximately 0.5% of this amount[.]"[68]
Given these facts, under Michigan law, Ovonyx ratified and
adopted what Lowrey and ECD had agreed to on its behalf before
its formation, and was bound by the term of the 1998 Contract that
gave ECD the Royalty Right.

For these reasons, ECD's Royalty Right from the 1998
Contract clearly is an obligation of Ovonyx, under the 1999
License Agreement. *Cf. Whittlesey v. Herbrand Co.*, 187 N.W.
279, 280 (Mich. 1922) (quoting *Short v. Van Dyke*, 52 N.W. 643
(Minn. 1892)).[69]
**[End of quotation from First Opinion].**

(First Opinion at 52-56; 621 B.R. at 712-15).[70]

The foregoing passage from the Court's First Opinion quotes from the Trust's First

Amended Complaint, but the Third Amended Complaint contains the same or similar allegations

to those quoted in the First Opinion.[71]

The Court's factual findings and legal conclusions in the First Opinion based on

allegations in the First Amended Complaint, quoted above, also apply to the allegations in the

---

[68] *Id.* at 12 ¶ 62.

[69] In *Whittlesey*, the Michigan Supreme Court held:

"In a written contract a reference to another writing, if the reference be
such as to show that it is made for the purpose of making such writing a
part of the contract, is to be taken as a part of it just as though its
contents had been repeated in the contract. But if the reference be made
for a particular purpose, expressed in the contract, it becomes part of it
only for that purpose."

[70] The passage from the Court's First Opinion quoted above continues with the following next
sentence: "[t]hat Royalty Right is unaffected by ECD's later rejection of the 1998 Contract, especially
given that ECD *assumed* the 1999 License Agreement in its bankruptcy case." That conclusion now
requires further consideration. *See* Part VI.A.1.c.ii of this Opinion, below.

[71] *See, e.g.,* Third Am. Compl. (Docket # 451 (redacted), Docket # 462 (unredacted, filed under
seal)) at 19-20 ¶¶ 88, 90, 91.

23

Third Amended Complaint.  And the facts alleged in the First Amended Complaint that are

quoted above, and re-alleged in the Third Amended Complaint, are now well supported, without

any genuine dispute, by the summary judgment evidence.

The Declaration of Gregory Coppola ("Coppola") confirms that after Ovonyx received

ECD's written request for the payment of royalties, as required by § 10 of the 1998 Contract,

Ovonyx paid ECD a 0.5% royalty on all revenues it earned, and this continued for a minimum of

10 years after Ovonyx and ECD entered into the 1999 License Agreement.  Coppola "served as

the Trust Administrator since the [E]ffective [D]ate of ECD's plan of reorganization on August

28, 2012 and continue[s] to serve in that capacity."[72]  "Prior to the formation of the Trust,

[Coppola] served as Treasurer of ECD, from October 2010 to the Plan [E]ffective [D]ate."[73]

Referring to the Royalty, Coppola's Declaration states:

> 13.  Ovonyx paid ECD this Royalty for at least a decade.  I
> note that in Ovonyx's financial statements through fiscal year
> ending May 31, 2012, Ovonyx reported payment of the Royalty to
> ECD. Appendix "6b."  Through discovery, I am aware that Ovonyx
> similarly reported payment of the Royalty in its financial statement
> for the fiscal year ending May 31, 2013. Appendix "6d."
>
> 14.  ECD reported the payment of the Royalty in public
> filings with the Securities & Exchange Commission. Appendix
> "5."
>
> 15.  From June 1999 to May 2012, Ovonyx received over
> $58 million in revenues primarily from license fees.  As required
> under the 1999 [License] Agreement, Ovonyx paid to ECD

---

[72]  Ex. 5 of Pl.'s Br. in Supp. of Partial Summ. J. on Count I (Docket # 789 (redacted), Docket # 796 (unredacted)) ("Declaration of Gregory C. Coppola in Support of Plaintiff's Motion for Summary Judgment" ("Coppola Decl."), at pdf pp. 57-58 ¶ 2.

[73]  *Id.* at pdf p. 58 ¶ 3.

24

approximately 0.5% of this amount . . . .[74]

The three documents cited by Coppola in his Declaration, at App. 6b, 6d, and 5 in the record, each support Coppola's statements.

It is undisputed that the amount of royalties owed were "calculated in accordance with paragraph 10 of the [1998] Contract," that their payment was ratified by the Board of Ovonyx, and that the April 11, 2012 payment was ratified during an Ovonyx Board meeting on May 23, 2012.[75]

The wording of the 1998 Contract and the 1999 License Agreement, the Coppola Declaration, Ovonyx's financial statements, Ovonyx's payments to ECD of a 0.5% royalty on all of its revenues over a ten year period after entering into the 1999 License Agreement, and the Court's reasoning in the First Opinion, quoted above, all show that under the 1999 License Agreement, Ovonyx had a duty to pay the royalty that was required by paragraph 10 of the 1998 Contract.

**b. Ovonyx failed to pay any royalties after May 2012, even though it received revenue.**

As the Trust correctly argues, "[t]here is no dispute that Ovonyx did not pay (and has not

---

[74] Coppola Decl. at pdf pp. 59-60.

[75] *See* Defs.' Ex. 6-36 at 2 ("Minutes of Regular Meeting of Board of Directors of Ovonyx, Inc." on May 24, 2011 ("**RESOLVED.** That . . . the Ovonyx, Inc. board of directors hereby ratifies the payment by Ovonyx, Inc. of $1,442 made previously to . . . ECD. . . for the quarterly royalty payment for the fiscal 2011 third quarter ended February 28, 2011, calculated in accordance with paragraph 10 of the [1998] Contract.")); Defs.' Ex. 6-43 at 2 ("Minutes of Regular Meeting of Board of Directors of Ovonyx, Inc." on May 23, 2012 ("**RESOLVED.** The Ovonyx board of directors hereby approves and ratifies the payments made to ECD calculated in accordance with paragraph 10 of the [1998] Contract").

25

paid) the Royalty since May 2012, even though it has received revenues."[76]  It is undisputed that

Ovonyx made its final royalty payment to ECD with a check dated April 11, 2012.[77]

The Trust alleges that "Ovonyx received at least $6,654,569 in revenues for fiscal years

ending May 31 for years 2013, 2014, and 2015[,]" but "did not disclose to the Trust that it had

been receiving revenues after May 31, 2012" and did not pay ECD 0.5% of those revenues.[78]

The summary judgment evidence supports these allegations.  Lowrey, "the former

President and Chief Executive Officer . . . of Ovonyx . . . and a former Director of Ovonyx from

1999 until July 31, 2015,"[79] testified that

> in its 2012, 2013, and 2014 fiscal years, Ovonyx earned a total of
> $1,335,748 in revenue and incurred a total of $4,120,960 in
> operating expenses.  By way of comparison, Ovonyx's total
> potential royalty obligation to ECD during this entire three-year
> period would have been only about $6,700 (0.5% of $1.34
> million).[80]

Lowrey also testified that either in May 2015 or very close to that time, Ovonyx "licensed

[its entire] patent portfolio [to Western Digital] to be able to make memory integrated circuits."[81]

---

[76]  Pl.'s Br. in Supp. of Partial Summ. J. on Count I (Docket # 789 (redacted), Docket # 796 (unredacted)) at pdf p. 42 ¶ 47 (relying on the Coppola Decl. (*id.* at Ex. 5, pdf p. 64 ¶ 28), and App. 6a-6g (*id.* at pdf pp. 230-381) (financial statements of Ovonyx)).

[77]  *See* Defs.' Ex. 6-39 (Check # 6297 dated "4/11/2012" from Ovonyx to ECD in the amount of $87.00 for royalty.)

[78]  Pl.'s Br. in Supp. of Partial Summ. J. on Count I (Docket # 789 (redacted), Docket # 796 (unredacted)) at pdf p. 25-26 ¶ 41 (citing App. 6 (Ovonyx 2015 financial statements)).

[79]  Lowrey Decl. (Defs.' Ex. 5-2) at ¶ 2.

[80]  Lowrey Decl. (Defs.' Ex. 5-2) at ¶ 12.

[81]  Defs.' Ex. 6-1 (Lowrey Dep. Tr.) at 159, 164-65.

Lowrey testified that Western Digital was "interested in phase change technology."[82] Lowrey testified further that Western Digital paid an up-front fee" in the range of [$]6 million[,]" and that there was a royalty provision in the license agreement with Western Digital.[83] Ovonyx did not pay ECD the 0.5% royalty on the $6 million in revenue Ovonyx received from Western Digital.

The Trust alleges further that Ovonyx received revenue as a result of the 2015 Transactions, but did not pay ECD 0.5 % of that revenue.[84]

Lowrey testified that Ovonyx decided to stop making royalty payments to ECD "in the late summer or early fall of 2012."[85] According to Lowrey's Declaration, Ovonyx made this decision based on a telephone conversation between Lowrey and outside counsel, in which outside counsel "advised [Lowrey] that Ovonyx should stop making royalty payments to ECD" because "ECD had 'abandoned' the [1998 C]ontract."[86] Lowrey declared that "[a]fter August 28, 2012, [he] did not believe that Ovonyx still had any obligations to ECD under either [the 1998 Contract or the 1999 License Agreement.]"[87]

---

[82] *Id.* at 165.

[83] *Id.*

[84] Pl.'s Br. in Supp. of Partial Summ. J. on Count I (Docket # 789 (redacted), Docket # 796 (unredacted)) at ¶ 59 (citing Coppola Decl. at ¶ 30 ("Ovonyx never paid any Royalty to the Trust for the monies it 'received' in connection with Project Fish[.]")).

[85] Defs.' Ex. 5-2 (Lowrey Decl.) (unredacted, filed under seal) at ¶¶ 8.b, 9.

[86] *Id.* at ¶ 8.b. To be clear, the Court is not relying on these hearsay statements by the outside counsel as proof of the truth of the outside counsel's statements.

[87] *Id.* at ¶ 11. The Trust objects to the admissibility of this statement by Lowery as irrelevant. The Trust argues that the fact that Lowery believed this, and the reason why Lowery believed this, is not relevant, because even if true, these facts would not establish a valid defense to the Trust's breach of

**c. Ovonyx's obligation to pay ECD royalties was terminated after the August 28, 2012 Effective Date of the Plan**.

The Defendants argue that Ovonyx did not have an obligation to pay royalties to ECD after the August 28, 2012 Effective Date of the Plan. The Court agrees.

**i. If the obligation to pay royalties under the 1998 Contract was terminated, due to ECD's breach of that contract, then the obligation of Ovonyx to pay royalties as ratified under the 1999 License Agreement also was terminated.**

The Defendants acknowledge that Ovonyx "ratified" the obligation in paragraph 10 of the 1998 Contract to pay ECD the royalty.[88] But they argue that Ovonyx's obligation to pay ECD a royalty on the revenues it earned after May 2012 was excused, because of ECD's material breach of the 1998 Contract. According to the Defendants, ECD was the first to materially breach the 1998 Contract, and in fact repudiated that contract, and such breach and repudiation occurred no later than on the August 28, 2012 Effective Date of the Plan.

The Defendants argue that ECD's rejection of the 1998 Contract, in ECD's bankruptcy case, was a material breach of that contract, and not only that, it also was a repudiation of the 1998 Contract. The Defendants also argue that ECD breached the 1998 Contract by failing to perform several specific obligations under that contract. According to the Defendants, those obligations of ECD included: "(i) operating 'as a partnership between ECD and Mr. Lowrey for

---

contract claim. The Court includes this evidence for background purposes, however, not as tending to establish a possible defense to the Trust's breach of contract claim.

[88] The Defendants admit that Ovonyx "ratified" the obligation in the 1998 Contract to honor ECD's Royalty Right, and thereby became bound by it. But the Defendants argue that such ratification did not come from Ovonyx merely signing the 1999 License Agreement. Rather, the Defendants argue that the ratification came from the combination of Ovonyx's conduct (1) in signing the 1999 License Agreement; (2) in actually making the periodic payments of the royalties to ECD; and (3) its Board formally ratifying such payments, as payments made under the 1998 Contract. (*See* Tr. of Hearing (Docket # 852) at 23).

all their activities in the field;' (ii) 'promptly describ[ing] to [Mr. Lowrey] . . . any developed intellectual property in the field;' and (iii) cooperating with Mr. Lowrey 'in prosecution, protection, and allocation of ownership as described [in the 1998 Contract].'"[89]  According to the Defendants, ECD was a "defunct" and "nonoperational" entity after the Effective Date of the Plan (August 28, 2012), so that beginning at least as early as August 28, 2012, ECD could not perform any of its obligations under the 1998 Contract.  And according to the Defendants, the evidence shows that ECD and the Trust "performed no obligations under the 1998 Contract after the Effective Date."[90]

The Defendants argue that ECD was the first to materially breach the 1998 Contract, by its contract rejection and non-performance on and after August 28, 2012.[91]  The Defendants argue further that under Michigan law, ECD's breaches allowed Ovonyx to elect to stop performing any obligation it had to pay on the Royalty Right under the 1999 License Agreement.

The Court concludes that ECD's breach of the 1998 Contract matters, because Ovonyx's obligation to pay the royalty under the 1999 License Agreement derived from, and was dependent upon, the royalty provision in the 1998 Contract.  Ovonyx's obligation to pay the royalty was nothing more than the obligation to pay whatever royalty was required by the 1998 Contract.  The

---

[89]  Defs.' Br. in Supp. of Mot. for Summ. J. (Docket # 791 (redacted), (Docket # 794 (unredacted, filed under seal)) at pdf p. 58 (quoting First Opinion (Docket # 192 ) at 44-45; 621 B.R. at 708).

[90]  *Id.* at 59.

[91]  *Id.*; *see also* Defs.' Resp. in Opp'n to Pl.'s Mot. For Partial Summ. J. (Docket # 803 (redacted), Docket # 807 (unredacted)) at pdf p. 9 ("Neither ECD nor the Trust has performed obligations under these agreements [(the 1998 Contract and the 1999 License Agreement]) since the confirmation and Effective Date of ECD's Plan," and therefore ECD committed the first substantial breach of those agreements.).

Court reiterates its reasoning and holding from the First Opinion, quoted above, that by signing the 1999 License Agreement, "Ovonyx clearly ratified, adopted, and agreed to be bound by the terms and conditions of the 1998 Contract, at least with respect to the payment of royalties under ECD's Royalty Right[,]" and that "ECD's Royalty Right from the 1998 Contract clearly is an obligation of Ovonyx, under the 1999 License Agreement."[92] As a result, if Ovonyx's obligation to pay on ECD's Royalty Right under the 1998 Contract was terminated, then Ovonyx's obligation to pay royalties under the 1999 License Agreement also was terminated.

The Trust disagrees with this view. It argues, in effect, that Ovonyx's obligation to pay royalties under the 1999 License Agreement was an independent, stand-alone obligation under that agreement, untethered to the 1998 Contract.[93] As a result, in the Trust's view, ECD's breach

---

[92] First Opinion at 53-54, 56; 621 B.R. at 713, 715.

[93] Relatedly, the Trust also contends that the 1999 License Agreement incorporated, into that agreement, some but not all of the rights and obligations in the 1998 Contract. Specifically, the Trust contends that the 1999 License Agreement incorporated, into that agreement, from the 1998 Contract, only the obligations that ECD and the "Entity" referred to in the 1998 Contract (which later turned out to be Ovonyx) owed to each other under the 1998 Contract. (*See, e.g.,* Tr. of Hearing (Docket # 852) at 104); *see also* Pl.'s Opp'n to Def.s' Mot. For Summ. J. (Docket # 801 (redacted), Docket # 810 (unredacted)) at pdf p. 12 ¶ 6). (From that starting point, the Trust argues that by 2012, ECD owed almost no obligations to Ovonyx, and none that it could not perform and that the Trust cannot still perform.) The Trust's view completely ignores the obligations that ECD had to Lowery, and that Lowery had to ECD, under the 1998 Contract, ***even though Lowery was a party to both the 1998 Contract and the 1999 License Agreement***. Those obligations, several of which are discussed below, were fundamental parts of the 1998 Contract, and were important to the obligation of the "Entity" to pay ECD the royalties. The Trust's incorporation theory, with its selective view of what was incorporated into the 1999 License Agreement, is not supported by any language in either the 1998 Contract or the 1999 License Agreement.

For their part, the Defendants argue that none of the provisions of the 1998 Contract were "incorporated" into the 1999 Contract. In the alternative, the Defendants argue that if **any** provisions of the 1998 Contract were incorporated into the 1999 License Agreement, **all** of the terms of the 1998 Contract were so incorporated. In that case, the Defendants say, ECD's breach and repudiation of the 1998 Contract also constituted a breach and repudiation of the 1999 License Agreement. It is unnecessary to decide the merits of all of the Defendants' arguments about "incorporation." This is because in the Court's view, as explained in this Opinion, as far as royalties are concerned, the 1999

and repudiation of the 1998 Contract did not impair its right to enforce the Royalty Right **under the 1999 License Agreement**. In effect, only the 1999 License Agreement matters, according to the Trust.

The Court must reject the Trust's argument, based on the unambiguous language in the agreements. First, there is no language in the 1999 License Agreement indicating that Ovonyx was bound by a royalty obligation other than the obligation to pay whatever royalty the "Entity" was required to pay under the 1998 Contract.

Second, Ovonyx's (the "Entity's") obligation to pay ECD royalties is explicitly stated and defined in the 1998 Contract, and only in the 1998 Contract. The only thing that the 1999 License Agreement says about royalties is that the license of ECD's IP to Ovonyx was "royalty-bearing."

Third, the language of the 1999 License Agreement clearly indicates that Ovonyx's obligation to pay royalties under the "royalty-bearing" license was dependent upon "the terms and conditions of the [1998] Contract." As quoted above, the second "Recital" in the 1999 License Agreement says that Ovonyx "desires to acquire" the "exclusive rights to [the] intellectual property rights developed by" ECD and Lowery, "**pursuant to the terms and conditions of the [1998] Contact[.]**"[94] This means that Ovonyx's obligation to pay royalties was to pay whatever the "Entity" was required to pay *under the 1998 Contract*. And paragraph

_____

License Agreement merely ratified and incorporated the obligation of Ovonyx to pay ECD whatever royalties were required under the 1998 Contract. The 1999 License Agreement did not create an independent, stand-alone obligation to pay royalties, untethered to the 1998 Contract.

[94] *See* Defs.' Ex. 6-16 (the 1999 License Agreement) at second paragraph of the "RECITALS" (bold added).

5 of the 1999 License Agreement made clear that the 1998 Contract, in its entirety, continued to govern Ovonyx's obligation to pay royalties, because that paragraph stated that "[a]ll terms and conditions and rights and obligations of the [1998] Contract remain in full force and effect."[95]

As the Court indicated in the First Opinion, quoted above, in entering the 1999 License Agreement, Ovonyx ratified, and thereby bound itself to meet, the "Entity['s]" obligation to pay the royalty as required under ¶ 10 of the 1998 Contract. That meant that Ovonyx's royalty obligation was simply to pay whatever royalty was required under the 1998 Contract, and nothing more. It follows that if the obligation under the 1998 Contract to pay the royalty was excused or terminated, because of ECD's breach or repudiation of the 1998 Contract, then necessarily Ovonyx no longer had any obligation to pay that royalty under the 1999 License Agreement either.

ii. **The obligation to pay royalties under the 1998 Contract was terminated, due to ECD's breach of that contract, so the obligation of Ovonyx to pay royalties as ratified under the 1999 License Agreement also was terminated.**

In the First Opinion, this Court ruled, at the pleadings stage and on the record then before it, that the Royalty Right in the 1998 Contract was not terminated because of ECD's rejection of that contract. Now, at the summary judgment stage, the Court must reexamine that previous ruling. The Court's reasoning in its First Opinion, which in part now requires further consideration, was this:

> The holding in *Mission Product* [*Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370 (2019),] compels the conclusions that ECD's rejection of the 1998 Contract was a breach of that contract, and that the Court must determine the effect of such breach by applying non-bankruptcy contract law. In this case, Michigan contract law is

---

[95] *Id.* at ¶ 5.

the applicable non-bankruptcy law, because the 1998 Contract states that it is to be interpreted, construed, and enforced under Michigan law.

In *Schnepf v. Thomas L. McNamara, Inc.*, 354 Mich. 393, 93 N.W.2d 230, 232 (1958), the Michigan Supreme Court explained:

> Where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has a genuine election either of continuing performance or of ceasing to perform. **Any act indicating an intent to continue** will operate as a conclusive election, *not indeed of depriving him of a right of action for the breach which has already taken place*, but depriving him of any excuse for ceasing performance on his own part. Anything which draws on the other party to execute the agreement after the default in respect of time or which shows that it is deemed a subsisting agreement after such default will amount to a waiver. (Italics ours.) 12 Am.Jur. p. 968, § 390. *Sinclair Refining Co. v. Costin*, Tex.Civ.App., 116 S.W.2d 894, 898.

*Id.* (bold added); *see also Blazer Foods, Inc. v. Rest. Properties, Inc.*, 259 Mich. App. 241, 673 N.W.2d 805, 812 n.7 (2003) (citing *Schnepf v. Thomas L. McNamara, Inc.*, 354 Mich. 393, 93 N.W.2d 230, 232 (1958); *Arnone v. Chrysler Corp.*, 6 Mich. App. 224, 228, 148 N.W.2d 902 (1967), and 2 Restatement Contracts, 2d (1981), § 236, comment b, p 214) ("When one party to a contract materially breaches the contract by failing to perform duties under it, the other party can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach.")).

Although ECD materially breached the 1998 Contract by rejecting it in its bankruptcy case, ECD did not indicate its intention to repudiate the 1998 Contract, especially given the fact that ECD assumed the 1999 License Agreement, and the 1999 License Agreement stated that "[a]ll terms and conditions and rights and obligations of the [1998] Contract remain in full force and effect." In any event, under *Mission Product*, and *Schnepf*,

whether the 1998 Contract survived ECD's rejection of it depended on whether Lowrey (who was the only other party to the 1998 Contract) chose to terminate that contract or to continue performing under it. After ECD rejected the 1998 Contract under § 365, under Michigan law, Lowrey, the non-breaching party to that contract, had two choices: (1) he could either consider the contract terminated, refuse to perform his obligations under it, and sue ECD for damages for total breach, without himself being liable for any damages resulting from his nonperformance,[96] or (2) continue to perform his obligations and receive benefits under the 1998 Contract, and sue for damages for a partial breach. If Lowrey chose the latter course, he could not later decide to terminate the 1998 Contract.

Lowrey chose to continue performing and receiving benefits under the 1998 Contract well after the effective date of ECD's rejection of the 1998 Contract (August 28, 2012). Lowrey remained in his position as President and Chief Executive Officer of the "Entity" (Ovonyx) whose formation was contemplated by the 1998 Contract, performing all of the duties contemplated by the 1998 Contract, until July 31, 2015. Similarly, Ovonyx continued operating in the same manner as prior to rejection, in pursuit of the activities that the 1998 Contract contemplated it would have in the event it was formed. This included Ovonyx's use of ECD's and Lowrey's intellectual property that had been assigned to Ovonyx. Therefore, ECD's Royalty Right survived ECD's rejection of the 1998 Contract in its bankruptcy case.[97]

The evidence now in the record, at this summary judgment stage of the case, requires the

Court to revisit some of its earlier conclusions just quoted.

First, the Court now disagrees with the following passage in its First Opinion, quoted

---

[96] [Footnote 144 in the Court's opinion, 621 B.R. at 718 n.144:] Had Lowery elected this course of action — termination and cessation of performance — he might have relied on the general rule that under Michigan law, "[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 639 (6th Cir. 2018) (citation omitted). But *Schnepf* and the other cases cited above take this case out of this general rule, given Lowery's continued performance after ECD's rejection of the 1998 Contract.

[97] First Opinion (Docket # 192) at 61-63; 621 B.R. at 717–18 (bold and italics in original) (footnote omitted).

above, that:

> ECD did not indicate its intention to repudiate the 1998 Contract, especially given the fact that ECD assumed the 1999 License Agreement, and the 1999 License Agreement stated that "[a]ll terms and conditions and rights and obligations of the [1998] Contract remain in full force and effect."

The Court now concludes that ECD's rejection of the 1998 Contract not only was a material breach of that contract by ECD; but also indicated "an intention to repudiate" the 1998 Contract, within the meaning of the *Schnepf* case, quoted above, and in fact was a repudiation of the 1998 Contract. This is because of the combination of the following three things: (1) under bankruptcy law, the result of ECD's rejection of the 1998 Contract was that ECD no longer had any enforceable obligation to perform that contract in any respect, *see Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 374, 386 (2019) (contract rejection under 11 U.S.C. § 365(a) meant that the debtor "could stop performing under the contract;" referring to contract rejection under § 365(a) as the debtor "repudiating any further performance of its [contractual] duties;" and noting that "[t]hrough rejection, the debtor can escape all of its future contract obligations");[98] (2) under ECD's confirmed Chapter 11 Plan, ECD was liquidating and no longer

_____

[98] This consequence of rejection under bankruptcy law means that upon ECD's rejection of the 1998 Contract, the 1998 Contract did **not** "remain in full force and effect." The provision in the 1999 License Agreement saying that the 1998 Contract terms remained in "full force and effect" could no longer have effect, because it came into direct conflict with bankruptcy law, when ECD rejected the 1998 Contract under Bankruptcy Code § 365(a).

In considering the consequences of ECD's rejection of the 1998 Contract, the Court assumes that 11 U.S.C. § 365(n) does not apply. That section applies when "the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property." *See* 11 U.S.C. § 365(n)(1) (opening phrase). No party has argued that § 365(n) applies in this case, presumably because ECD *assumed* the 1999 License Agreement, under which it had licensed its IP to Ovonyx. Also, by the time ECD rejected the 1998 Contract in 2012, ECD no longer was a "licensor of a right of intellectual property" within the meaning of § 365(n)(1). This is because of the 2008 Patent Assignment described Part V.B of this Opinion, in which ECD transferred to Ovonyx ownership of the IP that ECD previously

operating, and therefore could not perform its obligations under the 1998 Contract; and (3) as discussed further below, ECD did not perform any of its obligations under the 1998 Contract after rejecting it.  From these three things, it is clear that ECD did not intend to perform any of its obligations under the 1998 Contract, that ECD could not do so; and that ECD did not do so.

As a result, the Court must deem ECD to have repudiated the 1998 Contract.  That excused Ovonyx from honoring ECD's Royalty Right under the 1998 Contract.  *See, e.g.*, *Conn Aire, Inc. v. J.C. Leasing*, 921 F.2d 276, No. 90-5143, 1990 WL 209580, at *5 (6th Cir. 1990) (citations omitted) ("[W]here one party voluntarily acts to disable himself from performing his obligations under a contract, such act is a repudiation of his duties to render performance which discharges the other party's remaining duties to render performance.").  As a result, it eliminated Ovonyx's obligation to pay ECD any royalties under either the 1998 Contract or the 1999 License Agreement.

Even if ECD did not repudiate the 1998 Contract, ECD materially breached that contract when it rejected it, and when it confirmed a Chapter 11 plan of liquidation under which it could not perform any future obligations.  And ECD was the first to breach that contract.  As noted in the First Opinion, quoted above, the general rule under Michigan law is that "'[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform.' *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 639 (6th Cir. 2018) (citation omitted)." *See also Ellmann v. Dunivin* (*In re Ann Arbor Consultation Servs., Inc.*), 614 B.R. 789, 795-96 (Bankr. E.D. Mich. 2020) (applying Michigan's first-to-breach rule to preclude a bankruptcy trustee from enforcing an option to purchase contained in a real estate

---

had licensed to Ovonyx in the 1999 License Agreement.

lease, because the lessor's alleged breach occurred only after the Debtor breached the lease by failing to pay rent and after the trustee breached the lease by rejecting it under Bankruptcy Code § 365(d)(1)).

This general "first to breach" rule applies to ECD and the Trust here, because the exception to the rule described in the First Opinion does not apply. That exception is where the non-breaching party elects to continue performing under the contract, rather than terminating the contract. The evidence shows beyond any genuine dispute that neither Lowrey nor Ovonyx made an election to continue performing under the 1998 Contract. As a result, ECD's first breach of the 1998 Contract precluded it from seeking to enforce the Royalty Right provision in that contract. That, in turn, means that the Trust is now precluded from seeking to enforce that Royalty Right via the 1999 License Agreement.

In the First Opinion, as quoted above, the Court reasoned that after ECD rejected the 1998 Contract, Lowrey (the other party to that contract) continued to operate Ovonyx as before the rejection, including making use of the IP that ECD licensed to Ovonyx. The summary judgment evidence now shows, however, that neither Lowrey nor Ovonyx continued performing under the 1998 Contract after ECD rejected it. Lowrey continued to manage Ovonyx after the 2012 rejection, as Ovonyx's President and CEO, but that alone does not mean that he was operating Oxonyx under the 1998 Contract. The evidence shows that he was not.

First, Lowery and Ovonyx no longer were using *ECD's* IP, under a license, at all, as was contemplated under the 1998 Contract and provided by the 1999 License Agreement. After 2008, Ovonyx no longer was using any IP owned by ECD. Rather, Ovonyx was then using IP that ECD *formerly* owned, which *Ovonyx* had owned ever since ECD made the 2008 Patent

Assignment on October 10, 2008. And there was no longer any license by ECD in effect, because Ovonyx owned all the IP.

Second, after the 2012 rejection, ECD and Lowery clearly were no longer operating Ovonyx as a "partnership" or "joint endeavor," as contemplated by the 1998 Contract.[99] Rather, after ECD sold all of its Ovonyx stock to Micron, confirmed its plan of liquidation, and rejected the 1998 Contract, ECD no longer had anything to do with Lowery or Ovonyx, and stopped communicating with them altogether.[100]

Third, after the 2012 rejection, neither Lowery nor Ovonyx performed any of Lowery's obligations under the 1998 Contract. The Trust admitted this, in the deposition testimony of the Trust's representative, Gregory Coppola.[101] Coppola was asked whether "Lowrey performed any of Lowrey's obligations under the 1998 [C]ontract" after the August 28, 2012 Effective Date, and he responded: "Not to the Trust's knowledge."[102]

The Defendants point to several specific examples of how Lowrey was not performing under the 1998 Contract after ECD rejected it, in citing to admissions made by the Trust. In this regard, the Defendants accurately state:

> Mr. Lowrey has not, for example, sought the Trust's approval to
> enter into any agreements in the field in accordance with

---

[99] *See* 1998 Contract (Defs.' Ex. 6-15) at ¶¶ 5, 6.

[100] *See* Coppola Decl. at pdf p. 64 ¶ 28 ("[O]nce I resigned from Ovonyx's board in September 2012, Ovonyx ceased any communications with ECD or the Trust.").

[101] The Trust further admitted this in several of its answers to admission requests and interrogatories, cited by the Defendants. (*See* Defs.' Ex 6-58, the Trust's responses to admission request nos. 4, 8, 12, 14; Defs.' Ex 6-60, the Trust's answers to interrogatory nos. 9, 10).

[102] Defs.' Ex. 6-6 (Coppola Dep. Tr.) at 389.

38

paragraphs 1 and 20 of the 1998 Contract. Ex. 6-58, No. 8. Mr. Lowrey has not disclosed to the Trust any intellectual property in the field, as required under paragraph 2 of the 1998 Contract. *Id.*, No.12. Mr. Lowrey has not sought the Trust's approval to use, disclose, sell, trade, or negotiate rights to any intellectual property developed in the field, as required under paragraphs 2 and 20 of the 1998 Contract. *Id.*, No. 14. More examples exist, but the point is that the Trust admits that Mr. Lowrey stopped performing after the Effective Date.[103]

Similarly, Coppola was asked, "[s]ince the [E]ffective [D]ate, has the Trust performed in any material respect under the 1998 [C]ontract?" His answer was no: "The 1998 [C]ontract was rejected, and the Trust had no obligations to perform under that contract, and, hence, has not done any activities that would suggest a performance under that contract."[104]

As the Court noted in the First Opinion, before ECD rejected the 1998 Contract, Lowery and ECD had several ongoing obligations to each other under the 1998 Contract.[105] And the evidence shows that neither side performed their obligations after ECD rejected the 1998 Contract. These obligations of Lowery and ECD to each other included the obligations:

- even after the formation of the Entity (Ovonyx), to operate "**as a partnership** between ECD and Mr. Lowrey for all their activities in the field such as operating, licensing, expenditures, distributions, financing, employing, and contracting[;]"[106]

- "to promptly describe to the other in witnessed form any developed intellectual property in the field and to use, disclose, sell, trade, or negotiate

---

[103] Defs.' Br. in Supp. of Mot. for Summ. J. (Docket # 791 (redacted), (Docket # 794 (unredacted, filed under seal)) at pdf pp. 62-63.

[104] Defs.' Ex. 6-6 (Coppola Dep. Tr.) at 390.

[105] First Opinion (Docket # 192) at 44-48; 621 B.R. at 708-711.

[106] 1998 Contract (Defs.' Ex. 6-15) at ¶ 6 (bold added).

39

rights in that property only with approval[;]"[107]

- to utilize "all ECD proprietary and confidential information in the field originated before and after [the 1998 C]ontract . . . exclusively . . . to support **this joint endeavor's** efforts to manufacture, license and sublicense in the field[;]"[108]

and

- to "cooperate reasonably in disclosing, transferring, assigning, or licensing, as the case may be, to the Entity all pertinent information and assets in the field to the reasonable extent allowed by law including that learned or acquired in the field before and after Entity formation under the control of ECD or Mr. Lowrey, such as but not limited to: revenues, royalties, contracts, and IP."[109]

As for the reciprocal obligation to operate the Entity (Ovonyx) as a "partnership" together, in "this joint endeavor," ECD clearly made itself unable to perform such an obligation in 2012, when ECD sold all of its Ovonyx stock to Micron, rejected the 1998 Contract, stopped operating, and confirmed a plan of liquidation. As previously noted, ECD and Ovonyx stopped communicating with each other altogether when Gregory Coppola left the Ovonyx Board in September 2012,[110] and after that they had no further communications for at least five years.[111]

ECD's obligations under the 1998 Contract, which it could not perform after the events of 2012, also included:

- giving Lowrey and the Entity (Ovonyx) "**full access to** the ECD Troy facilities and

---

[107] *Id.* at ¶ 2.

[108] *Id.* at ¶ 5 (bold added).

[109] *Id.* at ¶ 7.b.

[110] *See* Coppola Decl. at pdf p. 64 ¶ 28 ("[O]nce I resigned from Ovonyx's board in September 2012, Ovonyx ceased any communications with ECD or the Trust.").

[111] *See, e.g.,* Defs.' Ex 6-58 at pdf pp. 26-28 (Trust's responses to admission request nos. 39-42).

40

**relevant ECD personnel for analytical work and process technology development** in support of their work in the field as reasonably requested by Mr. Lowrey[;]"[112]

and

- the obligations to indemnify Lowrey and hold him harmless "for his activities and any liabilities related to [the 1998 C]ontract except for gross negligence, willful misconduct, or breach of [the 1998 C]ontract, and to defend him and promptly pay for his reasonable legal expenses in defending litigation related to [the 1998 C]ontract or his related actions prior to termination, including for litigation arising thereafter[.]"[113]

For the foregoing reasons, the Court finds, beyond any genuine dispute of material fact, that ECD materially breached and repudiated the 1998 Contract, and that ECD was the first to breach that contract. As a result, neither ECD nor the Trust may obtain any relief for Ovonyx's failure to pay royalties, under either the 1998 Contract or the 1999 License Agreement. Ovonyx is entitled to summary judgment on the Trust's First Cause of Action.

    **2. Ovonyx's alleged breach of its alleged implied duty to use reasonable efforts to exploit its intellectual property, due to Ovonyx's transfer of assets to OMT in the 2015 Transaction**

        **a. Ovonyx had no express or implied duty to use reasonable efforts to exploit ECD's intellectual property.**

There is no *express* provision in either the 1998 Contract or the 1999 License Agreement that imposes a duty on Ovonyx to use reasonable efforts to exploit the intellectual property ("IP") that ECD licensed to Ovonyx. But the Trust argues that, under the circumstances of this case,

---

    [112] *Id.* at ¶ 9 (emphasis added). ECD closed the Troy facilities before the bankruptcy case was filed, and the parties dispute whether this closure was done with or without Lowrey's consent. The Court need not decide that particular dispute. The point that remains is that ECD had a duty to provide Lowery and Ovonyx with "full access" to ECD's "relevant personnel for analytical work and process technology development" for the purpose stated in ¶ 9 of the 1998 Contract. ECD obviously could not do this after it stopped operating and no longer had any "relevant personnel."

    [113] *See id.* at ¶¶ 26, 27.

there is such an *implied* duty under the 1999 License Agreement. Those circumstances, according to the Trust, are that under the 1999 License Agreement, ECD granted Ovonyx a "worldwide, exclusive right and license to ECD's past, present and future IP," without receiving any payment up-front or any consideration from Ovonyx, other than a right to receive a quarterly 0.5% royalty on all the revenues of Ovonyx, upon the written request of ECD (the Royalty Right).[114] According to the Trust, that meant that, absent an implied duty on the part of Ovonyx to use reasonable efforts to exploit ECD's IP, ECD would be entirely dependent on, and at the mercy of, Ovonyx to obtain any consideration whatsoever for the license of its IP to Ovonyx.

As discussed in more detail below, Courts generally will find an implied duty on the part of a licensee to use reasonable efforts to generate revenue where the license granted is exclusive, and the contract leaves the licensor totally at the mercy of the licensee to receive consideration for the grant of the license.

The Trust argues that Ovonyx had such an implied duty, and breached that duty by its participation in the 2015 Transactions.

Even if there was such an implied duty, however, the Trust's claim must fail, because it is based on the Royalty Right under the 1998 Contract, which Ovonyx ratified in the 1999 License Agreement. For the reasons discussed above, the Trust cannot obtain any relief for a breach of the Royalty Right, and the Trust had no right to be paid any royalties after the August 28, 2012 Effective Date of ECD's confirmed plan. As a result, Ovonyx is entitled to summary judgment on the Trust's implied duty claim.

---

[114] *See* Defs.' Ex. 6-16 (the 1999 License Agreement) at 1 ¶ 1; Defs.' Ex. 6-15 (the 1998 Contract) at ¶¶ 7, 10.

The Trust's implied duty claim also fails because, as explained below, the Court finds that Ovonyx had no implied duty to use reasonable efforts to exploit its IP.

The Defendants argue, as a threshold matter, that the Court should not consider the issue of whether Ovonyx had such an implied duty, because this is a new breach of contract theory that the Trust failed to plead or disclose during discovery.[115]

But in the event the Court considers the implied duty issue, the Defendants argue, Ovonyx has no such implied duty, for reasons that include the following:

- There is no language in either the 1998 Contract or the 1999 License Agreement that justifies implying such a duty.

- Under the 1999 License Agreement, ECD received more consideration for the grant of an exclusive license to its IP than just a right to receive royalties on the licensed IP. Under the 1999 License Agreement, ECD was also to receive "a 0.5% royalty on **all revenues**"of Ovonyx,[116] including revenues from services performed by Ovonyx. And ECD received an "equal distribution of stock, benefits, and voting;"[117] and membership on the Board of Ovonyx.[118] Defendants argue that ECD could exercise at least partial control over Ovonyx through its membership on the Board, and therefore ECD was not solely at the mercy of Ovonyx for generating revenue. The Defendants conclude: "Because ECD never relied on the Royalty [Right] alone to receive consideration for its license to Ovonyx, no basis exists for the Court to write an implied exploitation obligation into the contract here, nor is [that] necessary to give effect to the terms of the agreements."[119]

- The authorities the Trust relies on do not support finding an implied duty to exploit

---

[115] *See* Defs.' Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J. (Docket ## 803 (redacted), 807 (sealed)) at pdf p. 49.

[116] Defs.' Ex. 6-15 (1998 Contract) at ¶ 7 (bold added); *see also* Defs.' Ex. 6-16 (1999 License Agreement) at 1 ¶ 1.

[117] Defs.' Ex. 6-15 (1998 Contract) at ¶ 7.

[118] *Id.* at ¶ 8.

[119] Defs.' Resp. In Opp'n to Pl.'s Mot. for Partial Summ. J. (Docket ## 803 (redacted), 807 (sealed)) at pdf pp. 10, 12-15.

the IP in this case.  This case is distinguishable from the cases cited by the Trust because those cases involved "simple license agreements" in which an entity exclusively licensed its IP to a third party.  The Defendants argue that "unlike the agreements addressed in [the Trust's] cases, neither the 1998 Contract nor the 1999 [License] Agreement required ECD to exclusively license its IP to a third party; its licensee was the very entity that ECD and Mr. Lowrey agreed to own and operate 'as a partnership . . . for all their activities in the field.'"[120]

• The 1998 Contract contains a merger clause, a factor that the Sixth Circuit Court of Appeals has found "weighs against finding an implied obligation to exploit IP."[121]

The Court will consider the merits of the Trust's implied duty claim.  And the Court finds and concludes that, under the circumstances of this case, the Court *cannot* find any implied duty on the part of Ovonyx to use reasonable efforts to exploit the IP licensed to it by ECD.

### i. The Court will consider the merits of the Trust's implied duty claim, because the Trust's pleadings put the Defendants on notice of the claim.

As a threshold matter, the Court finds that the Trust's Third Amended Complaint put the Defendants on notice of the Trust's claim that Ovonyx breached the 1999 License Agreement by failing to use reasonable efforts to exploit its IP.  In paragraph 10 of the Third Amended Complaint, the Trust alleges, in relevant part: "[U]nder the 1999 [License] Agreement, Ovonyx had a contractual obligation to use its efforts to develop and exploit the technology provided to it by ECD[.]"[122]  This allegation was incorporated into the Trust's breach of contract claim in

---

[120] *Id.* at pdf p. 54 (record citation omitted).

[121] Defs.' Resp. In Opp'n to Pl.'s Mot. for Partial Summ. J. (Docket ## 803 (redacted), 807 (sealed)) at pdf p. 56 (citation omitted).  The Defendants also argue, in the alternative, that even if the 1999 License Agreement did contain an implied duty on the part of Ovonyx to use reasonable efforts to exploit the IP licensed to it by ECD, Ovonyx never breached that duty.  The Court finds it unnecessary to discuss that argument, because there was no such implied duty.

[122] Third Am. Compl. (Docket # 462) at ¶ 10.

Count I of its Third Amended Complaint.[123]  Therefore, this theory of breach of contract was

alleged in the Trust's Third Amended Complaint.  So the Defendants had adequate notice of it.

It also appears from Intel's interrogatories to the Trust that Ovonyx had notice of this

theory of breach of contract at least as early as April 2021, several months before the Third

Amended Complaint was filed.  Intel's Interrogatory No. 13 asks:

> INTERROGATORY NO. 13:
>
> **If you contend that Ovonyx had a duty to ECD or the Trust to
> "properly exploit Ovonyx's IP both before and in the context of the
> July 2015 transactions," as stated in the Trust's April 21, 2021 letter
> to Ovonyx,** describe in detail the nature and source of Ovonyx's purported
> duty, including by identifying any provision or provisions in the 1998
> [Contract], the 1999 [License] Agreement, or any other contract that you
> contend give rise to such a duty.[124]

This Interrogatory references an April 21, 2021 letter that the Trust wrote to Ovonyx, in which

the Trust made the very claim that the Defendants now say is a new breach of contract theory that

was not disclosed in discovery.  This interrogatory shows that the Defendants must have

understood that the Trust was claiming that Ovonyx breached an implied contractual duty to

exploit ECD's IP.  The Court therefore will consider this breach of contract theory on the merits.

### ii. Contract law principles governing the implied duty to use reasonable efforts to exploit the subject matter of an exclusive license

Michigan law applies to the interpretation of the parties' contracts.[125]  In any event,

---

[123]  *Id.* at ¶ 218.

[124]  Defs.' Ex. 6-56 ("Objs. and Resps. to Def. Intel Corp.'s Second Set of Interrogs.") at pdf p. 8 (emphasis added).

[125]  *See* Defs,' Ex. 6-15 (the 1998 Contract) at ¶ 29 ("**Interpretation**.  Both parties agree this contract shall be interpreted and construed according to the laws of Michigan, and enforced against the other in or about Troy, Michigan to the reasonable extent allowed by law.") (bold in original); Defs.' Ex.

however, "the general principles of contract law [governing the implied duty to use reasonable efforts to exploit the subject matter of an exclusive license][126] are the same in Michigan" as in other states. *ParaData Comput. Networks v. Telebit Corp.*, 830 F. Supp. 1001, 1006 n.1 (E.D. Mich. 1993) (citing, and applying principles governing the implied duty of best efforts, as stated in *Wood v. Lucy, Lady Duff–Gordon*, 118 N.E. 214 (N.Y. 1917) (applying New York contract law), and *Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98 (6th Cir. 1990) (applying Pennsylvania contract law); *see also Willis Bros. v. Ocean Scallops, Inc.*, 356 F. Supp. 1151, 1155 (E.D.N.C. 1972) (case where the plaintiffs sought "relief for a breach of an implied obligation to work a patent with due diligence or with best efforts" and the court stated: "The law in the field of patent licensing agreements is general and not likely to vary from state to state.").

As noted above, Courts generally will find an implied duty on the part of a licensee to use reasonable efforts to generate revenue where the license granted is exclusive, and the contract leaves the licensor totally at the mercy of the licensee to receive consideration for the grant of the license.

Otherwise, the cases generally do not find such an implied duty. "[T]he existence of a best efforts obligation should not be lightly inferred since such an obligation subjects the licensee to significant litigation exposure and deprives him of the fundamental power of determining for

---

6-16) (the 1999 License Agreement) ("WHEREAS, **pursuant to the terms and conditions of the [1998] Contract**, Ovonyx desires to acquire exclusive rights to such intellectual property rights developed by both ECD and Mr. Lowrey and that relate to the devices and products in the field; . . . .") (capitalization in original) (bold added); First Opinion (Docket # 192) at 61; 621 B.R. at 717 ("In this case, Michigan contract law is the applicable non-bankruptcy law, because the 1998 Contract states that it is to be interpreted, construed, and enforced under Michigan law.").

[126] The implied duty to use reasonable efforts also is referred to in case law sometimes as the implied duty of "best efforts," and also as the implied duty to use due or reasonable diligence.

himself the reasonableness of his marketing efforts." *Kardios Sys. Corp. v. Perkin-Elmer Corp.*, 645 F. Supp. 506, 509 (D. Md. 1986); *see also Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98, 101 (6th Cir. 1990) (same). And "when an inventor grants a license to patented technology, the application of which is unknown, a commitment on the part of the licensee to devote best efforts to the development of the technology is a substantial commitment which should not be automatically inferred." *Permanence Corp.*, 908 F.2d at 103.

Illustrative cases discussing when to find an implied duty include the following:

- *Vacuum Concrete Corp. of Am. v. Am. Mach. & Foundry Co.*, 321 F. Supp. 771, 773-74 (S.D.N.Y. 1971) (case citations omitted), in which the court stated:

   > It is settled law that the court will imply a duty on the part of an exclusive licensee to exploit the subject matter of the license with due diligence, where such a covenant is essential as a matter of equity to give meaning and effect to the contract as a whole. The reasoning of these decisions is that it would be unfair to place the productiveness of the licensed property **solely within the control of the licensee, thereby putting the licensor at his mercy**, without imposing an obligation to exploit upon the licensee. In effect the court is merely enforcing an obligation which the parties overlooked expressing in their contract or which they considered unnecessary to be expressed. In such circumstances the implied obligation 'must conform to what the court may assume would have been the agreement of the parties, if the situation had been anticipated and provided for. (Addison on Contracts, 22[.]) Thus whatever obligation is sought to be raised by legal implication, must be of such a character as the court will assume would have been made by the parties if their attention had been called to the subject, and their conduct inspired by principles of justice.

   (emphasis added).

- *Permanence Corp.,* 908 F.2d at 100-01 (citations omitted), in which the court stated:

   > In cases such as *Wood* [*v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (N.Y. 1917)] and *Maxwell* [*v. Schaefer*, 112 A.2d 69 (Pa. 1955)],

47

courts have found it necessary to imply a covenant to employ best efforts as a matter of law because otherwise the contract at issue would lack mutuality of obligation and be inequitable. It would be inherently "unfair to place the productiveness of the licensed property **solely within the control of the licensee, thereby putting the licensor at his mercy**, without imposing [a reciprocal] obligation upon the licensee."

(emphasis added).

- *Wood v. Lucy, Lady Duff-Gordon*,118 N.E. 214, 214 (N.Y. 1917) (citations omitted),

in which the court stated:

The implication of a promise ["to use reasonable efforts to bring profits and revenues into existence"] finds support in many circumstances. The defendant gave an *exclusive* privilege. She was to have no right for at least a year to place her own [e]ndorsements or market her own designs except through the agency of the plaintiff. The acceptance of the exclusive agency was an assumption of its duties. **We are not to suppose that one party was to be placed at the mercy of the other**. Many other terms of the agreement point the same way.

(emphasis added).

The following factors generally weigh ***against*** finding an implied duty on the part of an

exclusive licensee to use reasonable efforts to generate profits or revenue:

- if such an implied duty would be in conflict with language in the contract. *See* 3 Arthur Linton Corbin, Corbin on Contracts § 568, at 331, 334 (West 1960);

- if the contract contains a merger clause; *see Hayes Lemmerz Int'l, Inc. v. Epilogics Grp.*, 531 F. Supp. 2d 789, 804 (E.D. Mich. 2007), *aff'd sub nom. Kuhl Wheels, LLC v. Gen. Motors Corp.*, No. 2008-1158, 2009 WL 306732 (Fed. Cir. Feb. 10, 2009) (listing various characteristics of a contract which have led courts to refuse to imply a "best efforts" or a "due diligence" clause into a contract); *Permanence Corp.*, 908 F.2d at 102 (finding that the presence of an integration clause in the patent licensing agreement "further negates the implication that a duty to use best efforts was assumed" by the licensee); *but see Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333, 335 (N.Y. App. Div. 1981) (citations omitted) (. "[A merger clause] is of no relevance if[, r]eading the contract as a

48

whole,] the promise, albeit imperfectly expressed, is implicit in the contract as written.").

- if, in negotiations, the parties considered whether to include a reasonable efforts provision in the contract, and chose not to do so; "[W]hile perhaps not conclusive in itself, reference to earlier drafts of the agreement is instructive" in making this determination. *Kardios Sys. Corp. v. Perkin-Elmer Corp.*, 645 F. Supp. 506, 509 (D. Md. 1986) (citation omitted); *see also Willis Bros. v. Ocean Scallops, Inc.*, 356 F. Supp. 1151, 1155 (E.D.N.C. 1972) (considering whether during the negotiations leading up to execution of a contract, the parties considered adding an "obligation on the part of the exclusive license[e] to exploit the subject matter of the license with due diligence" in the contract but "deliberatively omitted any [such] obligation[.]").

- if the contract required a substantial up-front payment to the licensor; *see Farmaceutisk Laboratorium Ferring A/S t/a Ferring A/S v. Shire U.S ., Inc.*, No. CIV A 08-941, 2009 WL 973563, at *4 (E.D. Pa. Apr. 7, 2009) (citation omitted) ("When the licensor receives other compensation for the exclusive license, such as an advance payment or a guaranteed minimum royalty payment, the licensor is no longer completely at the mercy of the licensee and the need for an implied obligation of reasonable efforts diminishes."); *Permanence Corp.,* 908 F.2d at 102 (refusing to find an implied duty, in part, because of up front payment to licensor); *Hayes Lemmerz Int'l, Inc.*, 531 F. Supp. 2d at 803-04 (same); *ParaData Comput. Networks v. Telebit Corp.*, 830 F. Supp. 1001, 1006 (E.D. Mich. 1993) (same).

- if there is a guaranteed minimum payment of royalties in the contract; *see Havel*, 445 N.Y.S.2d at 335 (explaining that a contract provision for the payment by the licensee of minimum royalties is relevant in determining whether to imply a promise of exploitation and such provision generally precludes the finding of such an implied promise in the contract); *Vacuum Concrete Corp. of Am. v. Am. Mach. & Foundry Co.*, 321 F. Supp. 771, 773 (S.D.N.Y. 1971) (finding that the licensor's obligation "to pay a minimum royalty of $25,000 per year for the first two years of the contract" under the written contract "militate[d] against implying a covenant to exploit with due diligence"); *see also Farmaceutisk Laboratorium Ferring A/S t/a Ferring A/S v. Shire U.S ., Inc.*, No. CIV A 08-941, 2009 WL 973563, at *4 (E.D. Pa. Apr. 7, 2009) (finding that the defendant had an implied duty to use reasonable efforts where the plaintiffs granted the defendant an exclusive license "'for consideration of 2% of Net Sales'" and there was no up-front payment of royalties or guaranteed minimum royalty payment in the license agreement); *Fun Fest Prods., Inc. v. Greater Bos. Radio, Inc.*, No. 303980, 2012 WL 3319343, at *2 (Mich. Ct. App. Aug. 14, 2012) (no implied duty found where contract provided "that in no event shall [the plaintiff] receive less than $40,000 under th[e] provision [of the contract providing that the plaintiff would "receive

49

35%, of any advertising sponsorships sold by [the Defendant], regardless of the total revenue received");

- if the licensor had a right to terminate the contract if the royalty payments did not reach a certain amount in a specified period of time; *see Vacuum Concrete Corp. of Am. v. Am. Mach. & Foundry Co.*, 321 F. Supp. 771, 773-74 (S.D.N.Y. 1971) (finding that "[the licensor's] right to terminate [the contract] at the end of the four years if [the licensee's] royalty payments did not amount by that time to $100,000 a year]" also "militate[d] against implying a covenant to exploit with due diligence");

- if "the licensor retains the right to revert to a non-exclusive license if the royalties paid fail below a certain threshold;" *see Hayes Lemmerz Int'l, Inc.,* 531 F. Supp. 2d at 804 (listing various characteristics of a contract which have led courts to refuse to imply a "best efforts" or a "due diligence" clause into a contract);

- if the licensor retains some right to market the licensed item. *See Hayes Lemmerz Int'l, Inc.*, 531 F. Supp. 2d at 804; and

- if "'there is outside competition which the exclusive licensee cannot meet with [a] reasonable chance of success with the licensed article.'" *Farmaceutisk Laboratorium Ferring A/S t/a Ferring A/S v. Shire U.S ., Inc*., No. CIV A 08-941, 2009 WL 973563, at *4 (E.D. Pa. Apr. 7, 2009) (citation omitted).

Courts consider these factors to determine whether the contract renders the licensor "depend[ent] on the licensee for its 'sole compensation.'" *Hayes Lemmerz Int'l, Inc.,* 531 F. Supp. 2d at 804 (quoting *Vacuum Concrete Corp.*, 321 F. Supp. at 772-74). If a court finds that the contract leaves the licensor totally at the mercy of the licensee to receive compensation, the court will imply a duty to use reasonable efforts to generate profits or revenue.

### iii. Application of the case law principles to this case

Applying the principles and case law discussed above, the Court must conclude that Ovonyx did ***not*** have an implied duty, under either the 1998 Contract or the 1999 License Agreement, to use its best efforts to exploit the ECD IP or to forbear from taking any action that, in the words of one case, would "make performance [of that duty] impossible by going out of

50

business or otherwise." *See Bailey v. Chattem, Inc.*, 684 F.2d 386, 396 (6th Cir. 1982). In making this determination, the Court is particularly mindful of the rule stated in *Kardios*, 645 F. Supp. at 509, and *Permanence*, 908 F.2d at 101 (quoting *Kardios*, 645 F. Supp. at 509), that "the existence of a best efforts obligation should not be lightly inferred since such an obligation subjects the licensee to significant litigation exposure and deprives him of the fundamental power of determining for himself the reasonableness of his marketing efforts."

There are some factors present in this case that, under some of the case law, weigh in favor of finding an implied duty on the part of Ovonyx to use its best efforts to exploit the ECD IP. But there are several other factors that weigh heavily against finding such an implied duty. Given those factors, and in light of the rule set forth in *Kardios* and *Permanence*, quoted above, the Court must find that there was no such implied duty.

### a. Some factors weigh in favor of finding an implied duty.

The following factors in this case weigh in favor of finding an implied duty on the part of Ovonyx to use best efforts to exploit the ECD IP. But these factors are not sufficient, by themselves, to permit or require the Court to find such an implied duty. They are:

- The license ECD granted to Ovonyx was an exclusive license;

- Much or all of the IP that ECD licensed to Ovonyx was patented;

- The 1999 License Agreement does not contain a merger clause;

- There is no evidence that, during negotiations of the 1999 License Agreement, the parties considered adding a provision that required Ovonyx to use its best efforts to exploit ECD's IP, but then rejected the inclusion of such a clause in the final draft of the 1999 License Agreement;

- The 1999 License Agreement did not require Ovonyx to pay ECD an up-front licensing fee, or to pay ECD a guaranteed minimum amount of royalties;

51

- The 1999 License Agreement did not give ECD the right to terminate Ovonyx's license if the royalty did not reach a certain amount in a specified period of time;

- The 1999 License Agreement did not give ECD the right to convert Ovonyx's exclusive license into a non-exclusive license if the royalties paid fell below a certain threshold;

- Under the 1999 License Agreement, ECD did not retain the right to also market the licensed IP itself; and

- An implied best efforts obligation would not conflict with any language in the 1999 License Agreement.

**b. Numerous factors weigh heavily against finding an implied duty.**

The following nine relevant factors are present in this case, and taken both separately and together, they weigh heavily against finding that Ovonyx had any implied duty to exploit the ECD IP.

1. There was no express requirement in either the 1998 Contract or the 1999 License Agreement that Ovonyx use its best efforts to exploit the IP of ECD.[127] If the parties wanted Ovonyx to have such an obligation, they easily could have stated that in the 1999 License Agreement.

---

[127] The Defendants correctly argue that nothing in the 1998 Contract states such an obligation. And specifically, paragraph 2 of the 1998 Contract does not state such an obligation. (*See* Defs.' Reply in Supp. of Mot. for Summ. J. (Docket # 820 (redacted), Docket # 830 (unredacted, filed under seal) at pdf p. 28.) If and to the extent the Trust ever contended otherwise, in its Third Amended Complaint or in discovery responses, the Trust abandoned any such position in the summary judgment briefing and argument. (*See id.*, citing *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.")

Under paragraph 2 of the 1998 Contract, ECD and Lowrey agreed that *Lowrey* was permitted — *not required* — to conduct efforts to develop and license ECD's IP "in a manner of [Lowrey's] reasonable choosing." (*See* Defs.' Ex. 6-15 (the 1998 Contract) at ¶ 2). That clearly did not impose any *obligation* on Lowrey to use any effort to exploit the ECD IP, and it did not require *Ovonyx* to do anything.

52

2. As correctly argued by the Defendants, ECD must be viewed as having received much more consideration under the 1998 Contract and the 1999 License Agreement than just a royalty on the revenue Ovonyx earned as a result of ECD's license of its IP to Ovonyx.[128]

Under the 1999 License Agreement, which ratified the Royalty Right from the 1998 Contract, ECD received a royalty on **all of Ovonyx's revenues**, not just Ovonyx's revenues from the licensed ECD IP, as consideration for the license of ECD's IP. Ovonyx earned revenues not only from sub-licensing ECD's IP, and from royalty payments on the sale of products covered by ECD's patents, but also from "clean room" services Ovonyx provided to third parties.[129] Lowrey testified that Ovonyx "had three sources of revenue: .. . licensing fees, . . . service fees for clean room services, and . . . royalties on products and each of these was strong or weak in various years."[130] For the three years 2010, 2011, and 2012, for example, Ovonyx earned a total of $735,984 in revenue from service fees, and Ovonyx's revenue from service fees for the cumulative period 1999 through 2012 totaled $11,985,455.00:

---

[128] The Defendants argue that the Royalty Right was not the sole consideration ECD received from Ovonyx in exchange for the exclusive license to ECD's IP. (*See* Defs.' Resp. In Opp'n to Pl.'s Mot. for Partial Summ. J. (Docket ## 803 (redacted), 807 (sealed)) at pdf pp. 10, 14-15).

[129] "A clean room is a room that's kept clean by laminar flow ventilation, HEPA filters; and it's where you put semiconductor equipment to process devices to make devices or integrated circuits, and it has to be clean. . . . ECD had a clean room facility that they'd used to develop devices for some time, and . . . Ovonyx utilized that facility." (Defs.' Ex. 6-1 (Lowrey Dep. Tr.) at 130-31). Ovonyx used ECD's clean room in Troy, and later a clean room in Detroit, "to run processes and develop certain devices and characteristics for companies in return for [service] fees." (*Id.* at 91). Ovonyx performed clean room services for companies that were licensees of Ovonyx as well as for companies that were not licensees of Ovonyx. (*Id.*) Ovonyx also needed a clean room "[t]o help [Ovonyx] develop and improve [its] technologies in the field." (*Id.* at 131). Ovonyx helped Intel from "2003 to 2008, and maybe 2009" with developing products using ECD's Ovonic Threshold Switch on memory circuits, first in ECD's clean room in Troy, and later in a clean room in Detroit, and then even after Ovonyx no longer had a clean room. (*Id.* at 132-33).

[130] Defs.' Ex. 6-1 at 86.

|  | **2010** | **2011** | **2012** | **Cumulative** |
|---|---|---|---|---|
| **Revenue:** | | | | |
| License Fees | $4,500,012 | $1,999,980 | --- | $45,985,404 |
| Service Fees | $337,084 | $288,341 | $110,559 | $11,985,455 |
| Royalties | $1,112 | $122,769 | $ 80,336 | $216,745 [131] |

3. In addition, the Court must consider the stock in Ovonyx that ECD received upon the formation of Ovonyx, and that stock had relatively substantial value. Under paragraph 7 of the 1998 Contract, ECD received half the stock in Ovonyx. By 2012, ECD's Ovonyx stock represented a "38.6 equity interest (35.2% on a fully diluted basis)" in Ovonyx, and in 2012 ECD sold its Ovonyx stock to Micron for $12 million.[132] The Ovonyx stock that ECD received properly should be viewed as part of the consideration that ECD received for the license of its IP to Ovonyx under the 1999 License Agreement. This is so because the 1998 Contract, including paragraphs 7 and 14 of that contract, contemplated the "Entity" (Ovonyx) being formed, ECD receiving half the stock in Ovonyx, and ECD licensing its IP to Ovonyx, all to achieve the purposes of the 1998 Contract.

ECD's receipt of stock in Ovonyx is akin to ECD having received a significant up-front payment for licensing its IP to Ovonyx. In fact, through the year 2012, that stock proved to be far more valuable than all the royalties ECD received under its Royalty Right in the 1999 License Agreement. The $12 million that ECD eventually received from selling its Ovonyx stock in 2012 is more than 41 times the $290,000 in total royalties that ECD received from Ovonyx under

---

[131] The table above is a compilation of information from App. 6a at pdf p. 235 (years 2010-2011), and App. 6b at pdf p. 260 (years 2011-2012) to Pl.'s Br. In Supp. of Partial Summ. J on Count I (Docket # 789 (redacted), Docket 796 (unredacted, filed under seal)).

[132] *See* Part V.D of this Opinion, above.

the 1999 License Agreement during the period 1999 through 2012.[133]

That makes this case analogous to those cases, cited above, where the court refused to imply a best efforts obligation because the licensor had received a significant up-front payment from the licensee. Due to all that ECD received in return for licensing rights in ECD's IP, there is no "mutuality of obligation" problem under the 1999 License Agreement, nor is that contract inequitable. Absent such a problem, it is not necessary for the Court to imply a best efforts obligation on the part of Ovonyx.

4. The productiveness of ECD's licensed IP was ***not*** solely within the control of Ovonyx, so ECD was not "at Ovonyx's mercy" in the absence of an implied best efforts duty. That is because of the level of influence and control that ECD had over Ovonyx, by virtue of ECD's stock ownership and Board membership. Under the combined terms of 1998 Contract and the 1999 License Agreement, Lowery and ECD had equal control of Ovonyx, via equal stock and board memberships.[134] So, for example, when these agreements were made, and for at least several years afterward, Ovonyx could not cause an assignment of Ovonyx's assets, as was done much later in the 2015 Transactions, without ECD's consent or agreement. And because ECD had 50% of the Ovonyx Board membership, it could control Ovonyx's use of ECD's IP. That is because paragraph 1 of the 1999 License Agreement stated that "Ovonyx will sublicense, sell,

---

[133] According to the Trust's Third Amended Complaint and the Declaration of the Trust's Gregory Coppola, Ovonyx paid roughly $290,000.00 in royalties to ECD through 2012. (Third Am. Compl. (Docket # 451 (redacted), Docket # 462 (unredacted, filed under seal) at ¶ 88; Ex. 5 of Pl.'s Br. in Supp. of Partial Summ. J. on Count I (Docket # 789 (redacted), Docket # 796 (unredacted)) ("Declaration of Gregory C. Coppola in Support of Plaintiff's Motion for Summary Judgment" ("Coppola Decl."), at pdf p. ¶ 15.) That is merely 2.4% of the $12 million amount that ECD received for selling its Ovonyx stock to Micron in 2012.

[134] *See* Defs.' Ex. 6-15 (the 1998 Contract) at ¶¶ 7, 8.

trade or otherwise negotiate rights in ECD IP only with the majority approval of Ovonyx's Board of Directors."[135] Thus, when the 1998 Contract and the 1999 License Agreement were made, ECD clearly was *not* solely at the mercy of Ovonyx to determine how or how much ECD's licensed IP was exploited.

5. This situation of equal control changed later, because of events unrelated to the 1998 Contract and the 1999 License Agreement. But that change occurred only because ECD permitted and/or caused it to change. Additional shareholders later joined Ovonyx ownership, and ECD entered into the 2000 Shareholders Agreement with those shareholders. Then in 2012, ECD chose to sell all of its Ovonyx stock to Micron. ECD knew, at that time, that it would lose whatever management/business control or influence it had over Ovonyx by selling all its stock, but ECD did so knowingly, and obtained $12 million for doing so.

6. As described in Part V.B of this Opinion, above, in 2008, ECD transferred *ownership* to Ovonyx of all of the IP that ECD had licensed to Ovonyx under the 1999 License Agreement. ECD did this under an agreement dated October 10, 2008, entitled "Patent Assignment."[136] After this time, there was no longer any IP of ECD that was licensed to Ovonyx at all.

7. The language in the 2008 Patent Assignment is inconsistent with the parties having had an original intent, under either the 1998 Contract or the 1999 License Agreement, that Ovonyx have an implied duty to use best efforts to exploit the ECD IP. Under the 2008 Patent Assignment, ECD agreed "that Ovonyx shall have the sole and exclusive right, exercisable at its

---

[135] Defs.' Ex. 6-16 (the 1999 License Agreement) at ¶ 1.

[136] *See* Defs.' Ex. 6-19 ("**PATENT ASSIGNMENT**") (bold, capitalization, and underlining in original).

sole discretion, to prosecute or abandon any of the patents/applications [being transferred to Ovonyx], to pay maintenance fees or not to pay maintenance fees for any of the patents/applications [being transferred to Ovonyx], both without accounting to or incurring any liability to ECD under any one or combination of the [1999 License Agreement], or the [1998 Contract].”[137]  Imposing a duty on Ovonyx to use its best efforts to exploit ECD's IP appears to be in direct conflict with the language in the 2008 Patent Assignment, which expressly vested Ovonyx with “sole discretion” to take any action with regard to ECD's IP.  The language in the 2008 Patent Assignment strongly indicates that the parties did not intend for Ovonyx to have, or think that Ovonyx had, any implied duty of best efforts under either the 1999 License Agreement or the 1998 Contract.

8.  The application of the patented IP that ECD licensed to Ovonyx was largely unknown at the time of the 1998 Contract and the 1999 License Agreement.  This weighs against finding an implied duty of best efforts.  *See Permanence Corp.*, 908 F.2d at 103 (“[W]hen an inventor grants a license to patented technology, the application of which is unknown, a commitment on the part of the licensee to devote best efforts to the development of the technology is a substantial commitment which should not be automatically inferred.”).  The development and commercialization of products using ECD's patented IP was not certain, and faced significant hurdles, such as outside competition, and competing technologies and products with lower cost structures than phase change memory.[138]  In fact, one or more of the existing Ovonyx licensees

---

[137]  *Id.*

[138]  *See infra* text accompanying notes 141-42.

57

backed out of the phase change memory market, went bankrupt or were acquired.[139]  And Lowrey testified that when he signed the 1998 Contract, "[t]here [were] no memory integrated circuits products being produced at that time, but there were DVD disks or it could have been CD, CD and I think DVD at that time, I'm not sure, that stored memory on a disk that used phase change materials."[140]  According to Lowrey, that was the only application he knew about at that time.[141] Because ECD had not yet developed products using its patented IP, and there was only a *possibility* that the licensees of ECD's IP would be able to develop and commercialize products using that IP in the future, the application of ECD's IP was largely unknown at the time ECD licensed such IP to Ovonyx.

9.  Ovonyx faced significant outside competition in attempting to exploit the ECD IP. Robert Jecmen ("Jecmen") described the competition in the memory technology market as being a significant risk to Ovonyx being successful in commercialization of its memory change technology:

> [T]here were competing technologies and products out there, and they were all doing their own best efforts to improve their products and their cost structures. And so, you know, we were competing against essentially a moving target that was improving itself over time as well. So that added a level of risk in terms of the potential successful commercialization and ramp of revenue from phase change memory. . . .  Well, the competing technologies and products were all making efforts to improve their capabilities, and product lines, and cost structures. And so that was the environment in which phase change memory had to compete against. And, like I say, it was improving over time.  So for phase change memory to be

---

[139]  *See* Defs.' Ex. 6-4 (Dep. Tr. of David Kaplan, designated corporate representative on behalf of Ovonyx) at 279-81.

[140]  Defs.' Ex. 6-1 (Lowrey Dep. Tr.) at 48-49.

[141]  *Id.* at 49.

competitive and successful, it had to exceed the future improvement capabilities of these technologies as well. . . . Well, the primary ones were DRAM, dynamic, dynamic random access memory, and both Flash NOR and NAND technologies, which all had their own market segments and their own, you know, improvement rates. And phase change memory could have competed with any and all of them in various applications.[142]

Jecmen also explained that another challenge to the successful commercialization of phase change memory technology was its cost:

[S]ome of the application of phase change memory might replace other types of memory, and a very low cost alternative memory is called NAND, N-A-N-D, which is a very low cost memory. And so in order to displace that, the cost of phase change memory had to be competitive.[143]

### b. Conclusion about the alleged implied duty

Considering all of the relevant factors, and the case law discussed above, the factors weigh heavily against finding that Ovonyx had an implied duty to use best efforts to exploit the ECD IP. The Court must find that Ovonyx had no such implied duty. This, in turn, means that Ovonyx is not liable for any breach of contract based on such an implied duty.

## B. The Remaining Claims in the Third Amended Complaint's Second, Third, and Fifth Causes of Action

The Defendants argue: "The failure of the Trust's breach-of-contract claim also dooms its claims for alter ego recovery from Micron, tortious interference with contract against Micron, and fraudulent transfer against Micron and OMT. None of these claims can survive without an

---

[142] Jecmen Dep. (Defs.' Ex. 6-12) at 105-07. Jecmen was a "high level" employee of Intel from 1976 until August 2000, when he retired. (*Id.* at 13-14). In 2000, after his retirement from Intel, Jecmen joined the Board of Directors of Ovonyx. (*Id.* at 12).

[143] *Id.* at 35.

underlying breach [of contract] claim."[144]  The Court agrees.

> **1.  Micron is entitled to summary judgment on the Third Amended Complaint's "Second Cause of Action."**

In the "Second Cause of Action" in the Third Amended Complaint, the Trust seeks to hold Micron liable for Ovonyx's alleged breach of the 1999 License Agreement, based on alter ego and/or successor liability theories of recovery.[145]  It is undisputed that the Court must find Ovonyx liable for breach of contract under the "First Cause of Action," in order to hold Micron liable based on alter ego and/or successor liability theories of recovery (the "Second Cause of Action").  This is so because

> under Michigan law, alter ego liability and successor liability are only remedies, not independent causes of action. *See, e.g., Spartan Tube & Steel, Inc. v. Himmelspach* (*In re RCS Engineered Prod. Co., Inc.*), 102 F.3d 223, 226 (6th Cir. 1996) (applying Michigan law) ("[A]n alter ego claim is not by itself a cause of action."); *Mikron Digit. Imaging, Inc. v. Omega Med. Imaging, Inc.*, No. 16-13134, 2017 WL 372019, at *8 (E.D. Mich. Jan. 26, 2017) (citing *Morris v. Schnoor*, No. 315006, 2014 WL 2355705, at *44 (Mich. Ct. App. May 29, 2014) and holding that because "each of [the plaintiff's] underlying claims against [the defendant] fail ... the successor liability claim cannot survive as a separate cause of action.").[146]

In the "First Cause of Action" in the Third Amended Complaint, the Trust sought

---

[144]  Defs.' Mot. for Summ. J. (Docket # 791 (redacted), Docket # 794 (unredacted, filed under seal) at pdf p. 22; *see also id.* at pdf pp. 21, 69.

[145]  An alter ego claim sometimes is referred to as a claim to pierce the corporate veil.  *See Heritage Collegiate Apparel, Inc. v. Elemental Cap., Inc.* (*In re Heritage Collegiate Apparel, Inc.*), – B.R. –, Adv. No. 25-4146, 2026 WL 166928, at *11 (Bankr. E.D. Mich. Jan. 20, 2026).

[146]  First Opinion (Docket # 192) at 93; 621 B.R. at 736; *see also id.* at 87; 621 B.R. at 733 ("Piercing the corporate veil is not an independent substantive cause of action under Michigan law. Rather, it is a remedy used only for the benefit of third parties, and used only if the corporation has been found liable on some other independent claim. *Spartan Tube & Steel, Inc. v. Himmelspach* (*In re RCS Engineered Prods. Co., Inc.*), 102 F.3d 223, 226 (6th Cir. 1996) (applying Michigan law) ("[A]n alter ego claim is not by itself a cause of action.")").

damages against Ovonyx based on Ovonyx's alleged breach of (1) the Trust's Royalty Right after

April 2012, and (2) the Trust's Right of First Refusal under the 1999 License Agreement.[147]  The

Court's prior rulings on both the "First Cause of Action" and the "Second Cause of Action"

significantly narrowed the scope of what is now before the Court in the summary judgment

motions.  Those prior rulings include the following:

- The Court held that the Trust does not have a viable breach of contract claim, to the extent the Trust sought relief based on Ovonyx's alleged breach of ECD's First Refusal Right, or on an alleged right the Trust called the "Termination Return Right," and dismissed those claims for failure to state a claim upon which relief can be granted.[148]

- The Court dismissed the "Second Cause of Action" to the extent it sought recovery against Micron based on successor liability.[149]

- The Court dismissed the Trust's alter ego claim in the First Amended Complaint, and again with respect to the Third Amended Complaint, to the extent it sought to hold Micron responsible for Ovonyx's failure to pay ECD a royalty for the period before the July 2015 Merger when Micron became the 100% owner of Ovonyx.[150]

---

[147]  *See* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 45 ¶¶ 220-28.  The "First Cause of Action" also alleges that Defendant Tyler Lowery is liable for breach of contract, but the Court previously dismissed the claims against Lowery.  *See* "Order Regarding Defendants' Motions to Dismiss" (Docket # 193) at pdf p. 2; *see also* "Order Vacating Clerk's Default Entry Against Defendant Tyler Lowery" (Docket # 502) at pdf p. 2.

[148]  *See* Docket # 193 ("Order Regarding Defendants' Motion to Dismiss") at 2 ¶ (2); Docket # 730 ("Order Regarding . . . Motion to Dismiss Plaintiff's Third Amended Complaint in Part . . .") at 2 ¶ 4(a). Therefore, the alter ego claim against Micron has been narrowed to exclude any relief based on ECD's alleged First Refusal Right or its alleged Termination Return Right.

[149]  *See* Docket # 193 ("Order Regarding Defendants' Motions to Dismiss") at 2 ¶ (4); Docket # 507 ("Order Regarding Plaintiff's Claims for Successor Liability and Tortious Interference in Third Amended Complaint") at 2 ¶ 1.  Therefore, the "Second Cause of Action" against Micron has been narrowed to include only a claim based on an alter ego theory of recovery.

[150]  The Court made this ruling with respect to the Trust's First Amended Complaint, *see* Docket # 193 at 2, ¶ 4(b), and later made the same ruling with respect to the Trust's Third Amended Complaint. On October 13, 2023, the Court entered an order (Docket # 730, ("the October 13, 2023 Order"), which, in relevant part, granted a motion by Ovonyx and Micron entitled "Defendants Ovonyx, Inc. and Micron

61

Therefore, the Third Amended Complaint's "Second Cause of Action," against Micron, as narrowed by the prior rulings of this Court on the First and Second Causes of Action, seeks to hold Micron liable, under an alter ego theory, for Ovonyx's alleged breach of the 1999 License Agreement (1) by Ovonyx failing to pay ECD a royalty on the revenues Ovonyx received for the period beginning in July 2015, when Micron became the 100% shareholder of Ovonyx under the Merger; and (2) by Ovonyx failing to meet an alleged implied duty to use its best efforts to generate revenues that would result in royalty payments for ECD.[151]

The Defendants now seek summary judgment on what remains of the Trust's alter ego claim against Micron.

In this Opinion, the Court has ruled that, for the reasons stated above, "neither ECD nor the Trust may obtain any relief for Ovonyx's failure to pay royalties, under either the 1998 Contract or the 1999 License Agreement," and that "Ovonyx is entitled to summary judgment on the Trust's "First Cause of Action."[152] In addition, in this Opinion the Court has ruled that Ovonyx had no implied best efforts obligation under the 1999 License Agreement to exploit

---

Technology, Inc.'s Motion to Dismiss Third Amended Complaint and to Strike or Dismiss in Part Alter Ego Claim" ((Docket # 504, "Ovonyx/Micron Motion to Dismiss")). The Ovonyx/Micron Motion to Dismiss had "in an abundance of caution, . . . move[d] to strike (or, alternatively, to dismiss in part) the Trust's claim for alter ego liability *prior to July 31, 2015*." (Docket # 504 at 22 ¶ 4 (emphasis added).) The Court dismissed the alter ego claim to this extent. *See* October 13, 2023 Order at 2, ¶ 4(b). Therefore, to the extent the alter ego claim is based on the pre-Merger period, that claim was dismissed.

[151] *See* First Opinion (Docket # 192) at 96; 621 B.R. at 738. An alter ego claim is sometimes referred to as a claim to pierce the corporate veil. *See Heritage Collegiate Apparel, Inc. v. Elemental Cap., Inc.* (*In re Heritage Collegiate Apparel, Inc.*), – B.R. –, Adv. No. 25-4146, 2026 WL 166928, at *11 (Bankr. E.D. Mich. Jan. 20, 2026) (same).

[152] *See supra* Part VI.A.1.c.ii of this Opinion.

ECD's IP to generate revenue for Ovonyx and royalties for the Trust.[153]

Therefore, in this Opinion, the Court has ruled that the Trust has no viable breach of contract claim against Ovonyx, and that Ovonyx is entitled to summary judgment on the Trust's "First Cause of Action." This compels the conclusion that the Trust's "Second Cause of Action" against Micron based on the "First Cause of Action" also is not a viable claim, so that Micron is entitled to summary judgment on the "Second Cause of Action."

It is clear that the Trust cannot establish at least two of the necessary elements of an alter ego/veil piercing claim. The Court set out the elements in the First Opinion:

> In *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 798 (6th Cir. 2007), the Sixth Circuit Court of Appeals, applying Michigan law, explained:
>
> > Under Michigan law, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, 449 Mich. 542, 537 N.W.2d 221, 224 (1995) (citing *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 26 N.W.2d 757, 761 (1947)). "This presumption, often called the 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Id.* (alteration in original) (quoting *Wells v. Firestone*, 421 Mich. 641, 364 N.W.2d 670, 674 (1984)). Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss. *Foodland Distribs. v. Al–Naimi*, 220 Mich. [Ct.] App. 453, 559 N.W.2d 379, 381 (1996) (citing *SDC Chem. Distribs., Inc. v. Medley*, 203 Mich. [Ct.] App. 374, 512 N.W.2d 86, 90 (1994)); *see also Gledhill v. Fisher & Co.*, 272 Mich. 353, 262 N.W. 371, 372 (1935).
>
> *Id.*; *see also Bodnar v. St. John Providence, Inc.*, 327 Mich.App. 203,

---

[153] *See supra* Part VI.A.2 of this Opinion.

227-30, 933 N.W.2d 363 (2019) (same); *Llewellyn-Jones v. Metro Prop. Grp.*, LLC, 22 F. Supp. 3d 760, 796 (E.D. Mich. 2014) (applying Michigan law) (same).[154]

Therefore, under Michigan law, in order for the Trust to prevail on its alter ego/veil piercing claim against Micron, the Trust must establish: (1) that Ovonyx was a mere instrumentality of Micron; (2) that Ovonyx was used by Micron to commit a fraud or wrong; and (3) that the Trust suffered an unjust loss caused by Micron. The Trust cannot establish at least two of the elements of an alter ego claim.

The "wrong" alleged by the Trust as a basis for its alter ego claim is Ovonyx's alleged breach of the 1999 License Agreement. "Under Michigan law, a breach of contract can satisfy the 'fraud or wrong' element for piercing the corporate veil."[155] But the Court has ruled that Ovonyx did not breach the 1999 License Agreement in any way, so the Trust cannot satisfy the second element (the "fraud or wrong" element) of its alter ego claim.

The Trust also cannot satisfy the third element of its alter ego claim. The Trust cannot show that its loss of royalty payments from Ovonyx after April 2012 was "unjust," because the Court has ruled that the Trust was not entitled to any royalty payments from Ovonyx under the 1999 Licensing Agreement after April 2012.

For these reasons, Micron is entitled to summary judgment on the Trust's "Second Cause of Action."

---

[154] First Opinion (Docket # 192) at 84-85; 621 B.R. at 731-32; *see also* First Opinion (Docket # 192) at 94; 621 B.R. at 737 (listing the three elements of an alter ego claim); *see also Heritage Collegiate Apparel, Inc. v. Elemental Cap., Inc.* (*In re Heritage Collegiate Apparel, Inc.*), Adv. No. 25-4146, 2026 WL 166928, at *11-12 (Bankr. E.D. Mich. Jan. 20, 2026) (same).

[155] First Opinion (Docket #192) at 86; 621 B.R. at 732 (citation omitted).

**2. Micron is entitled to summary judgment on the Third Amended Complaint's "Third Cause of Action" for tortious interference with contract.**

In the "Third Cause of Action" in the Third Amended Complaint, the Trust seeks to hold Micron liable for damages caused by Micron's alleged tortious interference with ECD's contractual rights under the 1998 Contract and the 1999 Licensing Agreement.[156] The Trust alleges that Micron, with knowledge of ECD's Royalty Right and First Refusal Right under the 1998 Contract and the 1999 License Agreement, caused Ovonyx and Lowrey to breach those rights. According to the Trust, those alleged breaches caused ECD to suffer damages, in the form of lost royalty payments, and a loss of the opportunity to exercise its First Refusal Right.[157]

It is undisputed that the Trust's ability to prevail on the "Third Cause of Action," like its ability to prevail on the "Second Cause of Action," is dependent on the Trust prevailing on the Trust's breach of contract claim in the "First Cause Action."[158] But it is now clear that the Trust cannot prevail on its breach of contract claim in any respect. First, in prior rulings, the Court

---

[156] *See* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 47-48 ¶¶ 239-48. This claim is made as an alternative to the Trust's alter ego claim. (*See* Tr. of Hr'g on Mots. to Dismiss (Docket # 173) at 125 (regarding First Amended Complaint but equally applicable to Third Amended Complaint.)

[157] *See* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at ¶¶ 239-48.

[158] As this Court explained, in relevant part, in the First Opinion:

> Under Michigan law,
>
> > Tortious interference with a contract requires "(1) the existence of a contract, (2) **a breach of the contract**, and (3) an unjustified instigation **of the breach** by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc*., 268 Mich. App. 83, 89–90, 706 N.W.2d 843 (2005).

First Opinion (Docket # 192) at 102; 621 B.R. at 741 (emphasis added).

dismissed the Trust's breach of contract claim to the extent it was based on an alleged First Refusal Right or an alleged "Termination Return Right."[159]  Second, in this Opinion, the Court has ruled that the Trust has no other viable breach of contract claim under the "First Cause of Action."  As a result of these rulings, Micron is entitled to summary judgment on the Trust's "Third Cause of Action."[160]

### 3. Micron and OMT are entitled to summary judgment on the Third Amended Complaint's "Fifth Cause of Action" for an actual fraudulent transfer.

The "Fifth Cause of Action" in the Third Amended Complaint, against OMT and Micron, alleges an "actual fraudulent transfer" under the Michigan Uniform Voidable Transfers Act §§ 566.31-566.45 ("MUVTA").[161]  But, as the Court explained in its First Opinion, MUVTA, which amended and replaced the Michigan Uniform Fraudulent Transfer Act ("MUFTA"),  is not retroactive, and thus "it does not apply to transfers that occurred before its effective date of April 10, 2017.  *See* Mich. Comp. Laws Ann. § 566.45."[162]  The transfer at issue here is the transfer of all of Ovonyx's IP to OMT under the OMT Agreement, in July 2015.  Therefore, the MUFTA applies.  The provision of MUFTA that applies is Mich. Comp. Laws Ann. § 566.34, which stated, in pertinent part:

---

[159]  *See* Docket # 193 ("Order Regarding Defendants' Motion to Dismiss") at 2 ¶ (2); Docket # 730 ("Order Regarding . . . Motion to Dismiss Plaintiff's Third Amended Complaint in Part . . .") at 2 ¶ 4(a).

[160]  In prior rulings, the Court dismissed the Trust's "Fourth Cause of Action" against OMT, for tortious interference with contract.  *See* Docket # 193 ("Order Regarding Defendants' Motion to Dismiss") at 3 ¶ (9); Docket # 507 ("Order Regarding Plaintiff's Claims for Successor Liability and Tortious Interference in Third Amended Complaint") at 2 ¶ 2.

[161]  *See* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 51 ¶¶ 261-265.

[162]  First Opinion (Docket # 192) at 115-16 & note 231; 621 B.R. at 749 & note 231.

> Sec. 4. (1) A transfer made . . . by a debtor is fraudulent **as to a creditor**, whether the **creditor's claim** arose before or after the transfer was made . . . , if the debtor made the transfer . . .
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

Mich. Comp. Laws Ann. § 566.34(1) (bold added).

As stated in the First Opinion:

> Under MUFTA "'Creditor' means a person who has a claim." Mich. Comp. Laws Ann. § 566.31 Sec. 1.(d). "'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* at Sec. 1.(c)."[163]

Thus, in order to prevail on its fraudulent transfer claim, the Trust must show that it is a "creditor" of Ovonyx, with a "claim" against Ovonyx. The Trust cannot do that.

The Trust's only basis for alleging that it is a "creditor" of Ovonyx is its breach-of-contract damages claim against Ovonyx in the "First Cause of Action." That claim is based on Ovonyx's alleged breach of ECD's "valuable contractual rights" under the 1998 Contract and the 1999 License Agreement.[164] But the Court has ruled that the Trust has no valid breach of contract claim against Ovonyx under either the 1998 Contract or the 1999 License Agreement. The Trust thus is not a creditor of Ovonyx. For this reason, Micron and OMT are entitled to summary judgment on the Trust's fraudulent transfer claim.

## C. The Defendants' motion for partial summary judgment regarding damages

---

[163] First Opinion (Docket # 192) at 117; 621 B.R. at 750.

[164] *See* Third Am. Compl. (Docket # 451 (redacted), (Docket # 462) (unredacted, filed under seal) at 3 ¶ 8, 4-5 ¶ 12.

The Defendants seek a partial summary judgment on an issue of damages. A major component of the Trust's alleged damages arises from the fact that in the 2015 Transactions (also known as "Project Fish"), Ovonyx transferred away rights and assets such that, according to the Trust, Ovonyx "destroy[ed] itself."[165] The Trust claims damages that it characterizes this way: "[T]he Trust seeks 0.5% of the present value of expected future revenues Ovonyx would have received but for Project Fish."[166] The Trust does not seek summary judgment as to damages.

The Defendants characterize such damages as "hypothetical royalty damages," and seek partial summary judgment determining that such damages are invalid, for several reasons, including that they are "conjectural and speculative."[167] The Trust disputes these arguments.

Given the Court's rulings in this Opinion, it is unnecessary to discuss or rule on these arguments about damages. The Defendants are entitled to summary judgment that they are not liable to the Trust on any claims, so issues concerning damages are moot. For these reasons, the Court will deny the Defendants' request for partial summary judgment about damages.

## D. The parties' objections to each other's summary judgment evidence

The Trust and the Defendants each filed and briefed objections to certain of the summary judgment exhibits presented by the other side.[168] The Court has considered all of the objections,

---

[165] *See* Pl.'s Opp'n to Def.s' Mot. For Summ. J. (Docket # 801 (redacted), Docket # 810 (unredacted)) at pdf p. 55 ¶ 101.

[166] *Id.* at pdf p. 56 ¶ 102.

[167] Defs.' Br. in Supp. of Mot. for Summ. J. (Docket # 791 (redacted), (Docket # 794 (unredacted, filed under seal)) at pdf pp. 71-78.

[168] The objections and written briefs regarding them are filed, under seal in unredacted form, at Docket ## 807 (at pdf pp. 71-73), 811, 827, 824, 829, 834, and 835. The corresponding redacted versions are filed at Docket ## 803 (at pdf pp. 71-73), 802, 822, 818, 821, 832, and 833.

68

and concludes that with one possible exception, it is not necessary to discuss or rule on any of the objections. That is because in reaching its rulings in this Opinion, the Court has not relied on any summary judgment exhibit in a way that either side has argued is objectionable.

The one possible exception concerns one of the Trust's objections. The Trust objects to the Defendants' reliance on declarations and deposition testimony of what the Trust calls "the Defendants' own witnesses."[169] In its objections, the Trust includes in this list of "Defendants' own witnesses" the following persons: Tyler Lowery; David Westergard; David Kaplan; Steven Steger; Matthew Freeman; and Russ Meyer.[170] The Trust argues that the declarations and deposition testimony should not be considered at all in deciding the summary judgment motions, because the witnesses have not been shown to be unavailable under Fed. R. Evid. 804(b). The Trust argues that a declaration under penalty of perjury (which is the legal equivalent of an affidavit under 28 U.S.C. § 1746), and a deposition, in and of themselves are inadmissible hearsay that the Defendants cannot use for any purpose in these summary judgment proceedings.

The Trust's argument may be relevant *in a trial*, but it does not apply with respect to a motion for summary judgment. The only case the Trust cites concerned the use of depositions in a criminal trial. *See United States v. Provencio*, 554 F.2d 361, 362 (9th Cir. 1977). But a trial

---

[169] "Evidentiary Objections in Supp. of Pl.'s Opp. to Defs.' Mot. for Summ. J." (Docket # 802 (redacted), Docket # 811 (unredacted, filed under seal)) at pdf p. 2.

[170] *Id.*; Pl.'s . . . Evidentiary Objections (Docket # 818 (redacted), Docket # 824 (unredacted, filed under seal) at pdf p. 7. In this Opinion, the Court does not cite or rely on any declaration or deposition testimony of Steven Steger, Matthew Freeman, or Russ Meyer. And the Defendants are correct in arguing that Tyler Lowery is not one of their "own" witnesses. Mr. Lowery is a separate Defendant, and was a separate party to the 1998 Contract and the 1999 License Agreement. And he has not been connected with Ovonyx, or any of the Defendants, since he sold his stock in Ovonyx as part of the 2015 Transactions.

setting is very different from that of a summary judgment motion. At trial, the norm is for witnesses to testify live. On a motion for summary judgment, that is not the case — normally there is no live testimony in that setting. And Fed. R. Civ. P. 56, which applies in this adversary proceeding under Fed. R. Bankr. P. 7056, expressly permits a motion for summary judgment to be supported or opposed by, among other things, "depositions" and "affidavits or declarations." *See* Fed. R. Civ. P. 56(c)(1)(A);[171] *see also Bailey v. Floyd Cty. Bd. of Ed.*, 106 F.3d 135, 145 (6th Cir. 1997) (citations omitted) (italics in original) ("Rule 56 requires the [party] to present evidence of evidentiary quality . . . . Examples of such evidence include admissible documents or attested testimony, such as that found in affidavits or depositions . . . . The proffered evidence need not be in admissible *form*, but its *content* must be admissible."). And under Rule 56, it does not matter whether the declaration or deposition testimony is from a party's "own" witness. The Trust cites no authority for such a distinction, and the use by a party of his or her own affidavit or deposition testimony is commonplace in federal summary judgment practice. If there is content within such an affidavit or deposition testimony that is inadmissible hearsay, that is objectionable, but that is not the Trust's argument now being addressed.

For these reasons, the Trust's objection described above is overruled.

**E. The parties' motions to exclude expert evidence**

As noted in Part II above, the parties have filed motions to exclude certain expert evidence, namely:

1. The Trust's motion entitled "Plaintiff Energy Conversion Devices Liquidation Trust's

---

[171] Rule 56 requires that "[a]n affidavit or declaration . . . must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Motion to Exclude Testimony of Defendants' Expert Charles Bullock;"[172] and

2. The Defendants' motion entitled "Defendants' Motion to Exclude the Reports and Testimony of Jonathan D. Putnam."[173]

The Trust's motion seeks to exclude testimony of Charles Bullock, an attorney retained as an expert witness by the Defendants. Mr. Bullock authored a written expert report, and was deposed.[174] In making the rulings in this Opinion, and in concluding that the Defendants are entitled to summary judgment on all of the Trust's claims, the Court has not cited or relied in any way on any evidence from Mr. Bullock, including any statements or testimony in Mr. Bullock's report or his deposition. As a result, it is unnecessary to discuss or decide the merits of the Trust's motion. For that reason, the Court will enter an order denying the Trust's motion.

The Defendants' motion seeks to exclude testimony of Jonathan D. Putnam, a valuation and damages expert retained by the Trust. Mr. Putnam authored written expert reports, and was deposed.[175] In making the rulings in this Opinion, and in concluding that the Defendants are entitled to summary judgment on all of the Trust's claims, the Court has not cited or relied in any way on any evidence from Mr. Putnam, including any statements or testimony in Mr. Putnam's reports or his deposition. As a result, it is unnecessary to discuss or decide the merits of the Defendants' motion. For that reason, the Court will enter an order denying the Defendants'

---

[172] Docket # 788 (redacted), Docket # 797 (unredacted, filed under seal).

[173] Docket # 790 (redacted), Docket # 793 (unredacted, filed under seal).

[174] Copies of Mr. Bullock's report and a transcript of his deposition are attached as Exhibits 6 and 7 to the unredacted version of the Trust's motion (Docket # 797).

[175] Copies of Mr. Putnam's two expert reports and a transcript of his deposition are at Defs.' Ex. nos. 6-11, 6-65, and 6-66 (unredacted, filed under seal at Docket # 795).

71

motion.

## F. The Trust's spoliation arguments

In the Trust's summary judgment briefs, the Trust seeks sanctions against Ovonyx and

Micron under Fed. R. Civ. P. 37(e),[176] for their alleged spoliation of electronically stored

information ("ESI") that was allegedly material to the Trust's claims in the Third Amended

Complaint. Fed. R. Civ. P. 37(e) states:

> **(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that *should have been preserved in the anticipation or conduct of litigation* is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) *upon finding prejudice to another party* from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>>
>> (2) only upon finding that the party acted *with the intent to deprive another party of the information's use in the litigation* may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>>
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>>
>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e) (italics added). "Rule 37(e) does not create a duty to preserve evidence,

instead it is based on the common-law duty to preserve. Fed. R. Civ. P. 37(e) advisory

committee's note to 2015 amendment." *Buddenberg v. Est. of Weisdack*, 711 F. Supp. 3d 712,

818 (N.D. Ohio 2024).

---

[176] Fed. R. Civ. P. 37(e) is applicable to adversary proceedings under Fed. R. Bankr. P. 7037.

The Court has considered all of the parties' arguments about spoliation. For the reasons stated below, the Court will not sanction the Defendants based on any failure to preserve ESI.

## 1. The Trust's spoliation argument

As described in more detail below, Ovonyx deleted its emails at or shortly after the time of the 2015 Transactions, and Micron deleted certain of its ESI in 2016. The Trust argues that these failures to preserve evidence are sanctionable under Civil Rule 37(e).

The Trust argues that "[t]his Court has the power under the spoliation doctrine as a sanction to deny the Defendant[s' Summary Judgment] Motion in its entirety[,]"and should do so.[177] According to the Trust, making adverse inferences against the Defendants on any disputed issues and denying their motion for summary judgment, as a spoliation sanction, is appropriate because both Ovonyx and Micron had notice to preserve documents and failed to do so, and the Trust suffered prejudice because the emails and other documents that Ovonyx and Micron deleted were material to establishing Ovonyx's and Micron's liability and the Trust's damages.[178] The Trust alleges:

> 102. . . . [A]s part of Project Fish, Ovonyx deleted all of its e-mails. But at the time it did so, both Micron and Ovonyx knew that Ovonyx was supposed to provide notice to the Trust . . . regarding the transfer of the 2002 [License] Agreement.
>
> 103. Moreover, Micron (which became the owner of Ovonyx) knew of the 1998 [Contract] and 1999 [License] Agreement, knew of the Royalty obligation and the fact that Ovonyx had paid a Royalty to ECD for years, and even discussed these agreements with Tyler Lowrey as part of Project Fish, and yet took no steps to prevent Ovonyx from deleting

---

[177] Pl.'s Resp. in Opp'n to Defs.' Mot. For Summ. J. (Docket # 801 (redacted), Docket 810 (unredacted, filed under seal) at pdf p. 10.

[178] *Id.* at pdf pp. 10, 67.

73

e-mails relating to [the] 1998 [Contract], the 1999 [License] Agreement, or Project Fish.

104. At the time of Project Fish [(July 2015)], Micron had a policy of retaining e-mails but it made no effort to extend that policy to its (now) wholly-owned subsidiary, Ovonyx. This includes all internal Micron e-mails and any other e-mails exchanged with Ovonyx, Tyler Lowrey, or third parties. This policy was still in effect **when the [T]rust obtained an order granting the 2015 Rule 2004 Motion** that specifically requested from Ovonyx documents concerning the 1999 [License] Agreement. Micron could have, but chose not to, preserve e-mails, which would have included e-mails exchanged with Ovonyx (and others).

105. Given that both Micron and Ovonyx knew of the 1998 [Contract] and 1999 [License] Agreement (and Mr. Lowrey specifically discussed with Micron possible litigation risk over these agreements in July 2015), and knew that Ovonyx was assigning the 2002 [License] Agreement to OMT, and knew that Ovonyx was supposed to notify the Trust but did not do so, the Trust reserves the right to argue that the failure to preserve documents – both **at the time Ovonyx destroyed its e-mails** [(July 2015)] and **when Micron and Ovonyx received notice of the 2015 Rule 2004 Motion** - is spoliation and that this Court should impose an appropriate sanction if Ovonyx seeks to argue that there are material facts precluding summary judgment.[179]

Based on these allegations, the Trust argues:

131. Under Rule 37(e)(1), the Trust need not establish that either Ovonyx or Micron acted with a culpable state of mind when each destroyed documents to obtain a spoliation sanction; the Trust need only establish that **it suffered prejudice from the spoliation and the remedy imposed is no greater than necessary to cure the prejudice**.

132. Case law adds that if the requested remedy is a form of adverse inference, the Trust must show that **Ovonyx and/or Micron had an obligation to preserve it at the time it was destroyed**. *Automated Solutions Corp. v. Paragon Data Sys.*, 756 F.3d 504, 513 (6th Cir. 2014).

133. The obligation to preserve arises no later than **when a person**

---

[179]  Pl.'s Mot. For Partial Summ. J. (Docket # 789 (redacted), Docket # 796 (unredacted)) at pdf pp. 49-51 (record citations and footnotes omitted) (bold added); Pl.'s Resp. in Opp'n to Defs.' Mot. For Summ. J. (Docket # 801 (redacted), Docket 810 (unredacted, filed under seal) at pdf pp. 69-71.

**knows or should know that the subject information is relevant to reasonably foreseeable litigation**. *See Bull v. UPS*, 665 F.3d 68, 74 (3d Cir. 2012); *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 889 (S.D.N.Y. 1999). This obligation attaches before the service of a complaint or a formal discovery request, *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003), but it is clear that the duty attaches once a formal discovery request has actually been served. *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73-74 (S.D.N.Y. 1991). This includes subpoenas. *Flatow v. Islamic Republic of Iran*, 196 F.R.D. 203, 209 (D.D.C. 2000). **A Rule 2004 motion is a request to serve a subpoena, so if the motion is granted, the service of it is a form of discovery subpoena.**

. . . .

138. A Rule 2004 subpoena is a court-ordered obligation to produce documents. The **subject matter** of that subpoena is sufficient to put parties on notice to preserve documents because, by definition, the fact that the Trust was seeking to learn information concerning the status of the 1999 Agreement was sufficient to place Ovonyx and Micron on notice of **potential litigation**. They would have known that, despite their purported belief that the 1999 [License]Agreement was somehow not enforceable (notwithstanding the known fact it had been assumed by ECD's estate and transferred to the Trust), the Trust **might** dispute that position. That is sufficient to place both on notice. *See Stillwater Liquidating LLC v. New Five at Palm Point, LLC* (*In re Stillwater Asset Backed Offshore Fund Ltd.*), 2017 WL 1956848, *6 (May 10, 2017) (entity sanctioned for destroying documents subject to a Rule 2004 motion).[180]

The Trust argues that Ovonyx and Micron had a duty to preserve their relevant ESI as early as July 2015, or alternatively, at the latest, when the Defendants received notice of the Trust's *first* Rule 2004 Motion (the "2015 Rule 2004 Motion"), which was filed and served on October 7, 2015. According to the Trust, the subject matter of the 2015 Rule 2004 Motion provided Micron and Ovonyx with notice of "potential litigation," and that the Trust "might dispute" Ovonyx's and Micron's position that "the 1999 [License] Agreement was somehow not

---

[180] Pl.'s Resp. in Opp'n to Defs.' Mot. For Summ. J. (Docket # 801 (redacted), Docket 810 (unredacted, filed under seal) at pdf pp. 68-69, 71 (bold added).

enforceable."[181]

**2. The Defendants' response to the Trust's spoliation argument**

The Defendants deny that Ovonyx or Micron improperly failed to preserve evidence.  The

Defendants argue that "any allegation of spoliation fails because the Trust has no evidence that in

July 2015, Ovonyx or Micron anticipated litigation and thus had any duty to preserve potential

evidence."[182]  The Defendants argue that

> "[a] party's duty to preserve evidence must be triggered by an event that
> places the party on notice that the evidence is relevant to litigation or . . .
> [the party] should have known that the evidence may be relevant to future
> litigation." *Black v. Costco Wholesale Corp.*, 542 F. Supp. 3d 750, 753
> (M.D. Tenn. 2021) (quoting *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir.
> 2008)) (emphasis added) (internal quotation marks omitted).  Events
> triggering the anticipation of future litigation typically include demand
> letters, preservation requests, or threats of litigation, in addition to a
> party's own decision to pursue a claim. *Id.*  **A theoretical possibility of
> litigation does not give rise to any duty to preserve evidence; instead,
> the future litigation must be "probable."** *Crossley v. Kettering Adventist
> Healthcare*, No. 3:20-cv-319, 2023 WL 2554942, at *2 (S.D. Ohio Mar.
> 17, 2023).  In other words, **"future litigation" means "'reasonably
> foreseeable' specific litigation," not "any possible or hypothetical
> lawsuit."** *Design Basics, LLC v. Mitch Harris Bldg. Co.*, No. CV
> 16-14019, 2021 WL 5563981, at *4 (E.D. Mich. Nov. 29, 2021).
>
> Here, the Trust cannot show that any event before early 2018
> triggered the anticipation of future litigation with ECD or the Trust, or that
> any such litigation was probable or reasonably foreseeable before that
> time.[183]

---

[181] Pl.'s Resp. in Opp'n to Defs.' Mot. For Summ. J. (Docket # 801 (redacted), Docket 810 (unredacted, filed under seal) at pdf p.10.

[182] Defs.' Resp. in Opp'n to Pl.'s Mot. For Partial Summ. J. (Docket # 803 (redacted), Docket # 807 (unredacted)) at pdf pp. 63-64.

[183] *Id.* at pdf pp. 64-65 (bold added).

76

### 3. The Court concludes that no duty to preserve evidence arose, on the part of either Ovonyx or Micron, until at the earliest, December 21, 2017.

The Court agrees with the Defendants, to the following extent. No duty to preserve evidence arose, on the part of either Ovonyx or Micron, until at the earliest, December 21, 2017. That is when the Trust filed and served its *second* Rule 2004 motion on Ovonyx and Micron. That is the earliest time that the Defendants' ESI should have been preserved "in the anticipation . . . of litigation," within the meaning of the opening sentence of Fed. R. Civ. P. 37(e).

The Trust's motion for the second Rule 2004 Subpoena was filed and served on December 21, 2017.[184] An order granting that motion was entered on January 9, 2018.[185]

It is undisputed that the relevant failures by Ovonyx and Micron to preserve ESI occurred well before that time. All of Ovonyx's emails and other ESI regarding the 1998 Contract, the 1999 License Agreement, the 2002 License Agreement, and other agreements that Ovonyx entered into regarding ECD's IP, and Project Fish (collectively, the "relevant subject matters"), were not preserved, and ceased to exist in or about July 2015. This was after Micron acquired Ovonyx as part of Project Fish, and discontinued the use of Ovonyx's computer servers.[186] It is also undisputed that Micron's emails and other ESI regarding the relevant subject matters were

---

[184] *See* Docket ## 2596, 2597 in Case No. 12-43166.

[185] *See* Docket # 2600 in Case No. 12-43166 ("Order Authorizing the Liquidation Trustee to Issue Document and Deposition Subpoenas to Micron Technology, Inc., Tyler Lowrey, Ovonyx, Inc. and Ovonyx Memory Technology, LLC under Federal Rule of Bankruptcy Procedure 2004").

[186] *See* Defs.'s Ex. 6-2 (Dep. Tr. of Dave Westergard, who was deposed as corporate representative of Ovonyx and Micron) at 50 (testifying that, even though Micron's document retention policy applied to its subsidiaries, Micron did not subject Ovonyx's emails or other ESI related to the 1998 Contract, the 1999 License Agreement, the 2002 License Agreement or Project Fish to Micron's document retention policy, because Micron "discontinued the use of the Ovonyx servers after close [of July 2015 Transactions], and so whatever was on Ovonyx servers were not incorporated into any Micron storage system or protocol.").

not preserved, and ceased to exist, as a result of a new one-year document retention policy

Micron implemented in April 2016.[187]  It is also undisputed that Micron did not implement a

litigation hold on any emails or other ESI regarding the relevant subject matters until 2018, "after

the second Rule 2004 subpoena[.]"[188]

> As the Supreme Court has noted, "[d]ocument retention policies, which are created in part to keep certain information from getting into the hands of others, including the Government, are common in business. It is, of course, not wrongful for a manager to instruct his employees to comply with a valid document retention policy under ordinary circumstances." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005) (internal citation and quotation marks omitted). Thus, "a party can only be sanctioned for destroying evidence if it had a duty to preserve it." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). **The duty to preserve evidence begins when litigation is "pending or reasonably foreseeable."** *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir.2001). *See also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999) (applying the same standard). Thus, "[s]poliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence **in pending or reasonably foreseeable litigation."** *Silvestri*, 271 F.3d at 590. This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but **whether a reasonable party in the same factual circumstances would have**

---

[187]  *See id.* at 43-46.

[188]  *Id.* at 48.

> A litigation hold is a protocol that is turned on with respect to what [Micron] would call a document custodian, somebody that is likely to have documents that might relate to **a matter in dispute**. And the trigger for that is the time **when Micron Legal judges that the matter in dispute is likely to end up in litigation.** And at that moment, we do our best to figure out which Micron personnel might have relevant information, and then we put a so-called litigation hold in place that protects all of their documents, and particularly e-mail.  It overrides the e-mail policy as to those custodians. And so those document custodians will no longer have any e-mail at all subject to the policy.

*Id.* at 47 (bold added).

**reasonably foreseen litigation**.

> When litigation is "reasonably foreseeable" is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry. *Fujitsu Ltd. v. Fed. Express Corp*., 247 F.3d 423, 436 (2d Cir .2001). **This standard does not trigger the duty to preserve documents from the mere existence of a potential claim or the distant possibility of litigation.** *See, e.g., Trask–Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681–82 (7th Cir. 2008).

*Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1319–20 (Fed. Cir. 2011) (bold added).

### a.  The Trust's first Rule 2005 motion and subpoena, served in October 2015.

The Trust argues that a duty on the part of Ovonyx and Micron to preserve emails and other ESI relating to the relevant subject matters arose at the time of the 2015 Transactions in July 2015 or in the alternative, at the latest, in October 2015, when Ovonyx and Micron received notice of the Trust's *first* Rule 2004 motion, entitled "Liquidation Trustee's Motion for Authority to Issue Document and Deposition Subpoenas to Ovonyx, Inc. Pursuant to Federal Rule of Bankruptcy Procedure 2004," and the Court granted that motion.[189]  The 2015 Rule 2004 Motion was filed and served on October 7, 2015.[190]  The Order granting that motion was entered on October 27, 2015.[191]

The Defendants argue that nothing about the July 2015 Transaction or the 2015 Rule 2004 Motion, and the resulting order and subpoena, gave Ovonyx or Micron notice that future

---

[189]  Pl.'s Mot. For Partial Summ. J. (Docket # 789 (redacted), Docket # 796 (unredacted)) at pdf pp. 50-51 ¶¶ 104-05; Docket ## 2515, 2516, 2523 in Case No. 12-43166.

[190]  Docket ## 2515, 2516 in Case No. 12-43166.

[191]  Docket # 2523 in Case No. 12-43166 ("Order Authorizing the Liquidation Trustee to Issue Document and Deposition Subpoenas to Ovonyx, Inc. Pursuant to Federal Rule of Bankruptcy Procedure 2004," the "2015 Rule 2004 Order").

79

litigation was reasonably foreseeable.  The Court agrees.

The 2015 Rule 2004 Motion stated, in relevant part:

> 7.  Among the assets of the Trust currently being administered by the Liquidation Trustee are **certain rights to intellectual property** which, on information and belief, are subject to certain agreements with Ovonyx, Inc.  The Trustee has sought to obtain voluntarily from Ovonyx, Inc. comprehensive information concerning all such agreements and copies of same; however, Ovonyx, Inc. has not replied to such request.
> . . .
>
> 8. By this Motion, the Liquidation Trustee seeks entry of an order, substantially in the form attached hereto as Exhibit 1 authorizing the Liquidation Trustee to (a) issue a document subpoena to Ovonyx, Inc. for the **documents identified on Exhibit A attached hereto** and (b) to issue a deposition subpoena to Ovonyx, Inc. for testimony with regard to the subjects set forth on Exhibit B attached hereto.[192]

Exhibit A of the 2015 Rule 2004 Motion listed the documents to be produced as follows:

> 1.  A full and complete copy of [the 1999 License Agreement] together with all exhibits or documents referred to therein and all amendments and/or supplements thereto.
>
> 2.  A full and complete copy of [the 2002 License Agreement] together with all documents or agreements referred to therein or of which said agreement was a part or were delivered in connection therewith and together with copies of all amendments and/or supplements to all such agreements or documents.
>
> 3.  Copies of any and all other agreements, if any, by and among Ovonyx, Inc., the Debtors and/or any subsidiary or affiliate of the Debtors relating to intellectual property together with all amendments and/or supplements thereto.[193]

---

[192]  Docket ## 2515 in Case No. 12-43166 at 2-3 (underlining in original) (bold added).

[193]  *Id.* at 7.

Exhibit B to the 2015 Rule 2004 Motion stated:

**EXHIBIT B**
**MATTERS FOR EXAMINATION**

All of the agreements produced as requested pursuant to Exhibit A and the current status of the parties' respective rights and obligations thereunder.[194]

The Court granted the 2015 Rule 2004 Motion.[195] It authorized the Liquidation Trustee to "issue subpoenas for documents and depositions to Ovonyx," and required Ovonyx "to produce those documents identified on Exhibit A [of the 2015 Rule 2004 Motion] on or before November 10, 2015."[196] The 2015 Rule 2004 Order also granted the Liquidation Trustee the right to "examine Tyler Lowrey, Chief Executive Officer and President of Ovonyx, Inc., regarding those topics identified on Exhibit B under oath[.]"[197]

The Trust argues that the 2015 Rule 2004 Motion and the 2015 Rule 2004 Order (collectively, the "2015 Rule 2004 Subpoena") was a triggering event that put Ovonyx and Micron on notice that emails and other ESI concerning the 1998 Contract, the 1999 License Agreement, the 2002 License Agreement, and Project Fish were relevant to reasonably foreseeable litigation in the future. This is so, according to the Trust, because Micron and Ovonyx knew:

- about the Royalty Right under the 1998 Contract, and the 1999 License Agreement;

---

[194]  *Id.* at 8 (bold in original).

[195]  *See* Docket # 2523 at 2 ¶ 1.

[196]  *See id.* at 2 ¶ 2 (underlining in original).

[197]  *See id.* at 2 ¶ 4 (misnumbered paragraph 3) (underlining in original).

81

- that Ovonyx had failed to pay ECD a royalty after May 2012;

- that, at the time of Ovonyx's assignment of the 2002 License Agreement to OMT, the 2002 License Agreement contained a notice provision requiring Ovonyx to give ECD advance notice of that assignment;[198] and

- that Ovonyx had not provided notice to ECD of that assignment.

The Court rejects the Trust's argument. "[T]riggering events in spoliation cases are typically limited to demand letters, preservation requests, threats of litigation, or a party's decision to pursue a claim, *see* EPAC [*Techs., Inc. v. HarperCollins Christian Publ'g, Inc.*, No. 3:12-CV-00463], 2018 WL 1542040, at *16 (collecting cases)[.]" *Black v. Costco Wholesale Corp.*, 542 F. Supp. 3d 750, 753 (M.D. Tenn. 2021). The 2015 Rule 2004 Subpoena does not fall into any of these categories. Nor does it bear any of the characteristics of these triggering events recognized under the law. The 2015 Rule 2004 Subpoena does not demand money, does not request the preservation of any documents, does not threaten litigation, and does not state or imply that the Trust has a claim against either Ovonyx or Micron that it intends to pursue. The 2015 Rule 2004 Subpoena does not state or otherwise indicate that there is a matter in dispute between the Trust and any of the Defendants. The 2015 Rule 2004 Subpoena appears to be merely an effort by the Trustee to determine what, *if any*, rights or interests the Trust may have under the contracts it wanted Ovonyx and Micron to produce. The language regarding the Trust's possible rights and interests is vague, referring to the assets the Liquidation Trustee seeks to possibly administer as "certain rights to intellectual property," without specifying what rights, if any, the Trustee believes the Trust may have. Based on Exhibit B to the 2015 Rule 2004

---

[198] The Trust has not shown that the 2002 License Agreement contained a provision which required Ovonyx to provide ECD with notice of its assignment of that agreement to OMT. The Trust has not specified what provision in the 2002 License Agreement it is relying on for this assertion.

Subpoena, it appears that the Liquidation Trustee was even unsure of, and did not take any position on, what the "the current status of the parties' respective rights and obligations" are under the contracts he asked to be produced. The 2015 Rule 2004 Subpoena contained no threat of future litigation. The most that could be concluded from the 2015 Rule 2004 Subpoena was that there was a theoretical possibility that the Trust could determine that it had some sort of claim against Ovonyx or Micron, based on the agreements the Trust was requesting, and that there was a theoretical possibility that the Trust could initiate litigation to pursue claims.

In short, the standard for triggering a duty to preserve evidence was not met with the 2015 Rule 2004 Subpoena. It was not yet objectively reasonable to conclude that "reasonably foreseeable future specific litigation" based on specific enforceable rights under the contracts requested was "probable."

To the contrary, given the events that occurred after execution of the 1998 Contract, and the 1999 License Agreement, all of which are detailed in this Opinion above, it was objectively reasonably foreseeable, upon the Trust's receipt of the documents requested in the 2015 Rule 2004 Subpoena, that the Trust would determine, as Ovonyx and Micron have argued, and now the Court has determined, that the Trust had no rights or interests or claims, concerning what had formerly been its IP, that it could successfully pursue in litigation. Those events included, but were not limited to the following:

- On February 4, 2002, Ovonyx entered into the 2000 Stockholders Agreement with each of the stockholders of Ovonyx, which contained a "First Offer Right" which superseded the First Refusal Right in the 1998 Contract.

- In 2008, ECD transferred ownership of all of its relevant IP to Ovonyx.

- In 2012 in its bankruptcy case, ECD rejected the 1998 Contract which contained the

Royalty Right.

- In 2012 in its bankruptcy case, ECD sold its stock to Micron, and assumed and assigned to Micron its rights under the 2000 Stockholders Agreement.

- In ECD's bankruptcy case, Micron declined to assume the 1999 License Agreement, which referenced the Royalty Right in the 1998 Contract.

- In 2012 ECD confirmed a liquidating Plan, making it impossible for it to fulfill its obligations under the 1998 Contract, including ECD's obligation under the 1998 Contract to operate Ovonyx as a "partnership" with Lowery.

- Although Ovonyx stopped paying ECD a royalty after May 2012, the Trust never demanded royalty payments for more than six years (until June 6, 2018).

**b. The Trust's second Rule 2004 motion, served on December 21, 2017**

The Court's conclusion, that the 2015 Rule 2004 Subpoena did not serve as notice that future litigation was reasonably foreseeable, is further shown by comparing its content with the content of the *second* Rule 2004 motion the Trust filed in ECD's bankruptcy case.[199]

The second Rule 2004 motion, which the Trust filed and served on December 21, 2017, made it clear that the Trust was alleging that the 1998 Contract and the 2002 License Agreement "remain[ed] in full force and effect," and that the Trust had potential claims arising under these two agreements.[200] The second Rule 2004 motion also spelled out some of the specific rights that the Trust alleged it had under the 1998 Contract: namely, the Royalty Right and the First Refusal Right.[201] The second Rule 2004 motion also stated that the Trust had certain unspecified rights

---

[199] Ovonyx and Micron admit that the second Rule 2004 motion and the order granting that motion put them on notice that they had a duty to preserve evidence related to the 1998 Contract, the 1999 License Agreement, the 2002 License Agreement and other agreements between the parties. *See* Defs.'s Ex. 6-2 (Dep. Tr. of Dave Westergard) at 48.

[200] Docket # 2596 at 3 ¶ 10.

[201] *See id.* at 4 ¶¶ 11-12.

84

under the 2002 License Agreement that it was seeking to discover.[202]  The second Rule 2004

motion also stated that Ovonyx had not complied with its obligations under these agreements.[203]

In addition, the list of documents the second Rule 2004 Motion requested was expansive and the

topics to be inquired into were broad.[204]  The Trust admitted in the second Rule 2004 motion that

it was significantly broader in scope than the "limited" scope of the 2015 Rule 2004 Motion.

The Trust stated:

> In October 2015, the Trust filed a Rule 2004 motion, seeking
> authority to serve document and deposition subpoenas on Ovonyx
> (the "2015 Rule 2004 Motion"). *See* ECF No. 2515. The 2015 Rule
> 2004 Motion was **limited in scope** as it sought only copies of a
> 1999 [L]icense . . . [A]greement and the 2002 License Agreement,
> and copies of any agreements by and among Ovonyx, the Debtors,
> and any subsidiary or affiliate of the Debtors.  This Court granted
> the 2015 Rule 2004 Motion. *See* ECF No. 2523. Thereafter, the
> Trust obtained some information from Ovonyx, at the direction of
> Micron, but the documents and information obtained is different
> from the information sought now; **indeed, the 2015 Rule 2004**
> **Motion merely sought copies of agreements between the**
> **Debtors, their subsidiaries, and Ovonyx, and not any**
> **documents and information concerning rights under such**
> **agreements**.[205]

The second Rule 2004 Motion made clear that the Trust disagreed with the position of Ovonyx

and Micron regarding the enforceability of various agreements entered into between Ovonyx and

ECD; the Trust's rights under these agreements; and Ovonyx's compliance with its obligations

under those agreements.  Therefore, the service of the second Rule 2004 Motion and entry of the

---

[202]  *Id.* at 4-5 ¶ 14.

[203]  *Id.* at 5 ¶ 15.

[204]  *See id.* at Ex. B.

[205]  *See id.* at 6-7 ¶ 19 (bold added).

Order granting that Motion triggered Ovonyx's and Micron's duty to preserve evidence, while the 2015 Rule 2004 Motion and the 2015 Rule 2004 Order did not.

**c. The cases cited by the Trust do not support its position.**

None of the cases cited by the Trust support its position that the 2015 Rule 2004 Subpoena could serve as a triggering event. The Trust relies, in part, on in *Stillwater Liquidating LLC v. Net Five at Palm Point, LLC* (*In re Stillwater Asset Backed Offshore Fund Ltd.*), No. 12-14140 (MEW), 2017 WL 1956848 (Bankr. S.D.N.Y. May 10, 2017), where, according to the Trust, an "entity [was] sanctioned for destroying documents subject to a Rule 2004 motion."[206] But *Stillwater* is readily distinguishable from this case. In *Stillwater*, "the Unsecured Creditors' Committee [in an involuntary bankruptcy case,] filed a motion seeking discovery under Fed. R. Bankr. P. 2004." 2017 WL 1956848, at *1. In that motion,

> [t]he Committee explained that the requested documents were relevant to claims that might be pursued on behalf of the estate:

> Given the significant claims of actionable conduct in connection with the foregoing transfers to Net Five without fair consideration, the lack of transparency or disclosure with respect to these transfers, the lack of information with respect to where funds and assets flowed and the extent that Net Five and its insiders hold and/or control any such assets and/or the fruits of such assets, and any related improper or actionable conduct by Net Five and its subsidiaries, insiders and affiliates (and those acting in concert with any of such parties) (the "Discovery Parties"), the Committee respectfully submits that cause exists for entry of the attached order authorizing and directing examinations and production of documents against Net Five and its

---

[206] Pl.'s Resp. in Opp'n to Defs.' Mot. For Summ. J. (Docket # 801 (redacted), Docket 810 (unredacted, filed under seal) at pdf p. 71.

various insiders.

*Id.* The *Stillwater* court concluded that "[t]he Committee's Rule 2004 motion **made clear** that further litigation against the Net Five Companies **was not merely possible, but likely**." *Id.* at *6 (bold added). In this case, by contrast, the 2015 Rule 2004 Motion contains no comparable language which can be construed as putting Ovonyx or Micron on notice that litigation was even possible, let alone that litigation was likely.

The other cases cited by the Trust are similarly distinquishable:

- In *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68 (3d Cir. 2012), there was no destruction of evidence pursuant to a document retention program or otherwise. The plaintiff simply produced copies of her doctor's notes that were at issue, rather than the originals of those notes. The court held that the plaintiff's failure to produce the original notes was spoliation because future litigation was foreseeable under the facts of the case where: (1) there had been an adverse employment decision against the plaintiff which involved her doctor's notes; (2) the plaintiff "initiated both an EEOC proceeding and the instant litigation within a year of [the defendant's] employment action[;]" (3) the plaintiff knew that she and the defendant "fundamentally disagreed on the meaning of" her doctor's notes; (4) the plaintiff's attorney had asked her provide him with the originals of her doctor's notes at least once; (5) the defendant had stated in opening argument and in two motions "that it had never seen the originals of the doctor's notes; and (6) the plaintiff "had a duty under Rule 1002 of the Federal Rules of Evidence to produce the original documents before the notes could be introduced into evidence at trial.

  In this case, by contrast, the 2015 Rule 2004 Subpoena was served as part of ECD's main bankruptcy case, not as part of any adversary proceeding or any other litigation or adversarial process, there was no indication that Trustee disagreed with any position taken by Micron or Ovonyx, Micron and Ovonyx fully complied with the 2015 Rule 2004 Subpoena.

- In *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879 (S.D.N.Y. 1999), the plaintiff, **after commencing litigation**, knew of the imminent destruction of 3,000 cartons of business and financial documents that were in the hands of a receiver and were relevant to the defendants' defenses, and after having been given access to those documents for review and copying for his own use, allowed the destruction of those documents, without notifying the defendants that such documents would be destroyed.

87

In this case, by contrast, the Trust had not commenced any litigation at the time documents were destroyed as part of a document retention policy.

- *Flatow v. The Islamic Republic of Iran*, 196 F.R.D. 203 (D.D.C. 2000), *opinion aff'd in part, vacated in part,* 305 F.3d 1249 (D.C. Cir. 2002) did not concern the issue of whether litigation was foreseeable. This case concerned a post-judgment subpoena that was used for the purpose of getting information that would aid the prevailing plaintiff to collect on its judgment.

- In *Turner v. Hudson Transit Lines, Inc*., 142 F.R.D. 68, 73 (S.D.N.Y. 1991) (citation omitted) (bold added), a personal injury case, in which the plaintiff had been injured in a bus accident and alleged that the bus he was riding in did not have "'good and sufficient brakes,'" the court stated the well-settled rule that "the obligation to preserve evidence even arises prior to the filing of a complaint **where a party is on notice that litigation is likely to be commenced**." But, the *Turner* court did not find that the person who destroyed evidence was on notice that litigation was likely to be commenced before the complaint was filed. Rather, the court found that the obligation to preserve the bus's maintenance records arose "at least by the time the complaint was served." *Id.*

  In this case, there was no pending litigation, nor was there any event before December 21, 2017 that would put Ovonyx or Micron on notice that litigation was "likely to be commenced."

- In *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003), the court found that a duty to preserve evidence arose before the plaintiff filed an EEOC complaint, where it was shown through emails that virtually every co-worker associated with the plaintiff believed she would sue the company that employed her.

  In this case, there is no evidence that at any time before December 21, 2017, any employee of Ovonyx or Micron believed that the Trust would sue Ovonyx or Micron, or had reason to believe that.

For all of these reasons, Ovonyx's and Micron's duty to preserve evidence did not arise until, at the earliest, December 21, 2017. Because all of the alleged failures to preserve evidence occurred prior to that time (July 2015 for Ovonyx and April 2016 for Micron), there is no basis to sanction Ovonyx or Micron for spoliation of evidence.

**4. The Trust has failed to show "prejudice" to itself from the failures to preserve**

**evidence, as required by Civil Rule 37(e)(1).**

Because the Trust has failed to show that Ovonyx or Micron engaged in sanctionable spoliation of evidence, they cannot be sanctioned under Civil Rule 37. An additional reason why the Court will not grant spoliation sanctions is that the Trust has failed to show "prejudice" to itself from the failures to preserve evidence, as required by Rule 37(e)(1). It appears very unlikely that any lost ESI could have materially affected the result in this case, considering the particular grounds on which the Court has ruled in the Defendants' favor in this Opinion and in the First Opinion.

The Court's rulings in the First Opinion and in this Opinion were based largely on the Court's interpretation of unambiguous terms of the 1998 Contract, the 1999 License Agreement, and the 2000 Stockholders Agreement. For example, in the First Opinion, the Court found and concluded:

> based on paragraph 9.10 of the 2000 Stockholders Agreement, that the 2000 Stockholders Agreement superceded the 1998 Contract with respect to ECD's First Refusal Right. Because certain provisions of the 2000 Stockholders Agreement conflicted with, and were inconsistent with, ECD's First Refusal Right under the 1998 Contract, such right was extinguished by the 2000 Stockholders Agreement.
>
> Paragraph 9.10 of the 2000 Stockholders Agreement states, in relevant part: "The provisions in this [2000 Stockholders] Agreement . . . will be deemed to supersede any conflicting or inconsistent provisions contained in the [1998 Contract] between Lowrey and [ECD] dated as of December 17, 1998, including the Ovonyx-ECD Commercialization Acknowledgment thereunder (collectively, the '[1998 Contract]'). . . ." ECD's First Refusal Right granted in paragraph 11 of the 1998 Contract clearly conflicts with, and is inconsistent with, many of the provisions of the 2000 Stockholders Agreement, including provisions in sections 4 ("Restrictions on Transfer of Stockholder Shares"), 6 ("Intel

89

Right of First Offer"), and 7 (<u>Obligations in Connection With Approved Sale</u>").[207]

And in this Opinion, the Court has ruled that ECD's Royalty Right under the 1998 Contract was terminated based largely on the "the unambiguous language in the [1998 Contract the 1999 License Agreement]."[208]

> "In interpreting a contract, it is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning." *In re Smith Trust*, 480 Mich. 19, 24, 745 N.W.2d 754 (2008). If the contract's language is unambiguous, it must be enforced as written because it "reflects the parties' intent as a matter of law." *Id.*

*Mayberry v. Acrisure Wallstreet Partners, LLC*, – N.W.3d – , No. 367352, 2026 WL 450744, at *2 (Mich. Ct. App. Feb. 17, 2026). Given this, the Trust has failed to show any likelihood that anything in the ESI that was not preserved could alter, in any way, the Court's rulings on the merits about the parties' rights and obligations under the 1998 Contract or the 1999 License Agreement, including the Royalty Right and the First Refusal Right.

Finally, the Trust has admitted that it was able to obtain documents regarding Project Fish from other parties or their attorneys. The Trust stated: "It is telling that Intel, OMT, the law firm representing Ovonyx, and Duff & Phelps did preserve documents and thus the Trust was able to learn through those productions many of the key details surrounding Project Fish. Notably,

---

[207] First Opinion (Docket # 192) at 64-65; 621 B.R. at 719-20 (footnote omitted) (underlining in original).

[208] Opinion at 31; *see also* Opinion at 19 (footnote omitted) (citation to First Opinion omitted) ("In its First Opinion, this Court found that by entering into the 1999 License Agreement, "Ovonyx adopted and ratified the duty to pay ECD the royalty described in the 1998 Contract." The Court found that this was unambiguously so, based on the language of the two agreements.).

90

Micron chose not to engage outside counsel for Project Fish."[209]  Therefore, the Trust has also

failed to carry its burden under Rule 37(e) of demonstrating that the ESI "cannot be . . . replaced

through additional discovery."  *See United States v. Bell*, No. 6:23-CV-00058-CHB, 2026 WL

874442, at *16 (E.D. Ky. Mar. 31, 2026) ("[A] party seeking a spoliation sanction under Rule

37(e) for lost ESI must show that  " . . . (3) [t]he information 'cannot be restored or replaced

through additional discovery.'").  The Trust did replace at least some of the lost ESI but has not

presented any evidence that would change the results of the Court's rulings on the Trust's claims.

Because the Trust has failed to demonstrate any likelihood that it was prejudiced by the

failure of either Ovonyx or Micron to preserve ESI, the Trust is not entitled to any sanctions

under Civil Rule 37(e)(1).

**5.  On the present record, the Court cannot find that either Ovonyx or Micron acted with the intent required under Civil Rule 37(e)(2).**

As discussed above, the Trust has failed to show that Ovonyx or Micron engaged in

sanctionable spoliation of evidence, so they cannot be sanctioned at all under Civil Rule 37.  And

as discussed above, an additional reason why the Court will not grant spoliation sanctions is that

the Trust has failed to show "prejudice" to itself from the failures to preserve evidence, as

required by Rule 37(e)(1).

An additional reason why the Court will not grant spoliation sanctions is that the Trust

has failed to show that Ovonyx or Micron failed to preserve evidence with the intent required by

Civil Rule 37(e)(2).  The intent required for relief under Civil Rule 37(e)(2) is that the offending

party "acted with intent to deprive another party of the information's use in the litigation."

---

[209]  Pl.'s Opp'n to Def.s' Mot. For Summ. J. (Docket # 801 (redacted), Docket # 810 (unredacted)) at pdf p. 70 n.28.

91

On the one hand, the Trust's evidence of wrongful intent is at best only circumstantial, and rather weak. It might be enough, however, that this Court would feel a need to hold an evidentiary hearing on the intent issue, *if* the other elements of spoliation had been shown. Because they have not, however, an evidentiary hearing about intent is not necessary.

For their part, Ovonyx and Micron have presented evidence that when they failed to preserve the ESI at issue, in 2015 and 2016 respectively, they each did so for business reasons other than depriving the Trust of information in any future litigation.

The evidence presented is that the Ovonyx ESI was not preserved because Micron discontinued the use of Ovonyx's computer servers after it acquired Ovonyx in the 2015 Transaction.[210] The Defendants assert that after Micron acquired Ovonyx, it did not use Ovonyx's old computer servers, in order to avoid the risk of "IP contamination" — *i.e.*, Micron employees viewing information about confidential trade secrets owned by third parties that Micron had no right to see or use, but that might be on Ovonyx servers.[211]

Evidence presented about Micron is that Micron's ESI was deleted as part of an April 2016 change in Micron's document retention program that applied to all emails across the board, not just the emails concerning the agreements Ovonyx had entered into or Project Fish.[212]

On the present record, the Court cannot find that either Ovonyx or Micron had the

---

[210] *See* Defs.' Ex. 6-2 (Westergard Dep. Tr.) at 50.

[211] *See* Defs.' Resp. in Opp'n to Pl.'s Mot. For Partial Summ. J. (Docket # 803 (redacted), Docket # 807 (unredacted)) at pdf p. 70; Defs.' Reply in Supp. of Mot. for Summ. J. (Docket # 820 (redacted), Docket # 830 (unredacted, filed under seal) at pdf pp. 41-42. The Defendants twice cited the deposition testimony of David Kaplan, who described this type of risk of "IP Contamination," although Mr. Kaplan did not say specifically that this is why Micron discontinued the use of Ovonyx's computer servers. *See* Defs.' Ex. 6-3 (Kaplan Dep. Tr.) at 146-47.

[212] *See* Defs.' Ex. 6-2 (Westergard Dep. Tr.) at 29-32.

wrongful intent described in Civil Rule 37(e)(2).

### 6. Conclusion about spoliation

For the reasons stated above, the Court will not sanction Ovonyx or Micron for their failures to preserve ESI.

## VII. Conclusion

For the reasons stated in this Opinion, the Court will enter an order denying the two motions to exclude expert evidence. In addition, and for the reasons stated in this Opinion, in the First Opinion, and in the Court's other prior opinions filed in this case, the Court will recommend that the United States District Court enter a final order: (1) granting summary judgment for the Defendants on all of the Plaintiff Trust's claims in the Third Amended Complaint that were not previously dismissed; and (2) adopting this Court's previous orders that dismissed certain of the Plaintiff Trust's claims in the Third Amended Complaint.

**Signed on April 17, 2026**          /s/ Thomas J. Tucker
                                                           **Thomas J. Tucker**
                                                           **United States Bankruptcy Judge**